## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA | : |
|  | :  Hon. Claire C. Cecchi |
| v. | : |
| MATTHEW BRENT GOETTSCHE [DEFENDANT TWO] JOBADIAH SINCLAIR WEEKS JOSEPH FRANK ABEL SILVIU CATALIN BALACI | :  Crim. No. 19-877 |
|  | : |
|  | : |

---

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT WEEKS' MOTION TO REVOKE PRETRIAL DETENTION

---

CRAIG CARPENITO
United States Attorney

On the Brief:

Jamie L. Hoxie
David W. Feder
Anthony P. Torntore
Assistant United States Attorneys

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES .............................................................. ii

PRELIMINARY STATEMENT ......................................................... 1

ARGUMENT AND AUTHORITIES ................................................... 1

I.    Governing Legal Standard ..................................................... 1

II.    Pretrial Detention Is Warranted Based on Consideration of the § 3142(g) Factors. ........................................................................ 3

    A.    The Nature and Circumstances of the Offenses Support Pretrial Detention ........................................................... 3

    B.    The Weight of the Evidence Against Weeks Supports Detention .... 8

    C.    Weeks' History and Characteristics Counsel Strongly in Favor of Pretrial Detention ..................................................... 14

        1.    Weeks' Wealth, Much of Which is Held in Bitcoin and Foreign Accounts, Warrants Pretrial Detention .................. 15

        2.    Weeks' Self-Proclaimed Anarchist Views and Demonstrated History of Anti-Government Rhetoric Render Him a Flight Risk ......................................................................... 20

        3.    Weeks' Characterization of His Arrest as Akin to "Turning Himself In" is Incorrect ...................................... 23

        4.    Weeks Overstates His Ties to Colorado ............................. 24

        5.    Weeks' Significant Travel and Foreign Contacts Necessitates Pretrial Detention............................................. 25

CONCLUSION ............................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*United States v. Bergrin,*
  2009 WL 1560039 (D.N.J. May 29, 2009) ................................................... 32

*United States v. Boustani,*
  356 F. Supp. 3d 246 (E.D.N.Y. 2019) ......................................................... 7

*United States v. Delker,*
  757 F.2d 1390 (3d Cir. 1985) ...................................................................... 2

*United States v. Himler,*
  797 F.2d 156 (3d Cir. 1986) ........................................................................ 2

*United States v. Kachkar,*
  701 F. App'x 744 (11th Cir. 2017) ............................................................ 25

*United States v. Livingston,*
  2016 WL 1261464 (D.N.J. Mar. 31, 2016) ................................................. 2

*United States v. McIntyre,*
  2018 WL 385034 (D.N.J. Jan. 10, 2018) .................................................... 2

**Statutes**

15 U.S.C. § 77e ............................................................................................. 3

18 U.S.C. § 1349 ........................................................................................... 3

18 U.S.C. § 3142 ................................................................................... 1, 2, 3

18 U.S.C. § 3145 ........................................................................................... 1

18 U.S.C. § 371 ............................................................................................. 3

## PRELIMINARY STATEMENT

The Government respectfully submits this brief in opposition to the recently filed motion of defendant Jobadiah Sinclair Weeks ("Weeks") to revoke the pretrial detention order issued in the U.S. District Court for the Southern District of Florida on December 20, 2019.  *See* ECF No. 12 ("Weeks Br.").  For the reasons stated herein, Weeks remains a flight risk and, accordingly, his request should be denied.

In his motion, Weeks ignores the central points—Weeks stands accused of serious crimes with considerable sentencing exposure, has tremendous access to wealth, has significant foreign travel and contacts, and has a demonstrated history of anti-government rhetoric.  There is no combination of pretrial release conditions that can change that to ensure that he will appear in Court to answer for the significant criminal liability that he faces.

## ARGUMENT AND AUTHORITIES

### I.    Governing Legal Standard

The Bail Reform Act governs this Court's power to detain defendants pending trial.  18 U.S.C. § 3142(a), (e).   Title 18, United States Code, Section 3145(b) provides that "[i]f a person is ordered detained by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order."  *Id.* § 3145(b).  The district court "shall order the pretrial release" of the defendant "unless the judicial officer determines that such release will not reasonably assure the appearance" of the defendant. *Id.* § 3142(b). When a case involves a substantial

1

risk that the defendant will flee, the Government may move for a hearing, *id.* §
3142(f)(2)(A), where it must show by a preponderance of the evidence that no
condition or set of conditions of release will reasonably assure his appearance at
trial, *see United States v. McIntyre*, 2018 WL 385034, at *3 (D.N.J. Jan. 10, 2018)
(citing *United States v. Himler*, 797 F.2d 156, 160-61 (3d Cir. 1986)).  This Court's
review of the magistrate judge's decision is *de novo*.  *See United States v.
Livingston*, 2016 WL 1261464, at *1 (D.N.J. Mar. 31, 2016) (Cecchi, J.) (citing
*United States v. Delker*, 757 F.2d 1390, 1394-95 (3d Cir. 1985)).

At the hearing, the Court must take certain factors into account when
determining whether "there are conditions of release that will reasonably assure
the appearance of the person" at trial, such as:

> (1) the nature and circumstances of the offense charged,
> including whether the offense is a crime of violence, a violation
> of section 1591 [sex trafficking of children or by force, fraud, or
> coercion], a Federal crime of terrorism, or involves a minor victim
> or a controlled substance, firearm, explosive, or destructive
> device;
>
> (2) the weight of the evidence against the person; [and]
>
> (3) the history and characteristics of the person, including—
>
> (A) the person's character, physical and mental condition, family
> ties, employment, financial resources, length of residence in the
> community, community ties, past conduct, history relating to
> drug or alcohol abuse, criminal history, and record concerning
> appearance at court proceedings.

18 U.S.C. § 3142 (g).  "The rules concerning admissibility of evidence in criminal
trials do not apply" to detention hearings, *id.* § 3142(f).  If the court finds that
the defendant is a flight risk and that no condition or combination of conditions

2

of release will reasonably assure the defendant's presence at trial, it must order that the defendant be detained pending trial. 18 U.S.C. § 3142(e)(1).

