# EXHIBIT B

1

```
 1            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
 2
    Case No. 19-mj-00277-NYW-1
 3  _____

 4  UNITED STATES OF AMERICA,

 5       Plaintiff,

 6  vs.

 7  MATTHEW BRENT GOETTSCHE,

 8       Defendant.
    _____
 9

10          Proceedings before KRISTIN L. MIX, United States

11  Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 2:49 p.m., December 13,

13  2019, in the United States Courthouse, Denver, Colorado.

14  _____

15          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                     APPEARANCES

19          DAVID TONINI and JAMIE HOXIE, Attorneys at

20  Law, appearing for the Plaintiff.

21          PATRICK RIDLEY and KRISTEN FROST, Attorneys at Law,

22  appearing for the Defendant.

23  _____

24                  DETENTION HEARING

25
```

2

```
 1                    P R O C E E D I N G S
 2              (Whereupon, the within electronically recorded
 3        proceedings are herein transcribed, pursuant to order of
 4        counsel.)
 5              THE COURT:  Case Number 19-mj-00277, United States
 6        of America vs. Matthew Brent Goettsche -- Goettsche.
 7              MR. TONINI:  Good morning, Your Honor.  David
 8        Tonini, Assistant U.S. Attorney on behalf of the United
 9        States.  With me is also assistant U.S. Attorney Jamie Hoxie
10        from the District of New Jersey.
11              THE COURT:  All right, Mr. Tonini, Ms. Hoxie, good
12        afternoon.
13              MS. HOXIE:  Good afternoon, Your Honor.
14              MR. RIDLEY:  Good afternoon, Your Honor.  Patrick
15        Ridley and Kristen Frost on behalf of Mr. Goettsche who
16        appears.
17              THE COURT:  Good afternoon.
18              MS. FROST:  Good afternoon.
19              THE COURT:  Mr. Tonini, this case, as I understand
20        it, is currently under seal.  Is the Government moving to
21        remove the case from under seal?
22              MR. TONINI:  The Government is moving to remove the
23        case from under seal with the exception of ECF 1.  And in
24        connection with that, Your Honor, Mr. Ridley and I spoke
25        earlier today, and we would suggest just before this hearing
```

3

1  submit that it might be a good idea to clear the jury box

2  with the exception of the defendant.

3          THE COURT:  All right, thank you.  I would like to

4  ask the United States Marshal Service to do that.  I

5  understand that Mr. O'Hara is conversing with his client.  I

6  am going to let him finish that conversation and then ask the

7  marshal service to clear the jury box with the exception of

8  this defendant.

9          Counsel from New Jersey, would you give me your

10  name again, please, and spell your last name for me.

11          MS. HOXIE:  Yes, Your Honor.  This is United States

12  attorney Jamie Hoxie, last name H-O-X-I-E.

13          THE COURT:  Thank you.

14          All right.  We are here for a detention hearing

15  with respect to this defendant.  I have received and reviewed

16  the United States motion for defendant's pretrial detention.

17  There is a lot of information in that motion.

18          Mr. Ridley, what's the defendant's position with

19  respect to detention?  Does the defendant wish to have some

20  time to respond to the motion in writing or does the

21  defendant intend to proceed with the hearing today?

22          MR. RIDLEY:  Your Honor, we're prepared to proceed

23  today.

24          THE COURT:  All right, thank you.  Then let me hear

25  from the Government first.  Mr. Tonini or Ms. Hoxie.

4

1          MR. TONINI:  Thank you.  With leave of the Court,

2     Ms. Hoxie will address the issues.

3          THE COURT:  All right, fair enough.  Ms. Hoxie,

4     whenever you're ready.

5          MS. HOXIE:  Thank you, Your Honor.

6          THE COURT:  And by the way, the Government's motion

7     to unseal is granted.  Thank you.

8          (Quality of audio for Ms. Hoxie and Mr. Ridley was

9     poor.)

10          MS. HOXIE:  With the Court's permission, I would

11     like to proffer the information that's contained in the

12     pretrial services report.  I would like to proffer the

13     information which I intend to go through more thoroughly

14     that's contained in the Government's motion that was filed

15     this morning, and I would like to offer for the Court's

16     consideration what has been marked Government's Exhibits A

17     through O, some of which were attached to the Government's

18     motion.  There is a few that were not attached to the

19     Government's motion filed this morning.

20          THE COURT:  All right.  I will take judicial notice

21     of the pretrial services report, as I always do.  With

22     respect to A through O, has defense counsel had an

23     opportunity to review those exhibits?

24          MR. RIDLEY:  We have, Your Honor.

25          THE COURT:  And does the defendant have any

5

1   objection to A through O?

2            MR. RIDLEY:  No objection, Your Honor.

3            THE COURT:  All right, thank you.  A through O are

4   received.

5            MS. HOXIE:  Thank you, Your Honor.  May I approach?

6            THE COURT:  You may.

7            MR. TONINI:  It's actually A through N.

8            MS. HOXIE:  I'm sorry, A through N, Your Honor.

9            THE COURT:  Oh, I'm sorry, A through N.  Thank you,

10  A through N are received.

11           (Plaintiff's Exhibits A through N were admitted.)

12           MS. HOXIE:  May I approach.

13           THE COURT:  You may.  Thank you.

14           MS. HOXIE:  Your Honor, with the Court's

15  indulgence, I would like to give the Court a brief kind of

16  overview of what this case is about and the nature of the

17  scheme, because I think it's important to understand the

18  nature of the scheme, not only because that's one of the

19  factors for the Court to consider in determining whether

20  there are a combination of conditions that would militate

21  against the risk that this defendant would flee or the danger

22  to the community, but also just so that you can understand

23  that if this defendant were to be released, it would be very

24  easy for him to flee and for him to continue this scheme from

25  anywhere in the world.

6

1          So this case is about a cryptocurrency fraudulent

2    entity called the BitClub Network, and the defendant has been

3    indicted for conspiracy to engage in wire fraud and

4    conspiracy to sell an unregistered security, a share in the

5    BitClub Network.

6          Now, BitClub Network told investors that it was

7    offering membership in the BitClub Network which then would

8    in turn allow you to invest in pool mining -- like a mining

9    pool for bitcoin.  A mining pool essentially is a pool of

10   mining equipment that is connected together in order to have

11   a higher hash rate so that you are appointing the miner that

12   is more likely to mine a particular bitcoin.

13         Now, the way it works, Your Honor, put very

14   plainly -- and if Your Honor would like me to just skip

15   forward, I can.

16         THE COURT:  No, no, I'm very interested in what

17   mining bitcoin might possibly mean.

18         MS. HOXIE:  Okay.  So the way that -- mining

19   bitcoin is essentially how bitcoin is created, how we get new

20   bitcoin.  And so mining bitcoin essentially is computers that

21   are fighting to be the first computer to solve an algorithm

22   that is converting a transaction on the blockchain.  The

23   blockchain is a public ledger of the bitcoin transaction.

24   And so if you are the miner whose computer whose mining

25   equipment is the first to confirm the transaction to solve

1    the algorithm, then you are awarded new bitcoin.

2            So the process of fighting with the computer power

3    to be the first -- to solve the algorithm is the process of

4    mining bitcoin.

5            THE COURT:  All right, thank you.

6            MS. HOXIE:  Okay.  And so the hash rate is a

7    computer hash rate, that is how fast a computer can work

8    to -- to accomplish this -- to accomplish the algorithm and

9    to process forward in order to solve the algorithm and be the

10   miner awarded the particular new bitcoin.  Does that make

11   sense?

12           THE COURT:  It does, thank you.

13           MS. HOXIE:  So, in other words, Your Honor, if you

14   have a higher hash rate, it is more likely, generally

15   speaking, that you will be the miner, the computer that is

16   awarded the newly issued bitcoin.

17           Now, bitcoin and bitcoin mining equipment is

18   incredibly expensive and requires a tremendous amount of

19   electricity to operate.  And this equipment, as I understand

20   it, often becomes obsolete.  There are newer and newer and

21   newer types of chips and equipment that come on the market

22   all the time and those chips are faster and better at

23   processing -- processing these algorithms.

24           And so what is common is that miners or investors

25   will pool their assets together, will pool their mining power

8

1    together because that will have the hash rate increase and

2    they will collectively have a higher chance of being the --

3    the entity or the pool that is awarded the newly mined

4    bitcoin.  Does that make sense?

5            THE COURT:  It does.

6            MS. HOXIE:  So in this case, the bitcoin that were

7    told investors that they were -- what they were purchasing

8    were shares in one of three bitcoin mining pools.  Now, the

9    BitClub Network also offered several other investment

10   products, but the focus of the indictment is that investors

11   purchased shares in one of these three bitcoin mining pools.

