# EXHIBIT P

Jan 1. - Dec. 31

# 2018



CRIMINAL JUSTICE REFORM

# Report to the Governor and the Legislature



## New Jersey Courts

Independence • Integrity • Fairness • Quality Service

**NEW JERSEY JUDICIARY**

Submitted by:

**GLENN A. GRANT, J.A.D.**
**Acting Administrative Director of the Courts**

# TABLE OF CONTENTS

**I.   Executive Summary** ...................................................................................**3**

Overview .................................................................................................. 3

Research Studies ...................................................................................... 4

Comparing Criminal Justice Reform with Money Bail ............................ 4

Jail Population Analysis........................................................................... 6

2018 Performance .................................................................................... 7


**II.   2014 pre-CJR / 2017 CJR Research Project** ...........................................**9**

Comparing Criminal Justice Reform to Money Bail System ................... 10

Measuring Risk - Performance and Outcomes ....................................... 11

    Public Safety Assessment Performance ............................................. 11

    New Criminal Activity ...................................................................... 13

    Court Appearances ........................................................................... 14

Fairness and Equity ................................................................................ 16

    Summons/Warrant Decision ............................................................. 17

    Time to Pretrial Release for Summonses and Warrants ................... 19

    Total Time in Jail Pretrial ................................................................ 21


**III.   Jail Population Study - 2012 vs. 2018**....................................................**24**

Impact on County Jail Population............................................................ 25

Jail Population by Race/Ethnicity/Gender .............................................. 26


**IV.   Criminal Justice Reform - 2018 Performance** ......................................**29**

Pretrial Decision-Making Process ........................................................... 30

    Measuring and Managing Risk ......................................................... 30

    Pretrial Release Decisions................................................................. 30

Pretrial Monitoring ........................................................................................32

Violations of Monitoring and Revocation of Pretrial Release .........................33

Pretrial Detention Decisions ...........................................................................34

Speedy Trial....................................................................................................37

Decline in Jail Population.................................................................................38

Pretrial Services Program Operations and Funding ................................................39

Revenue and Expenses ...................................................................................39

Pretrial Services Unit Staffing.........................................................................41

Pretrial Services Monitoring ...........................................................................41

Access to Services ..........................................................................................42

Technology......................................................................................................42

Court Decisions and Rule Changes .......................................................................43

**V.      Conclusion and Next Steps.............................................................................45**

## <u>Addendum</u>
## Development, Maintenance and Administration of eCourts

# I.   EXECUTIVE SUMMARY

**Overview**

Created through the cooperation and commitment of all three branches of state government, Criminal Justice Reform (CJR) embodies principles of fairness in our American justice system that entitle all defendants to a presumption of innocence and a speedy trial.  The new system in place balances an individual's right to liberty with the State's responsibility of assuring community safety.

As this 2018 Annual Report details, CJR is working as intended.

New Jersey has moved away from a system that relied heavily on monetary bail.  Two years into its existence, CJR has begun to remove many of the inequities created by the prior approach to pretrial release.  At the same time, court appearance rates for CJR defendants remain high while the rate of alleged new criminal activity for CJR defendants remains low.  CJR defendants are no more likely to be charged with a new crime or fail to appear in court than defendants released on bail under the old system.

Under the risk-based system of CJR, monetary bail is rarely used.  Lower-risk individuals no longer spend weeks and months in jail because they lack the financial resources to post relatively small amounts of bail.  More than 70 percent of CJR defendants are released on a summons pending the disposition of their cases -- without first being sent to jail.  And a majority of defendants arrested on complaint-warrants are released on conditions that Pretrial Services officers monitor.

On the other end of the spectrum, higher-risk individuals who pose a danger to the community or a substantial risk of flight are no longer able to secure their release simply because they have access to funds.

New Jersey's jail population looks very different today than it did when the idea of reforming the state's criminal justice system began to take hold in 2013.  On any given day, there are thousands fewer defendants in jail, with only the highest-risk defendants and those charged with the most serious offenses detained.

In all, CJR has reduced the unnecessary detention of low-risk defendants, assured community safety, upheld constitutional principles, and preserved the integrity of the criminal justice process.

3

## Research Studies

During 2018, with an understanding of the importance of our state's CJR model in the nationwide discussion of pretrial reform efforts, the Judiciary engaged in two comprehensive research projects to review the impact and gauge the success of reforms to the pretrial criminal justice process in New Jersey.  The research was conducted by members of a research collaborative, including social science researchers and data scientists from the Judiciary's Quantitative Research Unit and two independent organizations (University of Chicago – Crime Lab New York and Luminosity, Inc.).

- The first study compared data from 2017, under the current reformed system, to data from 2014, under the longstanding system of monetary bail.

- The second study updated a Jail Population Study published in 2013 and compared the jail populations on October 3, 2012 to the same day in 2018.

Together, these two endeavors inform the main sections of this year's Annual Report.

## Comparing Criminal Justice Reform with Money Bail

The first study -- the 2014/2017 Research Project -- compared outcomes and performance measures in 2014 and 2017 for defendants issued a complaint-summons or complaint-warrant in those years.  The project tracked cases until final disposition or October 31 of the following year, whichever came first.

The study shed new light on factors that contributed to the decline in New Jersey's pretrial jail population.  It revealed that the jail population decreased substantially because CJR defendants were released much sooner than pre-CJR defendants had been.

The Research Project also revalidated and analyzed the performance of the Public Safety Assessment (PSA), a risk assessment tool that aids judges as they craft conditions of pretrial release for individual defendants.

An extensive review of the actual rates of alleged new criminal activity, court appearance, and alleged new violent criminal activity for CJR defendants in 2017 confirms that the PSA has been remarkably accurate in classifying a defendant's risk.  It found that as risk scores increase, actual failure rates of compliance increase in step.

As part of the project, researchers analyzed defendants who were released pretrial and confirmed that a large majority were not accused of committing a new crime and

4

appeared in court when required.  Notably, in 2014, 12.7 percent of defendants were charged with a new indictable crime while on pretrial release, a number that remained consistently low, 13.7 percent, in 2017.  Because of certain challenges in compiling data from 2014, small changes in outcome measures should be interpreted with caution and likely do not represent meaningful differences.

Moreover, the rate at which defendants appeared in court remained high after CJR, with an average appearance rate of 92.7 percent in 2014 and 89.4 percent in 2017.  Concerns about a possible spike in crime and failures to appear did not materialize.

Research has demonstrated that incarceration before trial can have significant unintended consequences, such as the loss of employment, housing, and custody of children. Defendants detained in jail while awaiting trial also plead guilty more often, are convicted more often, are sentenced to prison more often, and receive harsher sentences than similarly situated defendants who are released during the pretrial period.  For those and other reasons, it is critical for a system of criminal justice to limit pretrial incarceration to defendants who pose a substantial risk of flight or danger.  Researchers accordingly examined factors that affect the size and makeup of New Jersey's daily jail population.

Under CJR, a substantially larger proportion of lower-risk defendants are released on complaint-summonses, rather than complaint-warrants, without first going to jail. Greater prosecutorial oversight and screening as well as changes in court rules have contributed to that trend.  In 2014, 54 percent of defendants were issued a complaint-summons.  In 2017, that percentage increased to 71 percent.  For the remaining defendants, judges or judicial officers issued complaint-warrants.[1]  Viewed otherwise, the number of complaint-summonses went from 69,469 in 2014 to 98,473 in 2017.  That shift demonstrates that substantially fewer lower-risk defendants are going to jail.