## II.   Pretrial Detention Is Warranted Based on Consideration of the § 3142(g) Factors.

As the Government will show at the hearing, Weeks' detention pretrial is appropriate because there are no combination of conditions that will ensure that Weeks will not flee.  As discussed below, the arguments presented in Weeks' brief to the contrary do not countenance otherwise.

### A.   The Nature and Circumstances of the Offenses Support Pretrial Detention

The nature and circumstances of the offenses in the Indictment support Weeks' pretrial detention.  The Indictment charges Weeks and several of his coconspirators with one count of wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (the "Fraud Charge"), and one count of conspiring to promote the sale of an unregistered security, contrary to 15 U.S.C. § 77e and 77x, in violation of 18 U.S.C. § 371 (the "Promotion Charge").

As alleged in the Indictment, Weeks is accused of defrauding investors through his participation in the BitClub Network, "a worldwide fraudulent scheme that solicited money from investors in exchange for shares of pooled investments in cryptocurrency mining and that rewarded existing investors for recruiting new investors."  Ind. Count One ¶ 1.a.

Weeks has been charged with the Fraud Charge because he touted the BitClub Network to prospective investors around the world, both online and in person, and sold shares in BitClub Network while knowing that hopeful investors

3

were purchasing these shares while being misinformed about the aspects of BitClub Network's investment products, including the information that was displayed to BitClub Network investors as proof of "bitcoin mining earnings." *See* Ind. Count One ¶ 4.c.  Through the efforts of Weeks and others, BitClub Network took in at least $722 million from investors.  As discussed below, several aspects of the BitClub Network scheme suggest strongly that Weeks should remain detained through the pendency of this action.

First, the BitClub Network—and Weeks' involvement in the BitClub Network—involved traveling around the globe for the purpose of selling investors—many of whom were unsophisticated in the world of cryptocurrency—on the false promise of easy and dependable riches.  The heart of the case against Weeks and his coconspirators is that they lied over the course of several years and, based on those lies, amassed hundreds of millions of dollars.  As discussed more fully below, evidence reflects that Weeks knew that investors were being provided with misinformation but he nevertheless persisted in promoting the purchase of shares in BitClub Network because he continued to reap a profit from the pyramid scheme.

Second, Weeks faces a significant sentence in this case—his statutory exposure is 25 years and a preliminary estimate of his advisory guidelines range suggests that he is facing over 15 years' imprisonment.  The possibility of 15 years' incarceration suggests strongly that Weeks would be a flight risk if released pretrial.

Third, Weeks' involvement in the BitClub Network involved Weeks' efforts to thwart U.S. regulation, tax liabilities, and detection, and encouraging others to do the same.  For much of the conspiracy, Weeks encouraged potential U.S.-based investors to utilize virtual private network ("VPNs") to access the BitClub Network site to avoid detection by U.S. law enforcement and to anonymize the scheme.  Weeks publicly emphasized that the scheme was set up to avoid detection by U.S. tax authorities.

For example, in September 2018, Weeks exchanged messages on Facebook with a potential investor who asked about whether BitClub Network was actually blocking U.S. residents from investing in BitClub Network shares:

| Person 1 | Bcn blocked ppl in the states from joining so they wouldn't have to deal with the US government hitting them up for money all the time |
| Person 1 | The US government sees mlm companies as their full time piggy bank |
| Investor | So the last line that says, "Do Not Join BitClub Network" is generated by whom? |
| Investor | and is there anything I need to do? |
| Weeks | No, youre good. |
| Weeks | When I see you, ill show you how it all works. |
| Weeks | We just change our ip addresses to ones outside USA. |
| Weeks | All the money you make is NOT reported to the tax man so...Its like having an offshore account growing for you tax free. |

Additionally, in November 2018, a U.S.-based investor emailed Weeks and questioned how she should respond to a purported "agreement" that BitClub Network sent to investors in which investors affirmed that they were not U.S. residents.  The investor implored:  "I have always been a residence of the US.  How am I supposed to get around this."  Weeks provided the following explanation:

5

> UNITED STATES is Washington DC, Virgin Islands, Guam, Samoa, Puerto Rico. (Do you live there)
>
> US CITIZENS are corporations that are domiciled in the UNITED STATES. Are you a corporation or are you a human? Don't you live in the Republic of Utah, thats not THE UNITED STATES? You're a flesh and blood American right?

Finally, Weeks' involvement in BitClub Network was significant enough that he had business relationships with several coconspirators around the world. One of those coconspirators has been charged, remains at large, is believed to be residing in a country that does not have extradition with the United States, and has access to enormous wealth and two private planes. Weeks not only has significant incentive to flee, the means to finance it, and the example of his uncaptured coconspirator of the benefits of flight, he has contacts around the world—including coconspirators who likely would prefer to keep Weeks out of Court.

Notwithstanding the above, Weeks argues that his pretrial release is appropriate given the nature and circumstances of this offense because: (1) according to Weeks, the illegal scheme in which he participated lacks the traditional hallmarks of a "typical" Ponzi scheme; and (2) Weeks intends to contest the amount of loss attributable to the illegal BitClub Network scheme. *See* Weeks Br. at 4-5. Neither argument compels pretrial release under the circumstances of this case.

First, Weeks misunderstands this large-scale fraud as somehow meaningfully different from a traditional Ponzi scheme. The record to date reflects that a federal grand jury found probable cause to believe that Weeks

worked with others to engage in large-scale wire fraud and that Weeks promoted the illegal sale of unregistered securities in BitClub Network.  Whether the fraud mirrors a typical Ponzi scheme is beside the point that says nothing of the hundreds of millions of dollars taken from investors or whether Weeks poses a flight risk.  If anything, the size and international scope of this illegal conduct favors pretrial detention.  As recognized by another federal court, "a defendant's 'alleged ties to a large [ ] syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction' favors denying bail."  *United States v. Boustani*, 356 F. Supp. 3d 246, 252 (E.D.N.Y. 2019) (denying bail for defendant charged with fraud and money laundering offenses).