12           Now, unfortunately, at the beginning of this scheme

13   orchestrated by this defendant and some of his co-defendants

14   and other co-conspirators, at the beginning of the scheme we

15   see that this defendant and others talked about how they were

16   going to fake the pool and fake mining earnings.  In other

17   words, they were telling investors that they were going to

18   get mining earnings, that they were actually mining and what

19   they were receiving were mining earnings when, in fact, that

20   does not appear to be the case.

21           In addition, Your Honor, once the defendant and

22   others actually did procure mining equipment, mining power

23   from third parties, they nonetheless continued to show

24   investors altered mining figures.  In other words, they were

25   altering what they were telling investors were their profits

9

1    in the bitcoin mining pool, but, in fact, those numbers were

2    not tied to the actual bitcoin mining that BitClub Network

3    was accomplishing.  And we see that through several chats

4    that were captured and we also see that through e-mails

5    between the defendant and his co-defendants.

6           And the reason -- one of the reasons, Your Honor,

7    why they would be altering the mining earnings is because at

8    the end of the day the BitClub Network appears to have been a

9    pyramid scheme or a Ponzi.  You can see as referenced in the

10   Government's brief on page 12, Your Honor --

11          THE COURT:  Give me one second.

12          MS. HOXIE:  Yes, Your Honor.

13          THE COURT:  All right, thank you.  Page 12?

14          MS. HOXIE:  Page 12, Your Honor.  There are two

15   graphics on page 12, both of which were taken from BitClub

16   Network's website as it appeared in May of 2018, and you can

17   see that these are literally graphics of human pyramids.  The

18   way in which -- the way in which a revenue stream for the

19   BitClub Network or a way in which members of the BitClub

20   Network were able to generate revenue was by recruiting new

21   members like any typical pyramid scheme.

22          And as this defendant and his co-defendants

23   discussed at the beginning, many of the people, the investors

24   in the BitClub Network, did not appreciate or know that only

25   a portion of their money was going to go towards bit --

1   bitcoin mining, and a large portion, between 40 or 60

2   percent, was getting funneled into this pyramid scheme MLM

3   structure, a compensation structure, which basically new

4   investors paying existing investors just for signing up.

5          And so we see in the conversations this scheme has

6   been going on from the middle of 2014 and existed as of the

7   day of the takedown, which is December 10, 2019.  In fact,

8   the website, as I understand it, remains up on the Internet.

9   And so in short, that is the scheme in a nutshell, Your

10  Honor.

11         The evidence that we have of this scheme are the

12  conversations that this defendant had with his

13  co-conspirators.  We have them saying with Catalin Balaci,

14  that Balaci has seen this defendant's skill at constructing

15  attractive matrices that have almost 0 percent chance of

16  paying more than 50 percent of the max for 99 percent of the

17  people.  In other words, Balaci is saying that he has seen

18  this defendant do this before where he comes up with a

19  complicated compensation structure where the majority of

20  people who invest are not going to get any return.

21         We also see this defendant directing Catalin Balaci

22  to fake the mining, to fake mining proceeds.  In other words,

23  he's directing the computer programmer who created the -- the

24  bones of this website, Your Honor, he's directing him to not

25  only fake the pool and fake mining earnings, he also tells

1   him to bump up the payouts.

2           In one instance, Your Honor, he tells him to bump

3   up the payouts for mining earnings by 60 percent, and Catalin

4   Balaci says that that's, I think he used, fast cash Ponzi.

5   It's in the indictment.  That they're basically talking about

6   altering the figures, that they're telling the investors the

7   mining earnings, significantly, and the reason why they're

8   doing this is to promote further investment -- further

9   investment in the BitClub Network.

10          We also see, Your Honor, in 2017, the defendant

11  talks about -- he e-mails one of his co-defendants an exit

12  strategy for the BitClub member, and as part of the exit

13  strategy he says that they should start dropping mining

14  earnings significantly starting now.

15          What we see thereafter are investor updates where

16  they are talking about how mining earnings are projected to

17  not do so well, and, you know, people shouldn't be expecting

18  mining to do well in the coming months.  In other words, it

19  appears that this plan that is orchestrated by the defendant

20  in 2017 ends up going into effect thereafter with -- by both

21  this defendant and by his co-defendants.

22          The nature and the circumstances of this offense

23  also includes four other people who have been indicted for

24  this fraud scheme.  Three of them are -- three of them are in

25  custody in addition to the defendant.

1              So Joe Abel was arrested in the Central District of

2      California.  He has significant ties, foreign ties, and he

3      has been ordered detained.

4              His co-defendant Jobadiah Weeks also has

5      significant ties.  He travels around the world.  He has an

6      e-mail that is included in Your Honor's material where he is

7      asking the defendant if Sir Richard Branson can be hosted at

8      one of the defendant's foreign properties.  He is away, he is

9      currently detained in the Southern District of Florida.  His

10     detention hearing will be Monday.

11             The computer programmer, Catalin Balaci, is a

12     Romanian citizen and he was arrested in Germany.  It's my

13     understanding that he is detained pending extradition.

14             But there is one co-defendant who remains at large,

15     Your Honor.  That co-defendant is this defendant's long-time

16     business partner.  The materials show that that co-defendant

17     has been working with this defendant long before the BitClub

18     Network started.  They are copying each other on e-mails

19     regarding private planes, and that co-defendant who is still

20     outstanding is believed to reside outside the United States,

21     is believed to have access to not only millions of dollars,

22     but also two private planes, and is believed to travel

23     extensively to countries that do not have extradition

24     treaties with the United States.  All of those factors

25     militate in favor of keeping this defendant in custody

13

1  pending his trial.

2       In addition, Your Honor, when this defendant was

3  arrested on December 10, 2019, he was -- there was a search

4  warrant for his house and there was a warrant for his arrest.

5  When law enforcement approached this defendant's home, he was

6  observed in front of that home approximately somewhere

7  between 30 minutes, 45 minutes, an hour before law

8  enforcement actually made entry into the home.

9       Now, law enforcement actually had to breach the

10  door, and the reason why they breached the door is because

11  they knocked and no one came to the door, and then they

12  observed a figure who appeared to be a man walk from the

13  right to the left of the entryway without coming to the door

14  to let law enforcement in.

15       Now, law enforcement was banging on the door and

16  saying they were police, and no one came to the door.  At the

17  time they saw the person walk from right to left, they

18  breached the door.  What they saw was the defendant in the

19  entryway -- I'm sorry, in the doorway of what appeared to be

20  his home office.

21       The home office had several cellphones that were

22  charging and notably the office had two computers that

23  appeared to be set up in an operational way.  And what I mean

24  by that, Your Honor, is there were monitors that appeared set

25  up on the desk as if somebody had been using them, and there

1    were two desktops, the actual towers for the computer, that

2    were, I believe, behind the desk.  The desktop was connected

3    to the monitor and the desktop was also connected to the --

4    the power cord was plugged into the wall; however, the power

5    chord had been disconnected between the wall and the

6    computer.  So, in other words, somebody had disconnected the

7    power supply from the wall to the computer.

8              Now, at least one of those computers we know was

9    encrypted, and so by disconnecting that power supply, it

10   makes it significantly more difficult for law enforcement to

11   get into that computer.

12             The weight of the evidence, as I said, Your Honor,

13   against this defendant is fairly substantial.  We have copies

14   of his text messages -- copies of his chat communications

15   with his co-defendants talking about how they are going to

16   build this on the backs of idiots, how they want investors to

17   be unsophisticated, how the leaders understand, but the sheep

18   don't.  I mean, the rhetoric of these defendants is very

19   blatant and fragrant, that they are planning on taking

20   advantage of people who are unsophisticated with bitcoin

21   mining.

22             In addition, we have e-mails between this defendant

23   and his co-conspirators, and we also have a -- we also have a

24   video by his co-defendant Joe Abel, and in that video, Joe

25   Abel says -- and this video was posted I believe in June of

1    2019, Your Honor.  Joe Abel says, I think if you are

2    investing -- I think if you are promoting the BitClub

3    Network, you are promoting a Ponzi.  And so the weight of the

4    evidence in this case is strong.

5         The history and characteristics of this defendant

6    also show that detention is appropriate in this case.  Now,

7    while this information was not disclosed to pretrial

8    services, this defendant has a tremendous amount of wealth

9    and access to wealth in cryptocurrency accounts, in

10   exchanges, both domestic and foreign exchanges, and he has

11   run his money through several different entities and

12   several -- including what appear to be two law firms, in

13   accounts owned by two law firms.

14        These acts all make it very difficult for law

15   enforcement to trace the money, make -- and also make it

16   difficult to understand how much wealth he has.