For defendants who are arrested under a complaint-warrant, the CJR law requires that Pretrial Services complete a risk assessment and a judge make a release decision within 48 hours of an arrest.  A defendant must be released unless the prosecutor files a motion for detention.  In 2017, when no detention motion was filed by a prosecutor, the vast majority of defendants, 81.3 percent, were released within 24 hours; 99.5 were released within 48 hours.

---

[1] In New Jersey, a defendant can be charged with a crime or offense in two ways.  Law enforcement officers have discretion to issue a complaint-summons that lists a date to appear in court.  Alternatively, officers can apply to a judicial officer for a complaint-warrant, which directs that the defendant be sent to jail.  Only defendants issued a complaint-warrant are "eligible defendants" subject to the provisions of the CJR law.

5

In addition, the study confirmed that courts are completing cases in roughly the same amount of time under both systems.  In 2014, 80.4 percent of cases were completed within the 22-month period; in 2017, 78.2 percent of cases were completed within the same time frame.

**Jail Population Analysis**

The second study undertaken for this report -- a 2018 Jail Population Study -- analyzed the jail population on October 3, 2018.  The new study updates a 2013 New Jersey Jail Population Study by Luminosity Inc., conducted in partnership with the Drug Policy Alliance, which analyzed the jail population on October 3, 2012.  The 2013 study found that nearly 40 percent of New Jersey's jail population was incarcerated because of an inability to post bail; 12 percent remained in jail on bails of $2,500 or less.

A comparison of the jail population six years apart revealed the following:

- There were 6,000 fewer people incarcerated on October 3, 2018 than on the same day in 2012.

- Only 4.6 percent of individuals in jail on October 3, 2018 were held on bail of $2,500 or less, compared to 12 percent on the same day in 2012;

- On October 3, 2018, 47 percent of the jail population consisted of people charged with or sentenced for at least one violent offense, compared to 35 percent on the same day in 2012.

- Nearly 75 percent of the 2018 jail population consisted of defendants charged with or sentenced for the most serious offenses.

The jail population study in 2013 revealed that more than two-thirds of defendants held in jail were members of racial and ethnic minority groups.  A fundamental mission of CJR is to ensure that all defendants are treated equally under the criminal justice system, regardless of race, ethnicity, or gender.  The 2018 Jail Population Study shows that approximately 3,000 fewer black, 1,500 fewer white, and 1,300 fewer Hispanic individuals were incarcerated under CJR.

Results from the 2014/2017 research study align with the findings from both jail population studies.  Criminal Justice Reform in 2017 reduced the disparity between black and white defendants in terms of the amount of time spent in jail from arrest until initial pretrial release as well as the average number of days spent in jail awaiting trial.

For defendants who secured pretrial release, the time from either complaint issuance or arrest until initial pretrial release for black defendants decreased by 5.7 days from 2014 to 2017, while the time for white defendants decreased by 2.4 days.  The time in jail awaiting trial for black defendants decreased by 10 days from 2014 to 2017, and the time for white defendants decreased by 5 days.

Despite those significant improvements, the jail population studies found that on October 3, 2012 and 2018, the racial makeup of defendants in New Jersey's jails remained similar in some areas.  Although the percentage of black women in jail decreased from 44 percent to 34 percent, black men continued to make up more than 50 percent of the male jail population.  The overrepresentation of black males in the pretrial jail population remains an area in need of further examination by New Jersey's criminal justice system as a whole.

Together, the findings detailed in the 2014/2017 Research Project and the comparisons of the 2013 and 2018 Jail Population Studies reflect a criminal justice system that prioritizes both fairness and public safety.

**2018 Performance**

This report closes with an update on CJR's performance in 2018.  Among the highlights:

- When no detention motions were filed, courts met the 48-hour deadline for making a release decision 99.6 percent of the time.  In 81.9 percent of cases, a release decision was made within 24 hours.

- Only 102 defendants were ordered by courts to post monetary bail, out of a total of 44,383 CJR-eligible defendants.  Bail was ordered in 90 of those cases for violations of pretrial monitoring, for example, when a defendant failed to appear in court as required.

- Prosecutors filed detention motions in 49 percent of cases in which a complaint-warrant was issued.  Prosecutors withdrew or the court dismissed 4,819 motions.  Judges granted 51.2 percent of the remaining 16,930 motions.

- 8,669 defendants were ordered detained in 2018.  Out of the universe of 135,009 defendants charged by complaint-summonses or complaint-warrants in 2018, the rate of pretrial detention was 6.4 percent, and 93.5 percent of defendants were released pretrial.  Out of 44,383 defendants charged by complaint-warrants, the rate of pretrial detention was 19.5 percent, and 80.2 percent of defendants were released pretrial.

The Annual Report highlights a continuing critical need to identify and implement a sustainable way to fund CJR's Pretrial Services Program.  As the Judiciary has stressed from the outset of CJR, paying for the Pretrial Services Program through an increase in court filing fees in 2014 has created a structural deficit and is not a permanent workable solution.  The resulting funding imbalance has increased each year.  Even with careful limits on staffing levels, which are at the bare minimum to meet the program's needs, and aggressive cost-control measures for electronic monitoring and drug testing, annual expenses for the program exceeded revenues from filing fees in fiscal year 2018 for the first time -- as expected.  Projected annual deficits are expected to fully deplete what remains of the modest reserves that accumulated during the start-up period before January 1, 2017.   Those reserves have been drawn on each year since.  We estimate that the program will face an overall negative funding balance in late fiscal year 2020 and early fiscal year 2021.

The legislative and executive branches have been fully supportive of CJR throughout its development.  We respectfully urge them to address the approaching funding crisis.

Finally, the Annual Report provides an update on technology and an addendum on the Judiciary's eCourts electronic filing initiative.

# II.

## 2014 pre-CJR / 2017 CJR

## RESEARCH PROJECT

# COMPARING CRIMINAL JUSTICE REFORM TO
# MONEY BAIL SYSTEM

The overarching goal of Criminal Justice Reform to create a fairer system includes several components.  The system is equitably designed to release lower-risk individuals into the community subject to appropriate pretrial monitoring conditions.  Higher-risk individuals are detained to ensure community safety.  Assessments of those risk levels are guided by objective and evidence-based criteria.

To assess the impact of CJR on New Jersey's criminal justice system, it is worthwhile to compare it to the system of money bail that came before.  Thus, members of the Research Collaborative, including social science researchers and data scientists from the Judiciary's Quantitative Research Unit and two independent organizations (University of Chicago – Crime Lab New York and Luminosity), conducted a one-time comprehensive 2014/2017 Research Project to compare outcomes under the two systems.

The Research Project compared outcomes and performance measurements for two groups -- defendants issued either a complaint-summons or a complaint-warrant in 2014 and in 2017.  Researchers generated Public Safety Assessment (PSA) risk results for each defendant and collected data from the first 22 months of CJR as well as comparable data from a 22-month period in 2014 and 2015.  They tracked both groups of defendants until final disposition of a case or October 31 of the following year, whichever came first.  This ensured identical follow-up periods for both the 2014 pre-CJR and 2017 CJR groups.

For several reasons, pre-CJR data from 2014 proved far more challenging to compile than 2017 data.  New Jersey did not introduce a master statute table until March 2016, which made the comparison of certain charges a challenge.  Fingerprint records, where available, are a unique verifiable identifier for an individual across data systems. Fingerprinting rates were dramatically lower pre-CJR; only 24 percent of defendants were fingerprinted in 2016, as compared to 88 percent in 2017.  With the development of eCourts, the Judiciary improved processes for case transfer and tracking, which made it easier to track criminal cases remanded to Municipal Court or downgraded to lesser charges.  Finally, as a result of changes in court rules, case-related policies and practices were more consistent in 2017 than in 2014.  Those issues made it more difficult to identify and track people using the 2014 data.  As such, small changes in performance and outcome measures should be interpreted with caution.