Additionally, Weeks' position that he—much like most every white-collar criminal defendant—intends to present arguments to reduce the loss attributable to his fraud to lower his sentencing exposure under the advisory Sentencing Guidelines does not lessen his flight risk.  It is at best unclear from his own brief whether he can even make this argument.  On the one hand, Weeks claims that his knowledge of the fraud is different from that of his codefendants because he "did not control the company's financial affairs," and "had no access to its bitcoin wallets."  *See* Weeks Br. at 6.  Yet, on the other hand, he represents that the loss amount will be low.  Putting aside this inconsistency, it suffices to say that Weeks' *exposure* to a lengthy sentence in a case of such scope and size is a significant incentive to flee.

7

Finally, Weeks contends that he is entitled to pretrial release because there is "substantial discovery" that will require defense counsel to have "ready access" to Weeks to prepare for trial.  Weeks Br. at 14.  But Weeks' argument would be true of any complex, white-collar case.  Weeks has at least four lawyers from a major law firm that has an office in New Jersey; his legal team will undoubtedly "interpret records, develop strategy, and devise legal arguments" for Weeks. *Id.* Detaining Weeks pretrial will ensure that these lawyers will have ready access to Weeks, not prevent it.

### B.    The Weight of the Evidence Against Weeks Supports Detention

The evidence against Weeks also militates in favor of pretrial detention. While an exhaustive explanation of the evidence against Weeks is beyond the scope of this brief or a detention hearing, a sample of some of the evidence against Weeks favors pretrial detention.

The evidence shows that, from the time he got involved in BitClub and for several years thereafter, Weeks worked and communicated with his codefendants to make BitClub Network a success.  Although Weeks attempts to align himself with "more than 100 other people" who promoted the BitClub Network scheme, *see* Weeks Br. at 5, his involvement and roles were much more involved than the majority of people who promoted investment in the BitClub Network.  For example, as Weeks admits in his brief, Weeks "brokered the sale of tens of millions of dollars of mining equipment to BitClub[.]"  Weeks Br. at 4. While negotiating on behalf of the BitClub Network, Weeks had access to information that other promoters lacked.  Indeed, as alleged in the Indictment,

in 2017 Weeks discussed with his codefendants a business opportunity for BitClub Network, during which time he observed that "We (Bitclub) can't just 'sell' people mining hardware (shares) in Bitclub and then not use the money to buy equipment.  Its not right.  Bitclub makes 20% regardless of the price." Notwithstanding that Weeks knew that what BitClub was doing was "not right," he continued to work with his coconspirators and to convince others to invest in the scheme.

Even prior to 2017, evidence reflects that Weeks knew the BitClub Network was providing investors with misinformation and that his participation in the scheme was illegal.  For example, in 2015, Weeks had a conversation via Facebook with some of his coconspirators, during which he sent them an article about an SEC enforcement action against GAW Miners LLC, another digital currency mining scam.  *See SEC v. Homero Joshua Garza, et al.*, Civ. No. 15-01760 (JAM) (D. Conn.)  Weeks acknowledged that "we"—using the first person plural to refer to the BitClub Network—should be more transparent if they wanted to stay out of trouble with regulators:

> We really should have sep stats and oct stats and nov stats. The sophisticated investors with a lot of cash are hesitant with putting in big cash because they want to see the mining contract, the receipt or title to the mining equipments, proof that they own something in return, how much the mine made and what the mine paid out to each share holder so they can calculate what a share is worth etc. **Bitclub pool doesn't tell us how many share holders we have etc. Its not transparent enough for the big big money guys.** Thats why they are giving [Third-Party] $100M and not us right now...
>
> . . . .
>
> the biggest people in bitcoin are watching us right now

9

and waiting for the SEC to step in... which I really want to avoid at all costs.

If Weeks truly believed that he was engaged in a legitimate business—as opposed to a fraudulent pyramid scheme to sell unregistered securities—he would not have been discussing his concerns with his coconspirators about the SEC's likely involvement and BitClub Networks' parallels to GAW Miners.

Further, in a Facebook message exchange in January 2016, the Redacted Defendant ("RD 2") told Weeks that the mining earnings figures that BitClub Network displayed to investors did not reflect 100% of what BitClub Network had mined—a fact BitClub Network tried to hide from investors:

| Weeks | So, (am I explaining this correctly) as an example, we have been paid per share: 0.0065 01-04-2016 0.0066 01-07-2016 0.0065 01-11-2016 0.0062 01-15-2016 A total pay out from Jan 4-15th .0256. We found 18 blocks (450 BTC) in that time frame. (according to bitclubpool.com) 450 btc /.0256= 17,578 shares outstanding that we are splitting what the mine finds with. Correct? |
|---|---|
| RD 2 | Basicly yes |
| RD 2 | And that will confuse people |
| Weeks | of course it will |
| Weeks | these fuckers are stuck on the paralysis of analysis |
| RD 2 | Change their thinking. Don't let them change you |
| RD 2 | I have a hard line of I don't get in to that. It is just a waste of time |
| Weeks | Just as long as they know that 100% of the mining blocks found are paid out, it shouldn't be an issue. |
| RD 2 | There is other power running to pay electric. It isn't 100% |
| RD 2 | But basically 100% of what they see |
| Weeks | oh, I thought that came out of the rebuy. So its 100% of the mining earnings are paid out (after expenses) like the power bill. |
| RD 2 | Yes |
| RD 2 | But we try to keep that off of bitclubpool.com |

| Weeks | Is [Third Party] paying us for the hashing? I don't see it on the bitclubpool. I hope they are. |
|-------|------------------------------------------------------------------------------------------------|
| RD 2  | I promise you that you will cost your self time and money to focus on this |

Indeed, Weeks was under the mistaken impression that mining expenses were paid out of the "rebuy" because that is what BitClub Network told investors— that the costs of mining would be paid out of a portion of the forced reinvestment (*i.e.*, the "rebuy").  As reflected in one of the BitClub Network promotional videos, BitClub Network's website told investors that:

> Here's how it works…Whatever you earn from the pool will be credited to your account daily with a percentage automatically taken out and put toward re-purchasing additional shares. Each re-purchase goes toward more mining equipment and paying all fees associated with running the pool.