17        Now, if the defendant were to be released, it would

18   be -- the amount of money that we're talking about here, in

19   certain circumstances, is hundreds of millions of dollars,

20   and the number that is in the indictment of what investors

21   gave to these defendants as a part of the scheme is $722

22   million.  If the defendant were to be released, there is

23   nothing from stopping him from relocating and accessing

24   millions of dollars and starting like wherever he -- wherever

25   he pleases.  And what that will do, it would effectively

1   hinder law enforcement's ability, not only to get justice for

2   the victims, but would also hurt the Government's ability to

3   get some of that money, that investor money back.

4          Now, Your Honor, if you look at page -- starting at

5   page 18 of the Government's brief, when law enforcement

6   executed the search warrant at this defendant's home, they

7   found several cold storage devices.  Now, a cold storage

8   device is an offline wallet that can store cryptocurrency.

9   It's basically a wallet that can store crypto that is not

10   connected to the Internet at any given time.  And from these

11   cold storage wallets law enforcement was able to recreate and

12   see the amount of money, the amount of bitcoin, that had been

13   transferred through these wallets.

14          Now, those -- each of the devices and the number of

15   transfers, the date ranges and the amounts of bitcoin is

16   reflected on Government's page 18, but the total equivalent

17   in U.S. dollars of these transfers is over $246 million, Your

18   Honor.  And the analysis of where that money went is ongoing.

19          It is incredibly difficult to see where

20   cryptocurrency -- where cryptocurrency ends up because it can

21   go to exchanges that are overseas and we have no ability to

22   access those records.  It is intentionally used as a sort of

23   anonymous sort of way to transfer funds, but what we can tell

24   is at least six of these transfers that total the equivalent

25   of 5 -- over $5.7 million went to a Hong Kong-based

1    investment management company.

2           THE COURT:  Are you saying that these cold storage

3    wallets likely belong to the defendant because they were

4    found in the defendant's premises on execution of the search

5    warrant?

6           MS. HOXIE:  Yes, Your Honor.  Or whether they

7    belonged to him or not, he had access to them.

8           In addition to the cold storage wallets, Your

9    Honor, we have insight into some of the crypto-exchange

10   accounts that this defendant maintains.  Now, a crypto --

11   what I mean when I say a cryptocurrency exchange, I mean,

12   there are several different entities by which you can -- you

13   can swap out essentially cryptocurrency for fiat currency.

14   So I can take my bitcoin, go to an exchange and get fiat

15   currency in return.

16          So as shown in the bullet points on page 19, this

17   defendant has maintained an account with Zappos, which is

18   Hong Kong-based company, and from 2014 to 2017 he received at

19   least 743 bitcoin, which is the equivalent of the amount of

20   approximately just more of $300,000 into this account.

21          He maintained an account with Poloniex, which is a

22   U.S.-based digital access exchange.  He received

23   approximately $2.6 million in transfers from 2017 to 2018.

24   But in addition to this, Your Honor, we have a screenshot of

25   his account that appears to be taken in December 2017 that

1    shows the estimated value of this one account, Your Honor,

2    has holdings of approximately $9.4 million.

3          He also maintains an account -- maintained an

4    account with Gemini Trust from 2015 to 2017.  He received the

5    equivalent of approximately $2.6 million.

6          He maintained account with Coinbase from 2014 to

7    2017.  He received the equivalent of approximately just over

8    $2 million.

9          He maintained at least one or more accounts with

10   Bitconnect, which is headquartered in Hong Kong, registered

11   in the British Virgin Islands, from 2018 to 2019.  He

12   received at least $17 million worth of bitcoin into those

13   accounts.

14         Your Honor, we also have chat conversations where

15   this defendant is discussing that he has an entity or a

16   company in Hong Kong and that he was using that entity in

17   Hong Kong as a part of this BitClub Network scheme in some

18   form or fashion to try to hide that this scheme was operating

19   in the United States, and that's reflected in the

20   Government's motion as well.

21         Now, what I just explained is not a complete

22   snapshot of what this defendant has by way of cryptocurrency

23   accounts.  There is an e-mail in which itBit, which is a New

24   York-based financial services company that trades in custody

25   services for cryptocurrencies, he was asked several --

1   several questions about his holdings, about his history of

2   bitcoin mining and cryptocurrency -- not bitcoin mining, I'm

3   sorry, cryptocurrency holdings, and in that e-mail he

4   explained that he has several trading accounts on just about

5   all of the exchanges.  And when he was asked which

6   third-party bitcoin wallets he utilized, he responded in all

7   caps, ALL OF THEM, explanation point, and that is seen in

8   Government's Exhibit G.

9          In addition to these cryptoexchanges and the cold

10   storage wallets, this defendant has several entities, both

11   domestic and abroad, and several bank -- traditional bank

12   accounts that he has used to move money around from the

13   beginning of this scheme to present day.

14          For example, he has Sketch Holdings, LLC, which

15   appears to be created to liquidate his cryptocurrency

16   holdings.  There were several wire transfers that were

17   funneled through this entity including a January 2018 wire

18   transfer of approximately $2.497 million that was transferred

19   from a company in the British Virgin Islands believed to be

20   created by BitFenix to an RHB bank located in Singapore for

21   Dash Holdings, LLC.

22          Between February 2018 and March 2018, Sketch

23   Holdings, LLC received three incoming wire transfers totaling

24   approximately $5.237 million from an entity in Hong Kong held

25   at the China Construction Bank Corporation, which is also

20

1    suspected to be from BitFenix.

2            Bank records showed approximately $18.7 million was

3    deposited into accounts either controlled by Goettsche, on

4    behalf of Goettsche or at the request of Goettsche from a

5    prepaid either credit or debit card service called au Card.

6    There are several wire transfers that appear to be Goettsche

7    directing au Card to then send a wire to another third-party

8    entity.  Some of those include transfers to Biltwell Holdings

9    in the approximate amount of $7.3 million, CryptoWatt Mining

10   in the amount of $4.5 million, one of the law firms that

11   Goettsche appears to be using to move money in $2.8 million,

12   and another enterprise in the approximate amount of $3

13   million.

14           During the time period from January 2018 through

15   November 2018, Goettsche deposited approximately $28.5

16   million into a brokerage account he controlled at RBC Wealth

17   Management in the name of Goettsche Holdings through a series

18   of 12 wire transfers.  The source of these transfers appear

19   to be from BitFenix, which is a a cryptocurrency exchanger.

20           And as the deposits came into the account from

21   BitFenix, Goettsche made several disbursements out of this

22   account.  These disbursements appear to be approximately $23

23   million.  Some of the payments include approximately 6.7

24   million to purchase real estate and other business

25   investments, approximately 4.2 million to a company to

1  provide tax consulting services, and approximately 5.2

2  million to transfer to other Goettsche accounts at RBC Wealth

3  Management.

4  In 2018, Goettsche had an interest in an account

5  that contained at one point in time at least $9 million as

6  the high end balance for the year in OSL, which is a company

7  in Hong Kong.  OSL is believed to be related to Octagon

8  Strategies Limited.  Octagon Strategies Limited made several

9  wire transfers to CryptoWatt, which is a bitcoin mining

10  equipment company, of which Goettsche has served as the CEO.

11  It appears that a total of approximately $81 million has been

12  transferred from Octagon Strategy to CryptoWatt, and it also

13  appears that Goettsche controls and/or may have access to

14  this money.

15  It is believed that Goettsche has at least two

16  accounts at Commerce Bank in Frankfurt, Germany in the name

17  of BitChain GmbH.  From August 2017 through May 2017, the

18  BitChain GmbH accounts received four wire transfers totaling

19  approximately $6.35 million.

20  Just short of a million dollars was transferred

21  from what we were calling Law Firm 2, one of two law firms

22  that we have seen which appears to have been moving money

23  through this defendant, or at least has been used by the

24  defendant directly or indirectly to -- to move -- to move

25  funds; approximately $2 million from an au Card account;

22

1    approximately $2 million from one of Law Firm 1's account;

2    and then another approximately $1.4 million from another

3    account held by Law Firm 1.

4           And through the course of what we've been able to

5    identify so far, it appears that Law Firm 1 and Law Firm 2

6    have run at least $26 million of money owned directly or

7    indirectly by Goettsche through the course of this scheme.

8           In addition to these holdings, Your Honor, the

9    defendant has access to large number of properties.  Exhibit

10   H is a redacted version of a list of properties that we

11   believe were owned by this defendant.  They came from one of

12   his accounts that were searched in the course of this case.

13          Some of these notable properties include an island

14   that the defendant purchased in Belize for approximately $6.4

15   in late 2017.  From late 2017 to October 2019, it appears

16   that law -- what we're calling Law Firm 1 sent wire transfers

17   approximately -- totaling approximately $7.5 million to a

18   bank in Belize.