It should be noted that the Research Project includes all defendants charged with disorderly persons and indictable offenses issued by both complaint-summons and complaint-warrant, without separating these groups. This is an important distinction from the 2018 performance update starting on page 29. There are several reasons why all defendants charged with disorderly persons and indictable offenses were examined in the comparison study regardless of the type of complaint issued.

First, the population of defendants issued a complaint-summons or a complaint-warrant varied dramatically before and since the start of CJR, with more lower-risk defendants now being issued a summons. Notably, in 2014, 54 percent of defendants were issued a complaint-summons compared to substantially more, 71 percent, in 2017. Limiting the research to only defendants issued a complaint warrant would result in biased samples and an inequitable comparison. Finally, as mentioned above, CJR resulted in changes in court rules and case-related policies and practices, as well as more consistent practices in 2017. For all of those reasons, it was necessary to include in the study all defendants charged with disorderly persons and indictable offenses on both complaint-summons and complaint-warrants to provide the most equitable comparison.

The key performance measures for the two groups focused on outcomes related to community safety -- new criminal activity and court appearance rates -- as well as performance measures related to the amount of time defendants spent in jail pretrial. Again, for purposes of the study, pretrial release included situations when a summons was issued, when a warrant was issued and the defendant was released ROR or on pretrial monitoring or posted bail, and when a defendant was released from jail.

## MEASURING RISK -- PERFORMANCE AND OUTCOMES

A cornerstone of CJR is a system of pretrial release that reasonably assures a defendant's appearance in court when required and protects the community. Overall, the new system is working as intended through the use of the Public Safety Assessment (PSA) to guide pretrial release determinations, pretrial monitoring of release conditions, and detention of the highest-risk defendants.

**Public Safety Assessment Performance**

The Research Project compared outcomes for defendants in 2014 (pre-CJR) and 2017 (CJR). To understand those outcomes, we first consider the performance of the PSA --

11

the risk-assessment tool.  (For more specific details about the PSA, see the *Measuring and Managing Risk* section on page 30.)

Developed from national research data and initially validated in 2015 for use in New Jersey, the PSA relies on objective, race- and gender-neutral risk factors to assess the likelihood that a defendant will be charged with a new crime or fail to show up for court while on pretrial release.  The PSA provides judges with objective analysis to assist in making informed decisions about pretrial release and crafting conditions of release.

As part of the PSA, a defendant receives a risk score ranging from 1 to 6 on two separate scales -- new criminal activity (NCA) and failure to appear in court (FTA); 1 signifies the lowest risk level and 6 the highest.  The PSA also includes a flag to indicate whether the defendant presents an elevated risk of being charged with committing a new violent crime[2] while on pretrial release.

For purposes of the study, researchers generated PSA results for all defendants issued complaint-summonses and complaint-warrants in 2014 and 2017, and then compared the predicted risk scores to actual rates of failure to appear and alleged new criminal activity. The review found that the PSA is operating as designed and classifies defendants' risk levels with remarkable accuracy.  As PSA risk scores increased, the defendants' actual failure rates (i.e., new criminal activity and failure to appear) increased.  For example, only 9.7 percent of defendants who received an NCA score of "1" were charged with a new indictable crime or disorderly persons offense while on pretrial release; 61.6 percent of defendants with NCA scores of "6" were charged with new criminal offenses while on pretrial release.  Failure to appear rates were categorized with similar accuracy with respect to court appearances.

The PSA's New Violent Criminal Activity flag also proved to be an accurate predictor of future risk of new violent crime.  Defendants marked with a new violent criminal activity flag were three times more likely to be charged with committing a new violent crime while on release (14.4 percent) than defendants who did not receive a flag (4.8 percent).

---

[2]  Examples of violent offenses include murder, homicide, manslaughter, assault involving physical injury (including domestic assault), kidnapping, abduction, human trafficking, person-to-person sex offenses (such as rape and sexual assault), robbery, carjacking, and terrorism.  A charge of attempt, solicitation, or conspiracy to commit any of those offenses is considered a violent offense.

**New Criminal Activity**

No criminal justice system can ensure that all defendants will strictly adhere to the conditions of their pretrial release while they await trial.  But statistics show that predictions of an increase in crime under CJR did not materialize.

Crime rates for the State reported to date, particularly for violent crimes, have decreased since the start of CJR, according to the New Jersey State Police Uniform Crime Report.

A comparison of defendants from 2014 and 2017 showed that the rate of alleged new criminal activity for individuals released pretrial under CJR was virtually the same as the rate for defendants under the cash bail system.

As shown in Fig. 1:

- The percentage of defendants charged with a new indictable crime while awaiting trial was 12.7 percent in 2014 and 13.7 percent in 2017.

- The percentage of defendants charged with new disorderly persons offenses increased less than 2 percent, from 11.5 percent in 2014 to 13.2 percent in 2017.

Measuring new indictable crimes and new disorderly persons offenses together, the rate of defendants charged with new criminal activity increased slightly from 24.2 percent in 2014 to 26.9 percent in 2017.

Again, small changes in outcome measures should be interpreted with caution and likely do not represent meaningful differences.

13



**Fig. 1**

Looking solely at defendants released pretrial in 2017, less than 3 percent were accused of committing a No Early Release Act (NERA) or Graves Act offense. More specifically, in 2017:

- 1.6 percent of defendants on pretrial release were charged with a serious offense mandating no early release (NERA) from prison upon conviction; and

- 0.7 percent of defendants were charged with a non-NERA Graves Act gun offense as their primary offense while on pretrial release.

**Court Appearances**

In addition to community safety, court appearance is a critical component of pretrial justice. The average court appearance rate was more than 89 percent in both 2014 and 2017. Defendants showed up on average for 92.7 percent of pretrial court appearances in 2014 and 89.4 percent of court appearances in 2017. (Fig. 2). That includes court appearances for municipal disorderly persons events, criminal post-indictment events,

and family court events[3] for defendants issued either a complaint-summons or a complaint-warrant.



Fig. 2

Despite the slight decrease in court appearance rates, cases were still being completed in roughly the same amount of time under CJR as in 2014.  As shown in Fig. 3, for cases that began in 2014, 80.4 percent were completed within a 22-month period; in 2017, the percentage was 78.2.

The similar rates of cases disposed (Fig. 3), as well as the similar rates for new criminal activity (Fig. 1), suggest that defendants are returning for trial after missing an appearance and not fleeing.

---

[3] When a prosecutor downgrades criminal charges related to a violation of a domestic violence restraining order, defendants are required to appear in family rather than criminal court.



**Fig. 3**

# FAIRNESS AND EQUITY

CJR balances an individual's constitutional rights with the need for community safety -- to create a fairer system of pretrial justice.  Today's CJR process relies primarily on pretrial release by non-monetary means, based on a determination of a defendant's likelihood to appear in court or pose a danger to the community.  In 2014, the criminal justice process relied, for the most part, on the imposition of money bail as a means to secure release into the community.

The negative effects of pretrial incarceration are well documented.  Pretrial incarceration can lead to devastating and spiraling consequences for the accused and their families, from loss of housing, employment, and custody of children to interruptions of education and health care.[4]

---

[4] See https://nicic.gov/investigating-impact-pretrial-detention-sentencing-outcomes; https://nicic.gov/hidden-costs-pretrial-detention.

Moreover, pretrial incarceration impairs a defendant's ability to prepare a defense and increases the likelihood of conviction and other negative legal outcomes.  The potential for negative consequences increases with each day a defendant spends in jail pretrial while presumed innocent.

A comparison of the two systems shows that, under CJR, defendants spend less time in jail pretrial than under a monetary bail system.