Weeks was also warned by others that the BitClub Network scheme was illegal.  For example, in 2016, Weeks was negotiating with a third-party vendor on behalf of BitClub Network.  This vendor told Weeks that they were "not sure about a joint press release because we would need to get very comfortable from [the] legal side about your business" but were "not sure we can get there given the recent SEC guidance."  In response, Weeks wrote:

> No need for a joint press release. :) We understand there are a lot of people who don't know the difference between a legit MLM and a Ponzi and we definitely don't want to hurt your brand in any way.

Additionally, the investors voiced frequent skepticism.  For example, in August 2017, Weeks was warned by a potential BitClub Network investor:  "I don't know how to set up or use a VPN and more importantly I don't know if it's safe to assume that solves potential problems with the govt."  One month later,

11

Weeks was asked to admonish some BitClub Network investors in his downline who were using a recruiting video that promoted BitClub Network and contained projections. Weeks relayed: "Don't' give them a reason to go after you. US Citizens are at higher risk right now with Bitclub." Notwithstanding these obvious red flags, Weeks continued his heavy promotion of investment in the BitClub Network and to communicate with his coconspirators.

Weeks also knew that promoting the scheme and securing referral bonuses was more lucrative than the promised "passive investment" of bitcoin mining—a hallmark of an illegal pyramid scheme. For example, in November 2017, Weeks received an email from an investor who, it appears, invested in BitClub Network through Weeks. *See* USA Ex. A. After not seeing the returns he had hoped and getting no response to his several redemption requests, the investor reached out to Weeks to see if Weeks could help with the refund. *Id.* In response, Weeks attempted to shame the investor into staying with the company as opposed to seeking a refund:

> Bro
> What are you retarded?
> Bitcoin is up 971% this year. You want a refund? Thats the stupidest thing Ive heard all year.
> Whats the matter with you [REDACTED]  Why don't you start paying attention bro?
> You've had 70,000 hours to figure out bitcoin, since it was invented…Bro…you still don't get it?
> Bitcoin+golden egg. Bitclub=goose
> you had to have heard that story before right?
> Which is smarter?

When Weeks failed to convince the investor to remain in BitClub Network, Weeks doubled down, touting "1000% a year returns," admonishing that the doubtful

12

investor would end up using bitcoin "when all the rest of the slow, feeble minded people finally figure it out," that he was choosing to "live in fear," and reiterated that he was "[a]bsolutely" "calling your decision retarded." Weeks' admonitions suggest that he knew that, despite investors' dissatisfaction with their returns, he could not afford to lose them. If he lost the members that he had recruited into his compensation structure, he would be losing his primary profit center because referral rewards proved more valuable than his investments—a classic unsustainable pyramid scheme.

Weeks also chastised investors who expressed their doubts about BitClub Network's mining proceeds. In 2018, Weeks participated in a Facebook group chat with several BitClub Network investors. Weeks' messaging again indicates that his focus was on recruiting, not mining earnings. When two members mentioned that there were several days when BitClub Network did not make mining payments, Weeks said, "Is not seeing your $2 a day coming in really scaring you guys so much? really? lol Your mining earnings being delayed a couple days is going to break your bank?" When group members demanded clarity from BCN on the issue, Weeks sought to refocus them through belittlement:

> There is a direct correlation to leadership ranks, and complaining. Have you noticed that there are no actual leaders who are concerned at all because these things always get fixed? The mindset is so different between monster builders and miners who cant even get to builder... Not only does it show in their ability to lead, but rich people think actually differently that poor people. Its all in your head. Everything. If you embrace stinking thinking, youre probably going to stay broke no matter what business you join or try to start. Guard your thoughts guys.

13

This was classic pyramid speak: those who want to get rich should not focus on issues with the product; rather, they should bring in more members.

In addition to promoting BitClub Network and brokering mining equipment sales, Weeks told newly recruited members to obscure the true purpose of their investment payments—some of which, it appears, Weeks shunted to other ventures in which he was involved.  For example, Weeks sometimes told BitClub Network investors to wire investments to an account for "Manna Ministries," a corporate entity that he controlled, and gave instructions like:

- Don't mention bitcoin though.  Put donation when sending the wire

- Say it's a donation and nothing to do with bitcoin

- put that its for "Antarctica Trip"

This evidence suggests that Weeks knew that he was engaged in fraud, that he knew he was promoting unregistered securities, and that he had good reason to hide his financial dealings relating to the BitClub Network.

All of this evidence weighs in favor of his pretrial detention.

### C.   Weeks' History and Characteristics Counsel Strongly in Favor of Pretrial Detention

Finally, Weeks contends that his history and characteristics support his pretrial release.  The Government respectfully disagrees.

### 1.   Weeks' Wealth, Much of Which is Held in Bitcoin and Foreign Accounts, Warrants Pretrial Detention

Weeks' access to wealth is significant and warrants pretrial detention. Weeks begins by claiming incorrectly that, during Weeks' detention hearing in Florida, the Government alleged that one of Weeks' wallets "had received more than $560 Million . . . over the course of its existence," which Weeks claims involved "double counting" and is "inflated." Weeks Br. at 12. Not so. To be clear, during the Florida detention hearing, the Government explained that *Weeks*, in connection with his application for St. Kitts, provided a summary of one of his cryptocurrency wallets, which reflected that Weeks' wallet had a final balance of $3.6 million on March 1, 2018 and over the course of the wallet's existence received more than $560 million. *See* USA Ex. B (S.D. Fla. Tr. at p. 19, cited to at Weeks Br. at 12). This statement to the Court was based on one of the papers that Weeks submitted to St. Kitts with a date of March 1, 2018 plainly reflects that the "total received" for this wallet was $560,354,317.53. *See* USA Ex. C. In other words, the Government's representation does not "double count;" it simply quotes the figure reflected on documents that Weeks submitted to St. Kitts. Notwithstanding the accounting displayed by Weeks, this wallet *did in fact* receive significant holdings during the course of its existence— approximately $124 million.