19          And as referenced in Govern- -- on page 22 of the

20   Government's brief, the defendant -- we have chats of

21   defendant joking with one his friends about how he's

22   intending to make this island his own country, looking for

23   citizens.  He says, quote, We are going to do it they like

24   they did Iceland, rape and pillage some villages looking for

25   blonde hair and blue eyes.  His friend says, Absolutely, keep

1    the blood line pure.  This defendant responds, LOL, you know

2    it.

3         In addition to the Belize island, this defendant

4    has at least one, possibly two properties in Costa Rica.  He

5    also has a fractional interest in a condominium in St. Kitts.

6    It appears that that fractional interest is also shared with

7    his co-defendant, Jobadiah Weeks.  And in the event of having

8    that fractional interest in St. Kitts, is it appears that he

9    may have purchased St. Kitts citizenship by way of that

10   fractional interest.

11        Now, many of these properties, aside from being

12   outside of the United States, also appear to generate income

13   for this defendant.  So if he were to be released, he could

14   flee and he would still have an income stream, significant

15   income stream coming from these foreign properties.

16        THE COURT:  Does the United States contend that he

17   is still making an income stream from the operation of the

18   website?

19        MS. HOXIE:  We don't have -- we don't have insight

20   into that, but I will say, Your Honor, that this defendant

21   appears to have -- I have no reason to believe that this

22   defendant's access to the administrative account of this

23   website, which still appears to be operational, that he still

24   has access to this admin portion of the website, and that's

25   important because this website was -- it's not just a website

24

1    of the landing page.  This is an interactive website that

2    allowed a member to log in, to see their account balance, to

3    do things.

4            And so if this defendant were to be allowed to be

5    released, it is possible that he could go to another country,

6    he could go anywhere in the world with his resources and he

7    could easily re-brand those software, the programming behind

8    this current BitClub Network website and use some of the

9    investment products, the schemes and market them to

10   unsuspected investors who will have no idea that this

11   defendant is behind this newly ranked scheme.

12           In addition, Your Honor, this defendant has a

13   private plane, in addition to access to the two private

14   planes that his co-defendant also appears to have, and he has

15   a history of extensive travel.  Some of his travel is

16   reflected at the bottom of page 23 of Government's brief and

17   appears on the majority of page 24 of the Government's brief.

18           And as we said, Your Honor, even if this defendant

19   were to relinquish access to that private plane, his

20   co-defendant who is still out on the loose has access to we

21   believe two private planes.  And so he is going to have

22   access to private planes whether he gives over the keys to

23   this Tango and Cash plane or not, because his co-defendant

24   who has all of the reasons to make sure that this defendant

25   does not -- does not have to stand trial, the two of them

1   have the same incentives to flee, and that co-defendant has

2   access to a private plane as well, at least we believe two

3   private planes.

4         Now, Your Honor, I understand that this defendant

5   has family in this district; however, there are reasons to

6   believe that the family that he has in this district are not

7   going to -- they're not going to stop or mitigate the risk

8   that this defendant will flee.

9         As outlined in the Government's brief, we have

10  reason to believe that the defendant's brother is also

11  involved in the scheme.  We see communications at the

12  beginning of 2014 when this scheme began where the defendant

13  is directing Catalin Balaci to make several administrative

14  accounts, one of which is for the defendant, one of which is

15  for the defendant who is still out on loose, and one is --

16  one appears to be for the defendant's brother.

17        In addition, as outlined in the Government's brief,

18  we have an e-mail, or what appears to be an e-mail taken from

19  an account that was used by the brother in which it appears

20  that he is listing a to-do list of things, outstanding items

21  for BitClub Network, and it says the following:

22        Members asked about the specs of their mining and

23  complaining on the amounts they received.  I hit them with a

24  BS response that says:  All shares are earning and getting

25  the convenience of not having to pay a power bill or

1    maintaining their machine, and if the machine breaks, it's

2    replaced here at BCN and not at home.  If they were to

3    purchase it, is this good, help is needed for this, ammo.

4           In addition, on the day of the takedown, law

5    enforcement executed a search warrant at the brother's home

6    in which they found, among other things, notes that appear to

7    be notes related to the BitClub Network, and on a white -- a

8    dry white erase board a note that says something to the

9    effect of it's okay to take advantage.

10          The fact that the defendant's brother also appears

11   to be part of this scheme weighs against allowing this

12   defendant to be released because of his family ties to the

13   community.

14          In addition, Your Honor, when law enforcement went

15   to this defendant's parents' house, the defendant's mother

16   opened the door and she appeared to be hesitant to

17   acknowledge that the brother was actually inside of that

18   residence, and the agents had to say, We know he's here, we

19   see his car outside, before the brother then emerged and was

20   able to be served paperwork that law enforcement had for him.

21          And finally, Your Honor, when this defendant --

22   when this defendant was arrested, he was heard -- overheard

23   by law enforcement directing his wife to call a person who I

24   will call Subject 1.  Subject 1 we believe has opened up

25   several accounts overseas, both entities and bank accounts,

1   on behalf of this defendant.  At the time Subject 1 was

2   speaking to law enforcement, but this defendant's wife called

3   Subject 1, and as a result of her conversation with Subject

4   1, Subject 1 stopped speaking to law enforcement.

5          So each of these factors, I believe, warrant that

6   this defendant should remain in custody, and notwithstanding

7   his family ties, he will remain a flight risk if he were to

8   be released on conditions.

9          And as we point out at the end of our brief, Your

10  Honor, this scheme has been very serious and has taken a lot

11  of money from a lot of people.  As I mentioned earlier, what

12  we can see so far is at least $722 million in investor funds

13  were taken, and you can see by the quote at the end of the

14  Government's brief by a victim in the e-mail to BitClub

15  Network's customer support line, expressing anger about how

16  he was -- he was duped from their Ponzi scheme, and he says,

17  You duped thousands of people from my country in Cameroon,

18  including me.  You shall rot in hell for the amount of people

19  you rendered homeless.

20         This is an incredibly serious offense to the

21  Government, Your Honor.  I understand that this is a white

22  collar case, but there are many, many, many victims that were

23  taken advantage of by this scheme.  And the nature of this

24  scheme that it operates nearly anonymously over the Internet

25  means that if the defendant were allowed to be out, there

28

1    would be nothing stopping him from continuing this scheme

2    under a different name and from continuing to work with the

3    many, many, many people he knows around the world to continue

4    to defraud investors.

5            Thank you, Your Honor.

6            THE COURT:  Thank you.  Mr. Ridley, Ms. Frost.

7            MR. RIDLEY:  Thank you, Your Honor.

8            Your Honor, what the Government has done is they

9    initially indicted Mr. Goettsche for the wrong indictment.

10   They incorporated much of that indictment in today's motion,

11   and now the prosecution has read most of the motion, and so

12   we have kind of three layers that are talking about

13   essentially the same thing.

14           But, Your Honor, what the Government didn't tell

15   you is, for example, how much money is actually lost by

16   investors.  In the indictment, if you look at the reference

17   to the 722 million, it talks about the defendants obtained

18   $722 million.  Then in their motion filed late this morning,

19   they talk about the defendants having amassed $722 million.

20           While it may be true that individuals purchased

21   mining machinery and that amounted to hundreds of millions of

22   dollars in revenue, what's not referenced, Your Honor, is the

23   fact that when the bitcoins are mined and they mined

24   additional bitcoins, money flows back to the investors; in

25   this case, to the tune of over $700 million.

```
1              And this isn't a number that's an estimate or --
2    well, it's somewhat of an estimate, but it's public record,
3    because you can go to the bitcoin websites which reflect the
4    activity of the BitClub Network.  And what they're doing, and
5    you can see that through -- through different entities that
6    the Government is aware of, one produced approximately -- and
7    don't hold me to this number, Your Honor, but I think $685
8    million roughly, another one of the websites reflects that
9    there is well over $50 million or approximately $50 million.
10   And that money that's mined goes back to the investors.
11             Nowhere have we heard anywhere, other than the last
12   point made by the Government that a person from Cameroon
13   believes that he or she was ripped off and feels angry at the
14   people who allegedly ripped them off.  Other than that, there
15   is no reference anywhere as to who lost money, how many
16   people lost money, where they lost money from, are they
17   United States citizen, are they from Colorado, New Jersey,
18   Cameroon, there is nothing about that.  It's splashy, Your
19   Honor.  It makes a big splash when you talk about having
20   obtained $722 million through this scheme.
21             And you know what happens when you do that, you end
22   up with articles in the New York Times and the Los Angeles
23   Times and the Financial News, but there is no reference that
24   that's a loss amount.  They talk about a guideline analysis
25   based upon $722 million obtained or amassed.  They're not
```

1    talking about that being a loss amount.  We haven't heard any

2    analysis of what has actually been lost.

3             What is true is that when we're talking about that

4    account that has about $250 million, that's accounts of

5    bitcoins that are going to be distributed to the network.