- Under the CJR system in 2017, low-risk defendants were more likely to be issued a summons and thereby avoid being sent to jail altogether.

- Under the bail system in 2014, defendants issued a warrant too often waited in jail for months or years, while presumed innocent, to have their day in court, because they could not post bail.

- Under CJR, defendants issued a warrant were released quickly because initial hearings for pretrial release were held within 24 to 48 hours of commitment to jail and defendants were no longer required to post bail to secure their pretrial freedom.

**Summons/Warrant Decision**

With the advent of CJR on January 1, 2017, the Judiciary made changes to court rules, and the Attorney General issued directives to law enforcement officers statewide.  Both developments brought greater consistency and fairness to the charging process and the issuance of complaints.

As required by the CJR law, defendants charged with a crime or offense on a complaint-warrant issued by a judicial officer are considered "eligible defendants" and are sent to jail.  Soon after, a hearing is held, and a judge considers information presented by the parties and Pretrial Services, including the risk assessment, to make an informed release decision.  Defendants charged with a crime or an offense on a complaint-summons do not face pretrial commitment to jail and instead receive a date to appear in court.

The warrant-summons decision is informed by a number of factors:  the results of a preliminary PSA, which law enforcement can run; revised court rules, and directives the Attorney General issued to guide law enforcement officials.  Because of added objective information early in the process -- about a defendant's criminal past, history of court appearances, and risk results -- as well as early screening by prosecutors, far more defendants have been properly categorized as lower risk and released on a complaint-

17

summons without first going to jail. In turn, defendants categorized as higher risk are arrested on complaint-warrants. They are thus eligible for CJR, and Pretrial Services prepares a risk assessment, consistent with the CJR law.

In 2014, under the monetary bail system, 69,469 of defendants (54 percent) received a complaint-summons and 60,266 (46 percent) received a complaint-warrant. Three years later, under the CJR system, the percentage of complaint-summonses issued increased sharply. In 2017, law enforcement and judicial officers issued 98,473 summonses to 138,763 defendants (71 percent) and released them. The remaining 40,290 defendants (29 percent) went to jail initially on a warrant. (Fig. 4).



**Fig. 4**

The increase in the number of complaint-summonses is significant. Had law enforcement officers sought complaint-warrants in 2017 at the same rate they did in 2014, more than 24,000 additional lower-risk defendants would have gone to jail before they could be released pretrial.

**Time to Pretrial Release for Summonses and Warrants**

The Research Project examined pretrial release timeframes for defendants issued either a complaint-summons or a complaint-warrant in calendar year 2014 and 2017.  Pretrial release in this context included situations where defendants did not go to jail, went to jail and were released ROR or on conditions, and posted bail.

The study revealed that the percentage of defendants released pretrial stayed virtually the same.  In 2014, 94 percent of defendants were released while their cases were pending; in 2017, 95.6 percent were released while their cases were pending.

The chart below (Fig. 5) shows that, in 2014, defendants issued a complaint-summons or complaint-warrant spent an average of 7.4 days in custody until their initial pretrial release.  In 2017, they spent an average of 3.7 days in custody.  As noted earlier, to ensure an equitable comparison, all defendants charged with disorderly persons and indictable offenses issued by both complaint-summons and complaint-warrant are included.  Judges released nearly all defendants charged with warrants in 2017 within 24 to 48 hours when prosecutors did not file a motion for pretrial detention.

Viewed from another perspective, defendants issued a complaint-warrant were committed to jail at virtually the same rate under both systems.  In 2014, 32.1 percent of defendants were issued a complaint-warrant and went to jail following arrest.  In 2017, the percentage of defendants committed to the jail decreased slightly, to 31.8 percent.

The key difference -- and one of the driving factors in the decline in New Jersey's pretrial jail population -- is that, under CJR, defendants spent half as much time in jail from the time of commitment to when they are initially released pretrial.



Note: This chart includes complaint-summonses and complaint-warrants.  For purposes of this comparison, defendants released on the same day (including on a complaint-summons) were counted as one day until pretrial release.

**Fig. 5**

CJR defendants overall benefitted from quicker release.  As the chart below (Fig. 6) shows, the average time to initial release dropped most significantly for black defendants, from 10.7 days to 5.0 days.  For white defendants, the number of days to initial release dropped from 5.3 days to 2.9 days.



**Fig. 6**

## Total Time in Jail Pretrial

The Research Project also analyzed the total amount of time defendants issued a complaint-warrant spent in jail -- including those released pretrial, those detained, and those who failed to post bail.  The average time defendants spent in jail pretrial for the 22 months studied in 2014 was 62.4 days.  The average time dropped to 37.2 days in 2017 -- a decrease of 40 percent.  (Fig. 7).



Note: Total time in jail is calculated as a cumulative measure. When a defendant had more than one commitment to jail in the pretrial period, the days for each commitment were added to calculate total time in jail.

**Fig. 7**

The time in jail for black defendants was reduced by 10.3 days, and time in jail for white defendants was reduced by 5.2 days. (Fig. 8).



**Fig. 8**

The shorter length of commitments to jail under CJR has resulted in a significant decline in the daily jail population. On average, the population of New Jersey's jails declined by a few thousand defendants per day in 2017. That translates to more than 750,000 fewer jail beds over the course of a year.

# III.

# JAIL POPULATION STUDIES
# 2012 vs. 2018

**Impact on County Jail Population**

One of the prime catalysts that led to the adoption of CJR was a study Dr. Marie VanNostrand of Luminosity, Inc. conducted in 2013.  It found that, on October 3, 2012, nearly 40 percent of New Jersey's jail population was incarcerated because of an inability to post bail, including 12 percent who remained jailed on bails of $2,500 or less.  The study also found that more than two-thirds of jailed inmates were members of racial and ethnic minority groups.

Six years later, in 2018, the Administrative Office of the Courts, with the assistance of Luminosity, conducted an update to the Jail Population Study.  The new analysis found that, on October 3, 2018, the number of inmates in custody declined dramatically, with 6,000 fewer people incarcerated in 2018 compared to 2012.

The percentage of defendants held in jail on bails of $2,500 or less dropped from 12 percent (1,547 of 12,003 defendants) in 2012 to 4.6 percent (390 of 8,482 defendants) in 2018.  Most of those 390 defendants (60.5 percent) were ordered to post bail in Municipal Court and were not eligible for CJR.  Of the 154 Superior Court defendants held on $2,500 bail or less, 137 defendants had initially been released on a summons or on their own recognizance but were ordered to post bail after failing to appear for a scheduled court appearance.  The significant decline in defendants held on low amounts of bail is expected to continue, particularly as Municipal Court reforms are implemented.

Moreover, on October 3, 2018, the make-up of defendants held in jail, as it relates to the severity of the alleged or sentenced offense, had changed as follows:

- On October 3, 2012, 35 percent of the jail population included inmates charged with or sentenced for one or more violent offense; and

- On October 3, 2018, the number of inmates charged with or sentenced for one or more violent offense rose to 47 percent.

Further analysis of the charge distribution for those in jail on October 3, 2018 revealed that nearly 75 percent of the population had been charged with or sentenced for an offense of a serious nature.[5] (Fig. 9).



**Fig. 9**

## Jail Population by Race/Ethnicity/Gender

A comparison of the October 3, 2012 and October 3, 2018 jail population studies shows that almost all demographic groups benefitted from CJR.

- Viewed by gender, the studies show 5,600 fewer men and 600 fewer women incarcerated pretrial in 2018, as compared to 2012.

---

[5] Serious offenses include either a violent offense, a NERA violation, or an offense of the first- or second-degree.  A similar comparison for 2012 is not available because New Jersey did not introduce a master statute table to categorize criminal charges and include degrees until 2016.