Weeks claims that there is no allegation that "any of the funds received in [his] wallet are the result of any allegedly illegal conduct." Weeks Br. at 13-14. The source of the Weeks' funds matters much less than their tendency to enable flight. Additionally, Weeks did in fact make significant wealth off of the BitClub

15

Network scheme.  As reflected in an email exchange in the middle of 2017, Weeks claimed that more than approximately $62 million passed through one of his bitcoin wallets in the previous year.  As Weeks explained:

> I think Ive run through around $62,000,000 in the last year selling computer equipment that mines bitcoin.
>
> Now you know why I don't want my US Passport anymore.  Imagine the tax liability!
>
> . . .
>
> You should consider getting some bitcoin yourself bro.  Its doubled in value sine I say [sic] you last.  Mining it with us is quite profitable.
>
> Cheers bro.
>
> Joby

Weeks also states that "bitcoin transactions are easily viewable and increasingly hard to hide."  Weeks Br. at 13.  But Weeks' use of bitcoin rather than bank accounts makes it was much more difficult to track Weeks' financial transactions.  The anonymized bitcoin protocol makes it difficult to associate individuals or entities with the randomly-created alphanumerical wallet addresses with whom Weeks' transacted.  More relevant for the purpose of pretrial release, if Weeks were to be released and were to flee from law enforcement, he would be able to access his bitcoin holdings from any location around the world.  Additionally, Weeks has used several different bitcoin exchanges located in different countries.  As a result, not only are Weeks' financial holdings scattered around the world, U.S. law enforcement lacks visibility into these accounts or the ability to seize money from them.

16

Not even Weeks actually believes that his holdings in virtual currency are transparent or easy to track.  For example, in 2017, Weeks sent the following meme to a Facebook user:



Weeks' decision to send a meme to someone referencing the seizure of money shows that Weeks understands that cryptocurrency is harder to freeze than funds stored in a traditional bank account and suggests further that law enforcement has reason to seize funds from him.

Despite his preference for cryptocurrency, Weeks also maintains fiat currency accounts in foreign countries. For example, Weeks maintained an account at Emirates NBD Bank ("Emirates NBD"), which operates from Dubai, United Arab Emirates.  He opened the account in July 2018 and received 2 wire transfers totaling approximately $200,000 on or about July 9, 2018.  Notations on the wires indicate that they correspond to withdrawals from the overseas exchange Octagon, indicating that Weeks maintained a cryptocurrency account at Octagon at that time. Weeks subsequently received other wires in the Emirates NDB account, which had a balance of approximately $249,344 on or about

17

January 25, 2019, the most recent available accounting. Correspondence with Emirates NDB indicates that Weeks has a debit card and online banking access for the account.

Weeks also made high-dollar value international wire transfers from his account at Octagon. On or about April 30, 2018, Weeks caused Octagon to transfer approximately $1.2 million from its account at California-based Silvergate Bank to the Bank of Georgia on behalf of "Geo Servers LLC." On or about May 1, 2018, Weeks received a confirmation of the transaction from an individual using a third-party business's email account. Weeks negotiated on behalf of BitClub Network with this third-party business at various times during the conspiracy.

In addition to his own financial holdings, Weeks has bragged about his access to wealth. For example, Weeks emailed an officer of a cryptocurrency mining technology company in August 2016:

> I've got a guy worth $900m who has taken 50 companies public who is giving me an entity to do a reverse merger. These vegas guys put up the $60m capital to seed the company. We send you the $$ then in 4 months we get the hashing power to then hash with ourselves or parcel off and sell to Bitclub on the terms they want to buy at. By being public, many other institutions will jump in as well. That's the plan. One of the vegas guys does $1b a year in rev. He loves bitcoin!

Weeks also had multiple conversations in which he offered to broker conversions of fiat currency to cryptocurrency. In one exchange, Weeks introduced one of his co-conspirators to an exchanger who could convert $1m into bitcoin. Weeks described his associate as the "biggest bitcoin trader in the

world." For one such transaction, Weeks was asked, "Do we have to bring the cash from Jakarta to Singapore or is it already in Singapore?"

Weeks is also known to maintain cryptocurrency in easy-to-transport hardware wallets. Hardware wallets are located on an external or removable media device, such as a USB thumb drive or other commercially available device, and designed to store cryptocurrency. Some of these devices are quite small—some can be as small as a postage stamp—and highly portable.  In July 2018, Weeks sent a Facebook message to another user that read, "I keep Trezor and ledge coins offline." Similarly, in May 2017, Weeks sent a private message that read, "I use ledger and Trezor for hardware wallets."  Weeks also received periodic emails from "no-reply@trezor.com," an apparent promotional account for the Trezor brand of cryptocurrency hardware wallets. Trezor and Ledger are companies that manufacture and sell hardware wallets used to store cryptocurrency. Maintaining cryptocurrency on a hardware (or cold storage) wallet would give Weeks access to the funds stored therein from anywhere in the world.

At present, it is unclear how much cryptocurrency Weeks maintains. During his custodial interview on December 10, 2019, Weeks declined to give consent to law enforcement to access his holdings.  However, Weeks advised that he had a cold storage bitcoin wallet buried in a tube somewhere in Colorado, a cryptocurrency go-bag for emergency purposes. He refused to provide its exact location. Agents searching Weeks's residence in Colorado found an empty tube that matched what Weeks described.

19

Finally, Weeks had what appeared to be multiple thousands of dollars in cash concealed in the belt he was wearing when he was arrested. He did not tell the interviewing agents about it. The concealed cash was discovered only when the belt was removed when Weeks was processed for detention.

### 2. Weeks' Self-Proclaimed Anarchist Views and Demonstrated History of Anti-Government Rhetoric Render Him a Flight Risk

Weeks has a demonstrated history of refusing to follow rules that do not suit his needs and has a demonstrated streak of anti-government rhetoric.  In a March 2017 email to two co-conspirators, Weeks urged BitClub Network to post the following on its website regarding BitClub Network's decision to block U.S. investors:

> Bitclub pays all of our members around the world daily, tax free.
>
> Despite what you may have been told, America is, unfortunately, no longer a free country.
>
> If you are a U.S. CITIZENS with a SS# (Slave Surveillance Number) Then you may get in trouble with your masters at the IRS for making a bunch of Bitcoin tax free.
>
> As a precaution, we have decided to block people using ip addresses based in the USA from joining Bitclub.
>
> We understand U.S. CITIZENS are property and we don't want any trouble with your owners.