6    It's money that's going back to the network.

7             When we talk about some of the other accounts --

8    and I apologize, Your Honor, I only got the brief a few

9    hours, and so I can't speak that conversantly about it, but

10   there is other accounts that reflect that tens and hundreds

11   of millions of dollars are, in fact, being paid for

12   electricity, they're paying for machines, they're being used

13   to do exactly what was represented was going to take place.

14            What isn't said is that the lawyers that these

15   funds are going to are providing advice as to the legality of

16   what's going on here and that it's not just a couple of guys

17   who have got together to put together a scheme, they have

18   advisors, different ones across the country.  They have not

19   been stingy about leaning on those advisors.  They have tried

20   to do the right thing.

21            And so when we get to cherrypick text messages from

22   2014 and 2015, you know, that are devoid of context, it's

23   easy to come to the conclusion that this is -- that there

24   is -- these guys, you know, appear to be unsavory and

25   unseemly characters and they're just constructing a scheme to

1  defraud bunches of people for their own -- to line their own

2  pockets when these people for purchasing the mining machinery

3  are getting ripped off.  That's not the case here.

4           There are people who purchased this machinery and

5  engaged in this program who have, you know, tripled, you

6  know, quadrupled, they've made a ton of money using those

7  machines.  So they made those -- that money from the get-go.

8  And to be sure, the amount of money people make will

9  fluctuate necessarily based upon the price of bitcoins.  And

10  so when the price of bitcoins is high, people who are mining

11  bitcoin make more money.  When it's lower, they make less

12  money.

13           So when we're talking, when there is reference

14  about lower earnings or earnings are going down, that's based

15  at least in part on the fact that the price of bitcoin is

16  going down.  And because the price of bitcoin is going up,

17  people are going to make money.  That's what happens, and

18  it's not -- you know, the threat that this fluctuation

19  doesn't reflect that this is an illegal scheme, it doesn't

20  reflect that these folks are -- that the four defendants are

21  defrauding anybody.

22           Your Honor, I think that it is incredibly important

23  that you understand that all of these folks over here, all of

24  them, are life-long friends, friends of (inaudible)

25  immigration, uncles, aunts, Mr. Goettsche's wife, parents,

1  grandparents, and these are people who have, by and large,

2  lived in this community their entire life, like Mr. Goettsche

3  has lived in this community his entire life.  These are

4  people who have supported him when he went to public school

5  in Boulder County, when he went to Fairview High School, when

6  he went to the University of Colorado.  They have been here

7  for Mr. Goettsche and Mr. Goettsche has been here for them,

8  Your Honor.  He is not like these other folks, the other

9  co-defendants who are apparently because another co-defendant

10  is attempting to flee or because another co-defendant lives

11  in Germany or because they're engaging in evasive actions.

12          So now Mr. Goettsche -- you know, that's attributed

13  to him because of what his co-defendant said in terms of

14  evading arrest or living overseas or having been (inaudible)?

15  He's not that guy, he is not going anywhere.  He has got

16  three children under the age of 8, Your Honor, and he is not

17  leaving anywhere.

18          And the Government can talk about these different

19  accounts that -- all they can tell you about are numbers and

20  maybe where money has been transferred, but they don't know

21  why.  They don't know whether money is being transferred,

22  because that's in the nature of bitcoin businesses, because

23  you transfer money sometimes because that's how it's done.

24  You can't go down to the First National Bank and turn

25  bitcoins into dollars or trade bitcoins or that type of

1    thing.  So there is explanations for this money, you know,

2    the accounts which I don't have all of the explanations, but

3    I also don't think that I have to prove anything at this

4    point.

5            I get the concerns of the Government, they're

6    seeing a lot of bitcoin, a lot of money, and we're told there

7    is lots of victims, and there is this assumption of, you

8    know, hundreds of millions of dollars being gone, but I don't

9    know where that comes from.

10           So he must be leaving because he has got a bunch of

11   dough, because he travels internationally, because he has

12   access to planes.

13           I think, Your Honor, that given that he has no

14   criminal history, given that he has lived in his community,

15   given that there is nothing to indicate that he would flee,

16   the (inaudible) bond, frankly, is appropriate.

17           And I frankly don't think that supervision is

18   required, because while they talk about a lot of things,

19   frankly, not that much of it really goes to the issue of

20   flight, but I'm practical, I hear the numbers, and I hear

21   what the Government is saying, and so we don't want to be,

22   you know, in a position where we're not taking this seriously

23   and we're giving the appearance that you don't have to worry

24   about it because he'll never flee, you know, you're just

25   taking my word about it.  That's not our position, Your

1    Honor.

2                If I may approach to give a letter --

3                THE COURT:  You may.  That's fine, either way.

4    Thank you.

5                MR. RIDLEY:  Sometimes we get, more or less, formal

6    in this courthouse.

7                But as an example, the whole St. Kitts thing, the

8    fact that Mr. Goettsche applied for citizenship there is a

9    complete red herring.  He applied years ago.  He applied

10   with, you know, other people who were involved in

11   cryptocurrency.  He did that and, in fact, he invested, I

12   think, 400 to $480,000 in a timeshare there.  He and his

13   family had been there a through a few times.  Once?  One

14   time, they have been there one time.  And there was an

15   application for citizenship.  He did make a supplement to

16   that application several months ago.  He doesn't have

17   citizenship, he doesn't care about citizenship.  It's not

18   nothing that he has pressed.

19               He did just yesterday, he and I, wrote this letter

20   and we sent it off indicating it's not the citizenship.  You

21   know, the point is he doesn't care about it, he never planned

22   on leaving or moving there.  He also didn't plan on going

23   there to evade taxes or anything else.  It was an idea that

24   he developed years ago.  He's not leaving, he's not leaving

25   to St. Kitts, he's not leaving to Costa Rica, he's not

1    leaving to Belize, Your Honor.  Yes, he has properties in

2    both Costa Rica and Belize, and he's not going anywhere.

3           His -- you know, the Government has his passport.

4    He has no desire to do anything that would give this Court or

5    the Court in New Jersey any, any inkling that he intends to

6    leave, because what happens if he intends to leave?  Well, if

7    he does that, then who is he letting down?  He is letting

8    down all these people, his friends and family from life, and

9    he is not going to do that.  And, you know what, they're not

10   going to all pick up and follow him to whatever country, Your

11   Honor, be it Costa Rica or Belize or whatever.  Everybody's

12   life is here, their family is here, their people are here.

13   So that's not an issue.

14          In terms of the -- the plane.  There is a plane,

15   Your Honor, and it's a plane that Mr. Goettsche obtained in

16   conjunction with a business transaction, I think it was

17   (inaudible), don't hold me to it, but essentially the plane

18   was kind of thrown in as part of a business deal.  It's worth

19   about $4 million.  There is a $2 million note on that plane.

20   He does use it, he has used it, and he is happy to give the

21   plane over to the Court, to impound the plane, to pledge the

22   plane, to do whatever is necessary to ensure the Court that

23   he has no interest in using that plane.

24          In terms of the planes that the co-defendant may or

25   may not have, I'm not sure what relevance that has.  The

1    whole plane thing, Your Honor, frankly is a little bit of a

2    red herring because anybody with the money, and it doesn't

3    take a lot of money, but, you know, you have -- well, I mean,

4    I don't know, I've never done it, but I don't know what it

5    costs to lease a plane to go to San Jose, Costa Rica, I have

6    no idea, but I bet you can do it for under $10,000.  And I

7    bet if you wanted to leave to go to wherever, you could

8    probably do it for -- I mean, I'm guessing at that point, not

9    a great point I made in terms of the dollar amounts, but,

10   it's, you know, the ability to access a private plane does

11   not distinguish Mr. Goettsche from millions and millions and

12   millions of people in this country.  And so I don't think

13   that that's a point that should be held against him, but,

14   please, have the plane and whatever -- you know, whatever

15   needs to be done in that regard, we are happy to do that.

16          The other thing, Your Honor, is that I think most

17   of these folks, I haven't had a chance to talk with them, but

18   they've all (inaudible) signed up as third-party custodians

19   doing what they can do to ensure that Mr. Goettsche appears

20   in court as he's required to do, whether that's here in

21   Colorado or in New Jersey.

22          Speaking of New Jersey, there is another condition

23   that I haven't seen occur in this jurisdiction, but I've

24   heard of it and I know is sometimes put in place on the East

25   Coast, and that is that somebody like Mr. Goettsche is

1   accompanied by the marshal to the airport on the one end, put

2   on a plane, taken out of a plane on the other end, then that

3   or anything like that he's more than willing to do, but

4   whether that's practical or comports with the, you know, what

5   resources that are available, that's another issue, but he's

6   willing to do that, Your Honor.