- Viewed by race and ethnicity, approximately 3,000 fewer black defendants, more than 1,500 fewer white defendants, and 1,300 fewer Hispanic individuals were incarcerated under CJR.[6]

Although the total jail population has decreased, with reductions in all demographic categories, the racial and ethnic makeup within New Jersey's jail population has remained largely the same.  As shown in Fig. 10:

- Black defendants made up 54 percent of the jail population in 2012 and 54 percent of the population in 2018.

- The white jail population rose slightly, from 28 percent in 2012 to 30 percent in 2018.

- The Hispanic population declined slightly from 18 to 16 percent.



**Fig. 10**

---

[6] Other racial groups and individuals whose race is unknown account for the difference in numbers by gender and race.

Distribution by race among the male jail population remained consistent as well.  One notable change was among females:  the percentage of black females in the jail population decreased from 44 to 34 percent in 2018, and the percentage of white females in the jail population rose from 44 to 54 percent.

# IV.

# CRIMINAL JUSTICE REFORM
# 2018 PERFORMANCE

The comparison of data from 2014 and 2017 highlights trends in pretrial outcomes across the criminal justice system. The following analysis provides an update to the CJR data presented in our 2017 Annual Report.

## PRETRIAL DECISION-MAKING PROCESS

### Measuring and Managing Risk

The PSA, an objective risk assessment developed by the Laura and John Arnold Foundation, works to measure risk through an analysis of the defendant's criminal record and court history.[7] The Decision Making Framework (DMF), which the Supreme Court has approved, works to manage risk by setting forth policies that ensure consistent pretrial release recommendations throughout the state.[8]

Together, the PSA and DMF measure the risk defendants pose and recommend the least restrictive means to manage that risk. The PSA and DMF help Pretrial Services staff offer recommendations for release and assist judges who make actual pretrial release decisions. Together, the tools help guide judges in their decision-making; they do not replace judicial discretion. When determining the appropriate conditions of release tailored to a particular defendant, judges also take into account specific facts presented by the prosecution and defense. Although no pretrial release system can ensure that a defendant will not commit an offense after release, or will show up for all court hearings, judges in New Jersey now have the benefit of an informed, objective analysis to assess pretrial release.

### Pretrial Release Decisions

Under the CJR law, courts must hold a first appearance hearing and make a pretrial release decision within 48 hours of an eligible defendant's commitment to jail, unless the prosecutor makes a motion for pretrial detention.

In 2018, the courts met the 48-hour deadline 99.6 percent of the time (22,552 out of 22,634 defendants). In the vast majority of cases, 81.9 percent, judges made initial pretrial release decisions within 24 hours. (Fig. 11).

---

[7] See Public Safety Assessment: Risk factors and formula - https://www.psapretrial.org/about/factors, and Public Safety Assessment New Jersey Risk Factor Definitions - https://www.njcourts.gov/courts/assets/criminal/psariskfactor.pdf?c=m54.
[8] See Pretrial Release Recommendation Decision Making Framework https://www.njcourts.gov/courts/assets/criminal/decmakframwork.pdf?c=NUc.



**Fig. 11**

The CJR law outlines the conditions of release that a court may impose. Taking into consideration the recommendation from Pretrial Services staff as well as information provided by the prosecution and defense, the judge decides the appropriate release conditions based on a defendant's risk, the severity of his or her charges, and other legally relevant factors.

Typically, courts release the lowest-risk defendants on their own recognizance (ROR) without any need for monitoring. Defendants who pose greater risks may be released subject to conditions, like more frequent contacts with Pretrial Services staff. Courts may place defendants who pose a more elevated risk on home detention or electronic monitoring.

Trial judges do not have independent authority to detain defendants pretrial. Only prosecutors are authorized to file applications for pretrial detention in appropriate cases. Absent a detention motion by the prosecutor, a defendant must be released.

The following chart (Fig. 12) provides a breakdown of initial release decisions in 2018:



**Initial Release Decisions for Criminal Justice Reform Eligible Defendants 2018**
(Total of 42,410 defendants)





Note: These graphs plot initial release decisions for criminal justice reform eligible defendants who were arrested on or after January 1, 2018 on a warrant.  Defendants who only received a summons are not included in these graphs.  The graphs also do not include defendants whose cases were addressed prior to release decisions (1,861) or cases still pending (112).

**Fig. 12**

As noted earlier, in calendar year 2018, out of 44,383 CJR-eligible defendants, the court ordered 102 defendants to post monetary bail.  Of those matters, the vast majority (90) of bails were ordered for violations of pretrial release conditions, such as failure to appear at a required court event, and not as part of the initial release determination.

**Pretrial Monitoring**

If a defendant is released on monitoring, Pretrial Services works with the defendant to ensure compliance with any conditions the court imposes.  Monitoring may include requiring defendants to report to Pretrial Services by phone or in person, and, in some cases, electronic monitoring.  To promptly assess and respond to emergent monitoring alerts, certain aspects of the program function on a 24-hour-per-day schedule.

## Violations of Monitoring and Revocation of Pretrial Release

Pretrial Services staff use an automated system to record a defendant's compliance with conditions of pretrial release.  When court intervention is required, staff file a violation of monitoring notice and schedule the defendant to appear at a review hearing.  The court also may issue a bench warrant for a defendant's arrest.

If a defendant violates a condition of release -- for example, by allegedly committing a new offense or by failing to appear for a court date -- the prosecutor can file a motion to revoke the defendant's pretrial release.  When such a motion is filed, the court schedules the matter for a hearing at which the prosecution and defense have the opportunity to present evidence and arguments.  The court may then continue, modify, or revoke the defendant's conditions of release.

Prosecutors filed a total of 3,052 motions to revoke release in 2018.  Of those, 1,943 required a judicial decision.  The court granted 1,094 motions, or 56.3 percent, and denied 849 motions, or 43.7 percent.  The prosecution withdrew or the court dismissed the remaining 1,109 motions.

**Motions to Revoke Filed**
**2018**
**(Total of 3,052 motions)**





Fig. 13

**Pretrial Detention Decisions**

Under CJR, prosecutors may seek to detain defendants charged on a complaint-warrant without the opportunity for release.  Pretrial detention motions are limited to indictable charges and domestic violence related disorderly persons charges.  The prosecution has the burden to demonstrate that no combination of conditions or level of monitoring is sufficient to reasonably assure the safety of the community.

If the prosecutor files a detention motion, a Superior Court judge holds a pretrial detention hearing -- usually within three to five days of the filing -- so that both the prosecution and defense can present evidence.  If the court orders a defendant detained, CJR's speedy trial law sets specific timeframes that require the case to proceed to indictment and trial.  If those timeframes are not met, the defendant can be released from jail.

Statistics from the first two years of CJR reveal that prosecutors filed pretrial detention motions in 2018 at a slightly higher rate than the year before.  Specifically, in 2018, prosecutors filed pretrial detention motions in 49 percent of cases in which a warrant was issued.  In 2017, prosecutors filed detention motions in 43.7 percent of warrant cases.

Of the 21,749 pretrial detention motions filed in 2018, prosecutors withdrew or the court dismissed 4,819 motions.  For the remaining 16,930 motions, judges granted 8,669 detention motions (51.2 percent) and denied 8,261 (48.8 percent).  (Fig. 14).  By way of comparison, of the 19,366 motions filed in 2017, prosecutors withdrew or the court dismissed 5,350.  Of the remaining 14,016 detention motions, judges granted 8,043 (57.4 percent) and denied 5,973 (42.6 percent).