In a 2019 post on the website of Wired Magazine called "Anarchy, Bitcoin, and Murder in Acapulco," Weeks was described as one of thousands of "crypto-anarchists" that periodically gather in Mexico. Wired reported that Weeks owns property in Mexico:

Perpetual traveler and bitcoin evangelist Joby Weeks was so taken with Acapulco during his annual talks at the conference that he bought a 13-bedroom mansion overlooking the water three years ago, paying the equivalent of $4 million in bitcoin. Soon after, bitcoin went through the roof, making the amount of cryptocurrency he paid worth $40 million and then $80 million. Then his bitcoin stash got hacked. He smacks his head recalling how he felt: "Oh! I should have saved my bitcoin!"

He plans to turn the house into a time-share of sorts, giving members access for one week a month. Anarchists will be anarchists whether they are in Acapulco or anywhere else, he figures, while crediting Anarchapulco for drawing him to the city in the first place. Anarchy is "a state of mind, it's a state of living," **Weeks says. "The whole asking for forgiveness instead of permission mindset."**

*Available at:* https://www.wired.com/story/anarchy-bitcoin-and-murder-in-mexico/ (emphasis added). This "state of mind" and "state of living" suggests that Weeks is unlikely to follow pretrial release conditions of this Court.

Weeks evidently has close contacts with individuals overseas who are interested in forming sovereign states, usually involving some aspect of cryptocurrency as a focal point. For example, in October 2017, Weeks emailed several coconspirators regarding his "buddy Vit, The President of Liberland." According to a 2015 article posted on the website of the Independent:

Vit Jedlicka, a member of the Conservative Party of Free Citizens, is the self-appointed president of "Liberland," a 7sq km "country" (only the Vatican and Monaco are smaller) where taxes are optional and there is no military.

It is situated on the banks of the Danube between Serbia and Croatia in an unclaimed no-man's land, or terra nullius territory, meaning that neither country has ever held full sovereignty over the area.

*Available at:* https://www.independent.co.uk/news/world/europe/welcome-to-liberland-europes-tiny-new-country-where-taxes-are-optional-and-youre-

allowed-to-move-in-10185477.html. In the email, Weeks pitched an idea by which each of Liberland's 500,000 "citizens" would pay $5,000 each to become "founding father[]" investors in BitClub Network and all existing BitClub Network members would be granted Liberland citizenship. Weeks envisioned a $140 million commission for BitClub Network for onboarding Liberland citizens. He said, "Starting a country is a mission a ton of people are on board with," and that Liberland, with BitClub Network's help, "would be the first country that runs on bitcoin mining instead of taxing its citizens."

In 2015, Weeks participated in a Facebook chat with other users in which he discussed establishing a sovereign territory proximate to Madeira, an autonomous region of Portugal, that he referred to as "Atlantis."  On August 10, 2015, Weeks wrote:

> Here is how I see the evolution of Atlantis. Step 1 buy island (check) step 2 declare sovereignty and set up principality (check) step 3 refuse to pay tribute to Portugal/Madeira. (Check) step 4 defend sovereignty in court (happening hopefully soon) that would be preferable instead of dealing with an invasion. step 5 get recognition/treaty with Madeira. (Hoping to find out on this trip what that would entail) step 6 go to the rest of the world.

As evidenced by Weeks' behavior and involvement in the course of his criminal conduct at issue in this case, Weeks is has an anti-Government streak and has shown a willingness to disregard laws that he believes should not apply to him and has also taken steps to encourage others to do the same.

Weeks' position on this point in his brief is unclear.  While Weeks includes the proclamation that he "does not associate with 'anarchists,'" the paragraph

22

within this section concedes that he does, in fact, "associate[ ] with these self-proclaimed anarchists."  Weeks Br. at 11.

### 3. Weeks' Characterization of His Arrest as Akin to "Turning Himself In" is Incorrect

Weeks suggests to this Court that the circumstances of his arrest were similar to that of a recent defendant charged in the Southern District of New York who "voluntarily turned himself in" and that his posture of approaching the IRS (when he was completely unaware he was being investigated) was akin to "a person trying to make things right."   Weeks Br. at 10.   But Weeks' characterizations of his behavior with law enforcement is distorted.

Weeks reached out to law enforcement in 2019 when the Government's investigation was already underway and still covert.  Weeks claimed that he was well-situated to provide information on international money laundering through his contacts and association with others involved in the flow of large sums of funds through overseas cryptocurrency exchanges.  But the agents did not inform Weeks that he or anyone at BitClub Network was under investigation.

The arresting agents engineered their meeting with him in Florida to arrest him in order to ensure that Weeks would be in the country on the date the simultaneous arrests in this case were scheduled.  In contrast to someone who voluntarily turns himself in, Weeks did not show up to this meeting expecting to be arrested; at no point during the Government's investigation of Weeks was he ever informed of the instant charges or that the Government was investigating him or the others involved in BitClub Network.

23

And while Weeks admitted to law enforcement that he has never paid his taxes (notwithstanding his significant wealth), he did so in the context of a conversation in which he was trying to convince the agents that he might serve—in his words—as a "Jason Bourne" of cryptocurrency (in reference to the fictional secret agent).  Indeed, when agents relayed to Weeks that his continued failure to pay his taxes was serious, Weeks cited to a possible defense to his criminal tax liability based on the Fourteenth Amendment.  Weeks' tone suggested that he viewed his failure to pay taxes as significantly less serious than the other significant misconduct he professed to be able to report to law enforcement.  If anything, Weeks' admitted familiarity with international criminals cuts sharply against, not in favor, of his pretrial release.

### 4.    Weeks Overstates His Ties to Colorado

Weeks contends that his ties to Colorado cut in favor of his release.  He characterizes Colorado as his "home" and claims that he spends two to three months in Colorado every year.  Weeks Br. at 6.

But curiously, when law enforcement officers went to Weeks' purported "home" in Aurora, Colorado on December 10, 2019 they were met not by members of the Weeks family, but instead by several individuals who said that they rarely see Weeks at that residence, that he certainly did not live at that residence, and that he visited the residence only a few times a year.  Tellingly, when asked where Weeks lived, the people living in this house stated that Weeks lived all over the world, that he did not have a primary residence, and that he had lived this way for at least the last ten years.