7          Of course, if the Court wants more, you know, there

8   are other things that we can talk about in terms of ensuring

9   his appearance like (inaudible) monitoring.  I think that's

10  incredibly intrusive.  I think it's, you know, very

11  difficult, but I'll tell you this, that that's not Mr.

12  Goettsche's concern.  Mr. Goettsche is willing to do whatever

13  it takes, Your Honor, to prove to you, to the courts, to the

14  people in the courts in New Jersey that he's not going

15  anywhere.  And he doesn't want to prove that to you so you

16  can -- you know, by way of pulling the wool over your eyes.

17  He wants to do that so he can live with his family, his

18  daughters, his wife, see his friends and family, but there is

19  another part of his desire to not being detained in this case

20  and that, as indicated, this is a very technical,

21  computer-oriented case, which frankly his lawyers are going

22  to have a very, very difficult time defending the case

23  without his ability to be there with them working through the

24  technology, working through how this all works, and it's one

25  thing to talk to somebody, but it's another thing to sit down

1   in a work prod setting to illustrate how this complex

2   technology works.

3          I know that's, you know, not a factor in terms of,

4   you know -- you know, I mean, it doesn't necessarily go to

5   flight, Your Honor, but it's -- in terms of the

6   characteristics of the case and the charges against him, what

7   the Government is saying actually to some extent supports the

8   need to not detain him.

9          Your Honor, I'm going to take some time to review

10  the Government's motion, and I apologize, but I just -- I

11  don't have it down so it's going to take a little time here.

12  It's not going to be seemless, but I think it's important

13  that we at least address some of the things that I think are

14  assumptions that the Government is making, and I think kind

15  of the innuendo that comes out of the allegations that

16  they're making in the complaint, which is designed to lead

17  folks to believe that he is a scammer and a schemer and a

18  fraudster.  None of those things are the case.

19         I think that Ms. Hoxie did a good job in talking

20  about the technology and how it works, Your Honor.

21         THE COURT:  I think I have a general understanding

22  of it, thank you.

23         MR. RIDLEY:  And so I'm not going to comment -- a

24  lot to comment about that.  But what is significant is that

25  money comes in in a significant amount, 60 percent of dollars

1   that come in from people who joined the BitClub Network, goes

2   to purchasing the machinery that mines the hardware, it goes

3   to paying for the electricity, it goes to paying for the

4   infrastructure required to power up these machines and these

5   networks of machines.  That is a significant amount of money.

6           There is reference to MLM or multilevel marketing,

7   and the implication is that if it's multilevel marketing, it

8   must be fraudulent, and that's simply not the case.  We're

9   all familiar with legitimate, you know, brand name multilevel

10  marketing company such as Mary Kay, there is a company called

11  Rexel, it used to be called Rexel, there is tons of them,

12  there is tons of people who engage in multilevel marketing.

13          So when you scroll down the Government's motion to

14  the diagram that looks like a pyramid, to view that and come

15  to the conclusion that, oh, my God, it must be an illegal

16  pyramid scheme that is a type fraud that is often committed,

17  it's not going to serve the case.  It could be, it couldn't

18  be.  It could be completely legitimate based on that

19  structure.

20          I think that these text messages from 2014, 2015,

21  2016, suffer from (inaudible), Your Honor.  It's -- you have

22  a little snippet, it's five years old.  It is -- you know, we

23  can certainly look at that and prove, (inaudible) conclude

24  that, oh, my God, this must be the beginning of this -- this

25  horrible Ponzi scheme where millions of people are going to

1    get ripped off, or you cannot.  You can conclude that these

2    are young guys who are starting a business and who are

3    kicking around ideas, and they're bad ideas, I'll stipulate

4    to bad ideas, some of bad language, but I don't know what it

5    proves in terms of what we're discussing in December of 2019.

6           You know, just a little detail in terms of the

7    co-defendants and their attempts to flee or evade.  There is

8    a reference to co-defendant Frank Abel arrested and detained

9    in California, but he has significant foreign contacts

10   (inaudible), and the fact that he was arrested several months

11   ago in Malaysia, but had the resources to describe his way

12   out of the custody and flee the country.  I don't see how

13   that applies to Mr. Goettsche.

14          Mr. Balaci apparently is Romanian, but lives in

15   Germany, got arrested there, and he has been extradited.

16          Co-defendant 1 is FR.  Now, speaking of

17   Co-defendant 1.  Co-defendant 1 is the owner of this

18   business.  Mr.  Goettsche doesn't own the business,

19   Co-defendant 1 does.  The other two co-defendants are the

20   distributors or the marketing arms of these entities.

21   Mr. Goettsche is the person who is in charge of mining the

22   bitcoins.  And so it's frankly a little bit curious that

23   Mr. Goettsche ends up being labeled, as -- you know, I think,

24   it doesn't show on this motion, but I think in the earlier

25   redacted information, is Mr. Goettsche is the one who is

41

1   listed as the (inaudible) co-defendant.  It seems to me if

2   there is a problem here, it's going to be people who are

3   reaching out to the investors who are marketing the product

4   or distributing the product to -- you know, to people who

5   purchased that, and the guy who does the mining wouldn't

6   necessarily follow, for me, that he would be a lead defendant

7   (inaudible).

8          The missing defendant isn't listed as the lead

9   defendant because the Government is concerned that he is not

10  going to show up, they're not going to be able to find him,

11  and then it's a difficult case if your lead defendant isn't

12  at the trial.  So, you know, it has the feeling, based upon

13  my couple days on this case, that, you know, maybe because

14  they've got juicier text messages against Mr. Goettsche, but

15  you have to have the feeling that he is a little bit of the

16  fall guy for the missing co-defendant who owns and operates

17  the businesses and appears to be, based upon my understanding

18  at this point in time, the shot caller.

19         So there is the statement on page 9:  If Goettsche

20  were to be released, there is a significant risk that he and

21  Co-defendant 1 will leave (inaudible) any outstanding BitClub

22  Network money to overseas accounts adding to their millions

23  in foreign accounts in portable cryptocurrency (inaudible)

24  and flee to a nonextraditing country.

25         Well, Co-defendant 1 already out there, so

1    Co-defendant 1 can already do all those things and he

2    probably has already done it.

3              THE COURT:  Right.

4              MR. RIDLEY:  I don't know how it follows that

5    Mr. Goettsche is going to, you know, hop on the back of the

6    pony here with Co-defendant 1 and engage in these activities.

7    Indeed, it's my experience that co-defendants don't spend,

8    other than drug cases or (inaudible) cases like this, people

9    have lawyers, right, and, you know, it doesn't follow that

10   that's a realistic, realistic threat.

11             So there is a quote on 12 and 13 below the

12   schematics of the (inaudible) -- and there is a segment that

13   says I think:  If you are promoting BitClub Network, you are

14   promoting a Ponzi scheme.  And these are statements of

15   co-defendant Abel.  And then, to my mind, Your Honor, the

16   rest of that quote is largely incomprehensible.  I don't

17   really know what it means.  I know that they're talking about

18   giving billions of dollars in equipment.  I don't know where

19   that number comes from, I don't know where the 650,000

20   people, I don't know who it's distributed, what the audience

21   is; but while it may be a statement that ends up being

22   admitted in front of a jury, I don't think that at this point

23   in the proceedings you can look at that and say, you know, I

24   mean -- there is just no context and it's very difficult to

25   defend against it, (inaudible).

43

1          In terms of the actions on December 10 (inaudible),

2    and what happens on the 10th, Your Honor, either between Mr.

3    Goettsche and, you know, his brother who was served with a

4    subpoena, this seems like a big, big discretion to me, Your

5    Honor.  Apparently a law enforcement officer, and my

6    understanding is that there is approximately 40 law

7    enforcement officers.  I don't know the numbers myself,

8    that's what has been told to me, but let's say 30 or 40

9    officers.  I don't know how they're lined up, where they are,

10   whether they're in cars, whether they're in trucks or what

11   the circumstance is; but what -- the allegation is that, you

12   know, there appeared to be a man who walked past inside the

13   house from right to left.  And after that point, law

14   enforcement had to breach the door.

15         The implication is that the law enforcement -- law

16   enforcement wouldn't have breached the door anyways.  I mean,

17   my experience, Your Honor, when you've got that many folks

18   who are suited up in SWAT gear with assault weapons and

19   rifles and ramrods, they're taking down the door.  And the

20   notion that it's, you know, presumably Mr. Goettsche who is

21   walking past the door from one direction to the other, his

22   walking past the door is a basis for that doesn't jibe with

23   my experience, Your Honor.

24         The -- there is discussion of cellphones with

25   two-factor authentication.  That's not terribly unusual.

44

1   There is reference to the fact that a computer has been

2   unplugged and then the implication that they're cutting the

3   power supply to the computers rather than complying with the

4   law enforcement orders to open the door so it would be

5   difficult, if not impossible, for the law enforcement to open

6   the encrypted context inside the computers.