**Detention Motions Filed**
**2018**
**(Total of 21,749 motions)**




**Fig. 14**

The following chart (Fig. 15) depicts the different outcomes in 2018 for defendants charged on a warrant:

35



**Fig. 15**

To place the detention statistics in a broader context, the rate of pretrial detention for all defendants, including those released on a summons, was 6.4 percent in 2018 and 5.6 percent in 2017. The following chart (Fig. 16) depicts the different outcomes for all defendants charged, both on a complaint-summons or a complaint-warrant:



**Fig. 16**

## Speedy Trial

If the court orders an eligible defendant detained pretrial, the defendant is subject to the speedy trial provisions of the CJR law.  The timeframes recognize a fundamental tenet of the criminal justice system:  that defendants held in jail before trial are entitled to have their cases heard expeditiously.  The new law contains the following time limits:

- Pre-indictment, a defendant cannot remain in jail for more than 90 days.

- Post-indictment, a defendant cannot remain in jail for more than 180 days before the start of his or her trial.

- Overall, a defendant cannot be held in jail for more than two years before the start of a trial.

The timeframes can be extended under the statute for events such as competency hearings, drug or alcohol treatment, and pretrial motions.  The Judiciary's automated system tracks the statutorily required speedy trial timeframes along with any excludable time and provides alerts to court staff when defendants approach any time limits.  The information is easily accessible to the parties and the court.

**Decline in Jail Population**

New Jersey's pretrial jail population continued to decline in 2018.  As the following chart (Fig. 17) shows, the decline began in 2015 when Superior and Municipal Courts across the state, along with prosecutors and defense counsel, reviewed their local pretrial jail populations in preparation for CJR.  In 2017, the first year of CJR, the pretrial jail population decreased another 19 percent, from 7,058 to 5,718 defendants.  In 2018, the pretrial jail population declined an additional 13 percent to 4,995 defendants.  In total, New Jersey's pretrial jail population has declined 43.9 percent since December 31, 2015.



**Fig. 17**

## PRETRIAL SERVICES PROGRAM OPERATIONS AND FUNDING

### Revenue and Expenses

Annual expenses for the Pretrial Services Program in calendar year 2018 exceeded revenues from annual filing fees for the first time since the implementation of CJR. Even with close monitoring of staffing levels and cost-control measures in the areas of electronic monitoring and drug testing, the structural funding deficit is projected to continue unless funding changes are made. Projected annual deficits will leave the Pretrial Services Program with a negative balance by late fiscal year 2020-early fiscal year 2021.

The solution to this impending program funding crisis is straightforward. Like other state-run programs, the Pretrial Services Program should be funded from the state budget rather than from filing fees. To accomplish that, revenues collected from filing fees should go to the State Treasury. Pretrial Services Program staff positions, in turn, should be removed from the current Dedicated Fund positions to Direct State Service positions, thereby moving staff salary costs to the regular state budget and fringe benefit costs to the Interdepartmental Account. Those changes require legislative action and the support of the Governor.

Since November 17, 2014, the Judiciary has collected a total of $171.2 million from the authorized increase in court fees.  That continues to be the main funding source for CJR.  That approach, however, is not sustainable.

As of December 31, 2018, in accordance with the statutory requirements, the Judiciary allocated funds collected from increased court filing fees as follows:

(1) $88.4 million to the Pretrial Services Program;
(2) $40.6 million to Legal Services of New Jersey;
(3) $40.2 million for eCourts; and
(4) $2 million to the discretionary account.

To date, the Judiciary has expended or encumbered a total of $61.8 million for Pretrial Services, leaving a balance of $26.6 million.  That surplus is largely due to the program's relatively modest start-up costs.  Prior to January 1, 2017, we did not need full staffing to carry out the responsibilities the new law imposed.  Thanks to prudent hiring, we were able to save some revenue from filing fees before the program's official start date.  That is no longer possible.  A full complement of Pretrial Services staff is needed to prepare more than 40,000 PSAs annually and monitor tens of thousands of defendants placed on pretrial release, among other tasks.

For eCourts,[9] the Judiciary has expended or encumbered $22.7 million to date, leaving a balance of $17.5 million.

The Judiciary also has expended or encumbered $7 million for software for Pretrial Services and for eCourts, with $3.8 million coming out of Pretrial Services funding.

Electronic monitoring cost $565,163 in calendar year 2018.  Per diem payments to authorized Municipal Court judges for handling Centralized Judicial Processing hearings totaled $778,000 for the year.  Staff salaries for the calendar year totaled $22.5 million.

In the first three full fiscal years of collections, fiscal years 2016, 2017, and 2018, the Judiciary collected $44.1 million, $41 million, and $40.5 million, respectively.  As of the date of this report, fiscal year 2019 collections are tracking at about 1 percent below fiscal year 2018 for the same timeframe.

---

[9] See Addendum – Development, Maintenance and Administration of eCourts.

**Pretrial Services Unit Staffing**

In 2018, the Judiciary's Pretrial Services Program continued to operate six days per week, including holidays and weekends, to meet the statutory requirement that all pretrial release decisions occur within 48 hours of a defendant's commitment to jail.

To limit the expenditure of county resources, the Judiciary conducts holiday and weekend hearings through virtual courtrooms that offer the same protection and functions as in-person hearings without the need to open courthouses.  The public can view the sessions on the Judiciary's website, www.njcourts.gov, via LiveStream technology.

If a defendant is released on monitoring, Pretrial Services works with the defendant to ensure compliance with any conditions the court imposes.  Monitoring may include requiring defendants to report to Pretrial Services by phone or in person, and in some cases electronic monitoring.  To promptly assess and respond to emergent monitoring alerts, certain aspects of the program function on a 24-hour-per-day schedule.

Statewide, in addition to the judges assigned to hear these matters, a total of 297 staff positions are dedicated to the Pretrial Services Program.  That represents an increase of 30 positions from 2017.  Based on current needs, we do not anticipate significant further growth in staff size.

**Pretrial Services Monitoring**

Pretrial Services staff monitor eligible defendants from the time of release until final disposition.  Defendants may elect to receive text messages, emails, or phone call reminders of their court events.  The frequency of staff contact with a defendant on court-ordered pretrial monitoring is based on the level of risk the defendant poses.  Monitoring can range from monthly phone calls to weekly visits and, in some circumstances, home detention and electronic monitoring.  When court intervention is required because of noncompliance, staff will file a violation of monitoring notice and schedule the defendant to appear before a judge at a review hearing.

Pretrial Services staff review and respond to monitoring alerts and, depending on the circumstances, contact law enforcement or the defendant.  Emergent alerts occur 24 hours per day for a variety of reasons, including a defendant's entry into a prohibited zone, leaving home when ordered to home detention, or tampering with an electronic monitoring device.  In fewer than one-third of counties across the state, county jails have assumed responsibility for receiving and responding to emergent electronic monitoring alerts.  In the remaining counties, Pretrial Services staff perform those functions.

The cost to monitor defendants subject to electronic monitoring is $4.19 per defendant per day.  During 2017 and 2018, the Judiciary undertook a review of the electronic monitoring process to better manage resources while still ensuring public safety. Expenditures on electronic monitoring dropped significantly in the second year of CJR, from $784,017 in 2017 to $565,163 in 2018.

**Access to Services**

To help ensure an eligible defendant's pretrial success, it is imperative that adequate services be made available to those on release.  The CJR law sets forth conditions of pretrial release that a court may order when releasing a defendant on pretrial monitoring. The lack of available and affordable community-based substance abuse treatment, mental health treatment, and housing assistance programs continues to present a significant challenge for defendants on pretrial release who are in need of these services.

Prior to the implementation of CJR, each county compiled a list of available community resources.  Pretrial Services uses the lists to refer defendants in need to local services. However, those services are in short supply and often not affordable.  Where a free program exist, it can take months for space to become available.