Under these circumstances, Weeks' alleged ties to Colorado do not mitigate his risk of flight.  *See* Pretrial Detention Order ("PDO") at 4 (Mag. No. 19-08526-WM, ECF No. 11, S.D. Fl.) (noting that Weeks "does not maintain a permanent residence anywhere in the United States" as a factor in supporting pretrial detention).  Indeed, contrary to more traditional family ties, as discussed further below, Weeks' immediate family has spent significant time traveling alongside Weeks.

**5.   Weeks' Significant Travel and Foreign Contacts Necessitates Pretrial Detention**

Weeks has extensive foreign contacts and travel, including in nations where it would be difficult, and perhaps impossible, to locate and extradite him if he fled the United States.  His extensive history of foreign travel and substantial ties to individuals abroad counsel against releasing him from custody prior to sentencing. *See, e.g., United States v. Kachkar*, 701 F. App'x 744, 747 (11th Cir. 2017) (*per curiam*) (affirming pre-trial detention order in fraud case, concluding that the district court "did not err in concluding that [the defendant's] significant ties and travel to foreign countries weighed in favor of a finding that he was a flight risk") (internal quotation marks omitted).

This is not a case where Weeks' family will likely keep him in the United States.  Weeks' wife and child have accompanied Weeks on many of his travels. Weeks and his wife Stephanie maintain a travelogue on their website—www.weeksabroad.com—in which they tout their international adventures.  A map posted to the site highlights the scope of their whereabouts:



The site claims that Weeks has visited all 7 continents and 141 countries. It also has been reported that Weeks's daughter was the youngest person to visit all 50 states, completing the trip in just 42 days. *See* https://www.thegazette.com/50-states-in-42-days-baby-liberty-becomes-the-youngest-to-travel-the-us-20181207. Far from a situation where a defendant would feel beholden to stay in the United States to be near their family—Weeks' family has demonstrated a near preference to travel outside of the United States.

In a 2017 email that Weeks sent to codefendant Matt Goettsche, Weeks included his "pitch" for a television program that would follow Weeks and his wife around the world as they promoted what they called the "Bitcoin Revolution." Below are several excerpts:

> "In the last two years my wife and I have visited 400+ cities and over 100+ countries. We basically fly around the world on private jets selling machines that print money. Who wouldn't like to have a machine that prints money?"

26

Meet Joby and his wife Stephanie Weeks, entrepreneurs, investors, the front-line soldiers in a battle to change the way you spend and save your money. Except the money they want you to use is this NEW magical Internet money called Bitcoin!

. . .

Joby and Stephanie never stop moving. They call themselves Perpetual Travelers! On a perpetual workcation, promoting and living off of Bitcoin wherever they go...

Back on the Jet to Miami, St Kitts and then off Jeeping around Europe before swinging south for some dirt biking in the Sahara. Come crash at Richard Branson's pad in Marrakech, before skipping off to Necker Island for the Blockchain Summit Conference. Find out why all the Billionaires think Bitcoin and the Blockchain are the next big thing! See the underground mining pools of Iceland and learn everything you need to know about this evolving currency and others like it.

. . .

Meet the Founders of the Global Network of Bitcoin enthusiasts and miners called "The BitClub" Get up to date on current technologies from some of the richest investors in the world, and get inside knowledge of the next big thing before it happens.

Further, according to Government travel records, Weeks has undertaken the following travel between the U.S. and international locations since on or about November 15, 2016:

| Travel Date | Departure location | Arrival location |
|---|---|---|
| 11/22/2019 | Zurich | New York |
| 10/6/2019 | Key West | Nassau |
| 10/2/2019 | Rome | Chicago |
| 9/25/2019 | Chicago | Rome |
| 9/20/2019 | Bangor | Prince Edward Island |
| 8/26/2019 | St. Kitts/Nevis | Miami |
| 8/10/2019 | Atlanta | St. Kitts/Nevis |
| 7/14/2019 | Tokyo | Honolulu |
| 4/20/2019 | Washington Dulles | Munich |
| 4/16/2019 | St. Kitts/Nevis | San Juan |
| 4/10/2019 | Dominica | Denver-Aurora |

| Travel Date | Departure location | Arrival location |
|---|---|---|
| 4/4/2019 | Cancun | Dallas/FT Worth |
| 4/2/2019 | Houston | Cancun |
| 3/21/2019 | Cancun | Miami |
| 3/19/2019 | Houston | Cancun |
| 2/26/2019 | Mexico City | Salt Lake City |
| 2/14/2019 | Houston | Mexico City |
| 1/28/2019 | Panama | Denver |
| 12/30/2018 | Miami | Santiago |
| 12/14/2018 | Reykjavík | Denver |
| 12/8/2018 | Miami | Lisbon |
| 12/6/2018 | Belize City | Miami |
| 11/30/2018 | Dallas/FT Worth | Belize City |
| 9/10/2018 | Greenland | Chicago |
| 9/8/2018 | Canada | Fairbanks |
| 7/23/2018 | St. Kitts/Nevis | Miami |
| 7/18/2018 | Belize City | Miami |
| 7/18/2018 | Miami | St. Kitts/Nevis |
| 7/13/2018 | Houston | Belize City |
| 7/6/2018 | Amsterdam | Atlanta |
| 4/12/2018 | New York | Istanbul |
| 3/23/2018 | BC, Canada | Gypsum, Colorado |
| 3/23/2018 | BC, Canada | Denver |
| 3/20/2018 | Gypsum, Colorado | BC, Canada |
| 3/2/2018 | Nassau Intl | Atlanta |
| 2/27/2018 | Mexico City | Miami |
| 2/27/2018 | Miami | Nassau Intl |
| 2/15/2018 | Los Angeles | Mexico City |
| 2/5/2018 | Tokyo | Denver |
| 1/26/2018 | Washington Dulles | Tokyo |
| 1/24/2018 | Belize City | Miami |
| 1/21/2018 | Quito, Ecuador | Houston |
| 1/21/2018 | Houston | Belize City |
| 1/12/2018 | Las Vegas | Mexico City |
| 1/5/2018 | St. Kitts/Nevis | Miami |
| 12/23/2017 | Charlotte | St. Kitts/Nevis |
| 12/10/2017 | Tokyo | Los Angeles |
| 11/6/2017 | Honolulu | Sydney |
| 10/30/2017 | Panama | Los Angeles |
| 10/8/2017 | Miami | St. Kitts/Nevis |
| 10/2/2017 | Istanbul | New York |