7           Your Honor is well aware of what these things are

8   like.  I mean, there are 30 to 40 law enforcement officers

9   invading a house, weapons, trying to, you know, make sure

10  that officer safety is taken care of, having people, you

11  know, go to the ground, holding him down, restraining them,

12  making sure there is no other people.  And could it be

13  possible that one of the officers, you know, knocked out a

14  plug during what is a chaotic scene?  Could that be it?  Who

15  knows, who knows what happened, but to come to the conclusion

16  that Mr. Goettsche, who is trying to get in the way of law

17  enforcement, as I said, is a stretch.

18          In terms of -- you know, there is some more text

19  messages on pages 14 and 15.  You know, I take the same

20  position as I've already discussed.  On page 15, you know,

21  the heading is Roman numeral small iii, (inaudible)

22  involvement in the offense conduct warrants detention.  And

23  then there is reference to a 2018 e-mail from the brother

24  talking about checking out a map in Catgar (ph) or Cagar

25  (ph).  This is on page 16.  It doesn't say who that e-mail is

1    from, it doesn't have the rest of the e-mail chain.  It's

2    from 2018, it's from the brother.  I'm just not sure what it

3    means.  You know, it kind of looks bad.  It says he helps

4    me -- help is needed for this ammo, but without context, I

5    don't know what to do with it, Your Honor.

6             In terms of law enforcement found, among other

7    things, (inaudible) related to BitClub Network and a white

8    board that had displayed something to the effect of, quote,

9    it's okay to take advantage.  I don't know what that means.

10   What else is on the white board?  Was it Mr. Goettsche or

11   whatever?  Apparently it's at the brother's house in Utah.

12   It seems completely meaningless to me.

13            December 10 there is reference to law enforcement

14   knocking on the door and Ms. Goettsche's mother answering the

15   door, and she appears to be hesitant to confirm whether the

16   brother was there or not.  Well, I don't know how old

17   Ms. Goettsche is, all these folks could tell me, but I think

18   that people hesitate and are often surprised when one or more

19   law enforcement officers, and this doesn't say how many law

20   enforcement officers there were, knocked on the door.  And

21   are we really to a point that we're going to justify

22   detaining Mr. Goettsche based upon the hesitancy of his

23   mother?

24            So it's on page 18 where those funds, the 246

25   million, those are funds -- those are bitcoins that will be

46

1    transferred to people in the network, people (inaudible).

2              I can't speak to all of the transfers, Your Honor,

3    quite candidly, on 19, other than what I've already said in

4    terms of, you know, the market for dealing with bitcoins and

5    cryptocurrency is limited and so it's not unusual to move

6    that around.

7              I note that the indictment doesn't include any

8    money laundering charges, I note that the indictment doesn't

9    include any tax offenses, despite that my understanding is

10   that the IRS is leading the charge on this case.  So I don't

11   think that should be held against him.

12             In terms of the properties that he owns, he owns

13   what he owns, Your Honor, and the fact that he owns

14   properties I don't think is dispositive of his -- the

15   analysis of whether he's going to flee the jurisdiction.  He

16   will be without a passport, he'll do whatever the Court wants

17   with respect to the first plane, he'll wear an ankle monitor

18   if need be.  He is willing to have marshals take him to the

19   airport so he can fly back and forth from Newark.  He will

20   not be visiting any of those properties.  I don't know what

21   to make with the reference to Sir Richard Branson.  I don't

22   think that is particularly meaningful.

23             And then, you know, the last quote from the person

24   in Cameroon, you know, (inaudible) Ponzi scheme and thousands

25   have been duped, I hope you brought. . .  It is frankly, in

1    my experience, very unusual in a fraud case of this

2    magnitude, an indictment littered with those types of

3    statements, and the fact that somebody out of Cameroon has a

4    bones to pick and upset, that is what is.

5            Your Honor, I talked a little bit about Mr.

6    Goettsche's character, we talked about the nature and

7    circumstances of the offenses.  I can tell you that Mr.

8    Goettsche rather than fleeing (inaudible) fighting these

9    charges.  He's not going to run away from them.  He's going

10   to take them straight on and he is going to do everything in

11   his power to demonstrate to his present family, to the

12   community, to the people who have read about this case from

13   coast to coast that what he was doing was what he always

14   thought he was doing, which was engaging in a legitimate

15   business that spent millions and millions of dollars on

16   infrastructure, tens or hundreds of millions of dollars on

17   these (inaudible) that had employees, that looked like and

18   felt like any other business, it had accountants, auditors.

19   That's what he plans to do, Your Honor.  He does not plan to

20   flee.

21           So let me confer with my client --

22           THE COURT:  Certainly.

23           MR. RIDLEY:  And Ms. Frost.

24           Your Honor, if the Court has particular concerns or

25   interests in discussing the details of any of the conditions

1    we suggested or any additional conditions, of course, I would

2    be more than happy to talk about that, but for now that's it.

3              Thank you, Your Honor.

4              THE COURT:  Thank you.

5              Ms. Hoxie, I'll give you the last word with respect

6    to this argument.  Also, I wanted to ask you a question about

7    the alleged e-mail from co-defendant Abel mentioned on the

8    bottom of page 12 and top of page 13 of your brief.  It's

9    unclear to me as to why a co-defendant in this alleged scheme

10   would be warning people about a Ponzi scheme.  Maybe you can

11   explain that to me.

12             MS. HOXIE:  Yes, Your Honor.

13             So the text that is on the bottom of page 12 and at

14   the top of page 13 is actually on a video that's posted on

15   line by co-defendant Joe Abel, and this video is posted in

16   June 2019.  And to be clear, Your Honor, co-defendant Abel is

17   only a defendant as to the promotion charge.  He is not a

18   co-defendant to the fraud charge.  But I think that it is

19   telling that he does say that he thinks that this is a Ponzi,

20   and he explains why, Your Honor.  He says if BitClub receives

21   no more money, they should be able to pay the 650,000 people

22   who have given them millions of dollars in equipment and

23   sales, and they should have hundreds and hundreds of millions

24   of dollars in equipment, which they don't.

25             Joe Abel through the course of BitClub Network

1  scheme was a promoter of the scheme and he identified himself

2  as one of the main people involved, that he was at the top --

3  if you're thinking of a pyramid, that he was at the top of

4  this, and here he is in 2019 saying they don't have it, they

5  don't have the equipment and the mining that they are

6  representing that they should have in light of the sales that

7  are coming from investors.

8         I don't know what -- what this co-defendant's

9  motivations are in the whole scheme of this.  It's my

10 understanding that he stopped being affiliated with BitClub

11 Network after posting this, and I don't want to speculate or

12 give incomplete information to the Court as to why he would

13 have put this on the Internet.

14        If there are any particular points that Your Honor

15 would like me to address in response, otherwise I will just

16 hit some highlights.

17        THE COURT:  You know, there really is not.  I know

18 there is a lot of information here, I know Mr. Ridley went

19 through a lot of it.  To the extent that you wish to clarify

20 anything, of course, feel free to do so.

21        MS. HOXIE:  I will just note, Your Honor, there is

22 much to be said about how this is not a -- this is just an

23 MLM, this investor money went back to investors, that these

24 texts or these -- these are actually chats taken out of

25 context.  Grand jury, in short, disagreed, Your Honor.  This

1    is an indictment.  Federal grand jury returned the wire fraud

2    conspiracy charge against this defendant and found that this

3    was fraud and that this defendant conspired to commit fraud.

4             With respect to whether this money was nefarious or

5    not, for purposes of this detention hearing, Your Honor, the

6    main focus that this defendant has access to this money,

7    whether it's by legitimate means or not, he has access to

8    millions and millions of dollars, some of which is in foreign

9    accounts, some of which is in crypto exchanges and some of

10   which was in or was transferred cold storage wallets.

11            Now, the defendant has, as we can see, entities in

12   Hong Kong, entities and accounts in Germany, crypto accounts

13   in a variety of different exchanges.  That access (inaudible)

14   means that there are no combination of conditions that can

15   ensure that he will not flee.  And there is little to stop

16   him from taking his family and going somewhere with these

17   millions of dollars and living a good life.

18            Now, there is mention -- there was mention that he

19   does not want to let down the people who are in this

20   courtroom; however, if you look at page 15 of the

21   Government's brief, there is explanation from his

22   co-defendant Balaci, somebody who has worked with this

23   defendant for the past ten years, and Balaci explains,

24   notwithstanding their (inaudible) relationship, what this

25   defendant did when it was advantageous to him.