The Judiciary continues to partner with county officials and officials from the state Department of Human Services to find solutions for defendants in need.

**Technology**

The continued digital transformation of the CJR process is a collaborative effort among criminal justice partners.  It is fueled by the shift from a paper-driven process to a fully electronic one.  To keep pace and extend the system's maturity, enhancements and new application modules designed to assist in analytics and data sharing continue to evolve.

The Judiciary enhanced the eCDR application throughout 2018 to make electronic monitoring orders and mug shot images immediately available to law enforcement.  That enables officials to respond quickly to violations.  The Judiciary also created a Law Enforcement Dashboard to allow law enforcement officers to access real-time data on defendants subject to electronic monitoring.  Additionally, the Judiciary enhanced its speedy trial application, which calculates potential release dates for pretrial defendants and provides immediate notification to interested parties when courts remand, downgrade, or dismiss a case.

Before CJR, law enforcement fingerprinted only 30 percent of defendants.  In 2018, law enforcement officers fingerprinted more than 94 percent of defendants using LiveScan before the issuance of a complaint, making it easier to identify people across systems and save time.



**Fig. 18**

## COURT DECISIONS AND RULE CHANGES

In 2018, the Supreme Court continued to develop a robust body of case law applicable in CJR matters:

In <u>State v. S.N.</u>, 231 N.J. 497 (2018), the Court held that the proper standard of appellate review of pretrial detention decisions is whether the trial court abused its discretion by relying on an impermissible basis, by relying on irrelevant or inappropriate factors, by failing to consider all relevant factors, or by making a clear error in judgment.

In <u>State v. Dickerson</u>, 232 N.J. 2 (2018), the Court concluded that the affidavit supporting a search warrant disclosed in discovery need not be disclosed as a matter of course.  The Court also held that, to the extent that the trial court's order of release served as a "sanction" for the State's perceived failure to meet its discovery obligation, the release order was improper.

In the consolidated appeals in <u>State v. Mercedes</u> and <u>State v. Travis</u>, 233 N.J. 152 (2018), the Court revised <u>Rule</u> 3:4A(b)(5) to make clear that a recommendation against a defendant's pretrial release that is based only on the type of offense charged cannot justify detention by itself -- unless the charge is encompassed by N.J.S.A. 2A:162-19(b).

In <u>State v. Pinkston</u>, 233 N.J. 495 (2018), the Court held that the CJR Act provides defendants a qualified right to summon adverse witnesses.  The Court held that, when seeking to call an adverse witness, a defendant must present a proffer about the anticipated testimony of the witness and its relevance to the issue of probable cause, and show how the anticipated testimony would rebut or diminish the State's evidence in support of detention in a material way.

Finally, in <u>State v. Hyppolite</u>, 236 N.J. 154 (2018), the Court considered the appropriate remedy when the State fails to disclose exculpatory evidence before a detention hearing. The Court held that when exculpatory evidence is disclosed after a detention hearing, judges should use a modified materiality standard to decide whether to reopen the hearing.  If there is a reasonable possibility that the result of the detention hearing would have been different had the evidence been disclosed, the hearing should be reopened.

## VI.   CONCLUSION AND NEXT STEPS

Criminal Justice Reform in New Jersey replaced a cash bail system that had roots in the State's 1776 Constitution.

The first two years of CJR demonstrate that commitment and cooperation among all branches of government -- executive, legislative, and judicial -- and all levels of government -- state, county, and municipal -- can bring about not just legislative change, but a fundamental change in the culture of our criminal justice system.  The systemwide collaborative effort in support of CJR also included the defense bar, both public and private; prosecutors at the state and county levels; all levels of law enforcement, including Sheriffs and Wardens; various community groups; and the public.

The Research Project produced for this report demonstrates that CJR is operating as intended and has resulted in a fairer criminal justice system that respects and balances constitutional rights, the presumption of innocence, and community safety.

New Jersey's jail population is no longer comprised of large numbers of lower-risk defendants, charged with less serious offenses, who cannot afford to post bail.  The pretrial jail population has declined consistently, and defendants now held in jail pretrial because of CJR are more likely to present a significant risk of flight or danger to the community.

Defendants charged with low-level offenses spend less time in jail pretrial under CJR. As a result, they avoid the spiraling, life-changing consequences of being detained for weeks and months while presumed innocent.  The use of bail has largely been relegated to defendants who fail to appear in court.

The research conducted for this report also shows that the risk assessment tool used for CJR is an accurate and effective tool that is working as expected.  New Jersey judges now have the benefit of an informed and objective analysis when making pretrial release decisions.  Unlike in the past, judges today can also consider a defendant's risk to the community in deciding whether to detain the individual pretrial.

Defendants released pretrial under CJR are not ignoring reporting or court dates at a substantially higher rate than under the bail system; nor are they creating a greater risk to the community.  CJR defendants appear, on average, at nearly 90 percent of their court hearings, and their cases are disposed of in roughly the same amount of time as defendants under the cash bail system.

Even with these successes, the Judiciary remains committed to a continuous review of CJR's performance and already has engaged researchers to study key areas that need further improvements.  For example, the Judiciary plans to bolster its efforts to notify defendants charged with disorderly persons offenses about upcoming court appearances to further improve court appearance rates.

The Judiciary's ongoing review will also examine areas for improvement in the PSA, such as quantifying and incorporating in the risk-assessment process particular risks posed by defendants charged with domestic violence offenses.

In addition, the Judiciary recognizes the need to continue to examine the effect of CJR on racial disparity in the criminal justice system and to ensure that all defendants are treated equally by the courts.  There are several thousand fewer black defendants in jail overall under CJR, and black females now make up a lower percentage of the female jail population.  However, black defendants continue to represent a disproportionate percentage of the male jail population.

Insufficient resources to provide community-based substance abuse treatment, mental health treatment, and housing assistance to those on pretrial release remains a substantial concern.  Adequate services must be made available if more defendants are to succeed in complying with conditions of pretrial release.

The Pretrial Services Program also faces an impending funding crisis.  There is a continuing critical need to identify and implement a sustainable means to fund the program.  The current method -- which relies on annual court filing fees -- is not a workable approach.  As predicted at the outset of CJR, the model in place has a built-in structural deficit, and within the next year, will result in an actual funding deficit.

The Judiciary remains committed to working with all stakeholders and partners in the criminal justice system to address these and other issues and properly balance constitutional rights and public safety.  We will continue to strive to create and maintain the best possible criminal justice system for New Jersey and try to serve as a model for others.

## ADDENDUM

### DEVELOPMENT, MAINTENANCE and ADMINISTRATION of eCOURTS

The Judiciary is engaged in a multifaceted initiative to convert its legacy information technology systems, based on mainframe databases, into a modern integrated eCourts electronic filing, electronic storage, and electronic case management application. Over the years, the Judiciary has collected millions of party and case records, currently maintained in numerous decades-old databases, which require rebuilding from the ground up. Four essential functionalities support this concerted effort to transform the Judiciary into the digital age:

(1) Electronic filing and information exchange between the court and attorneys;

(2) The establishment of electronic case files;

(3) The maintenance of electronic records management systems that provide attorneys and the public with appropriate access to case information; and

(4) Modern case management systems that will enable the Judiciary to track, dispose of, report on, and share data with our government partners.

The various systems described below represent a significant undertaking and a bold push toward the Chief Justice's vision of total modernization. Despite the progress that has been made in the areas of efiling, several more years of work are required to complete our goals of replacing all systems from both front-end efiling to back-end case management.