| Travel Date | Departure location | Arrival location |
|---|---|---|
| 9/20/2017 | Munich | Denver |
| 9/5/2017 | San Francisco | Manila |
| 8/31/2017 | Mexico City | Los Angeles |
| 8/13/2017 | Panama | San Francisco |
| 8/9/2017 | Houston | Panama |
| 7/29/2017 | British Virgin Islands | St. Thomas |
| 7/23/2017 | Charlotte | St. Maarten |
| 6/21/2017 | Reykjavík | Boston |
| 5/19/2017 | Westchester County, NY | London |
| 5/18/2017 | St. Kitts/Nevis | San Juan |
| 5/14/2017 | Miami | St. Kitts/Nevis |
| 5/7/2017 | Seattle Lake Union | Ontario |
| 5/4/2017 | Mexico | Los Angeles |
| 4/20/2017 | Miami | Columbia |
| 4/19/2017 | Zurich | Miami |
| 3/21/2017 | Miami | Lima |
| 3/19/2017 | Seoul | Los Angeles |
| 3/13/2017 | Denver | Tokyo |
| 3/7/2017 | Punta Cana | San Juan |
| 2/24/2017 | Chicago | Mexico City |
| 2/23/2017 | Hong Kong | Chicago |
| 2/24/2016 | Hong Kong | Newark |
| 12/23/2016 | Hong Kong | Newark |
| 11/15/2016 | Houston | London |

The chart does not account for travel entirely between international locations.

Weeks counters that this travel reflects that, pre-indictment, he returned to the United States during the course of these travels. But a defendant's risk of *not returning* to the United States increases markedly when he knows he is facing significant charges, a restitution money judgment, and potentially significant tax penalties, all of which jeopardize his jet-setting lifestyle.

In addition to significant travel, Weeks has sought citizenship in at least two countries:

*St. Kitts & Nevis:* Weeks sought to obtain citizenship in the Caribbean island nation of St. Kitts & Nevis through its Citizenship by Investment Program.

In April 2017, Weeks corresponded with a realtor in St. Kitts & Nevis ("St. Kitts") regarding a timeshare property. He asked, "since its $400,000 to get citizenship, can 4 people go in on this property and get 4 passports? If that works, that would be awesome. (I have 3 friend of mine who are also wanting to buy a place down there to get a passport too)." A review of other correspondence indicates that Weeks was referring to BitClub Network coconspirators as the other parties interested in purchasing property and citizenship in St. Kitts.

In an email to the "second citizenship" concierge Weeks enlisted in an effort to obtain St. Kitts citizenship, Weeks wrote:

> The funds that I used to buy the property and pay you came from me selling some bitcoins.
>
> I try to keep my money out of the banks and in Bitcoin instead.
>
> Thats why that bank account has such a low balance all the time.
>
> What should we do? I don't like or trust banks and I am not a fan of fiat money.
>
> This is one of my bitcoin wallet addresses, [1Joby Wallet].
>
>  . . .
>
> I think Ive run through around $62,000,000 in the last year selling computer equipment that mines bitcoin.
>
> Now you know why I don't want my US Passport anymore. Imagine the tax liability!

Although it appears Weeks actually purchased property in St. Kitts—his email account contained a signed contract documenting the purchase of a fractional

30

interest in a condominium at the Windswept Residence Club for $465,000—it is not believed that he succeeded in obtaining citizenship there.

*Vanuatu:* Turned away from St. Kitts, Weeks next sought citizenship in the Pacific island nation Vanuatu. Vanuatu does not have an extradition treaty with the U.S. It appears that Weeks was unsuccessful in his bid to obtain Vanuatu citizenship.

In addition to significant travel and a history of seeking out foreign citizenship, it appears that Weeks also has access to travel documents in short order.  For example, in 2019 Weeks engaged in the following chat with another Facebook user ("User1"):

| User1 | IRS took my passport |
|-------|----------------------|
| User1 | I get it back in a few days |
| User1 | Fuckers |
| Weeks | no shit? |
| Weeks | wow |
| Weeks | I can get you a mexican one for $20k |

At the time of his arrest, Weeks had a U.S. passport and a diplomatic passport issued by the World Sports Alliance. A Mexican national voter card was found in a subsequent consent search of his AirBNB rental.  Nearly every page of Weeks's U.S. passport was filled.

Weeks argues further that pretrial release is appropriate because GPS monitoring is "reliable," Weeks Br. at 13, but, as Judge Arleo of this Court has recognized, "it is well-settled that electronic monitoring, use of GPS device, and

home detention do not guarantee against flight." *United States v. Bergrin*, 2009 WL 1560039, at *10 (D.N.J. May 29, 2009) (Arleo, M.J.).  While GPS monitoring may deter certain defendants, it is not a foolproof method, particularly for a demonstrated anti-Government defendant who has proclaimed that he does not like to follow rules that don't suit him and who has a family who is willing and able to travel the world with him and considerable access to wealth to help him do so.  *See* PDO at 6-7 (recognizing that electronic monitoring would be inadequate to ensure Weeks' appearance).  Under these circumstances, anything short of incarceration will run the risk that he will flee.  As put by the judge in the Southern District of Florida:  "Simply stated, the Court does not believe that [Weeks] would comply with any conditions of release set by the Court."  PTO at 7.

## CONCLUSION

For all of the reasons set forth above, the Government submits that the Court should detain Weeks without bail pending trial.

Respectfully submitted,

CRAIG CARPENITO

By:   s/ Jamie L. Hoxie
Jamie L. Hoxie
David W. Feder
Anthony P. Torntore
Assistant U.S. Attorneys

Dated:   January 15, 2020

**CERTIFICATE OF SERVICE**

I certify that on January 15, 2020, I caused the foregoing document to be served on counsel of record by filing it through the Court's CM/ECF system.

s/ Jamie L. Hoxie
Jamie L. Hoxie
Assistant U.S. Attorney