1          He explains:  In February he told me to buy and
2     rent extra space and deal with the power for at least an
3     (inaudible) 25 megawatts, so I did, did rental agreements,
4     bought land and a high voltage transportation station,
5     prepped everything.  This month when I flew to Canada, he
6     told me that the only way he'll buy from me is if I give him
7     50 percent of my company, so he put me with my back against
8     the wall because I trusted him, and now takes advantage of
9     it, this after I literally made him hundreds of mill --
10    millions for the past two years of his stupid projects.  He
11    literally has an island in Belize and a private plane.  For
12    the past 11 years I was his loyal dog, did not work for
13    anyone else, and now he is treating me like this.
14         The defendant's assurances that he is going to do
15    the right thing here run contrary to the evidence that the
16    Government has in this case.
17         With respect to a mention that there were auditors
18    and that's what makes this business legitimate, you see at
19    the bottom of page 14, at the top of page 15 of the
20    Government's brief, that's just saying to Balaci, quote:  We
21    can make up the numbers any way we want to appease auditors.
22    This defendant has no problem misrepresenting, lying and
23    taking advantage when it is in his interest.
24         And nothing, no conditions that this Court can
25    impose is going to change that.  If he has ankle monitoring,

52

1  as Your Honor knows, if he cuts his ankle monitor off, it is

2  not an immediate response.  There is a delay period in which

3  this defendant will have plenty of time and resources to flee

4  the country if that's what he wants to do.

5        And with respect to Co-defendant 1, the Government

6  significantly disagrees with the characterization that

7  Co-defendant 1 is not the lead defendant in this case merely

8  because he is believed to reside outside the United States.

9        You see in these chat messages there in the

10 indictment and the Government's motion that it is this

11 defendant who is directing Balaci to alter the mining

12 figures.  Now, this defendant is in communication with

13 Co-defendant 1 throughout, but it is this defendant who is

14 saying bump up the volume, fudge the numbers, we're building

15 this on the backs of idiots.  And it is this defendant in

16 2017 who sends to Co-defendant 1 the plan to drop mining

17 earnings significantly so that they can retire RAF, quote,

18 rich as fuck, Your Honor.  That came out of this

19 defendant's -- this was this defendant, not Co-defendant 1,

20 coming up with these plans that they will to continue to

21 manipulate the numbers throughout the course of the scheme.

22        And just to be clear, Your Honor, SWAT was not at

23 this defendant's house when they made entry, there were no

24 SWATs in there.  This was not a case where they knocked out

25 the plugs, Your Honor.  The plugs were -- the plugs were

1    plugged into the wall.  The point of disconnect was that this

2    was a -- this was a desktop.  The point of disconnect was the

3    power source here, Your Honor.  That is not something that

4    happens unintentionally, and I can certainly -- I would

5    certainly be skeptical of the suggestion that that would be

6    an accident that would happen to both computers that were set

7    up.

8            For these reasons, Your Honor, Government

9    respectfully requests that this defendant be detained pending

10   his trial.

11           THE COURT:  Thank you.  Give me just a moment.

12           MR. RIDLEY:  Your Honor, if I could just address

13   the issue of the one specific e-mail that you were concerned

14   about.

15           THE COURT:  Yes.

16           MR. RIDLEY:  With reference to the --

17           THE COURT:  The video, Mr. Abel's video?

18           MR. RIDLEY:  Exactly.

19           THE COURT:  Right.

20           MR. RIDLEY:  And so my understanding is that --

21   that the point in time that the -- or the video was sent,

22   Mr. Able had already been terminated.  There was a competitor

23   by the name Dunnings (ph), a competitor in the cryptocurrency

24   space, that paid him $250,000 to make and upload that video.

25           THE COURT:  Thank you.

54

1            Ms. Hoxie, with respect to Government Exhibit E and

2    an e-mail or a couple of e-mails dated 10 September 2017, is

3    the Government's contention that the writer of the e-mail

4    that begins, Dude, had an idea, is this defendant?

5            MS. HOXIE:  Yes, Your Honor.  It is the

6    Government's position that this defendant maintained control

7    and used -- we have redacted it so that it's not a public

8    record, but this e-mail account is under the name BitClub

9    Network.

10           THE COURT:  Thank you.

11           The Court has jurisdiction over the subject matter

12   of the action and over the parties.  Venue is proper in the

13   District of Colorado.  Each party has been given a fair

14   opportunity to be heard on the issue of detention.

15           Mr. Goettsche, as you've heard, there are certain

16   factors I must consider under the law in making a decision as

17   to whether there are conditions of release that I can impose

18   that will reasonably assure your appearance in court in the

19   future as well as the safety of the community.  Those factors

20   include the nature and circumstances of the offense charged,

21   the weight of the evidence against you and your history and

22   characteristics, including your character, your physical and

23   mental condition, your family ties, your employment, your

24   financial resources, your length of residence in the

25   community and community ties, your past conduct, your history

55

1    relating to drug or alcohol abuse, your criminal history,

2    your record concerning appearances at court appearances,

3    whether you were on some form of release at the time of the

4    commission of the alleged incident offense and the nature and

5    seriousness of the danger to any person or to the community

6    that would be posed by your release.

7            I have received and reviewed and take judicial

8    notice of the pretrial services report.  The pretrial

9    services report reflects some information that is necessary

10   for the Court to consider, and that information was pointed

11   out by your attorney; for example, that you have very limited

12   criminal history and that you have resided at your current

13   address for ten years, that you're married, have been married

14   to your wife for 13 years, that you have three children, ages

15   8, 5 and 3.

16           I also note from the information provided to the

17   Government -- provided by the Government, excuse me, that

18   there are certain other issues that the Court must consider

19   in making a decision as to detention.  I have to consider the

20   information relating to the Government's position that you,

21   in fact, have access to vast sums of bitcoin which can be

22   easily exchanged for dollars.

23           I have to consider the Government's contention that

24   on your arrest you ignored the knocking of the Government

25   officers at the door, delayed in opening the door, thus

56

1   requiring them to break into your home and that at the time

2   when they did so, the power supply to your two desktop

3   computers had been disconnected.

4          I have to consider the various e-mails provided in

5   the Government's submission, including some e-mails which

6   contain some statements that appear to be misrepresentations

7   or appear to endorse misrepresentations.  For example, the

8   statement in the September 2017 exchange at the bottom of

9   page 14 and top of page 15 where you allegedly stated:  And

10  we can make up the numbers anywhere we want to appease

11  auditors.

12         I have to consider the call that you directed your

13  wife to make at the time of your arrest.  I have to consider

14  the Government's statement that the person who you directed

15  your wife to call was speaking to law enforcement about his

16  relationship with you at the time when your wife called and

17  that he thereafter ended the interview.

18         I have to consider the properties that you own, as

19  reflected in the Government's submissions, the island in

20  Belize, there is a home in Keystone, a long-term rental in

21  Pennsylvania, a home in Utah, some turnkey properties in

22  Scottsdale, some properties in Costa Rica.

23         I have to consider the amount of travel reflected

24  in the Government's submission on page 23 and 24 between May

25  of 2016 and November 30 of 2019, over a period of three and a

57

1    half years.  By my rough count, I have you in at least 14

2    foreign countries, including Costa Rica, Mexico, Belize,

3    United Kingdom, Montreal, Germany, the Bahamas, Jamaica,

4    Macedonia, Iceland, Tokyo, South Korea, Dubai and Hong Kong.

5              I have to consider your access to a private plane.

6    I have to considerate the serious nature of the offense and

7    the serious nature of the charge -- the penalty that you will

8    face in the event that you are convicted of this offense.

9              Under these circumstances, I cannot find that there

10   is a condition or combination of conditions that I can impose

11   that will reasonably assure your appearance in court in the

12   future and, therefore.  You are remanded to the custody of

13   the United States marshals.

14             Counsel, I know you will be addressing issues in

15   New Jersey.  The Court will sign the commitment to another

16   district form for transportation of the defendant to New

17   Jersey for further proceedings.  I will also sign the order

18   requiring the defendant to appear in the other district to

19   the extent that that's necessary as well.  I know the

20   defendant will be informed of the date and time when he needs

21   to appear there.

22             Anything further from the Government with respect

23   to Mr. Goettsche today?

24             MR. TONINI:  No, Your Honor, thank you.

25             THE COURT:  Anything further from the defendant,

1   Mr. Ridley?

2           MR. RIDLEY:  No, Your Honor, thank you.

3           THE COURT:  Thank you.  We're in recess.

4           (Whereupon, the within hearing was then in

5   conclusion at 4:29 p.m.)

6

7                   TRANSCRIBER'S CERTIFICATION

8   I certify that the foregoing is a correct transcript to the

9   best of my ability to hear and understand the audio recording

10  and based on the quality of the audio recording from the

11  above-entitled matter.

12

13  /s/ Dyann Labo                    December 20, 2019

14  Signature of Transcriber          Date

15

16

17

18

19

20

21

22

23

24

25