### eCourts Supreme Court: Implemented in 2017

The Offices of the Attorney General, Public Defender, and County Prosecutors are all filing electronically in the Supreme Court. The Judiciary presently is expanding electronic filing to include private attorneys in criminal matters, and the next expansion will include private attorneys in civil matters. The application provides for electronic access by counsel, Justices, and Supreme Court staff to all electronically filed documents.

### eCourts Appellate Division: Implemented June 2013

eCourts Appellate was initially available in criminal cases in which the Public Defender filed the motion and the Attorney General or County Prosecutor was the responding party. The system has progressively added new case types or case filers over the last several years, including Children in Court, Family, Pretrial Detention (CJR) appeals, and as of January 1, 2018, civil cases under mandatory efiling. System use of both Judiciary Account Charge System (JACS) and credit cards has enabled access to the entire bar for filing. With the advent of efiling, data and documents are transmitted to the appellate case management system, which has ensured access to these data and documents by the bar, the court, and staff. In addition, efiling will assist with instant notifications of submissions, document review at the touch of a button, and record retention.

47

**eCourts Criminal: Implemented July 2014**

The Judiciary in 2014 implemented eCourts Criminal, the first eCourts application. At the outset, it provided the attorneys the ability to efile motions, responses, and briefs. The Judiciary has since expanded the application to include almost all other documents filed in the Criminal Division. The Superior Court Clerk's Office has converted thousands of archived paper records to digital images and added them to the eCourts system.

**eCourts Tax: Implemented February 2015**

The introduction of electronic filing in the Tax Court was instrumental in reducing significant data entry and processing backlogs. This project automated case initiation and complaint docketing. Added functionality allows non-attorneys, such as municipal assessors, municipal clerks, and county boards of taxation, the ability to receive electronic notification of a new case or judgment and to access the Electronic Case Jackets. Attorneys will be able to file with a credit card by the summer of 2019. Pro Se efiling is also currently being developed with a pilot expected by the end of 2019.

**eCourts Probation Electronic Case Jacket: Implemented June 2016**

An eCourts electronic case jacket was implemented for the Probation Division in June 2016, eliminating most paper files and allowing simultaneous access to probation information by judges and staff. The Probation case jackets also include embedded hyperlinks to other eCourts electronic files in the Criminal, Family, and Municipal Divisions, eliminating delays and gaps between divisions.  eCourts Probation will be expanded to include a mobile application for ISP in July 2019 and case management functions by December 2019.

**eCourts Foreclosure: Implemented September 2016**

eCourts Foreclosure, in September 2016, replaced the Judiciary Electronic Filing and Imaging System (JEFIS), implemented in 1995. In eCourts Foreclosure, attorneys can electronically file documents from complaint through judgment processing. Attorneys can also access electronic case files and automated notifications between attorneys of record and the court. County clerks and sheriffs can access eCourts Foreclosure Electronic Case Jackets to verify judgments of foreclosure.

**eCourts Special Civil DC: Implemented September 2016**

eCourts Special Civil DC pertains to cases with a demand amount of less than $15,000, and focuses on the replacement of an older electronic filing system, the Judiciary Electronic Filing and Imaging System (JEFIS). In eCourts Special Civil DC, attorneys can electronically file documents from complaint through post judgment. Attorneys of record and the court can access Electronic Case Jackets and receive automated notifications.

**eCourts Family FM (Dissolution/Divorce) case jacket archived cases: Implemented November 2016**

This eCourts project provides judges and court staff with easy access to archived files. Thousands of paper records converted to digital images are now easily accessible for court proceedings or to fulfill

records requests from the public. This application has eliminated significant delays in accessing older records from the Superior Court Clerk's Office records warehouse in Trenton. eCourts FM will be expanded to include efiling, automatic notification, and case management. Pilot expected in April 2020.

### eCourts Criminal – Criminal Justice Reform: Implemented January 2017

eCourts Criminal required enhancement to accommodate the many tasks involved in Criminal Justice Reform (CJR), including automation of the Public Safety Assessment (PSA) risk assessment tool utilized by judges to inform their release decisions. Such automation helps Pretrial Services Program staff manage cases and prepare orders. Additional applications include a pretrial monitoring system, detailed tracking mechanism for speedy trial dates and electronic bench warrants processing for defendants on electronic monitoring. Planned enhancements in March 2019 include automation of detention, release, and revoke release orders that will result in improved data collection.

### eCourts Municipal: Implemented January 2017

This broad initiative, integral to CJR, provides an enhanced and improved complaint system for law enforcement statewide. It includes a Live Scan fingerprint interface, developed in partnership with the New Jersey State Police, which connects a defendant's complaint, arrest record, fingerprint record, and criminal history. The system utilizes the data from the LiveScan fingerprint interface to populate the criminal complaint and calculate the PSA risk score.

The system gives prosecutors the ability to review and modify charges on a complaint before a finding of probable cause. After a finding of probable cause and issuance of a summons or warrant, the complaint is stored in the eCourts Municipal Electronic Case Jacket, and is accessible by the court, prosecutors, attorneys, law enforcement, and the county jails. Plans for enhancements to eCourts Municipal include allowing attorneys to file motions and cross reference other municipal cases, including disorderly persons and traffic offenses.

### eCourts Special Civil Small Claims (SC) case jacket: Implemented September 2017

eCourts Special Civil SC pertains to cases with a demand amount of less than $3,000. This ongoing project provides an electronic case jacket, enabling simultaneous access by judges, court staff, and attorneys. It also provides for centralized processing of court-generated notices. Implementation began with the placement of select notices in the case jacket and it was expanded to include additional notices and documents.

### eCourts Special Civil Landlord Tenant (LT) case jacket: Implemented September 2017

eCourts Special Civil LT pertains to cases with a dispute between the landlord and a tenant. This ongoing project provides an electronic case jacket, enabling simultaneous access by judges, court staff, and attorneys. Implementation began with the placement of all notices in the case jacket and will be expanded to include eCourts efiling, auto docketing, case management, and centralized printing functionality. Pilot expected by the end of 2019.

**eCourts Civil Law: Implemented December 2017**

The end result of this project will be the electronic filing of all documents from complaint through final judgment. It includes access to electronic case files and automated notifications between attorneys of record and the court. Rollout for pilot counties began in March 2017; all counties were operational by the end of 2017.  Enhancements are being planned to include an arbitration program module, which will allow for electronic notification to parties and arbitrators. Pilot expected in early 2020.

**eCourts Family Children in Court (CIC) Dockets: Implemented September 2017 & June 2018**

This eCourts project focuses on electronic filing in child neglect cases initiated by the Attorney General's Office on behalf of the New Jersey Division of Child Protection and Permanency, the Office of Parental Representation, and the Office of the Law Guardian. Four different docket / case types -- FN, FC, FG, FL -- have been implemented in 2017 and 2018.  Enhancements are being made to include motion filing and order processing. This will result in reduction in data entry tasks and more efficient case management.

**eCourts Family (FD) Case Jacket:  To be implemented May 2019**

This eCourts project focuses on a case jacket for non-dissolution matters. The FD Case Jacket has been developed (Dec 2016), however, the judiciary is working with Division of Family Development on an interface to provide the Uniform Summary Support Order into the FD case jacket.  Additional documents are being reviewed for future uploading.

**eCourts Family (FJ) :  To be implemented December 2019**

This eCourts project focuses on automating the process of filing juvenile delinquency complaints. Building on enhancements made to eCDR for Criminal Justice Reform, this will enable the timely entry of juvenile matters as well as improved data collection on juvenile complaints.



**Administrative Office of the Courts**

**STUART RABNER**
Chief Justice

**GLENN A. GRANT, J.A.D.**
Acting Administrative Director
of the Courts

April 2019