# EXHIBIT R

**123 Yale L.J. 1344**

**Yale Law Journal**
March, 2014

Essay
Samuel R. Wiseman [a1]

Copyright (c) 2014 Yale Law Journal Company, Inc.; Samuel R. Wiseman

# PRETRIAL DETENTION AND THE RIGHT TO BE MONITORED

**ABSTRACT.**

Although detention for dangerousness has received far more attention in recent years, a significant number of non-dangerous but impecunious defendants are jailed to ensure their presence at trial due to continued, widespread reliance on a money bail system.

This Essay develops two related claims. First, in the near term, electronic monitoring will present a superior alternative to money bail for addressing flight risk. In contrast to previous proposals for reducing pretrial detention rates, electronic monitoring has the potential to reduce both fugitive rates (by allowing the defendant to be easily located) and government expenditures (by reducing the number of defendants detained at state expense).

Second, despite the potential benefits to defendants and governments, electronic monitoring is not likely to be adopted by legislative or executive action. The best prospect for meaningful change is the Eighth Amendment's prohibition of excessive bail. To achieve this goal, however, the courts will, for the first time, have to develop a meaningful jurisprudence of excessiveness to test the fit between the government's pretrial goals and the means employed to accomplish them. This Essay begins this inquiry, arguing that the text, purpose, and history of the Amendment all support the requirement that the chosen means be, at minimum, not substantially more burdensome than necessary. Under this standard, a money bail system that leads to widespread detention without a corresponding increase in performance or savings cannot survive in the face of a less restrictive technological alternative.

*1345 ESSAY CONTENTS

| | | |
|---|---|---|
| | INTRODUCTION | 1346 |
| I. | FLIGHT RISK, PRETRIAL DETENTION, AND THE NEED FOR ALTERNATIVES TO MONEY BAIL | 1351 |
| | A. The Burdens of Pretrial Detention | 1353 |
| | 1. The Criminogenic and Plea-Inducing Effects of Pretrial Detention | 1354 |
| | 2. Financial Harm to Defendants and Their Families | 1356 |
| | 3. The Tax Burden | 1357 |
| | B. The Problems with Money Bail | 1358 |
| | 1. Wealth Discrimination | 1359 |
| | 2. Direct Financial Burdens on Defendants and Their Families | 1360 |
| | C. Not Worth the Cost: The Ineffectiveness of Money Bail | 1361 |
| | D. Traditional Alternatives to Money Bail | 1363 |
| II. | ELECTRONIC MONITORING AS AN ALTERNATIVE | 1364 |
| | A. Technologies and Implementation | 1364 |
| | B. Effectiveness | 1368 |
| | C. Cost | 1372 |

|  | D. Privacy and Net-Widening | 1375 |
|  | E. Inequality | 1380 |
| III. | THE RIGHT TO BE MONITORED | 1382 |
|  | A. An Eighth Amendment Right to Be Monitored | 1383 |
|  | 1. Current Eighth Amendment Doctrine | 1385 |
|  | 2. Text, History, and Purpose | 1389 |
|  | 3. Applying Intermediate Scrutiny | 1393 |
|  | B. Statutory Approaches | 1395 |
| IV. | THE CASE FOR JUDICIAL INTERVENTION | 1397 |
|  | A. Public and Private Interests in Pretrial Release | 1398 |
|  | B. An Imperfect Judicial Solution | 1400 |
|  | CONCLUSION | 1403 |

## *1346  INTRODUCTION

Innocent or not, roughly half a million people in the United States are in jail awaiting the resolution of the charges against them at any given time.[1] Some of these defendants are dangerous, but a significant number are charged with nonviolent offenses and simply cannot afford relatively modest bonds imposed to assure their presence at future court appearances; roughly thirty percent of state court defendants assigned bonds of less than $5,000 are detained.[2] They cannot work during the often considerable time that they spend in jail[3] --leaving any children and other dependents to fend for **1347** themselves--and their jobs may not be waiting for them when they get out.[4] Apart from the often devastating impact of pretrial detention on defendants and their families, the Attorney General has estimated that the annual cost to taxpayers is nine billion dollars.[5] Nor is the bail system outstandingly effective: roughly fifteen percent of defendants released on commercial bonds fail to make at least one court appearance.[6] Responding to these problems, both the Conference of Chief Judges and the Conference of State Court Administrators have recently called for the use of more accurate pretrial assessments of dangerousness and flight risk, and for the release of non-dangerous defendants.[7]

Although rising detention rates and shrinking governmental budgets have recently brought these issues wider attention, their basic contours have not changed for decades.[8] With the rapid advance of computing technology, however, the available solutions have changed a great deal. Increasingly sophisticated remote monitoring devices have the potential to sharply reduce the need for flight-based pretrial detention. In a world in which scientists can monitor and recapture wolves,[9] snakes,[10] and even manatees[11] in the wild, and **1348** AT&T Wireless offers family-member tracking for $10/month,[12] the question of finding other ways of ensuring a non-dangerous defendant's presence at trial is one not of ability, but of will-- albeit a difficult one. By reducing jail populations, these technologies can lower overall costs--it costs at least four times as much to jail a defendant as it does to monitor him[13] --and, while invasive, are vastly preferable to a jail cell for most defendants.

Among bail reform advocates, however, monitoring has relatively few vocal proponents, perhaps due to understandable, but (I will argue) probably overstated, privacy concerns. Indeed, the problems addressed in this Essay are in some respects the reverse of the usual concerns about criminal justice technology. The rapid advance of technology has been accompanied by a corresponding increase in legal scholarship concerned about its effect on the relationship between government and society. And not without reason, of course: increasingly efficient, inexpensive, and nearly invisible methods of surveillance and control have the potential to radically alter that relationship, and law and lawyers are appropriately concerned with preventing an Orwellian disaster.[14] Largely omitted, however, from these larger debates is discussion of where new government technology would be most beneficial.[15] Although placing GPS monitors on the free population would impose enormous privacy costs, for those whom the government is already allowed to imprison in **1349** pursuit of its goals, technology that allows those goals to be achieved less obtrusively is a nearly unalloyed good.

More critically, as previous generations of bail reformers found, motivating governments to act for the benefit of the poor and unpopular against the will of the commercial bail industry is an arduous task; at the legislative level it is often nearly

impossible. [16] However, for the many detainees who are jailed not for dangerousness but for flight risk, there are meaningful constitutional and statutory grounds for future judicial intervention. A right to pretrial monitoring fits squarely within existing state and federal statutes requiring courts to impose the least restrictive conditions of release. [17] More fundamentally, although the Bail Clause has recently been somewhat neglected by both courts and scholars, this is precisely the type of problem it was meant to address: monetary conditions resulting in detention are excessive when equally effective, and cost effective, alternatives for reducing flight risk are available. That is the argument I advance here: (1) that poor, non-dangerous criminal defendants are a discrete constituency in need of judicial protection because they are effectively locked out of the political process (an argument vividly illustrated by their current treatment under the Bail Reform Act), and because historic efforts at reform have repeatedly failed; (2) that, while further studies are needed, electronic pretrial monitoring is, or will soon be, a less expensive, less burdensome, and judicially administrable alternative to money bail for ensuring appearance at trial; and (3) that the emergence of this alternative necessitates a new jurisprudence of excessiveness under the Eighth Amendment prohibition of "[e] xcessive bail."

The Supreme Court, although it has defined the narrow substantive bounds of the Excessive Bail Clause, has failed to clarify how close the fit must be between the reasons for restricting pretrial liberty and the burdens imposed. Nor has the Court explained whether the analysis must consider reasonable alternatives not provided by the legislature--thus leaving in question the definition of "excessiveness" itself. As the number of pretrial detainees continues to rise and monitoring technology improves, these questions are likely to become vital, and as an initial step towards resolving them I suggest that a standard resembling, at a minimum, intermediate scrutiny is warranted. **\*1350** Under this approach, maintaining a money bail system that consistently results in detention for poverty is substantially more burdensome than necessary if an equally effective and efficient option that does not rely on detention exists.

Part I of the Essay documents the serious problems with the current system and the limitations of the most commonly proposed alternatives. Part II provides an overview of existing monitoring technologies and their implementation and presents the argument that the benefits of replacing detention for flight risk with the use of pretrial monitoring far outweigh the costs. It concludes that the usual objections to government monitoring--the intrusion on individual privacy and the threat of surveillance extending to new segments of society [18]--have relatively little force in the pretrial context, where detention currently all but extinguishes privacy interests and the number of criminal defendants is largely independent of the means of preventing flight. Part III lays out the doctrinal avenues for achieving a right to pretrial monitoring, defining the clearest and most likely path toward the right. In addition to a strong case under current--but amendable--state and federal statutes, there are powerful doctrinal, textual, and historic reasons to conclude that the constitutional prohibition against excessive bail includes a right, for many non-dangerous defendants, to have the option of electronic monitoring in lieu of imprisonment.

The argument is more modest than it might initially seem--it would be an incremental step in line with existing Eighth Amendment doctrine and would require only that, once proven cost-effective relative to the current system, certain forms of monitoring be available to defendants who would otherwise be detained for risk of flight, not for dangerousness. [19] Recognizing that there is an important debate about the government institutions best suited to respond to technological change, however, Part IV explains why courts are a proper venue for reform. The long, mostly sad history of bail reform efforts suggests that between a perhaps-justified legislative fear of being seen as soft on crime and the existence of an entrenched public- and private-sector lobby opposed to change, prospects for legislative adoption of a monitoring alternative are likely to be dim in many jurisdictions.

## **\*1351  I. FLIGHT RISK, PRETRIAL DETENTION, AND THE NEED FOR ALTERNATIVES TO MONEY BAIL**

Historically, the U.S. system of bail and associated pretrial detention was employed solely to prevent pretrial flight, [20] but increasingly, the many individuals awaiting trial in jail are detained because a judge has deemed them potentially dangerous. [21] Although this type of detention raises serious constitutional concerns, the liberty [22] and privacy burdens placed on this subset of detainees seem, to some extent, intuitively reasonable; if evidence suggests that individuals could jeopardize the safety of

their community while they awaited trial, their detention might be merited. [23]  In light of the recent rise in officially sanctioned detention for dangerousness, however, the modern literature addressing the problems with bail tends to focus on this group of **\*1352**  pretrial detainees, highlighting the problems with predicting dangerousness, the expansive judicial discretion allowed within this predictive process, and suggesting better constitutional protections. [24]  Nonetheless, the Department of Justice estimates that non-dangerous defendants make up approximately two-thirds of the 500,000 defendants held pretrial in jails at any given time. [25]

These individuals are the product of a long tradition of money bail in the United States. [26]  Since the founding of this country, judges have required individuals to post some form of collateral [27]  in order to incentivize them to appear at a trial that they strongly wish to avoid--a process that could ultimately lead to their conviction and imprisonment. This system of money bail is an archaic institution, a holdover from times when there were few police officers and jails and when fleeing across a county or state line was more likely to be an effective means of avoiding trial; [28]  requiring an individual or family members to post something of value was a necessary and reasonable means of preventing flight.

Recent, extensive changes in technology, such as the rise of Internet photos and enhanced police communication, have greatly decreased flight incentives,  **\*1353**  and technologies such as GPS monitoring also allow the police to easily monitor those individuals who still have an incentive to flee. [29]  Yet money bail still dominates the pretrial process in most states. [30]  This system typically employs both personal bonds, in which an individual, friends, or family members post the money or a percentage of the money with a court, and commercial bonds, in which a bondsman becomes responsible for the amount of the bond and charges the defendant a percentage of the bond amount as a fee; [31]  both types are exceedingly problematic. Money bail is increasingly not an alternative to pretrial detention but rather an enabler of the practice: as bail amounts are set higher, and as financial inequalities become wider in the United States, many individuals cannot pay and are thus detained while awaiting trial. [32]  Increased pretrial detention harms poor defendants and their families, leads to greater recidivism, and uses up scarce criminal justice resources. These pervasive problems, explored in further detail below, create a pressing need for an alternative to money bail and associated pretrial detention of non-dangerous defendants. Advancing monitoring technology will soon, if it does not already, provide this alternative.

**A. The Burdens of Pretrial Detention**

Non-dangerous individuals jailed to prevent flight suffer the same harms as those detained for safety reasons--the same harms suffered by convicted defendants. [33]  They are taken from their communities and physically barred from the outside world, restricted to limited visits by family members and attorneys. [34]  Their conversations are constantly monitored by guards and other inmates, their mail is searched, and they are subjected to frequent and invasive  **\*1354**  searches and pat-downs to ensure institutional security. [35]  To compound the gravity of the harm, these high liberty and privacy burdens are often prolonged; despite speedy trial requirements, many defendants awaiting trial are detained for months. [36]

Being jailed also has a variety of more quantifiable negative effects. It increases the likelihood that detainees will commit future crimes, substantially impacts the quality of their defense, and encourages plea bargains--all of which increase the likelihood that the detainee will be convicted, imprisoned, and subjected to prolonged deprivation of liberty, privacy, and other fundamental elements of human existence.

1. The Criminogenic and Plea-Inducing Effects of Pretrial Detention

Many inmates detained pretrial have been accused of low-level or non-violent crimes, [37]  yet they are jailed with convicted criminals and potentially dangerous defendants who await trial. [38]  Predictably, incarceration multiplies the chances that the

accused will learn criminal behavior.[39] Those accused of drug possession may develop new addictions, and non-violent criminals may quickly learn violence (if only to defend themselves at first[40]). As months pass and new defendants arrive, desperation may set in, leaving a potentially permanent mark and possibly lingering violent tendencies.[41]

 **\*1355**  Moreover, the current pretrial system produces false convictions in addition to training real criminals. In the mid-1960s, the Manhattan Bail Project led by the Vera Foundation concluded that "a person's inability or unwillingness to post bail may result in more than a temporary deprivation of his liberty,"[42] finding that those detained pretrial were more likely to be convicted and imprisoned than those released on bail, regardless of whether they had been previously charged or imprisoned.[43] This trend has continued, leading some to conclude that "[t]he most glaring concern of the pretrial detainee is the large percentage of detainees who are eventually found guilty."[44] While this could simply suggest that judges assessing flight risk and dangerousness are also accurately predicting guilt, further research suggests several other likely contributors to this trend, which are troubling from an equality perspective--and, of course, with respect to defendants' long-term liberty interests. One factor is the substantial difficulty faced by a pretrial detainee attempting to mount a successful defense from a jail cell.[45] The defendant must recruit friends or family members to collect evidence and witnesses and will often have difficulty communicating with his attorney due **\*1356** to limited visiting hours.[46] The difficulty of preparing an adequate defense makes the likelihood of success at trial much lower for pretrial detainees than for those who have secured release and have avoided the stigma of a prison cell.[47]

Faced with these high defense burdens, defendants jailed pretrial often accept plea bargains in lieu of persevering through trial. In some cases, the periods that defendants spend in jail awaiting trial is comparable to, or even greater than, their potential sentences,[48] thus substantially incentivizing quick plea deals regardless of guilt or innocence. One empirical study found that of the federal pretrial detainees in 1987 and 1988, about eighty-five percent were criminally convicted, and that the majority of these convictions appeared to have "resulted from some form of plea bargaining."[49]

2. Financial Harm to Defendants and Their Families

Even if detention does not lead to a conviction, it places significant financial costs on detainees and their families, who, in addition to suffering the stigma of having a loved one in jail, are also deprived of the detainee's financial support.[50] Many detainees lose their jobs even if jailed for a short time,[51] and **\*1357** this deprivation can continue after the detainee's release. Without income, the defendant and his family also may fall behind on payments and lose housing, transportation, and other basic necessities.[52] More broadly, the removal of productive workers from the labor pool negatively affects the economy. As Attorney General Holder recently noted, nonviolent defendants "could be released . . . and allowed to pursue or maintain employment, and participate in educational opportunities and their normal family lives--without risk of endangering their fellow citizens or fleeing from justice."[53]

3. The Tax Burden

High pretrial detention rates do not only impose high costs on defendants, but also on the public. During the recent economic downturn, the cost of money bail to society has been raised as a more practical rallying flag for reform.[54] The American Bar Association notes that "the taxpayer implications of pretrial detention are significant given the expenses of operating detention facilities," observing that "New York City spends approximately \$45,000 annually to house a single pre-trial detainee."[55]

Accurately assessing the exact costs of pretrial detention is itself difficult. Fixed costs of prisons must include the expense of housing both convicted criminals and pretrial detainees, and it is difficult to identify the point at which the number of pretrial detainees, in isolation, forces construction of a new **\*1358** facility. It is clear, though, that some states and counties have had to build new jails to accommodate burgeoning populations. The Baltimore City Detention Center, for example, in which

ninety percent of women held are awaiting trial, is planning a new $181 million facility to accommodate more inmates. [56] The variable costs of pretrial detention are somewhat better known. Although they differ by jurisdiction, the costs of feeding, clothing, securitizing, and providing medical care for millions of pretrial defendants are high. Daily estimates range from $50 in Kentucky [57] to $85 in Florida [58] and $123 in New York. [59] Additional estimates suggest that jail costs range from $84 million [60] to $124 million [61] or even $860 million [62] annually.

## B. The Problems with Money Bail

The broad liberty and privacy implications of pretrial detention are somewhat easy to pinpoint: individuals presumed innocent are deprived of most freedom of motion and interaction with family and community, they are subjected to deplorable privacy intrusions, and they face a higher likelihood of prolonged liberty deprivations. The specific harms of money bail are also deeply problematic, however, and have been explored and analyzed in-depth since the early twentieth century. [63]

**\*1359** 1. Wealth Discrimination

Just as scholars have long noted the inequalities faced by defendants detained pretrial and those rich enough to be released, they have documented how money bail specifically contributes to this divide, observing in 1927, for example, that "[t]he amount of bail in a given case is determined arbitrarily and with little or no regard to the . . . financial ability of the accused." [64] A later survey of the Philadelphia bail system concluded:

> One purpose for imposing a higher [bail] amount which would be consistent with the theory of bail would be that the increase in the defendant's financial stake reduces the likelihood of non-appearance at his trial. In practice, however, higher bail usually means that appearance in court is being obtained by holding the defendant behind bars. [65]

A 1956 New York project observed similar inequalities, noting that even at a seemingly low bail amount of $500, "only three out of four defendants obtained pre-trial release, while at $7500 and above only one defendant in seven [was] able to post bail." [66] Yet for the felony prosecutions studied--2,292 of which involved the setting of bail--69 cases were set at $7,500, and many **\*1360** more cases (732) were set at points "at which most defendants cannot post bail" ($2,500 and above). [67]

Unfortunately, these conditions have not meaningfully changed: in a study of data from 1990 to 2004, the Bureau of Justice Statistics noted a "direct relationship between the bail amount and the probability of release." [68] When bail was set at $100,000 or more, only one in ten defendants was released; at bail amounts between $10,000 and $24,999, approximately forty-five percent of defendants who received bail were released; and only when bail dropped to $5,000-$9,999 did more than fifty percent of defendants who received bail obtain release. [69] Simply put, defendants without assets cannot obtain bail. As the American Bar Association concludes, "Detaining persons simply because they cannot afford bail is unwarranted . . . ." [70] Despite the growing criticisms, judges in most states still do exactly that. [71]

2. Direct Financial Burdens on Defendants and Their Families

Even if a defendant is able to post bail and avoid pretrial detention, the result is often disastrous financially. Although bail is sometimes based on a defendant's ability to pay, it is also largely determined by fixed bail schedules, [72] which assign specific monetary amounts based on the charges lodged. This often forces indigent defendants and their families to spend money that otherwise would have covered basic necessities. The many challenges faced in this uphill battle of collecting adequate funds

for bail are in some cases dramatic: in Wisconsin, for example, police allegedly confiscated the bail money that a family had managed to piece together through loans from friends and co-workers and various ATM visits because the police believed that the **\*1361** money collected was connected to the drug activity with which the defendant was charged. [73]

In sum, money bail and the high pretrial detention rates associated with this antiquated system impose high burdens on defendants, families, and society. This tragedy is not unavoidable, but rather has been perpetuated despite the availability of technology to meaningfully enhance equality, privacy, and liberty, and at a much lower cost than the current system.

## C. Not Worth the Cost: The Ineffectiveness of Money Bail

From a bird's-eye view of the U.S. system of money bail and associated pretrial detention for flight, one might assume that the high burdens imposed by this system are justified by its effectiveness--or perhaps a lack of feasible alternatives. [74] In fact, however, neither effectiveness nor a lack of alternatives justifies this costly system.

A non-negligible percentage of defendants flee despite having posted large bonds. In the seventy-five largest counties in the country, twenty-one to twenty-four percent of state court felony defendants who were released on bail or personal recognizance between 1990 and 2004 failed to appear at trial. [75] Twenty-five percent of the defendants who failed to appear had been released on surety bond; [76] of all defendants released on surety bond during this time, there was an eighteen percent failure to appear rate. [77] While this failure rate was lower than that of defendants on emergency release (forty-five percent of defendants released on an emergency basis failed to appear) and unsecured bonds (thirty percent of those released under this type of bond failed to appear), [78] it shows that bail bonds of any type do not perfectly achieve their **\*1362** goal of ensuring a defendant's presence at trial; the system tolerates a relatively high level of failure as compared to the alternative of jailing all individuals, which would guarantee nearly perfect appearance rates.

This failure is likely due to flight incentives that remain despite technological advances in tracking and monitoring defendants. Although there is no longer as high a likelihood of avoiding conviction by escaping across a state or county line, as the police will eventually detect and track down the defendant, [79] the temptation remains. The common use of fixed bail schedules [80] contributes to the problem: in addition to placing unfair burdens on indigent defendants charged with pricey crimes, it leaves rich defendants charged with the same crime in a relatively easy financial condition. A crime with a fixed bail rate of $50,000 is expensive for a poor man, in other words, but relatively cheap for someone with adequate funds. The wealthier individual may not think twice about absconding and forever forfeiting these funds, particularly if the alternative--a long jail sentence-- has a particularly high cost.

In commercial bail states, individuals may also be incentivized to flee despite low chances of success because their bondsmen have insufficient incentives to monitor them. In the majority of states that allow commercial sureties, the system relies largely on private entities to track down individuals and ensure their appearance at trial. The defendant pays the bondsman a percentage of the bail set as a fee, often along with additional collateral, and the bondsman posts the bail. [81] Depending on the size of the collateral, even defendants of reasonable means may have relatively little incentive to stay in a jurisdiction. [82] Bondsmen, in turn, will only worry about funds that they have put down to the extent they think that the court will collect it upon the defendant's failure to appear. Yet many courts have been lax about declaring bonds forfeited when defendants flee, thus allowing bondsmen to keep the **\*1363** money and reducing private incentives to monitor defendants. [83]

## D. Traditional Alternatives to Money Bail

Unfortunately, the non-technological alternatives to money bail, which are often proposed as options to reduce the inequality, liberty, and privacy burdens associated with bail and pretrial detention, are similarly ineffective. Studies suggest that release on

personal recognizance--a promise by the defendant that he will appear--is, unsurprisingly, less effective in securing presence at trial. [84] Pretrial supervised release programs, which couple release without bond with different combinations of, inter alia, required check-ins, travel and curfew restrictions, monitoring, and/or treatment and classes, can be highly effective, and for many bail reform advocates they have been the preferred option. [85] But because these programs typically rely on humans for supervision, job training, drug treatment courses, and sometimes for their monitoring, they can also be expensive [86] and limited in the number of defendants that they can accept. Persuading policymakers to increase funding, often in the face of opposition from the bond industry, has in many cases been difficult or impossible, resulting in the current, bad situation. An inexpensive, effective alternative to money bail does--or likely soon will-- exist, however, in the form of technological monitoring.

### *1364  II. ELECTRONIC MONITORING AS AN ALTERNATIVE

Increasingly advanced technologies are able to closely monitor pretrial defendants' locations while granting them far greater freedom--and with it the opportunity to continue working, consult with attorneys, and spend time with their families. [87] Indeed, in recent years U.S. and international jurisdictions have deployed monitoring technologies both pretrial and post-trial for thousands of defendants. [88] While these monitoring programs, described in greater detail below, represent a promising start, electronic monitoring has yet to meaningfully supplant pretrial detention for flight risk. There are numerous obstacles to that goal, including practical concerns as well as the likelihood of entrenched opposition from the bail industry. With this in mind, after describing existing technologies and programs, this Part addresses likely concerns about monitoring's effectiveness, costs, and impact upon liberty, privacy, and equality. These issues will have legal significance, because, as developed in Part III, both the statutory and constitutional arguments for a right to monitoring depend on demonstrating that monitoring is at least as effective and inexpensive as money bail. [89]

#### A. Technologies and Implementation

Defendants and offenders in the United States and Europe have been electronically monitored since the 1980s, and monitoring has since spread to a limited number of other countries. [90] As early as 1983, one judge required an offender in New Mexico to be confined to his home and monitored with an electronic bracelet that sent signals to his home, [91] and in 1985, Palm Beach  **1365** County deployed one of the first electronic monitoring programs using radio beepers--for convicted, not pretrial, defendants. [92] Indeed, although it is counterintuitive, as monitoring seems better suited for locating fugitives than controlling their behavior, [93] electronic monitoring is more widely used in sentencing. [94]

Nonetheless, electronic monitoring has a long history of pretrial use. In the late 1980s, Marion County, Indiana, ran an experimental program of pretrial home detention and electronic monitoring for those who could not afford bail or meet release on personal recognizance conditions. Discussing the benefits of the Marion County program, Indiana University professors note that "awaiting trial at home is less restrictive than confinement in jail" and that the program allowed "offenders to maintain employment and ties to their families." [95] And in 1991, Federal Pretrial Services began a national, pretrial home confinement programming using electronic monitoring. [96] Monitoring was introduced in Europe around the same time. [97]

Current electronic monitoring technologies take several forms. In Europe, the most common monitoring systems use radio devices combined with home  **1366** curfews. [98] In continuous-signal curfewed monitoring systems, [99] individuals wear a tag on their ankle, which sends a signal to a receiver attached to the individual's phone. [100] The individual is typically confined to the home during certain hours, and a 24-hour monitoring center, using data from the receiver, can track when the individual is at home and whether the equipment has been tampered with. [101] Other monitoring does not rely on confinement to the home but rather requires periodic check-ins through "voice verification" or another means of proving location. [102] In the United

States, Federal Pretrial Services uses both radio and GPS tracking devices to enforce home confinement and other conditions of supervised release, [103] along with frequent, required **1367** interactions with supervising officers. [104] Cook County, Illinois, has used electronic monitoring--a radio signal and home monitoring unit--for more than 250,000 non-violent defendants since 1989, some of whom were released in the pretrial context. [105]

House-arrest models, however, are both more restrictive and, when not combined with real-time monitoring, likely less effective [106] than the active tracking [107] of individuals using GPS satellite technology, which has become more common in recent years. [108] Mesa, Arizona, for example, releases and electronically monitors certain defendants pretrial using GPS satellite tracking devices. [109] And Strafford County, New Hampshire, tracks certain defendants on pretrial release (as well as sentenced offenders in community supervision) using GPS systems that allow "officials to know within 10 meters where a person has been throughout the day." [110] Private firms have also begun to offer **1368** GPS monitoring to help wealthy defendants avoid pretrial detention. [111]

Although active monitoring can be limited by the availability of the cellular telephone networks through which the device transmits location data, [112] it appears to be the best current option for both defendants and governments: its accuracy deters flight and allows fugitives to be readily located, and it is much less restrictive than a curfew requirement. Indeed, at least for relatively low-risk defendants, it potentially need only be actively (as opposed to periodically) monitored once a defendant has failed to appear for trial. And other technologies may emerge in the near future. The advent of phones capable of mobile videoconferencing and Google Glass, [113] for example, suggests that live audio-video monitoring may be a possibility in the future, presumably for the highest flight risk defendants.

## B. Effectiveness

One concern about the use of monitoring technology in lieu of pretrial detention for failure to post bond is purely practical: that it will never be totally effective at eliminating failures to appear. [114] Of course, the effectiveness of any given monitoring program at reducing flight risk is an empirical question, and while, as discussed below, existing technology shows promise, no conclusive empirical evidence of effectiveness currently exists (and with respect to future innovations, obviously cannot). The sparse empirical studies addressing the **1369** cost and effectiveness of monitoring have, as a result of the predominance of post-conviction monitoring, focused largely on that context. [115] In the United States, there are few studies of the effectiveness of monitoring pretrial, and the limited research available tends to involve small sample sizes. [116] Federal courts have generally been positive in their assessment of the Federal Pretrial Services location-based implementation of monitoring, [117] although, as noted above, it is typically combined with a high degree of supervision. [118]

The European literature is slightly richer, although still inconclusive. In a pilot study conducted in England between 1998 and 1999, judges imposed conditional bail with monitored curfews [119] on a select group of defendants--in some cases, directly in lieu of pretrial detention. [120] Of the 173 individuals who received monitoring curfews, researchers collected data on 118 individuals, eleven of whom absconded [121] --a failure to appear rate "lower than national and local figures" for other forms of bail. [122] Other European studies suggest **1370** potentially positive results, although, again, not producing any firm empirical conclusions. In Portugal, very early results of a small pilot of a bail curfew and electronic monitoring program showed "no relevant non-compliances, nor revoked orders" in 2002, from a total of 39 participants. [123] In Scotland, however, a study of the country's bail monitoring pilot showed more compliance problems; in 31 of the 63 monitored bail orders completed, defendants were accused of breaching bail conditions or committing new offenses. [124]

Studies of post-trial monitoring in Europe and the United States also suggest potential success in terms of individuals completing their programs without recidivating. [125] These statistics are not easily compared with the ability of monitoring to prevent flight, however--the core purpose of the monitoring proposed here.

Further study--particularly of the use of active GPS tracking in place of pretrial detention--will be essential to convincing wary judges and legislators. But the potential of advanced tracking technology to reduce flight risk and aid in fugitive recovery appears enormous. Anecdotally, this intuition is supported by the use of GPS monitors by bondsmen themselves, [126] as well as by recent high-profile examples of GPS monitoring as an alternative or addition to bail, including for arms dealers, gangsters, and financial fraudsters. [127] A judge initially ordered Bernie Madoff, for example, to wear a GPS monitoring ankle  **\*1371** bracelet in addition to paying $10 million in bail and remaining on nightly house arrest. [128] Dominique Strauss-Kahn was similarly granted bail and assigned a GPS electronic ankle bracelet-- along with house arrest, armed guards, and "24-hour video monitoring of every door"--at Strauss-Kahn's expense, [129] leading Slate magazine to the conclusion advanced here: "Most defendants don't run the International Monetary Fund. They don't have citizenship in non-extraditing countries or standing arrangements to board any Air France flight. They don't need guards to keep them from escaping justice. They just need an ankle monitor." [130]

Nonetheless, it might be argued that no amount of high-tech monitoring will ever be as effective at ensuring a defendant's presence at trial as detaining the defendant (which is, of course, nearly 100% effective). As Blackstone observed, defendants facing the most serious penalties could not be bailed because of their great incentive to flee: "in . . . offenses of a capital nature, no bail can be a security equivalent to the actual custody of the person. For what is there that a man may not be induced to forfeit, to save his own life?" [131] This will almost certainly be true of monitoring as well. No matter how ingenious the technology, it is likely that highly motivated defendants will find a way to defeat it, perhaps by damaging or removing the tracking device or by blocking its signal. [132] Technology, then, cannot completely eliminate pretrial detention for flight risk; at most, by being more effective than money bail, it could narrow the class of defendants considered too great of a flight risk to release (most of whom, under contemporary practice, would be detained for dangerousness anyway). But this is not a particularly serious objection: the principal beneficiaries of replacing money bail with monitoring are not those who, facing serious charges, have too much at stake to be released, but those who, facing less serious charges, simply have too little to stake. These concerns,  **\*1372** moreover, can also be addressed by imposing higher penalties for failing to appear while monitored or for tampering with a monitoring device. [133]

There will likely be missteps, in the form of malfunctioning technology and fugitive defendants, along the way to widespread deployment as an alternative to pretrial detention. [134] But, in the near term, it has the potential to effectively replace unmeetable monetary requirements for non-dangerous defendants. Technology might not be able to completely eliminate detention for flight risk, but it should be able to eliminate detention for poverty.

### C. Cost

As the American Bar Association and other organizations have begun to emphasize the expense of pretrial detention, [135] the practical benefits of the technological alternative have become even more compelling. Increasingly computerized, they do not require the staff, medical programs, and vast security controls of pretrial detention. Monitoring programs appear to generate significant savings if used in place of pretrial detention, although some of the savings may be lost if convicted defendants are not given time-served credit for time-monitored, and thus eventually spend the same amount of time incarcerated. [136]

Pretrial services programs that combine technology with relatively inexpensive monitoring have substantially reduced the financial cost of preventing flight. Miami-Dade County cut costs from approximately $20,000 per pretrial defendant to $432 annually for released, monitored defendants, [137]  **\*1373** and the Southern District of Iowa saved $1.7 million over one fiscal

year by releasing 15% more defendants. [138] Federal active monitoring of pretrial defendants in the 1990s cost approximately $2.77 to $9.04 daily, [139] compared to daily costs of pretrial detention ranging, according to some estimates, from $50 to $123. [140] Other estimates suggest that electronic monitoring programs "[o]n average . . . cost between five and twenty-five dollars per day." [141] And approximately one out of three offenders who were electronically monitored in Florida between 2001 and 2007 would have otherwise been jailed at six times the cost, according to one study, which concluded that monitoring was a "cost-effective method of dealing with offenders." [142] Similarly, results from Europe also suggest that monitoring can be far less expensive than other options if implemented properly--ensuring that monitoring is implemented in lieu of jail, thus offsetting costs. [143]

As GPS, live audiovisual monitoring, and other technologies become more common outside of the criminal world for ease of navigation and of sharing life experiences with friends and family, costs likely will continue to decline, while effectiveness will rise. Governments need not operate the programs themselves: already, multiple competing private providers exist (and one could imagine bond agents, some of whom already use tracking devices, becoming monitoring agents). [144] The cost-effectiveness of a monitoring program, of **\*1374** course, will depend on the details. A minimalist system, designed to track the location only of those who have already failed to appear and giving at least partial time-served credit, which is clearly more desirable from a privacy perspective, will also be more cost-effective than a more intrusive program [145] without credit. And, for better or worse, it is likely that monitoring programs will shift pretrial flight prevention costs to defendants; some defendants in pretrial release programs already pay for the cost of their own monitoring. [146] If electronic monitoring is implemented on a broader scale, more legislatures will try to recoup the costs of monitoring from indigent defendants as they have done with counsel [147] and jail costs. [148] As others have noted, this is deeply problematic, [149] but it is still preferable to detention (which defendants might also have to pay for).

Empirically, the cost savings of monitoring in lieu of detention require further detailed investigation. The goal here is not to suggest that monitoring is completely effective or costless, but rather that the available data suggest that it can be at least as cheap and effective as money bail.

### \*1375  D. Privacy and Net-Widening

Another, more fundamental set of reservations centers on privacy. The degree to which a monitored defendant's privacy is invaded depends on the technology employed--a device that transmits location data only on the day of a court appearance is less invasive than one that transmits constantly, and both are far less invasive than a device that transmits audio and video. But even the most limited version is a serious intrusion, and privacy concerns almost certainly explain why monitoring technologies have not so far been widely heralded by academics and criminal justice advocacy groups as a solution to the serious and seemingly intractable problems with money bail and pretrial detention described above. [150]

Focusing solely on defendants who would otherwise be detained for failure to post bond, privacy objections have little purchase. Even the most thorough observation--even if it causes defendants to carefully monitor and restrict their behavior in order to limit the government's knowledge of their lives-- would for most defendants almost certainly be preferable to imprisonment. Agence France-Presse, for example, described Strauss-Kahn's ankle bracelet as a "symbol of shame for the beleaguered global finance titan," [151] but even a high-profile figure like Strauss-Kahn apparently preferred shame (and constant surveillance) to imprisonment. In one study of those subject to home curfew and monitoring, the most common complaints voiced included "[n]ot being able to go to the store when you want" and "[n]ot being able to go out to eat when you want," followed by "[h]aving to wear a visible monitor." [152] These are significant deprivations, but, unsurprisingly, "most electronically monitored offenders prefer house arrest to jail." [153] A fortiori, a less intrusive, curfew-less monitoring regime would also be preferable to jail.

This calculus holds even if, leaving aside the tremendous increases in liberty and physical and psychological well-being, privacy is used as the sole criterion. Being in jail, after all, involves not only near-constant surveillance by **\*1376** guards, but also by fellow inmates. And in the absence of other realistic options for systemic reform, the perfect must not be the enemy of the good.

Not surprisingly, then, opposition to the use of monitoring technology has largely focused not on those already subject to a high level of government surveillance, but on the risk that technology will allow the government to surveil more people [154]: ever cheaper and more powerful monitoring equipment lessens resource constraints, and the physically unobtrusive nature of the monitors themselves lessens political and constitutional opposition. [155] These net-widening concerns are slippery slope arguments--the use of monitoring in a given context may not be bad in itself, but it will lead to the use of monitoring in other, more objectionable contexts. And as Frederick Schauer observed, slippery slope arguments are empirical arguments. [156] Thus, the question is whether the benefits of replacing pretrial detention for failure to post bond will outweigh the harms from any resulting increase in the number of people monitored. These net-widening concerns will be considered in two parts, first across society at large, and then among pretrial defendants.

In many cases, of course, there is good reason to be skeptical of the expanded use of surveillance and control technology in criminal justice. Although the precise causes of our astoundingly large prison population are disputed, [157] the costs of physical imprisonment impose at least a weak restraint on our desire to incarcerate. Technology eases that restraint, and since political support for crime control measures remains strong, and the Supreme Court has taken an extremely limited view of the privacy rights of those convicted of a **\*1377** crime, [158] this allows government to extend its control over a far wider group. Thus, for example, as Wayne Logan [159] and Erin Murphy [160] have noted, custodial "treatment" of dangerous sex offenders is quite expensive, but monitoring is not, [161] allowing non-dangerous offenders to be swept into the net. For the many who, quite reasonably, think that government already exerts too much control, particularly over vulnerable groups, concern over advancing technology is generally justified.

Although the prospect of the government requiring all citizens to wear ankle monitors or, worse, a pair of Google glasses that upload everything we see and hear to the Internet, is indeed a frightening one, using monitoring in lieu of detention is unlikely to move us meaningfully closer to that nightmare scenario. Crucially, the expanded use of monitoring technology in the pretrial context does not have the same potential to directly increase the number of people subject to the power of the state-that is, the number of pretrial defendants. [162] This is because the costs of pretrial supervision of non-dangerous defendants, whether in the form of traditional pretrial services programs, monitoring, or detention, although sizeable, simply do not play a meaningful role in determining the number of prosecutions. Relative to the costs of maintaining police departments, prosecutors' offices, and prisons (or their future technological alternatives), they are a drop in the bucket. The same may be said with respect to the political costs of maintaining a system in which the potentially innocent are thrown in jail with convicts for lack of funds. Thus, even a drastic reduction in the resource and political costs of pretrial supervision would be unlikely to cause a measurable increase in the number of **\*1378** criminal defendants. To be sure, as discussed below, it may affect the amount or form of that supervision, but the size of the population potentially subject to it will continue to be determined by larger factors, such as policing levels and policies (and thus arrest rates) and incentives for charging rates within prosecutors' offices.

Nonetheless, there remains the worry that broader use of monitoring in the pretrial context will lead to its expanded use in other contexts, including probation and parole. As the supply of monitoring technologies increases, competitive production expands, and manufacturers learn new and cheaper production methods, the cost of monitoring is likely to shrink, making it generally more appealing. More subtly, it could increase familiarity with, and acceptance of, monitoring technology among both law enforcement and the public. Although the rapid proliferation of location-tracking cell phones and services arguably poses a far greater threat in this regard than pretrial monitoring, [163] this concern cannot be easily dismissed. Ultimately, while future proposed uses of monitoring technology should be carefully scrutinized, this necessarily somewhat vague threat should not prevent its use to help the very real people currently in jail.

Turning to the narrower class of pretrial defendants eligible for release, the risk is that expanding the use of monitoring as an alternative to detention will lead to the increased use of monitoring on defendants who would previously have been released on bail, personal recognizance, or other less restrictive conditions. [164] And, to some extent, it likely would: once a monitoring infrastructure is in place, the marginal cost of adding to the monitored population is likely to be relatively low, and if monitoring is more effective at producing presence at trial than the alternatives, policymakers will have an incentive to use it. As discussed above, expanded use will lead to greater economies of scale. Moreover, increasing the demand for monitoring technology may lead to a corresponding increase in the financial ability of its **\*1379** producers to lobby governments for further expansion. [165] These fears appear to have been partially realized in England and Wales. [166] Nonetheless, the potential harms should not be overstated. Many defendants are likely to be monitored in the future regardless of whether technology is used as a replacement for flight-risk detention. Indeed, electronic monitoring by pretrial services departments is increasingly imposed as an additional condition of release, while private bondsmen have begun exploiting monitoring as a means of protecting their investment. [167] (As discussed in Part IV below, this is an unsurprising outcome given the interests of both bondsmen and technology purveyors in maximizing their profits.) To the extent that wider monitoring of non-dangerous pretrial defendants is probable in any case, net-widening concerns diminish. There are some ways to combat net-widening within the class of pretrial defendants. Perhaps most significantly, granting time-served credit, whether in full or part, for the monitoring period would both acknowledge the very real privacy cost to the defendant and likely reduce the incentive to use monitoring in place of non-incarcerative options. Maintaining a money bail option for those able and willing to pay for it could help as well--indeed, this is advisable from both a privacy and political economy perspective. Finally, the Scottish experience suggests some cause for optimism about the ability of legislation to control net-widening. Judges in the small trial program there were instructed to consider monitoring only as an alternative to detention, and this appears to have been effective. [168]

 **\*1380** On the whole, then, Orwellian fears about monitoring--however well justified elsewhere--are not as strong in the context of its use as a substitute for pretrial detention for failure to post bond. From the perspective of the defendant who would otherwise sit in jail, the privacy and liberty gains are immense. Larger segments of society are unlikely to be snagged by the criminal justice system as a result. And while some released defendants may be monitored who would otherwise not be if monitoring were to replace flight-risk detention, the liberty and privacy costs must be weighed against the benefits to those who would otherwise not be released. Similarly, if monitoring decreases the marginal cost of arrests by reducing jail costs, arrests may increase--a benefit if more murderers are caught, but, in the eyes of many, a cost if more low-level drug offenders are arrested. [169] The exact balance of this tradeoff is difficult to predict, and it depends, inter alia, on the form of monitoring employed--the more invasive it is, the lower the benefit to the newly freed and the greater the harm to the newly monitored. As discussed below, the doctrinal bases for courts to limit the extent of flight-risk monitoring exist, and for all but the most intrusive technologies, the result is likely to be a net gain of liberty and privacy.


### E. Inequality

Finally, there are concerns about continued inequality if monitoring is used in lieu of commercial bail. These are, in a way, the opposite of the net-widening objection discussed just above: to the extent that unmonitored release on bail remains an option for those who can afford it, the economic discrimination of the current system is maintained. So far, in fact, the advent of GPS tracking, combined with older and more expensive forms of monitoring, has in some cases worsened this discrimination, as rich-and-high-flight-risk defendants have avoided detention by a combination of electronic monitoring and expensive private guards. [170] But if it is true, as argued here, that electronic monitoring is a major improvement over imprisonment, then the gap between rich and poor will be narrowed significantly by using it in place of imprisonment for failure to post bond. In the absence of better alternatives, opposing the expanded use of monitoring on equality grounds would seem **\*1381** perverse, but equality concerns might justify a call for universal monitoring of pretrial defendants. Such a proposal pits liberty (for the wealthier) against economic equality in an unusually stark way, and while the resolution of the moral question may be in some doubt, the practical question is not: courts as well as legislatures are unlikely to curtail the rights of moneyed defendants in the name of equality. [171]

Considered as a whole, the objections to the replacement of pretrial detention for flight risk with electronic monitoring pale in comparison to the arguments in its favor--the tremendous gains in liberty, privacy, fairness, and equality for those released. Because pretrial detainees are subjected to an extremely high and extremely burdensome level of government control, a less repugnant method of control offered by technology is a boon. And because the size of the group subject to this control is governed almost entirely by factors unrelated to the financial and political costs of exercising it, lowering those costs will not cause the government to extend its grasp much further. There is something unsavory about a government electronically monitoring its citizens, but in this case, it is more savory than a government imprisoning them for lack of funds; it is an evil, but a lesser one.

Nonetheless, as explored further below, the political process cannot be trusted to widely embrace electronic monitoring as a replacement for detention. [172] For nearly a hundred years, the existence of a powerful commercial bondsmen lobby [173] --and a lack of interest in the plight of poor **\*1382** defendants--has hampered reform efforts. The judiciary, then, is the most promising locus of reform. Part III will show that there is a solid basis for both a constitutional and statutory right to monitoring for defendants detained for lack of funds, and Part IV will demonstrate that despite a vigorous, ongoing debate over the courts' role in responding to technological change, they should not hesitate to implement those rights.

### III. THE RIGHT TO BE MONITORED

Over the years, numerous solutions have been proposed to the broken bail system, [174] and some, including the expanded use of personal recognizance bonds and pretrial services programs, have been implemented on a small scale--often against the opposition of the commercial bail industry--with varying degrees of success. Recently, New York's Chief Judge proposed bail reform legislation that he hoped will make the bond industry "basically irrelevant." [175] He may be able to achieve this, but history suggests that, if so, it will be through his judicial decisions, not his rhetoric. As has long been recognized, judges can sometimes succeed in protecting the rights of unpopular groups where legislatures do not, [176] and in the bail context, state and federal constitutions and statutes form a perhaps surprisingly solid foundation for a right to monitoring. As discussed below, the statutory arguments are somewhat more straightforward, but, of course, much more subject to change.

### *1383 A. An Eighth Amendment Right to Be Monitored

Although pretrial detention for failure to post bond clearly implicates other constitutional concerns, [177] the Excessive Bail Clause is the provision that speaks directly to pretrial detention, and the strongest case for a right to monitoring rests on it. This is true even though it has not generated a great deal of judicial or academic interest in recent years. In a previous generation, a vigorous debate focused on whether the Clause created a right to a bail calculation based solely on flight risk. [178] Interest waned, however, after the Supreme Court answered this question in the negative in United States v. Salerno, [179] upholding detention for dangerousness and indicating that neither the Bail Clause nor Substantive Due Process meaningfully limits the permissible justifications for pretrial detention. [180]

But Salerno did not completely empty the clause of content: regardless of what ends are permissible, "excessive" -ness clearly implies an inquiry into the relationship between those ends and the means employed to achieve them. As one court in the Southern District of New York put it, although the Excessive Bail Clause contains no "absolute 'least restrictive conditions' requirement . . . it must preclude bail conditions that are more onerous than necessary" and "result in deprivation of the defendant's liberty." [181] This must surely be broadly **\*1384** correct, but it also reflects the lack of a clear standard. Distinct from identifying the types of threats restrictions on pretrial liberty may be used to counter or the methods used to quantify that threat, however, the question of how close a fit the Clause requires between that threat and the response remains uncertain. In other words, the Court has told us what restrictions on pretrial liberty must be measured against, but not how they are to be measured--how closely the means must fit the ends.

How is excessiveness to be measured? Crucially, for a right to monitoring, is it to be calculated solely using the internal, actuarial logic of the money bail system, or should it be measured on the basis of all viable alternatives? The courts have not yet provided a clear answer to these questions.

A richer jurisprudence of excessiveness is needed, and towards that goal the balance of this Section will argue the text, history, and case law of the Excessive Bail Clause suggest that at least an intermediate level of scrutiny should be applied to the fit between the legislature's goals for its system of pretrial release and the means employed to achieve them. Applying this standard, which requires that the means chosen not be "substantially broader than necessary to achieve [the government's] interest," [182] a bond requirement resulting in detention is clearly excessive if monitoring could serve the state's goals equally well (and equally efficiently).

The key to this constitutional argument, as well as the statutory arguments below, is establishing monitoring's superior effectiveness. In light of the strong liberty, privacy, and equality infringements of jailing pretrial defendants, the standard of proof should be somewhat low, perhaps requiring proof that it is "more likely than not" that jail is a substantially overbroad means of preventing flight. Here, the relevant reference point is the appearance rate of defendants released on financial conditions against that for otherwise similarly situated monitored defendants who would have been detained for lack of bail--if the latter rate (and the cost of monitoring relative to imprisoning [183]) is as low or lower, a concern over flight risk cannot justify imprisonment. The effectiveness of pretrial detention at producing the defendant at trial cannot be the point of comparison, because bail, not detention, is the explicitly preferred option, and **\*1385** its continued use establishes beyond doubt that Congress does not require 100% success. Nonetheless, producing such a record is a serious hurdle, and without it, defenders of the bail system would be able to argue that the same lack of resources that prevents the poor from obtaining release makes them less likely to fear the repercussions of failing to appear for trial. The best hope for the creation of such a record may lie in one of the four states that have banned commercial bail [184]--or, perhaps, from entrepreneurial bondsmen. The limited success of systems in Europe, as discussed in Part II, will also provide an important foundation.

1. Current Eighth Amendment Doctrine

There is surprisingly little precedent interpreting the Excessive Bail Clause, and the methodology for determining excessiveness remains somewhat uncertain. Nonetheless, a heightened scrutiny approach is consistent with the case law.

The leading case remains United States v. Salerno, in which the Court considered a challenge to the Bail Reform Act of 1984. The petitioner argued that the Act, which allows defendants to be detained out of concern that they would commit a crime if released pending trial--a concern largely unrelated to flight--was unconstitutional. The Court rejected, 6-3, this argument in an opinion authored by Chief Justice Rehnquist. After reviewing the roots of the Excessive Bail Clause in the English Bill of Rights and the Court's scanty and somewhat contradictory precedents, [185] the Court declined even to decide whether the Clause placed any limits at all on Congress, as opposed to the judiciary:

> [W]e need not decide today whether the Excessive Bail Clause speaks at all to Congress' power to define the classes of criminal arrestees who shall be admitted to bail. For even if we were to conclude that the **\*1386** Eighth Amendment imposes some substantive limitations on the National Legislature's powers in this area, we would still hold that the Bail Reform Act is valid. . . . The only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be "excessive" in light of the perceived evil. [186]

The Excessive Bail Clause, so interpreted, provides a rather narrow window through which to challenge conditions of pretrial release--or a lack thereof. [187] Indeed, as I have argued elsewhere, the Clause has been of so little importance that the question

of its incorporation against the states appears to have been decided in a footnote--in a case about an unrelated constitutional provision. [188] Nonetheless, assuming that the "only arguable substantive limitation" imposed by the Excessive Bail Clause--the prohibition on excessive means of achieving desired bail purposes--does in fact exist, the continued detention of impecunious defendants despite the existence of cost-effective alternatives to ensuring their presence at trial conflicts with even this rather stunted conception of pretrial liberty. And this limit should exist: applying the Clause only to the judiciary would be highly anomalous. [189] The Framers, along with later constitutional theorists, [190] understood that legislative majorities can be as much of a threat to individual rights as the executive, and certainly the judicial, branch. [191] And indeed, the lower courts have consistently assumed or held that  *1387  the Salerno limit applies. [192] The question, then, is what the contours of that limit are. Although, as discussed below, the Court has left them rather vague, nothing in the case law precludes the requirement of a close fit between means and ends.

In Stack v. Boyle, the Court considered an Eighth Amendment challenge brought by twelve petitioners charged with conspiring to violate the Smith Act, which criminalized, inter alia, advocating the violent overthrow of the United States government or organizing or joining a group that did so. [193] Bail had been set for each petitioner at an amount greater than was typical for crimes with maximum punishment.

The Court began its analysis by noting that "[b]ail set at a figure higher than an amount reasonably calculated to fulfill [its] purpose is excessive," and that "the fixing of bail for any individual defendant must be based upon standards relevant to the purpose." [194] It then looked to the "traditional standards as expressed in the Federal Rules of Criminal Procedure," which included the offense charged, the weight of the evidence, and the defendant's financial ability and character. [195] The government had put forth no evidence, but asked the Court to affirm on the theory that "each petitioner is a pawn in a conspiracy and will, in obedience to a superior, flee the jurisdiction." [196] The Court rejected this argument, holding that "[t]o infer from the fact of indictment alone a need for bail in an unusually high amount is an arbitrary act," and that in the absence of evidence the bail set violated "statutory and constitutional standards." [197]

 *1388  Stack, then, is more concerned with how flight risk must be proven than with matching flight risk to the government's response, but there are some indications that the Court was engaging in something more than a rational basis review. "Reasonably" and "arbitrary" can both suggest a range of levels of scrutiny, and arguably foreclose strict scrutiny. [198] At the same time, the Court's reasoning seems inconsistent with a rational basis approach. In a time in which the American Communist Party was viewed as "a highly disciplined organization, adept at infiltration into strategic positions," dedicated to the "overthrow of the Government by force and violence" and possessing the "slavish[]" obedience of its members, [199] it hardly seems irrational for the Court to have thought that those who were charged with Smith Act violations categorically posed a greater risk of flight. [200]

In Salerno, the excessiveness analysis was more cursory. The Court stated that "to determine whether the Government's response is excessive, we must compare that response against the interest the Government seeks to protect . . . . [B]ail must be set by a court at a sum designed to ensure that goal, and no more," [201] and added little more before concluding that detention was a permissible means of preventing serious pretrial crime.

The Salerno Court did, however, acknowledge that "the individual's strong interest in liberty" is of a "fundamental nature," [202] and it would be highly anomalous not to subject a deprivation of such a right to meaningful review under a constitutional provision designed to protect it. And importantly, the Court has not looked to its rather permissive Cruel and Unusual Punishment proportionality jurisprudence to determine excessiveness under the Bail Clause  *1389  as it has under the Excessive Fines Clause. [203] This is wholly appropriate, because bail is not meant as punishment--which legislatures have a great amount of

discretion to tailor [204] --but rather process. And the courts and other parts of the Constitution typically give far less leeway to legislatures in limiting criminal procedural rights.

Thus, although there is nothing definitive either way, requiring, at the minimum, a substantial fit between the ends served by a system of pretrial release and the means employed is consistent with current doctrine. [205] Nor is there anything to foreclose looking beyond the internal logic of the money bail system; due to the historical dearth of highly effective, efficient alternatives, the issue has not yet arisen.

2. Text, History, and Purpose

Requiring at least a substantial relationship between pretrial burdens and their justification also finds support in the text of the Eighth Amendment, which mandates that "[e]xcessive bail shall not be required . . . ." From the beginning, this deceptively simple phrase has seemed more noble sentiment than source of concrete rights. As the speaker of the only recorded comment on the Bail Clause during the congressional debate over the adoption of the Bill of Rights put it: "The clause seems to express a great deal of humanity, on which account I have no objection to it; but as it seems to have no meaning in it, I do **1390** not think it necessary. What is meant by the terms excessive bail? Who are to be the judges?" [206]

Nonetheless, we can put some meat on the bare bones of the Clause. Looking to the original public meaning [207] of constitutional provisions, as the Court has done with respect to the Excessive Fines Clause, [208] "excess" meant, according to Samuel Johnson's dictionary, "[m]ore than enough; superfluity," and excessive "[b]eyond the common proportion of quantity or bulk." [209] And when the Fourteenth Amendment, which applied the Eighth Amendment to the states, was adopted, "excessive" meant "[b]eyond the established laws of morality and religion, or beyond the bounds of justice, fitness, propriety, expedience, or utility," with the Excessive Bail Clause specifically cited as an example of this usage. [210] Thus, in contrast to Fourth Amendment reasonableness, [211] excessiveness clearly embodies a requirement of meaningful proportionality. [212] And unless it is to be a constitutional nullity, it must require more than a merely rational relationship between means and ends--that much, of course, is required by the Due Process Clause. Moreover, constitutional proportionality must necessarily take into account changing real-world **1391** conditions to avoid obsolescence. We would not, for example, judge the excessiveness of a fine (or bail setting) using eighteenth-century standards; inflation would render that approach absurd. Similarly, whether an amount is "excessive" under the Bail Clause should not be judged in terms of the money bail system of the past, but in light of modern alternatives. And as argued below, this rich conception of excessiveness is essential to fulfilling the purpose of the Clause. As Jamal Greene has noted, the Framers' intent remains relevant to courts dealing with constitutional questions, [213] and purpose more broadly is important to theorists of many stripes. [214] The Founders transferred the phrase "[e] xcessive bail shall not be required," with slight modification, from state charters, which had borrowed the phrase from the English Bill of Rights and other English laws. [215] The English Bill of Rights was a direct response to the Crown's practice of imprisoning political dissidents indefinitely without cause and denying them bail. While the Petition of Right in 1627 and the later Habeas Corpus Act provided some protections, judges were still able to effectively deny bail by setting it at a high monetary amount--a practice that still occurs in American courts today, although not for such egregiously political reasons as those of the 1600s. [216] The Excessive Bail Clause of the English Bill of Rights therefore directly addressed the problem, outlined in a House of Commons report, of the "'illegal and a high breach of the liberty of the subject' [in] the refusing of 'sufficient' bail." [217]

The history of the Excessive Bail Clause in England and its transfer to the United States suggests a direct response to the sovereign's use of political **1392** power--and his influence on judges--to wrongly and indefinitely imprison individuals to punish or coerce them. [218] The right to monitoring is consistent with this core purpose of the Excessive Bail Clause: keeping people locked up increases the likelihood of a guilty plea, [219] weakening the core protection against arbitrary or discriminatory prosecution--the jury trial. Indeed, as Professor Sanford Levinson has observed, the federal-state relationship is not the sole guarantee against a tyrannical national government; the Bill of Rights also intends to enlist citizens in this mission by protecting

"popular liberty against state depredation." [220] Incarceration is the most intrusive and thorough means of depriving individuals of liberty, yet we currently jail thousands of citizens not yet proven guilty of any crime. We prevent these individuals from forming a good defense, [221] thus raising their chances of being convicted and incarcerated, and this liberty deprivation extends to families and society as a whole. The right to remain free before trial--albeit within a somewhat intrusive monitoring regime-- seems to rest comfortably alongside, or even above, other rights often cited as necessary to free citizenship. This, too, strongly suggests that the required fit between the legislature's ends and the chosen means must not be overly loose: a rational basis analysis, under which almost anything is permissible, would do little or nothing to prevent these abuses.

And while an amendment that specifically contemplates the existence of bail might at first glance seem an unlikely source of a right to an alternative, this is not an especially serious objection. In the same way that even a low bail setting is excessive if the traditional alternative of release on personal recognizance would equally satisfy the purposes of the bail setting, any bail requirement aimed at reducing flight risk and resulting in detention is excessive if monitoring would achieve that goal as efficiently and effectively. More fundamentally, it is clear that the setting of non-excessive bail is not an end in itself, but rather a means toward the goal of greater pretrial liberty. [222] Its **\*1393** purpose was not to enshrine the money bail system, but to ensure pretrial liberty (using the best option available at the time) and to prevent tyrannical use of pretrial detention. As technology makes achieving society's goals with respect to pretrial defendants easier, so should our measure of what is excessive. [223] And indeed, the Excessive Bail Clause has not been thought to apply only to financial conditions--it has been used to successfully challenge non-monetary conditions. [224]

### 3. Applying Intermediate Scrutiny

At least an intermediate level of scrutiny is consistent with precedent and warranted by the text and purpose of the Eighth Amendment. Applying this standard, the question is whether the use of money bail to ensure the defendant's presence at trial is excessive under Salerno--that is, substantially broader than necessary to achieve the governmental interests at stake--in the face of a record, like that discussed above, proving the existence of an equally effective and inexpensive monitoring alternative. Given the large percentage of defendants detained for failure to post relatively modest bonds in many jurisdictions, [225] the answer appears to be very likely yes--rendering those jurisdictions susceptible to Eighth Amendment (and/or state constitutional) challenges to bail settings from detained, non-dangerous defendants not posing an extreme flight risk. [226] Courts would, in all likelihood, give these jurisdictions reasonable time to deploy a monitoring regime, but eventually they would be forced to release these defendants, monitored or not. [227]

**\*1394** At this point, however, an acknowledgement of the limits of the proposal's ability to eliminate wealth inequality in pretrial outcomes or eliminate net-widening concerns is appropriate. To be clear, under the analysis set out above a jurisdiction could very reasonably conclude, even once the efficiency of monitoring is clearly established, that it prefers to maintain a money bail option because it is less intrusive for those who can afford it. And it is very likely true that for some of those who can afford it, even a large amount of money would not seem excessive if the alternative is some form of electronic monitoring. Nothing in the foregoing argument would prevent them from doing so. A right to the alternative would simply be an option to select monitoring in lieu of pretrial release. But it would forbid a jurisdiction from jailing a defendant because he could not pay this "luxury tax." This outcome might be unsatisfying to those concerned with economic discrimination, as it would perpetuate, to a lesser degree, the disparity of pretrial treatment based on financial resources. And beyond principle, ensuring that white-collar defendants were subject to the same conditions as the less affluent would help limit the invasiveness of those conditions. But although these concerns bear careful consideration, similar arguments have received short shrift under the Equal Protection Clause, and it is difficult to find a toehold for them under the Eighth Amendment. [228]

**\*1395** However, for those concerned that even monitoring is not a carefully delineated approach to achieving pretrial presence and that defendants who would have simply been released may now be swept into the monitoring net, Salerno and Stack provide the doctrinal foundation for limiting the extent of monitoring, at least to a degree--the amount and nature of monitoring would

have to be justified with reference to their effect on flight risk. In light of the intrusive nature of many current conditions of pretrial release, this might not be a particularly strong protection, but it would likely prevent extreme forms of monitoring, such as twenty-four-hour surveillance, that the government might seek in order to gather evidence or prevent crime.

### B. Statutory Approaches

For federal detainees and detainees in states with similar bail statutes, [229] another path to monitoring in lieu of detention for flight risk lies in the Bail Reform Act's requirement that a judge impose "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." [230] Electronic monitoring is clearly less restrictive than a monetary requirement resulting in detention; therefore, once a sufficient record of a technological alternative's efficiency and **\*1396** effectiveness exists, it should be required by the Bail Reform Act and similar statutes. At least one court has taken a preliminary step in this direction. In Karpouzis v. Government of the Virgin Islands, [231] the Appellate Division of the District Court of the Virgin Islands applied the least restrictive means requirement of a territory law to reverse a $2 million bail requirement when the "trial court gave no explanation why house arrest with electronic monitoring, a responsible third-party custodian, and a very significantly reduced monetary bail in the range proffered by appellant would not adequately ensure appellant's presence at trial." [232]

Karpouzis was limited, of course, to the individual circumstances of the case. For meaningful reform, a broader approach is necessary. If monitoring's superiority in reducing flight can be established, then it should always be required under these statutes as an alternative to an unmeetable bail setting. Further, since judges (and defendants themselves, who very often lack counsel at the bail stage [233]) often cannot know in advance exactly what a defendant can afford, [234] and since a meetable bond will often be more restrictive than electronic monitoring, courts should be required to offer monitoring as an alternative when setting bail. In this way, a portion of the least restrictive means analysis is given over to the party with the greatest ability--and incentive--to get it right.

The Bail Reform Act applies only in federal court, leaving only constitutional arguments for detainees in states without analogous statutory language. Indeed, even in jurisdictions with similar legislation, judges may be more comfortable imposing the adoption or expansion of monitoring on constitutional grounds. Constitutional grounds, moreover, have the added advantage of being further removed from the reach of legislatures--and special interests. [235]

### *1397  IV. THE CASE FOR JUDICIAL INTERVENTION

Having made the normative, constitutional, and statutory case for a right to monitoring, it is necessary to consider one last set of objections. In light of an ongoing, important debate over whether courts or legislatures are the proper bodies to define the limits on governments' use of technology, [236] it is worth explaining why judicial intervention is necessary. Broadly speaking, on one side, the unpopularity of criminal defendants and the existence of a potent law enforcement lobby may lead legislatures to systematically undervalue defendants' rights, thus necessitating increased judicial scrutiny of encroachments on liberty and privacy. [237] On the other hand, because society as a whole benefits from, and is burdened by, increased police power, democratically elected legislatures may accurately reflect the preferred balance. [238]

 **\*1398** But regardless of the resolution of the debate over institutions best suited to regulate the government's use of technology that affects society as a whole, it is clear as a matter of theory and history that legislatures cannot be relied upon to appropriately weigh the interests of the unpopular and politically weak, particularly when those interests conflict with those of a concentrated lobby. [239] If it is true that GPS, or future forms of monitoring technology, will soon, if it does not already, offer a fairer, more effective, and more efficient alternative to money bail for producing defendants for trial, it would be natural to assume that, over time, the political process--indeed, mere prudence--might lead to its widespread adoption. And in some jurisdictions it probably

will be adopted. But the adoption of beneficial technology depends on the priorities of those in charge--football teams get iPads before philosophy departments. And modern political theory, amply illustrated by a long history of stunted bail reforms, suggests that in many jurisdictions, pretrial monitoring will not be adopted without court involvement. Because of this, the courts, despite some limitations, should be a driver of reform.

## A. Public and Private Interests in Pretrial Release

Commercial bail bonding is among the oldest forms of privatization in criminal justice. Because it has always relied on the government to create demand for its services by imposing financial conditions for pretrial release,[240] the bond industry has long invested in government relations. Factors crucial to the industry's profitability--the number and amount of bonds imposed-- are determined by government policy. And it is a multi-billion dollar industry.[241] This creates a classic public choice problem: the benefits of the bail system are concentrated in the industry, while the harms are borne by a politically weak group, criminal defendants. Indeed, bondsmen have opposed many efforts to change the traditional money bail system--including efforts to implement **\*1399** pretrial monitoring.[242] They view pretrial release programs as direct threats to their business,[243] and despite using monitoring technologies themselves to track defendants,[244] they have argued that the technologies are ineffective and costly to defendants. In response to concerns about the affordability of bonds, one consultant writing for a bondsman blog suggests that family members or friends do not post bonds for an accused and leave him in jail because "the accused is unable to abide by any semblance of rules and regulations."[245] "More than anything," he argues, "this is an indictment of our society's deteriorating parental skills which seems to have trouble teaching responsibility, accountability, and discipline. Instead, a family would rather have their 'deadbeat' left in jail where they might learn a lesson or two as opposed to being released on bail."[246]

The greatest harm from the system, moreover, is suffered by the least influential of criminal defendants, those too poor to make bail, while the relatively few defendants of significant means suffer little inconvenience. Compounding the problem, the costs of detaining defendants who cannot post bond are widely dispersed to taxpayers, while bondsmen and their political allies can claim that the private surety system is otherwise run without cost to **\*1400** the public fisc. And the employees of the jails housing pretrial detainees have their own lobbies to protect their continued employment.

All of this goes a long way towards explaining why money bail, a practice developed at a time when there were no professional police and few jails,[247] the earliest possible trial might be months away,[248] and the odds of an absconding defendant being recaptured were long, has survived in modern times despite vigorous reform efforts. Despite compelling arguments for the expanded use of personal recognizance and pretrial services programs, in many jurisdictions, detention for failure to post bond remains widespread. And indeed, despite the enormous budget pressures facing state and local governments in the wake of the 2008 financial crisis and subsequent economic downturn,[249] moves to release a greater number of pretrial defendants have been only sporadic. This pattern is visible in the history of monitoring technology as well. Although providers of monitoring technology and services have their own lobbies to pursue their interests, the result has largely been the monitoring of those who would previously have been released anyway. In at least one documented case, the bond industry has successfully lobbied to kill a large-scale monitoring program.[250] Thus, while monitoring technology will probably replace detention in some jurisdictions in the coming years, likely those with weak or absent bail lobbies or especially pressing budget problems, there is reason to believe that in many places the result of the political process will be the continued existence of money bail--and detention for flight risk.

## B. An Imperfect Judicial Solution

Under these circumstances, it is clear that regardless of the resolution of the larger debate over the relative merits of courts and legislatures in responding to **\*1401** new technologies, the best hope for an actual monitoring right for flight-risk detainees lies in judicial intervention. In light of the near certainty of legislative inaction, the limitations of judicial responses to new

technology lose their usual force; half a loaf is better than no loaf at all. The judiciary, particularly the elected judiciary, is of course not immune from political considerations, but its relative independence makes it a far more promising locus of reform. And although generalist judges typically have no particular scientific expertise, courts have long experience evaluating the efficacy and affordability of new technology. The clearest example of this may be in the torts context, which relies heavily upon proof of available technologies in ascertaining standards of care to which various actors are held. [251]  In the famous T.J. Hooper case, Judge Learned Hand declared that tugboat operators who could have but failed to use new weather information technologies negligently damaged barges and cargo. [252]  Despite the fact that the radio receiving technologies that would have warned of storms had not yet been "generally adopted" in the business--indeed, there was "no custom at all" to use the sets, at least according to Hand [253] --the court observed that in some cases, "a whole calling may have unduly lagged in the adoption of new and available devices," thus inducing court action. [254]  Indeed, subsequent cases have confirmed that where affordable, state-of-the-art technology would make products safe but has not been widely adopted, products manufacturers can be liable for failure to install these products. [255]  And, of course, federal courts are experienced in assessing the effectiveness of monitoring provided by Federal Pretrial Services and private operators in the context of individual bail determinations. [256]

 **\*1402**  Nonetheless, courts are likely to be much more hesitant to base significant new constitutional or statutory law, as opposed to new tort liability (or individual release determinations within an established framework), on emerging technology. As Professor Kerr has observed in his influential work, judges are largely reliant on parties to bring them information about new technologies, and, due to stare decisis, the rules they announce cannot easily be changed. [257]  This, as the Supreme Court has acknowledged, makes them cautious when evaluating the effect of new technology on constitutional law. [258]  Moreover, though judges' intimate knowledge of the bail system (with monitoring as its use becomes increasingly common) may help make them more comfortable with intervening, that same comfort level, and indeed their active role in setting bail, may cut against intervention. Adding to the case for judicial caution are the deep marks left by the history of the judiciary's involvement in prison reform [259] and the lasting backlash against it: in recent years, the courts have been extremely reluctant to require costly remedies even for the most severe constitutional violations. [260]  In light of that experience, judges will be extremely hesitant to be seen as requiring taxpayers to foot the bill for improvements in criminal defendants' quality of life or as micromanaging detention policies.

Due to these factors, courts are likely to require extremely convincing proof of the effectiveness and efficiency of monitoring technology before mandating that it be offered as an alternative to detention. Even the relatively modest performance advantage of money bail over personal recognizance bonds and its **\*1403**  arguable cost savings (to the state) over existing pretrial services programs currently insulate it from judicial attack. Despite some promising results from pretrial monitoring and growing experience with its use in other contexts, courts will be hesitant to consistently grant monitoring in lieu of detention to indigent, non-dangerous defendants until at least a few jurisdictions adopt monitoring more widely in lieu of detention and have established a well-documented record of failure-to-appear rates at least equal to those of traditional money bail systems for similarly situated defendants at equal or lesser cost. [261]  A large-scale study, funded by the National Institute of Justice, of the effectiveness of electronic monitoring at reducing recidivism among released felons in Florida showed that it reduced failure rates by over thirty percent compared with other forms of supervision. [262]  A similar study with respect to flight risk and money bail would be a critical data point. The four states that have abolished money bail are perhaps the most likely candidates to provide the necessary data, and they would be a logical starting place for reform efforts.

Further, any remedies that are eventually imposed are likely to be imposed gradually to allow jurisdictions to spread out fixed costs and gain familiarity with the technology. In the pretrial context, the judiciary will likely not be at the vanguard of reform. But delayed, gradual reform is better than its probable alternative, no reform. Even the relatively modest intervention contemplated here would bring significant benefits. In the absence of judicial action, thousands of criminal defendants will continue to be detained--and suffer all of the deleterious effects of detention--long after available technology would allow

the government to achieve its goals at lower financial and human cost. No matter how sound the policy, of course, judicial intervention requires a judicial basis for decision, which this Essay has located primarily in the Eighth Amendment.

**CONCLUSION**

At any given time, thousands of criminal defendants around the country are imprisoned to ensure their presence at trial despite being eligible for **\*1404** release, simply because they lack the financial resources to make bail. Monitoring technology, which will only increase in effectiveness and decline in cost, is already in wide use, including as a condition of bail,[263] and represents a far less burdensome means of achieving the government's aims. Moreover, especially as compared to the potential gains from releasing those currently held for trial, net-widening concerns are fairly minor, as the means of ensuring trial presence appear to have relatively little effect on the size of the overall criminal defendant population, and within that population there are relatively few currently released without various types of conditions.[264]

In many cases governments will adopt less-intrusive, cost-effective technologies voluntarily, without judicial prompting. This has been the case with police use of advancing investigative techniques generally. But well-established theory and long and bitter experience strongly suggest that when adopting these technologies would aid the poor and unpopular at the expense of established lobbies, they will not be adopted through the political process. If they are not, courts must intervene. The Eighth Amendment prohibits the imposition of excessive bail, and if it is to fulfill its core purpose of preventing needless or discriminatory pretrial detention, it must require the use of technologies that prevent flight as efficiently and effectively as the bail system without its concomitant detention. Building the necessary evidentiary record will be a significant hurdle for advocates, and courts will have to overcome their reluctance to involve themselves in the mechanics of both pretrial justice and detention, but these challenges must be met. If they are not, the iniquitous result will be a twenty-first-century system of detection coupled with a nineteenth-century system of detention.

Footnotes

[a1]     AUTHOR. Assistant Professor of Law, Florida State University College of Law. Many thanks to Professors Laura Appleman, Shima Baradaran, Shawn Bayern, Curtis Bridgeman, Dan Coenen, Adam Feibelman, Sam Halabi, Timothy Holbrook, Eric Kades, Jay Kesten, Ronald Krotoszynski, David Landau, Jake Linford, Wayne Logan, Dan Markel, David Markell, Murat Mungan, Garrick Pursley, Mark Seidenfeld, Christopher Slobogin, Mark Spottswood, Franita Tolson, Hannah Wiseman, and Saul Zipkin, and to participants at the Southeast Law School Junior-Senior Faculty Workshop for their valuable comments.

[1]      Shima Baradaran, The State of Pretrial Detention, in The State of Criminal Justice 2011, at 187, 190 (Myrna S. Raeder ed., 2011) (estimating that there are 500,000 total pretrial detainees in the United States); The Socioeconomic Impact of Pretrial Detention, Open Soc'y Just. Initiative 16 (2011), http://www.opensocietyfoundations.org/sites/default/files/socioeconomic-impact-pretrial-detention-02012011.pdf (listing the pretrial population at 476,000).

[2]      Thomas H. Cohen & Brian A. Reaves, Pretrial Release of Felony Defendants in State Courts, Bureau Just. Stat. 1 (Nov. 2007), http:// bjs.ojp.usdoj.gov/content/pub/pdf/prfdsc.pdf. Five out of six defendants jailed pretrial are jailed because they cannot afford bail amounts. See id. In some cases this reflects a judgment (in the form of a high bail setting) that the defendants are dangerous, but in other cases not. It is difficult to separate out these numbers because some states allow judges to impose higher bail amounts to control for dangerousness; it is likely safe to assume, however, that the low bail amounts at the state level are typically imposed on non-dangerous defendants, and the statistics for this low-bond defendant class are compelling. See Eric Holder, Att'y Gen., U.S. Dep't of Justice, Address at the National Symposium on Pretrial Justice (June 1, 2011), http://www.justice.gov/iso/opa/ag/speeches/2011/ ag-speech-110601.html (noting that many pretrial detainees have been "charged with crimes ranging from petty theft to public drug use," and that they are detained "because they simply cannot afford to post the bail required--very often, just a few hundred dollars-- to return home until their day in court arrives"); Criminal Justice Section, State Policy Implementation Project, A.B.A. 2, http:// www.americanbar.org/content/dam/aba/administrative/criminal_justice/spip_ handouts.pdf [hereinafter A.B.A. Study] ("Two thirds of the 500,000 individuals incarcerated in jail and awaiting trial are low bail risk ... pos[ing] no significant risk to themselves or the community, as well as representing a low risk of flight." (emphasis added)). A defendant's income affects both whether he ends up

in jail and the length of his pretrial detention. See Mary T. Phillips, Pretrial Detention and Case Outcomes, Part 1: Nonfelony Cases, N.Y.C. Crim. Just. Agency, Inc. 9, 22 (2007), http://www.cjareports.org/reports/detention.pdf (noting in an empirical study of New York City nonfelony defendants in 2003-2004 that "[e]very $1,000 increase in bail amount was accompanied by an average increase in 2.3 days in pretrial detention time" and that "a lack of income ... led to a longer [pretrial] detention").

[3]   Between October 1, 2003, and September 30, 2004, federal defendants detained pretrial because they could not afford bail, whose cases were eventually terminated, spent an average of 71.2 days in jail. Compendium of Federal Justice Statistics, 2004, Bureau Just. Stat. 55 tbl.3.11 (Dec. 2006), http://bjs.ojp.usdoj.gov/content/pub/pdf/cfjs04.pdf; see also United States v. Zannino, 798 F.2d 544, 547-48 (1st Cir. 1986) (holding a sixteen-month pretrial detention period constitutional, but noting "that in many, perhaps most, cases, sixteen months would be found to exceed" constitutional limits).

[4]   See infra notes 50-52.

[5]   Holder, supra note 2.

[6]   For defendants in the 75 largest counties between 1990 and 2004, 86,107 were released on surety bond. Of these defendants, 13,411 failed to appear within a one-year study period. Cohen & Reaves, supra note 2, at 2, 8.

[7]   Arthur W. Pepin, 2012-2013 Policy Paper: Evidence-Based Pretrial Release, Conf. St. Ct. Admins. 11 (2012), http://cosca.ncsc.org/~/ media/Microsites/Files/COSCA/Policy%20Papers/Evidence%20Based%20Pre-Trial%20Release%20-Final.ashx; Todd Ruger, Chief Judges Group Calls for Changes in How Courts Determine Bail, BLT: Blog LegalTimes (Feb. 6, 2013, 3:18 PM), http:// legaltimes.typepad.com/blt/2013/02/chief-judges-group-calls-for-changes-in-court-determine-bail.html.

[8]   See, e.g., Arthur Lawton Beeley, The Bail System in Chicago 164 (1927) (noting the burden on poor defendants).

[9]   See Nancy jo Tubbs, What Is Radio Telemetry?, Int'l Wolf Center, http://www.wolf.org/wolves/experience/telemsearch/telem_defined.asp (last visited Sept. 13, 2013).

[10]   See Julius Whigham II, Burmese Python Carrying 87 Eggs Sets State Record at 17 Feet, 7 Inches, Palm Beach Post, Aug. 13, 2012, http://www.palmbeachpost.com/news/news/local/burmese-python-sets-state-record-at-17-feet-7-inch/nQ9w5.

[11]   See, e.g., Nancy Sadusky, Stormy: A Success Story, Save the Manatee Club, http://www.savethemanatee.org/newsfstormy.htm (last visited Sept. 3, 2013) (discussing a satellite tracking device used on a manatee).

[12]   AT&T FamilyMap, AT&T, https://familymap.wireless.att.com/finder-att-family/welcome.htm (last visited Sept. 3, 2013).

[13]   Marie VanNostrand & Gena Keebler, Pretrial Risk Assessment in the Federal Court, Fed. Probation, Sept. 2009, at 3, 6 (indicating an average cost of $19,000 per pretrial detainee and "between $3,100 and $4,600" per released defendant).

[14]   See, e.g., Jeffrey Rosen, The Naked Crowd: Reclaiming Security and Freedom in an Anxious Age 33-61 (2004) (critically describing modern police surveillance); Christopher Slobogin, Privacy at Risk: The New Government Surveillance and the Fourth Amendment 3 (2007) (noting that surveillance has changed due to the "ease with which it can be conducted" and "the strength of the government's resolve to use it").

[15]   But cf. Ric Simmons, Ending the Zero-Sum Game: How to Increase the Productivity of the Fourth Amendment, 36 Harv. J.L. & Pub. Pol'y 549, 552-53 (2013) (noting that "advances in technology can increase the effectiveness of surveillance in catching criminals without reducing the privacy rights of ordinary citizens"); William J. Stuntz, The Distribution of Fourth Amendment Privacy, 67 Geo. Wash. L. Rev. 1265, 1281-87 (1999) (noting that the Fourth Amendment tends to raise the costs of policing drug markets in middle-class areas relative to poor, urban neighborhoods).

[16]   See, e.g., Betsy Kushlan Wanger, Note, Limiting Preventive Detention Through Conditional Release: The Unfulfilled Promise of the 1982 Pretrial Services Act, 97 Yale L.J. 320, 330-35 (1987) (explaining that many federal districts had not yet implemented reforms that would have expanded pretrial services).

[17]   See infra notes 229-230 and accompanying text.

[18]   See infra text accompanying notes 150-169.

[19]    Although electronic monitoring may reduce the risk of future crime, it will never be as effective as detention. See, e.g., Anthea Hucklesby, Vehicles of Desistance? The Impact of Electronically Monitored Curfew Orders, 8 Criminology & Crim. Just. 51, 60 (2008) (noting that over half of seventy-eight offenders who were released, curfewed, and monitored "said that curfew orders had not affected their offending, claiming to have offended as frequently as before they were imposed").

[20]    See Beeley, supra note 8, at 160 ("The purpose of bail law ... is to insure the presence of accused persons for trial ...."); Shima Baradaran, Restoring the Presumption of Innocence, 72 Ohio St. L.J. 723, 754 (2011) (noting that the "original purpose of bail" was "to assure that a defendant appears at trial"); William F. Duker, The Right to Bail: A Historical Inquiry, 42 Alb. L. Rev. 33, 68-69 (1977) ("The function of bail is ... limited to insuring the presence of a defendant before the court."); David J. McCarthy, Jr. & Jeanne J. Wahl, The District of Columbia Bail Project: An Illustration of Experimentation and a Brief for Change, 53 Geo. L.J. 675, 715 (1965) ("[T]he purpose of bail is to ensure that the accused will appear in court ... not to prevent the commission of crime."). But see John S. Goldkamp, Danger and Detention: A Second Generation of Bail Reform, 76 J. Crim. L. & Criminology 1, 4 n.15 (noting "historical rationales" that supported the use of bail to prevent crime pretrial).

[21]    John S. Goldkamp, Two Classes of Accused: A Study of Bail and Detention in American Justice 24 (1979) (noting the "state interest in protecting the community"); Baradaran, supra note 20, at 745 n.131, 752 (documenting state court decisions allowing consideration of dangerousness and noting that "[o]ver time, states increasingly changed their positions" to consider community safety and other factors); Goldkamp, supra note 20, at 30 (describing laws requiring judges to consider the threat defendants pose to the community); Samuel Wiseman, Discrimination, Coercion, and the Bail Reform Act of 1984: The Loss of the Core Constitutional Protections of the Excessive Bail Clause, 36 Fordham Urb. L.J. 121 (2009) (documenting and criticizing the federal shift toward dangerousness determinations).

[22]    Erin Murphy, Paradigms of Restraint, 57 Duke L.J. 1321, 1352 (2008) ("No one doubts that the government infringes liberty when it physically incarcerates individuals.").

[23]    See, e.g., United States v. Salerno, 481 U.S. 739 (1987) (confirming the constitutionality of congressional requirements for assessing dangerousness pretrial); Ronald J. Allen & Larry Laudan, Deadly Dilemmas III: Some Kind Words for Preventive Detention, 101 J. Crim. L. & Criminology 781, 801-02 (2011) (largely defending detention for dangerousness and arguing that "[f]ailure to intervene to prevent a likely harm" is "much more costly" than a failure to convict a defendant for past crimes).

[24]    See, e.g., Goldkamp, supra note 21, at 18-31 (expressing concern about the vagueness of dangerousness determinations and proposing a stricter standard); Baradaran, supra note 20, at 767-70 (same).

[25]    See A.B.A. Study, supra note 2; see also John Schmitt et al., The High Budgetary Cost of Incarceration, Center Econ. & Pol'y Res. 1 (2010), http://www.cepr.net/documents/publications/incarceration-2010-06.pdf (finding that "[n]on-violent offenders now make up over 60 percent of the prison and jail population"). This latter statistic is relevant only if one assumes that the population of those accused but not yet convicted is similar to the incarcerated population.

[26]    See, e.g., Task Force on Admin. of Justice, President's Comm'n on Law Enforcement & Admin. of Justice, Task Force Report: The Courts 37 (1967) (describing money bail as "traditional practice"); John N. Mitchell, Att'y Gen., U.S. Dep't of Justice, Address at the 92nd Annual Meeting of the American Bar Association 10 (Aug. 13, 1969), http://www.justice.gov/ag/aghistory/ mitchell/1969/08-13-1969a.pdf (during a period of money bail reform, noting that "[t]he money bail system ... made an accused's pretrial freedom depend upon his bank account").

[27]    Duker, supra note 20, at 70-71 (citing Consol. Exploration & Fin. Co. v. Musgrave, [1900] 1 Ch. 37 (U.K.)). Musgrave notes that the English system of using monetary sureties was intended to "'prevent the accused from disappearing.'" Duker writes that "[t]his doctrine was readily absorbed into American jurisprudence." Id.

[28]    See id. at 41 (quoting F. Pollock & F. Maitland, The History of English Law 584 (2d ed. 1968)) (noting that in the early English system, which used pretrial release accompanied by compensation, these requirements existed because imprisonment was "costly and troublesome").

[29]    See infra note 79 and accompanying text.

[30]    Only four states have banned commercial bail. See Cohen & Reaves, supra note 2, at 4.

31  See, e.g., Dayla S. Pepi & Donna D. Bloom, Take the Money or Run: The Risky Business of Acting as Both Your Client's Lawyer and Bail Bondsman, 37 St. Mary's L.J. 933, 938-39 (2006) (describing the options available to Texas defendants).

32  See, e.g., Holder, supra note 2 (noting that a "disproportionate number of [pretrial detainees] are poor" and are detained because they are indigent).

33  See infra notes 38-40.

34  See generally Douglas L. Colbert, Prosecution Without Representation, 59 Buff. L. Rev. 333, 428 (2011) (describing the need for guaranteed representation "at the initial assessment of bail" for indigent defendants).

35  Indeed, the highly intrusive strip searches challenged in Florence v. Board of Chosen Freeholders were a "standard part" of the intake practice at a pretrial detention facility. 132 S. Ct. 1510, 1518 (2012).

36  See supra note 3; see also Jeffrey Manns, Liberty Takings: A Framework for Compensating Pretrial Detainees, 26 Cardozo L. Rev. 1947, 1962 (2005) (noting that "detention can be extended indefinitely if any one of eighteen open-ended exclusions is satisfied").

37  See Holder, supra note 2.

38  See, e.g., Laura I. Appleman, Justice in the Shadowlands: Pretrial Detention, Punishment, & the Sixth Amendment, 69 Wash. & Lee L. Rev. 1297, 1320-21, 1363 (2012) (noting that "many ... nonviolent offenders do become dangerous after being exposed to violent criminals in jail or prison").

39  See, e.g., Arthur R. Angel et al., Preventive Detention: An Empirical Analysis, 6 Harv. C.R.-C.L. L. Rev. 300, 352 (1971) (noting that being jailed with criminals "leave[s] many defendants hardened, embittered, and more likely to recidivate once released").

40  See Richard C. McCorkle, Personal Precautions to Violence in Prison, 19 Crim. Just. & Behav. 160, 165 (1992) (noting that approximately seventy percent of prisoners surveyed in one maximum security facility "got tough" with another inmate in self-defense).

41  See, e.g., Roger Bowles & Mark Cohen, Pre-Trial Detention: A Cost-Benefit Approach, Dep't for Int'l Dev. 34 (2009), http://www.opensocietyfoundations.org/sites/default/files/justice_20081124d_0.pdf (noting that pretrial detention "could create a long-term cost of crime itself").

42  Anne Rankin, The Effect of Pretrial Detention, 39 N.Y.U. L. Rev. 641, 641 (1964); see also Charles E. Ares, Anne Rankin & Herbert Sturz, The Manhattan Bail Project: An Interim Report on the Use of Pre-Trial Parole, 38 N.Y.U. L. Rev. 67 (1963) (describing the Manhattan Bail Project).

43  Rankin, supra note 42, at 648.

44  Douglas J. Klein, Note, The Pretrial Detention "Crisis": The Causes and the Cure, 52 J. Urb. & Contemp. L. 281, 293 (1997); see also Manns, supra note 36, at 1972-73 (pointing to "[n]umerous empirical studies"--most from the 1970s or 1980s--showing the longer the period of pretrial detention, the higher the likelihood of conviction, "even after controlling for factors such as the seriousness of the charges" and "prior convictions"); Phillips, supra note 2, at 2-7, 56 (reviewing the literature finding a link between pretrial detention and case outcomes, and, in an empirical analysis of defendants in New York City detained and released in 2003-2004, finding that "detention to disposition" was "one of the most important single factors" that influenced the "likelihood of conviction"); Thomas E. Scott, Pretrial Detention Under the Bail Reform Act of 1984: An Empirical Analysis, 27 Am. Crim. L. Rev. 1, 15 (1989) ("Both in 1987 and in 1988 approximately 85 percent of all detainees were ultimately convicted of a criminal charge.").

45  See, e.g., Stephanos Bibas, Plea Bargaining Outside the Shadow of Trial, 117 Harv. L. Rev. 2463, 2493 (2004) (noting that "[d]etained defendants find it harder to meet and strategize with their lawyers and to track down witnesses"); Marc Miller & Martin Guggenheim, Pretrial Detention and Punishment, 75 Minn. L. Rev. 335, 424 (1990) ("The differences in the ability of the defendant [released pretrial] to work, maintain a family life, and prepare for the defense of criminal charges are substantial.").

46  See Bibas, supra note 45, at 2493; Colbert, supra note 34, at 400 (noting that "people accused of crimes in the ten states that deny representation at the defendant's initial bail determination face delays, generally ranging from two to sixty days, before they obtain a lawyer's assistance"); Klein, supra note 44, at 293 & n.71 (noting that "prisoners, including pretrial detainees, may be incarcerated

in facilities far away from the district in which they are tried," which "can inhibit a defense attorney from consulting with the pretrial detainee," and providing an extreme example of a defendant awaiting trial who was moved from New York to Texas).

47    See, e.g., Malcolm M. Feeley, The Process Is the Punishment: Handling Cases in a Lower Criminal Court 205 (1979) (noting that even after controlling for the "seriousness of the offenses and other factors," pretrial "[d]etainees were less likely to receive nolles than were those who were released"); Cohen & Reaves, supra note 2, at 7 (in a survey of state pretrial release and detention in the seventy-five largest U.S. counties, finding that sixty percent of released defendants were later convicted as compared to seventy-eight percent of detained defendants); sources cited supra note 44.

48    See, e.g., Bibas, supra note 45, at 2492 (noting that "pretrial detention can approach or even exceed the punishment that a court would impose after trial").

49    Scott, supra note 44, at 15.

50    Beeley, supra note 8, at 60 (noting that pretrial detention "imposes an unjust burden upon the prisoner's dependents"); Baradaran, supra note 20, at 770 n.245 (describing congressional and judicial recognition of the burdens pretrial detention places on families).

51    See, e.g., A.B.A. Study, supra note 2, at 5 (listing "job loss, inability to pay child support and eviction" as collateral consequences of pretrial confinement); Laura Sullivan, Bail Burden Keeps U.S. Jails Stuffed with Inmates, Nat'l Pub. Radio (Jan. 21, 2010, 2:00 P.M.), http://www.npr.org/2010/01/21/122725771/Bail-Burden-Keeps-U-S-Jails-Stuffed-With-Inmates (noting that a defendant charged with stealing a television had lost his job, apartment, and truck while detained pretrial).

52    See Laura Sullivan, Inmates Who Can't Make Bail Face Stark Options, Nat'l Pub. Radio (Jan. 22, 2010, 12:00 A.M.), http:// www.npr.org/templates/story/story.php?storyId=122725819 (describing a defendant whose child's mother has not been able to pay the bills without his income).

53    Holder, supra note 2.

54    Cost concerns were also a focus of earlier scholarship. See, e.g., Angel et al., supra note 39, at 354-55 (noting that the per diem cost of supporting a prisoner in Massachusetts increased fifty percent between 1965 and 1968 and that added procedural steps further increase the cost of preventative detention); McCarthy & Wahl, supra note 20, at 721-22 (noting that, including fixed and variable costs of imprisonment, "the average daily per-prisoner cost may be as high as $7.00 for men and $11.00 for women," and highlighting other costs).

55    A.B.A. Study, supra note 2, at 5.

56    Fact Sheet: When More Is Less: How a Larger Women's Jail in Baltimore Will Reduce Public Safety and Diminish Resources for Positive Social Investments, Just. Pol'y Inst. 2 (Jan. 2011), http://www.justicepolicy.org/images/ upload/11-01_REP_WhenMoreisLess_MD-AC.pdf.

57    A.B.A. Study, supra note 2, at 6.

58    Editorial, In Pretrial Debate, Listen to Sheriffs, Tampa Trib., Apr. 26, 2011, http://tbo.com/list/news-opinion-editorials/in-pretrial-debate-listen-to-sheriffs-202449.

59    Cost of Pre-Trial Detention in City Jails Takes Bite out of Big Apple's Budget, N.Y.C. Indep. Budget Off., http://www.ibo.nyc.ny.us/ newsfax/nws56pretrialdetention.html (last visited Sept. 3, 2013); see also UT Dallas Study to Help Curb Jail Costs, Cut Repeat Offenses, U. Tex. Dall. News Center (Dec. 1, 2011), http://www.utdallas.edu/news/2011/12/1-14451_UT-Dallas-Study-to-Help-Curb-Jail-Costs-Cut-Repeat_article-wide.html (estimating $57 in daily costs per inmate in Dallas County).

60    Stacia Willson, Bexar County Jail Inmates Cost Taxpayers More than $80 Million, KENS5 San Antonio (Jan. 5, 2011, 7:48 AM), http://www.kens5.com/news/Bexar-County-Jail-population-is-costing-tax-payers-more-than-80-million-112918419.html.

61    UT Dallas Study to Help Curb Jail Costs, Cut Repeat Offenses, supra note 59.

62    Cost of Pre-Trial Detention in City Jails Takes Bite out of Big Apple's Budget, supra note 59.

63    See, e.g., Beeley, supra note 8, at 164-71 (criticizing the bail system and proposing solutions); Ronald Goldfarb, Jails: The Ultimate Ghetto 33-50 (1975) (describing problems with the bail system and concluding that it should be abandoned); Paul Bernard Wice, Bail and Its Reform: A National Survey 14, 22-23 (1973) (criticizing "overcrowding" and other pretrial detention problems driven by the bail system and noting that "[o]ne of the most ironic aspects of the bail-setting procedure is that the factor explored least frequently by the judge has the greatest impact on the defendant's ability to secure pretrial release--his financial status and the amount of bail he can afford to pay"); Caleb Foote, The Coming Constitutional Crisis in Bail (pt. 1), 113 U. Pa. L. Rev. 959, 995-96 (1965) (criticizing bail fixed at unaffordable amounts); McCarthy & Wahl, supra note 20, at 721 (critically noting the potentially long duration of pretrial detention); Laurence H. Tribe, An Ounce of Detention: Preventive Justice in the World of John Mitchell, 56 Va. L. Rev. 371, 383-84 (1970) (noting that the burdens of pretrial detention include "the diminished ability to prepare one's defense ... and ... severe economic hardships for the accused and his family"); Note, Compelling Appearance in Court: Administration of Bail in Philadelphia, 102 U. Pa. L. Rev. 1031, 1067 (1954) (criticizing the commercial bail system); Field Study, A Study of the Administration of Bail in New York City, 106 U. Pa. L. Rev. 693, 718 (1958) (criticizing the bail system).

64    Beeley, supra note 8, at 155.

65    Note, supra note 63, at 1033.

66    Field Study, supra note 63, at 694, 708. All monetary bail amounts described here were set for individual defendants.

67    Id. at 694, 707-08.

68    Cohen & Reaves, supra note 2, at 1, 3.

69    Id.

70    A.B.A. Study, supra note 2, at 5.

71    See infra note 72.

72    See Pretrial Justice in America: A Survey of County Pretrial Release Policies, Practices and Outcomes, Pretrial Just. Inst. 7 (2010), http://www.pretrial.org/wpfb-file/pji-pretrial-justice-in-america-a-survey-of-county-pretrial-release-policies-practices-and-outcomes-2010-pdf (showing that sixty-four percent of counties participating in a survey use bail schedules); Lindsey Carlson, Bail Schedules: A Violation of Judicial Discretion?, 26 Crim. Just. 12 (2011) (documenting widespread use of bail schedules).

73    Radley Balko, Under Asset Forfeiture Law, Wisconsin Cops Confiscate Families' Bail Money, Huffington Post (May 20, 2012, 8:52 AM), http://www.huffingtonpost.com/2012/05/20/asset-forfeiture-wisconsin-bail-confiscated_ n_1522328.html.

74    Cf. Shawn J. Bayern, False Efficiency and Missed Opportunities in Law and Economics, 86 Tul. L. Rev. 135, 142 (2011) (observing that an activity "may well be more efficient than its absence but significantly less efficient than its alternatives").

75    Cohen & Reaves, supra note 2, at 8.

76    Id. at 8 (showing a total of 54,485 defendants who failed to appear, including 13,411 defendants who had been released on surety bond). Of those defendants who had been released on personal recognizance, 20,883 failed to appear. Id.

77    Id.

78    Id.

79    See, e.g., Paul D. Schultz, The Future Is Here: Technology in Police Departments, Police Chief, June 2008, http://www.policechiefmagazine.org/magazine/index.cfm?article_ id=1527&fuseaction=display&issue_id=62008 (noting that police "can locate a fleeing fugitive or a missing child in a field in a matter of minutes").

80    See supra note 72.

81    Cohen & Reaves, supra note 2, at 4 (showing that defendants "usually" pay "10% of the bail amount" as a fee).

82      See Curtis E.A. Karnow, Setting Bail for Public Safety, 13 Berkeley J. Crim. L. 1, 23 (2008) (noting that "to inhibit future illegality, the defendant must expect that on forfeiture of the bond, the surety will seek to recover from the defendant the total forfeited amount," but that in California, "the statutory scheme does not favor forfeiture").

83      See, e.g., Kevin Krause & Ed Timms, Dallas Bail Bondsman Reported Clients Rearrested to Avoid Losses But Didn't Provide Documentation, Dall. Morning News, Dec. 4, 2011, http://www.dallasnews.com/news/community-news/dallas/headlines/20111204-dallas-bail-bondsman-falsely-reports-defendants-rearrested-to-avoid-losses.ece (observing that in Dallas County "[c]urrent and former bail bondsmen and attorneys authorized to write bonds owed the county $35 million in unpaid judgments").

84      See, e.g., Cohen & Reaves, supra note 2, at 8 (showing that between 1990 and 2004, of the 54,485 state felony defendants in the seventy-five largest U.S. counties who failed to appear at trial, 20,883 had been released on recognizance).

85      See Cohen & Reaves, supra note 2, at 5 (showing that more than 300 pretrial release programs operated in the United States in 2001); A.B.A. Study, supra note 2 (supporting pretrial release); cf. Beeley, supra note 8, at 169 (proposing, before pretrial release programs had been established, that "the services of social workers" be available to indigent defendants to provide "assistance to the accused or his dependents").

86      See, e.g., Office of Program Policy Analysis & Gov't Accountability, Report No. 10-08: Pretrial Release Programs' Compliance with New Reporting Requirements Is Mixed, Fla. Legislature 2 (Jan. 2010), http://www.oppaga.state.fl.us/MonitorDocs/Reports/pdf/1008rpt.pdf (noting that "the amount of funds provided by local governments to ... [pretrial release] programs ranged from $65,000 in Bay County to $5.2 million in Broward County").

87      See, e.g., Appleman, supra note 38, at 1362 (describing the benefits of pretrial release).

88      See infra text accompanying notes 98-112.

89      See infra text accompanying notes 182-184.

90      See George Mair, Electronic Monitoring in England and Wales: Evidence-Based or Not?, 5 Crim. Just. 257, 259, 262 (2005) (indicating that monitoring technology has been used in the United Kingdom since 1989 and is also now used in Israel, Singapore, and New Zealand); Mike Nellis, Surveillance and Confinement: Explaining and Understanding the Experience of Electronically Monitored Curfews, 1 Eur. J. Probation 41, 41 (2009) (explaining that electronic monitoring began in the United States in 1982, "spread to Canada and Australia, is now widely used in Western Europe, and is taking root in Eastern Europe").

91      J. Robert Lilly & Richard A. Ball, A Brief History of House Arrest and Electronic Monitoring, 13 N. Ky. L. Rev. 343, 362 (1987).

92      See Annesley K. Schmidt, The Use of Electronic Monitoring by Criminal Justice Agencies in the United States 1988, in The Electronic Monitoring of Offenders 9, 9 (Ken Russell & J. Robert Lilly eds., 1989). By 1988, thirty-two states had implemented electronic monitoring programs that followed 2,300 people, although only 4.6% of them were pretrial detainees or defendants awaiting an appeal. Id. at 10, 15; see also Keith W. Cooprider & Judith Kerby, A Practical Application of Electronic Monitoring at the Pretrial Stage, Fed. Probation, Mar. 1990, at 28, http://www.19thcircuitcourt.state.il.us/resources/Documents/Smaart/StaffPub-PretrialElectronicMonitoring_0390.pdf (describing a pretrial electronic monitoring program in Lake County, Illinois, instituted in 1986).

93      See supra note 19.

94      Pat Best, Curfew/Electronic Monitoring: The Northern Ireland Experience, 6 Irish Probation J. 91, 92 (2009) (explaining that in the late 2000s sixteen European jurisdictions used electronic monitoring "mostly as additional requirements to community orders or as part of early or post release from custody," and noting that four European jurisdictions use monitoring in pretrial/bail curfew arrangements). In the United States, 100,000 individuals are monitored daily. Mike Nellis, Electronic Monitoring: Exploring the Commercial Dimension, 58 Crim. Just. Matters 12, 12 (2008).

95      Michael G. Maxfield & Terry L. Baumer, Home Detention with Electronic Monitoring: Comparing Pretrial and Postconviction Programs, 36 Crime & Delinq. 521, 523 (1990).

96      Beginnings of Probation and Pretrial Services, U.S. Cts., http://www.uscourts.gov/FederalCourts/ProbationPretrialServices/History.aspx (last visited Sept. 3, 2013).

97   See Joseph Hughes, You're Tagged, J.L. Soc'y Scot., Nov. 1, 2003, http://www.journalonline.co.uk/Magazine/48-11/1000631.aspx (describing monitoring as originating in Europe in Britain in 1989).

98   Nellis, supra note 90, at 41; see also Jennifer Airs et al., Electronically Monitored Curfew as a Condition of Bail --Report of the Pilot, Home Off., at v (2000), http://xa.yimg.com/kq/groups/5593953/2064697648/name/occ-bail+research+development+and+statistical +directorate.pdf (describing a 1989-1990 bail EM-curfew pilot program in England that tagged approximately 173 individuals). About twenty years later, "approximately 3,500 adults were subject to an electronically monitored curfew bail condition at any one time" in England and Wales. Anthea Hucklesby, Keeping the Lid on the Prison Remand Population: The Experience in England and Wales, 21 Current Issues Crim. Just. 3, 12 (2009). In Northern Ireland, judges can similarly require curfews, tagging, and a home monitoring unit. Best, supra note 94, at 94. Scottish law allows judges to offer electronic monitoring as a bail condition if bail is denied, Report on the Use of Bail and Remand, Sent'g Comm'n for Scot. 9 (2005), http://www.scotland.gov.uk/Resource/Doc/925/0116775.pdf, and a 2005 electronic monitoring bail pilot curfewed and monitored sixty-three individuals, Monica Barry et al., An Evaluation of the Use of Electronic Monitoring as a Condition of Bail in Scotland, Scot. Executive Soc. Res., at iii (2007), http://www.scotland.gov.uk/ Resource/Doc/179989/0051173.pdf. A similar three-year pilot in Portugal monitored thirty-nine pretrial defendants. José Ricardo Nunes, The Portuguese Pilot Project on Electronic Monitoring, in Will Electronic Monitoring Have a Future in Europe? 155, 155, 157 (Markus Mayer et al. eds., 2003). In several of these programs, a private monitoring company was responsible for checking defendants' compliance. Airs et al., supra, at 24; Best, supra note 94, at 94.

99   See Mike Nellis, The Electronic Monitoring of Offenders in England and Wales, 31 Brit. J. Criminology 165, 166 (1991) (introducing the term).

100   Dick Whitfield, The Magic Bracelet: Technology and Offender Supervision app. at 122 (2001).

101   Id.

102   Timothy P. Cadigan, Electronic Monitoring in Federal Pretrial Release, Fed. Probation, Mar. 1991, at 28-29.

103   Location Monitoring/Home Confinement (Tether Program), U.S. Pretrial Servs. Agency E.D. Mich., http://www.miept.uscourts.gov/ pages/monitoring.cfm (last visited Sept. 3, 2013).

104   See Supervision, U.S. Cts., http://www.uscourts.gov/FederalCourts/ProbationPretrialServices/Supervision.aspx (last visited Sept. 3, 2013) (stating that "[w]ith location monitoring, the court determines the extent to which people are restricted case by case, requiring some individuals to remain on 24-hour-a-day lockdown at home and allowing others to leave for preapproved and scheduled absences" and describing "frequent phone calls" and "frequent, unannounced face-to-face visits" from supervising officers).

105   Electronic Monitoring, Cook County Sheriff, http://www.cookcountysheriff.org/dcsi/electronicmonitoring.html (last visited Oct. 9, 2013).

106   See, e.g., United States v. Parahams, No. 3:13-CR-005, 2013 WL 683494, at *5 (N.D. Ind. Feb. 25, 2013) ("[T]he monitoring equipment generally sends a signal when its wearer travels outside of a preprogrammed range from the transmitter. But that does not mean it tracks the exact whereabouts of the wearer once he or she goes out of range."); Nat'l Inst. of Justice, Electronic Monitoring Reduces Recidivism, U.S. Dep't Just. 2 (Sept. 2011), https://www.ncjrs.gov/pdffiles1/nij/234460.pdf (finding electronic monitoring via GPS more effective than radio monitoring in reducing the "failure to comply" rate for released felons).

107   Schmidt, supra note 92, at 15. Passive monitoring likely has less potential as a bail substitute, as it does not provide live location data to aid in a fugitive's recovery. See generally Supervision, supra note 104 (describing passive GPS systems).

108   Best, supra note 94, at 92; Electronic Monitoring, Merrimack County, N.H., http://www.merrimackcounty.net/pretrial/ monitoring.html (last visited Oct. 9, 2013) (describing the use of electronic monitoring for pretrial defendants in a county in New Hampshire, including GPS monitoring); The Pretrial Process, Merrimack County, N.H., http://www.merrimackcounty.net/pretrial/ process.html (last visited Oct. 17, 2013) (same).

109   Electronic Monitoring Program, Mesa, Ariz., http://www.mesaaz.gov/court/electronicmonitoring.aspx (last visited Sept. 3, 2013).

110   XML, GPS, RF: New-Age Crime Fighters, 43 Security, May 2006, at 40.

111    See William Saletan, Get Out of Jail Unfree, Slate (June 1, 2011, 11:11 AM), http://www.slate.com/articles/health_and_science/human_ nature/2011/06/get_out_of_jail_unfree.html.

112    See GPS: Your Supervising Officer Is Watching, U.S. Cts.: Third Branch News, http://www.uscourts.gov/News/TheThirdBranch/07-04-01/GPS_Your_ Supervising_Officer_is_Watching.aspx (last visited Sept. 3, 2013) (noting that, in Maine, "[a]ctive GPS is difficult because large areas of the state have poor cell phone service"). This will become less of a problem as cellular service continues to improve. It can also be surmounted, albeit more expensively, through the use of satellite phones. See, e.g., Irridium EXTREME Satellite Phone with GPS, Sattrans, http://www.sattransusa.com/irid-pho-9575.html (last visited Oct. 9, 2013) ("The new phone works anywhere on Earth and provides the most reliable voice, data and location-based GPS satellite service in remote areas.").

113    Google Glass: What It Does, Google, http://www.google.com/glass/start/what-it-does (last visited Sept. 3, 2013).

114    See, e.g., Eric Maes & Benjamin Mine, Some Reflections on the Possible Introduction of Electronic Monitoring as an Alternative to Pre-Trial Detention in Belgium, 52 How. J. Crim. Just. 144, 150-57 (2013) (arguing that electronic monitoring is costly and raises a host of legal issues, privacy concerns, and execution challenges).

115    Best, supra note 94, at 93 (noting that "there are very few published studies on the effectiveness of EM"); Hucklesby, supra note 19, at 55 (noting that the "evidence base" on the effectiveness of monitoring "relies almost exclusively on evidence undertaken by or for the Home Office" and focuses on a limited set of issues).

116    See, e.g., Cadigan, supra note 102, at 26, 29-30 (noting that failure-to-appear rates of electronically monitored defendants were higher than those released on bail in one study, but that electronic monitoring tended to be used for the highest-risk defendants); see also William Bales et al., U.S. Dep't of Justice, A Quantitative and Qualitative Assessment of Electronic Monitoring 6 (2010) (noting that even Cadigan's study lacked statistical controls); cf. Schmidt, supra note 92, at 17 (noting that officials provided very different statistics for success rates).

117    See, e.g., United States v. O'Brien, 895 F.2d 810, 814-16 (1st Cir. 1990) (describing reduction in flight rate from monitoring program but concluding that "evidence concerning the effectiveness of the bracelet alone only arguably rebuts the presumption of flight"). But see United States v. Parahams, No. 3:13-CR-005, 2013 WL 683494, at *5 (N.D. Ind. Feb. 25, 2013) (noting limitations of federal monitoring).

118    See supra note 104 and accompanying text.

119    Judicial decisions affecting pretrial defendants in Europe are called "remand," the three main types of which include "in custody [pretrial detention], conditional bail, and unconditional bail." Airs et al., supra note 98, at v.

120    Id. at vi (concluding that bail was a "true alternative" to detention in more than half of the cases studied).

121    Id. at 35.

122    Id. at 60. Concerns raised included, among others, objections from the police that they had to maintain responsibility for the defendants, whereas jail officials would have otherwise taken over these duties. Id. at vi. Some technical problems with the equipment also emerged. Id. at 48.

123    Cristina Penedo, Evaluation of the Portuguese Electronic Monitoring Programme, in Will Electronic Monitoring Have a Future in Europe?, supra note 98, at 159, 161; see also Nunes, supra note 98, at 157 (documenting the Portuguese study).

124    Barry et al., supra note 98, at iii-iv. The authors noted, however, that judges may have required electronic monitoring for those most unlikely to comply with bail conditions. Id. at 60-61.

125    See, e.g., Bales et al., supra note 116, at x (finding that electronic monitoring reduced the risk of failure under community supervision by thirty-one percent); Whitfield, supra note 100, at 13 (concluding, in the postconviction context, that monitoring has produced "some consistent results ... on both sides of the Atlantic," with a success rate of around ninety percent for post-trial monitoring during a period of two or fewer months); Nat'l Inst. of Justice, supra note 106 (finding, in a study of Florida offenders, that electronic monitoring significantly reduced the likelihood of failure under community supervision).

126    See infra notes 165-167.

127    Saletan, supra note 111, at 1 (citing monitoring deals made for "Saudi arms dealer Adnan Kashoggi; U.S. arms dealer David Brooks; financial fraudster Marc Dreier; domestic-help abusers Mahender and Varsha Sabhnani; John A. Gotti, son of the Gambino crime boss; and Cameron Douglas, son of actor Michael Douglas").

128    Madoff Ordered to Wear Monitoring Ankle Bracelet, Fox News, Dec. 17, 2008, http://www.foxnews.com/story/0,2933,468504,00.html.

129    Saletan, supra note 111, at 1.

130    Id.

131    William Blackstone, Commentaries on the Laws of England 1001 (George Chase ed., Baker, Voorhis & Co. 1938) (1769).

132    See, e.g., Paige St. John, Tests Found Major Flaws in Parolee GPS Monitoring Devices, L.A. Times, Mar. 30, 2013, http://articles.latimes.com/2013/mar/30/local/la-me-ff-gps-monitors-20130331 (reporting a range of technical problems with GPS sex offender monitoring equipment in California).

133    See, e.g., Electronic Monitoring Program, supra note 109 (noting that tampering with a monitoring device is a felony). In the parole context, California is considering increasing the penalty for tampering with a monitoring device. See Heather Tirado Gilligan, More Parolees Tamper with Ankle Monitoring Bracelets, Cal. Health Rep. (Feb. 13, 2013), http://www.healthycal.org/archives/11068.

134    See supra note 132 (discussing problems in California GPS monitoring of sex offenders).

135    See A.B.A. Study, supra note 2; Pretrial Justice: Problem and Solution, Pretrial Just. Inst., http://www.pretrial.org/download/pji-reports/Pretrial%20Justice%CC20Problem%20Solution.pdf (last visited Nov. 6, 2013) (noting high cost of pretrial detention).

136    But see Feeley, supra note 47, at 205 (noting the lower conviction rate for released defendants).

137    Shima Baradaran, The Right Way to Shrink Prisons, N.Y. Times, May 30, 2011, http://www.nytimes.com/2011/05/31/opinion/31baradaran.html; see also A.B.A. Study, supra note 2, at 5 (noting the cost-saving potential of monitoring).

138    A.B.A. Study, supra note 2, at 5.

139    Cadigan, supra note 102, at 29.

140    Supra notes 57-59 and accompanying text.

141    Natasha Alladina, The Use of Electronic Monitoring in the Alaska Criminal Justice System: A Practical Yet Incomplete Alternative to Incarceration, 28 Alaska L. Rev. 125, 144 (2011).

142    Bales et al., supra note 116, at 150-51.

143    Cf. Airs et al., supra note 98, at 55 ("Our cost calculations take into account an element to cover the offsetting of remand against sentence."). In the English 1989-1990 bail pilot study introduced above, the researchers estimated that the use of bail curfews in lieu of pretrial detention at the national level would save between £1.25 and £1.78 million annually, depending on the percentage of defendants who would have otherwise been detained or placed on other bail conditions. Id. at 57. But see Mike Nellis, Electronic Monitoring and the Community Supervision of Offenders, in Alternatives to Prison: Options for an Insecure Society 224, 234 (Anthony Bottoms et al. eds., 2004) (characterizing the study as finding that because only half of the monitoring curfews were used on individuals "genuinely at risk of custody," monitoring would not produce cost savings). In Portugal, daily electronic monitoring costs are estimated at •13.77, as opposed to •37.05 costs of daily imprisonment. Nunes, supra note 98, at 158.

144    See Ky. Pretrial Servs., Pretrial Reform in Kentucky 6 (2013) ( "Kentucky has no funding to provide [electronic monitoring] services to defendants. As such, pretrial officers allow defendants to choose the provider ...."); St. John, supra note 132 (noting that monitoring of offenders in California is awarded via a bidding process).

145    See, e.g., Supervision, supra note 104 (stating that "[s]upervising people on location" requires "frequent phone calls" and visits).

Case 2:19-cr-00877-CCC   Document 40-18   Filed 02/11/20   Page 33 of 41 PageID: 900

146    See, e.g., Office of Program Policy Analysis & Gov't Accountability, Report No. 11-27: Pretrial Release Programs Generally Comply with Statutory Data Collection Requirements, Fla. Legislature 2 (Dec. 2011), http://www.oppaga.state.fl.us/MonitorDocs/Reports/pdf/1127rpt.pdf (noting that "programs most commonly charged fees for electronic monitoring"); Pay Electronic Monitoring & Pretrial Program Fees, Denver Dep't Safety, http://www.denvergov.org/safety/DepartmentofSafety/AlternativeCorrections/CommunityCorrections/ ElectronicMonitoring/PayClientFees/tabid/443659/Default.aspx (last visited Sept. 3, 2013) (noting that fees are required for electronic monitoring).

147    See, e.g., Fuller v. Oregon, 417 U.S. 40, 42, 54 (1974) (affirming an order that a probationer pay attorneys' fees and investigative expenses incurred by the state in providing his defense); Murphy, supra note 22, at 1371 n.259 (providing examples of "states [that] require tracked individuals to pay for their tracking").

148    Phil Willon, Riverside County to Make Inmates Pay Jail Costs, L.A. Times, Nov. 20, 2011, http://articles.latimes.com/2011/nov/20/local/la-me-inmate-fees-20111120.

149    See Wayne A. Logan & Ronald F. Wright, Mercenary Criminal Justice, 2014 U. Ill. L. Rev. (forthcoming) (manuscript at 14, 29), http:// ssrn.com/abstract=2309093 (describing "application fees" and "co-payments[s]" for appointment of counsel).

150    See, e.g., Maes & Mine, supra note 114, at 157 (exploring privacy concerns).

151    Strauss-Kahn Faces Ankle Bracelet Shame, Inquirer, May 19, 2011, http://technology.inquirer.net/542/strauss-kahn-faces-ankle-bracelet-shame.

152    Brian K. Payne & Randy R. Gainey, The Electronic Monitoring of Offenders Released from Jail or Prison: Safety, Control, and Comparisons to the Incarceration Experience, 84 Prison J. 413, 421 (2004).

153    Id. at 417.

154    See, e.g., James Cannings, Electronic Monitoring: A Chief Probation Officer's Perspective, in The Electronic Monitoring of Offenders, supra note 92, at 83, 85-89 (arguing that net-widening may occur if electronic monitoring is introduced in the post-trial context without rigid guidelines).

155    Cf. Murphy, supra note 22 (observing that when individuals are restrained by GPS monitoring and other non-physical methods, courts offer few constitutional protections).

156    Frederick Schauer, Slippery Slopes, 99 Harv. L. Rev. 361, 381 (1985) (observing that "a persuasive slippery slope argument depends for its persuasiveness upon temporally and spatially contingent empirical facts"); see also Hucklesby, supra note 98, at 11 ("There is no accurate information about the extent to which net-widening occurs at the pre-trial stage as a result of the introduction of initiatives to divert defendants from custody.").

157    See generally Michelle Alexander, The New Jim Crow (2010) (suggesting that discrimination against African Americans is now accomplished through disproportionate arrests, prosecution, and imprisonment); John F. Pfaff, The Micro and Macro Causes of Prison Growth, 28 Ga. St. U. L. Rev. 1239 (2012) (describing many factors that contribute to the large prison population in the United States).

158    See, e.g., United States v. Knights, 534 U.S. 112 (2001) (upholding a warrantless search of a probationer's house on reasonable suspicion).

159    See Wayne A. Logan, Federal Habeas in the Information Age, 85 Minn. L. Rev. 147, 149 (2000) (expressing deep concerns about "the use of information and its dissemination to exercise ongoing control over ex-offenders after they fulfill their penal obligations").

160    Murphy, supra note 22, at 1367-68 (noting that "the economics of technological control enable the regulation of greater numbers of persons under less stringent conditions for a longer period of time and to a greater degree than an equivalent physical intrusion," including custody); id. at 1371 ("[T]he cost of imposing a technological restraint may decrease over its period of use.").

161    Logan, supra note 159, at 201 (noting that "emerging technologies carry additional promise for intrusiveness"); id. at 177 (noting a recent shift toward "massive, impersonal surveillance").

162    But see Hucklesby, supra note 98, at 11 (noting concerns that efforts to reduce pretrial detention could increase "the number of defendants" subjected to pretrial control but that no empirical proof of this exists).

163    Cf. United States v. Jones, 132 S. Ct. 945, 963 (2012) (Alito, J., concurring) ("The availability and use of these and other new devices will continue to shape the average person's expectations about the privacy of his or her daily movements.").

164    See, e.g., Mike Nellis, Electronic Tagging: Grounds for Resistance?, in The Electronic Monitoring of Offenders: Symposium Papers, Second Series 20, 23 (J. Robert Lilly & Joan Himan eds., 1991) (concluding that "[t]here is ample evidence that ... [net-widening] occurred with all the so-called alternatives to custody introduced in Britain since the 1960s" but that "it is wrong to assume that it is inevitable").

165    See J. Robert Lilly, An Overview on Electronic Monitoring: The United States and Britain 1988, in The Electronic Monitoring of Offenders: Symposium Papers 5, 5 (Ken Russell & J. Robert Lilly eds., 1989) (noting "the development in the US of an increasingly significant number of private corporations organized to offer 'tagging' services on an expanding market"); In for a Penny: The Rise of America's New Debtors' Prisons, ACLU 63 (2010), http://www.aclu.org/files/assets/InForAPenny_web.pdf (reporting the efforts of private probation companies to expand the scope of supervision); Tarheel Monitoring, LLC, http://www.tarheelmonitoring.com (last visited Sept. 3, 2013) ("A secured bond married to a GPS electronic monitoring anklet is indeed the best possible tool for the production of the defendant and public safety.").

166    Cf. Nellis, supra note 94, at 13 (noting the success of electronic monitoring companies and how they view the "entire prison market" as potentially open to them).

167    See, e.g., Ackerman v. State, 179 P.3d 951, 952 (Alaska Ct. App. 2008) ("Fred's Bail Bonding in Anchorage now has some private electronic monitoring for pretrial or bail situations."); Global Monitoring, David Valentine Bail Bonds, http://www.davidvalentinebailbonds.com/global-monitoring (last visited Sept. 3, 2013) (offering monitoring services).

168    See Report on the Use of Bail and Remand, supra note 98, at 9 (describing how Scottish law allows judges to offer monitoring only if bail has been denied and defendant applies).

169    See, e.g., Alexander, supra note 157 (arguing that the criminal justice system facilitates mass incarceration of racial minorities, often for relatively minor offenses).

170    Saletan, supra note 111.

171    It is possible that if monitoring proves significantly more effective at preventing flight than money bail, courts may begin to require it in lieu of money bail for non-indigent defendants. In light of the strength of the bail lobby and wealthy defendants, however, this is perhaps unlikely.

172    See infra Part III.

173    See Beeley, supra note 8, at 156 (concluding in 1927 that the bondsman "[i]n many cases ... works in collusion with lawyers, clerks, policemen, politicians etc." and that "[t]he professional bondsman plays too important a role in the local administration of criminal justice"); Wice, supra note 63, at 16 (describing in 1973 the use of problematic "double bonding" in "cities where bondsmen appeared to possess relatively strong political clout"); Timothy R. Schnacke et al., The History of Bail and Pretrial Release, Pretrial Just. Inst., 6-7, 21, http://www.pretrial.org/download/infostop/PJI-History%20of%CC20Bail%CC20Revised%CC20Feb%202011.pdf (last updated Sept. 24, 2010) (describing the history of the U.S. bail bondsman industry and noting that it likely began as early as 1898, with common use by the 1920s, and describing "Strike Back!," an "aggressive and concerted effort to eliminate pretrial services agencies ... and release on personal recognizance bond to promote the interests of the commercial surety industry" in the mid-1990s, which was waged with the help of "money bail bond organizations" and the American Legislative Exchange Council); infra note 242 (showing recent bondsmen opposition to reform).

174    See Beeley, supra note 8, at 165-71 (proposing "direct measures" and "palliatives"); Wice, supra note 63, at 49-52 (proposing a model program that would serve as an alternative to the traditional bail system); Caleb Foote, The Coming Constitutional Crisis in Bail (pt. 2), 113 U. Pa. L. Rev. 1125, 1126-37 (1965) (proposing how a hypothetical bail case would proceed without violating constitutional principles).

175    Joel Stashenko, Lippman Proposes Bail System Fix, Expansion of Supervised Release, N.Y. L.J., Feb. 6, 2013, http://www.newyorklawjournal.com/PubArticleNY.jsp?id=1202587085501&Lippman_Proposes_ Bail_System_Fix_Expansion_of_Supervised_Release.

176    See United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938); John Hart Ely, Democracy and Distrust: A Theory of Judicial Review 8, 135 (1980) (proposing that courts must do more than "remov[e] barriers to ... participation in the political process"); Patrick Luff, Captured Legislatures and Public-Interested Courts 3 (Dec. 31, 2012) (unpublished manuscript), http:// ssrn.com/abstract=2195169 (arguing that "courts generally act in the public interest," unlike legislatures).

177    See infra note 228.

178    See Mitchell, supra note 26, at 10-14; Tribe, supra note 63, at 404; see also Wiseman, supra note 21, at 130 n.52 (collecting sources).

179    481 U.S. 739 (1987); see sources cited supra note 178 (describing the scholarly arguments for a right to bail that were rejected by Salerno).

180    In an early article building on the work of Jed Rubenfeld and Laurence Claus, I argued that the Excessive Bail Clause was intended to limit arbitrary, discriminatory, and coercive bail demands and therefore requires the use of objective, actuarial measures of risk. See Wiseman, supra note 21 (proposing an objective standard in order to avoid discrimination in the setting of bail); cf. Christopher Slobogin, A Jurisprudence of Dangerousness, 98 Nw. U. L. Rev. 1, 62 (2003) (proposing objective preventive detention rules).

181    United States v. Arzberger, 592 F. Supp. 2d 590, 605 (S.D.N.Y. 2008). With the existence of inexpensive monitoring technologies and a lack of evidence that money bail better ensures presence at trial, other plaintiffs may be similarly successful. Cf. Goldkamp, supra note 21, at 228 ("[I]f the burden fell to the state to show that--in the face of a defendant's right to pretrial release--the present operation of the bail decision is relevant to the causes of assuring appearance and protecting the community from dangerous defendants, in the strictest empirical sense it would fail. The state could not demonstrate that the bail decision and the use of detention ... serve to keep failure-to-appear rates and rates of pretrial crime at a noticeably lower rate than if all defendants were released before trial.").

182    Ward v. Rock Against Racism, 491 U.S. 781, 783 (1989).

183    There is a strong argument, of course, that detention should not be justified on the basis of cost savings alone. But, as noted above, given the Court's recent history of extreme reluctance to force governments to spend money on the machinery of criminal justice even to prevent the most serious deprivations, monitoring will likely have to be demonstrably cost-neutral, or very close to it, for a challenge to succeed.

184    See Cohen & Reaves, supra note 2, at 4.

185    Compare Stack v. Boyle, 342 U.S. 1, 4 (1951), which found that "[u]nless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning," with Carlson v. Landon, 342 U.S. 524, 545 (1952) (footnotes omitted), which observed that "[i]n England that clause has never been thought to accord a right to bail in all cases, but merely to provide that bail shall not be excessive in those cases where it is proper to grant bail. When this clause was carried over into our Bill of Rights, nothing was said that indicated any different concept." See also United States v. Salerno, 481 U.S. 739, 752-53 (1987) (reviewing these cases).

186    Salerno, 481 U.S. at 754.

187    See id. at 761 (Marshall, J., dissenting) (noting that under the Court's interpretation of the Excessive Bail Clause, "every federal magistrate and district judge could simply refuse, despite the absence of any evidence of risk of flight or danger to the community, to set bail"); Wiseman, supra note 21, at 146.

188    Samuel Wiseman, McDonald's Other Right, 97 Va. L. Rev. In Brief 23 (2011).

189    See, e.g., Tribe, supra note 63, at 399-400 (arguing pre-Salerno that an interpretation of the Clause that bound only the courts would be "totally inconsistent with a Bill of Rights concerned almost exclusively with curtailing the powers of Congress").

190    See, e.g., Ely, supra note 176, at 78 (noting that the American democratic system "does not ensure ... the effective protection of minorities"); Silas J. Wasserstrom & Louis Michael Seidman, The Fourth Amendment as Constitutional Theory, 77 Geo. L.J. 19, 94

(1988) (concluding that Fourth Amendment rights are likely to be "undervalued in the political process" and that "judicial intervention is justified" because searches and seizures primarily affect "politically less powerful groups").

191 See 1 Annals of Cong. 455-56 (1789) (Joseph Gales ed., 1834) (statement of Rep. James Madison) (observing that "improper laws could be enacted by the State Legislatures, for fulfilling the more extended objects of those Governments").

192 See, e.g., Galen v. Cnty. of Los Angeles, 477 F.3d 652, 660 (9th Cir. 2007) ("Salerno confirms that the Excessive Bail Clause prevents the imposition of bail conditions that are excessive in light of the valid interests the state seeks to protect by offering bail."); Payton v. Cnty. of Carroll, 473 F.3d 845 (7th Cir. 2007) (recognizing a Salerno limit on the legislature); Broussard v. Parish of Orleans, 318 F.3d 644, 651 (5th Cir. 2003) (same).

193 342 U.S. 1, 3 (1951); see also Alien Registration Act (Smith Act), 18 U.S.C. § 2385 (2012) (making it a criminal offense to advocate the violent overthrow of the U.S. government); Dennis v. United States, 341 U.S. 494, 496, 516 (1951) (holding the Smith Act constitutional and affirming a conviction under the Act for organizing and advocating "the overthrow or destruction of any government ... by force or violence" or affiliating with a group that would do so).

194 Stack, 342 U.S. at 5.

195 Id. at 5 n.3.

196 Id. at 5-6.

197 Id. at 6.

198 Moreover, judicial measurements of individual flight risk, like those of the gravity of individual offenses, are arguably imprecise. This imprecision was a factor supporting a weak proportionality requirement under the Excessive Fines Clause. See United States v. Bajakajian, 524 U.S. 321, 336 (1998) ("[A]ny judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise .... [W]e therefore adopt the standard of gross disproportionality articulated in our Cruel and Unusual Punishments Clause precedents.").

199 Dennis v. United States, 341 U.S. 494, 498 (1951).

200 Cf. FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993) (holding that under equal protection rational basis review in areas of social and economic policy, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data").

201 United States v. Salerno, 481 U.S. 739, 754-55 (1987).

202 Id. at 750.

203 Compare Bajakajian, 524 U.S. at 334 ("[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."), with Salerno, 481 U.S. at 754 (discussing excessive bail without reference to cruel and unusual punishment), and Stack v. Boyle, 342 U.S. 1, 5 (1951) (same).

204 See Bajakajian, 524 U.S. at 330-31 (concluding that deference to legislative judgments with respect to punishment and the imprecision of judicial determinations of the gravity of individual offenses support a gross disproportionality standard).

205 Numerous excessiveness challenges have been made to the Adam Walsh Child Protection and Safety Act, in which Congress mandated bail limitations for sex offenders charged with certain crimes or a failure to register. 18 U.S.C. § 3142(c)(1)-(2) (2012). One court noted that it must compare "proposed conditions with the interests the government seeks to protect, including assuring the defendant's appearance at trial." United States v. Crowell, No. 06-M-1095, 2006 WL 3541736, at *5 (W.D.N.Y. Dec. 7, 2006). In hinting at the needed closeness, the court suggested that the "least restrictive" conditions might be necessary. Id. at *7. But see, e.g., United States v. Gardner, 523 F. Supp. 2d 1025, 1031 (N.D. Cal. 2007) (citing Stack and Salerno and noting that "until Crowell, there appears to be no case law holding that the 'least restrictive' requirement of the Bail Reform Act is constitutionally mandated").

206 1 Annals of Cong. 754 (1789) (Joseph Gales & William Seaton eds., 1834) (statement of Rep. Samuel Livermore).

207    See Jamal Greene, The Case for Original Intent, 80 Geo. Wash. L. Rev. 1683, 1684 (2012) ("Today, most academic originalists and even some living constitutionalists say that constitutional interpretation should proceed, first and foremost, from the original meaning of the text at issue." (footnote omitted))

208    See Bajakajian, 524 U.S. at 335 (citing 1 Noah Webster, American Dictionary of the English Language (1828), which defined "excessive" as "beyond the common measure or proportion," and Samuel Johnson, A Dictionary of the English Language 680 (4th ed. 1773), which defined it as "[b]eyond the common proportion").

209    Samuel Johnson, A Dictionary of the English Language (3d ed. 1768).

210    Noah Webster, An American Dictionary of the English Language 418 (1862).

211    Cf. Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 629 n.9 (1989) (discussing various cases in which the Supreme Court has rejected post hoc "less-restrictive-alternative" tests for assessing the reasonableness of police searches and seizures).

212    In Solem v. Helm, 463 U.S. 277, 285 (1983), the Supreme Court reasoned that this proportionality principle was embedded in the 1689 English Bill of Rights's prohibition on "excessive Baile" and "cruell and unusuall Punishments." See Harmelin v. Michigan, 501 U.S. 957, 967 (1991) (opinion of Scalia, J.) (rejecting the Solem Court's equation of "cruell and unusuall Punishments" with "disproportionate" or "excessive" punishments); see also Laurence Claus, The Antidiscrimination Eighth Amendment, 28 Harv. J.L. & Pub. Pol'y 119, 122-23 (2004) ("Where a court exercises its bail or fine jurisdiction to set bail or to impose a fine that cannot be paid, its action is objectively excessive and that excessiveness invites an inference of immoral discrimination.").

213    See Greene, supra note 207, at 1686 ("[C]onstitutional practitioners continue to reason as though the intentions and expectations of prominent members of the Founding generation are highly relevant to the Constitution's application to modern cases and controversies.").

214    See, e.g., Wiseman, supra note 21, at 149 n.166 (listing theorists who "look to the purposes for the adoption of constitutional text at the time of its adoption").

215    Wiseman, supra note 21, at 127-30; see also Duker, supra note 20, at 45-46 (discussing the Statute of Westminster's (1275) provision of certain protections against the extortionate practices of local sheriffs).

216    Claus, supra note 212, at 123 (noting that in England "the Court of King's Bench repeatedly abused its discretion by setting bail and imposing fines of more than the offender could pay" and thus "effectively imposed indefinite prison sentences upon political opponents of the Stuart monarchs," and concluding that "[t]he Eighth Amendment's prohibition of excessive bail and excessive fines thus contemplated an objective referent for what counted as excessive").

217    Lois G. Schwoerer, The Declaration of Rights, 1689, at 90 (1981) (quoting 9 H.C. Jour. 692 (1680)); see also Foote, supra note 63, at 965-79 (describing the purpose of British bail protections and their adoption in the United States).

218    See Claus, supra note 212, at 123.

219    See supra notes 48-49 and accompanying text.

220    Sanford Levinson, The Embarrassing Second Amendment, 99 Yale L.J. 637, 652 (1989).

221    See supra note 45.

222    Cf. Akhil Reed Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 774 (1994) (arguing that the Framers viewed search warrants "as an enemy, not a friend," and relied on juries' ideas of reasonability to protect liberty (quoting Telford Taylor, Two Studies in Constitutional Interpretation 41 (1969))).

223    Cf. Orin S. Kerr, An Equilibrium-Adjustment Theory of the Fourth Amendment, 125 Harv. L. Rev. 476, 487-88 (2011) (arguing that judges "adopt lower Fourth Amendment protections" when changing technologies or practices weaken police enforcement powers and more stringent protections when technology "significantly enhances government power," and defending this approach).

224    Cf. United States v. Gardner, 523 F. Supp. 2d 1025, 1029 (N.D. Cal. 2007) (assuming that "the Excessive Bail Clause applies to conditions of release," noting that "[a]lthough the explicit text of the Eighth Amendment appears to address the amount of bail fixed,

no court has so limited the reach of this provision," and observing that "Salerno broadly states that the 'substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be "excessive" in light of the perceived evil'" (citing United States v. Salerno, 481 U.S. 739, 754 (1987))).

225   See supra notes 68-69 and accompanying text.

226   Depending on the magnitude of economies of scale in the deployment of monitoring systems, larger jurisdictions might be required to act more swiftly.

227   Cf. Brown v. Plata, 131 S. Ct. 1910, 1921 (2011) (upholding a release order for Eighth Amendment violations in California prisons but stating that the lower court must "accord the State considerable latitude" and noting that a deadline extension may be appropriate).

228   Several additional constitutional arguments are worthy of mention but likely have a lower chance of success than an Eighth Amendment claim. Although the blatant and pervasive financial inequity of the current system implicates the principles underlying the Equal Protection Clause, as a doctrinal matter a Fourteenth Amendment argument would face a steep uphill climb. See, e.g., McGinnis v. Royster, 410 U.S. 263, 268-70 (1973) (finding a rational basis for slight differences in "good-time credit" earned for those who could and could not afford or qualify for bail); Schilb v. Kuebel, 404 U.S. 357, 369 (1971) (holding that Illinois's bail system did not violate equal protection guarantees). The extremely permissive rational basis standard applicable to wealth discrimination would likely doom an equal protection challenge, as the bail system, for all its faults, is not wholly irrational, and maintaining it could likely be justified on the basis of avoiding short term administrative costs. See, e.g., Armour v. City of Indianapolis, 132 S. Ct. 2073, 2081-84 (2012) (holding that administrative convenience justifies unequal treatment of sewer customers).
Recently, Professor Baradaran has argued forcefully that the presumption of innocence embodied in the Due Process Clause requires better and more consistent procedures if courts are to deprive defendants of pretrial liberty, Baradaran, supra note 20, at 767-68, but such a challenge faces perhaps an even steeper hurdle in the Court's reluctance to rely on a general constitutional provision when a more specific one exists. The same hurdle exists in the bail context for the persuasive argument advanced by Professors Logan, Janus, and Slobogin that the Fourteenth Amendment imposes a least-restrictive-means requirement for preventive detention. See Eric S. Janus & Wayne A. Logan, Substantive Due Process and the Involuntary Confinement of Sexually Violent Predators, 35 Conn. L. Rev. 319, 360-61 (2003) (proposing a strict scrutiny standard, including a compelling interest requirement and "least restrictive means available to achieve that end"); Slobogin, supra note 180, at 13, 62 (proposing that for preventive detention, "the duration of the commitment must be reasonably related to the prevention of the harm predicted" and that rules should require "treatment and detention in the least restrictive manner feasible" (emphasis omitted)).

229   See, e.g., Karpouzis v. Gov't of the V.I., 961 F. Supp. 841 (D.V.I. 1997) (requiring least restrictive conditions and criticizing the lower court's rejection of inexpensive electronic monitoring). The following examples show state statutes, rules, and cases that require the use of the least restrictive means: Alaska Stat. § 12.30.011(b) (2012); Conn. Gen. Stat. § 54-63b(b), -64a (2013); D.C. Code § 23-1321(c)(1)(B) (2012); Maine Rev. Stat. Ann. tit. 15, § 1026 (West 2013); Mass. Gen. Laws ch. 276, § 58A(2)(B) (West 2005); Utah Code Ann. § 77-20-10 (LexisNexis 2003) (bail on appeal); N.C. 26th Judicial Dist. Bail Policy (2010); N.M. Stat. Ann. Rule 5-401 (LexisNexis 2013); Bail Guidelines, R.I. Ct. R. Ann. (2013); Wash. Super. Ct. Crim. R. 3.2 (2013); Thomas v. State, 542 S.W.2d 284 (Ark. 1976); Brill v. Gurich, 965 P.2d 404 (Okla. Crim. App. 1998).

230   18 U.S.C. § 3142(c)(1)(B) (2012). Although the Bail Reform Act does not specifically list electronic monitoring as a possible condition, it may be ordered under the catchall provision.

231   961 F. Supp. 841 (D.V.I. 1997).

232   Id. at 851-52.

233   See Colbert, supra note 34, at 345.

234   Karpouzis involved the "'the sub rosa use of money bond' to detain the appellant," 961 F. Supp. at 851, but many flight risk detentions do not. Indeed, although the Bail Reform Act forbids "financial condition[s] that result[] in the pretrial detention of the person," 18 U.S.C. § 3142(c)(2), this has been interpreted to allow detention when the defendant cannot afford a bond sufficient to ensure his presence; in these cases, as the First Circuit explained, the defendant is detained "not because he cannot raise the money, but because without the money, the risk of flight is too great," United States v. Jessup, 757 F.2d 378, 389 (1st Cir. 1985).

235   For the many defendants jailed under state criminal law, state constitutions offer some support for a right to electronic monitoring. Indeed, most state constitutions include language similar to the Eighth Amendment's Excessive Bail Clause, and these, as in the federal context, could be interpreted to include a right to monitoring. See, e.g., Ariz. Const. art. II, § 15; Cal. Const. art. I, § 12; Conn. Const. art. I, § 8; Ind. Const. art. I, § 17; Minn. Const. art. I, § 7; Ohio Const. art. I, § 9; Pa. Const. art. I, § 14; Tex. Const. art. I, § 11; Wash. Const. art. I, § 20.

236   See Jack M. Balkin, The Constitution in the National Surveillance State, 93 Minn. L. Rev. 1, 20-21 (2008) (arguing that "legislative, administrative, and technological solutions may be far more important means of guaranteeing constitutional freedoms" than the Fourth Amendment); Orin S. Kerr, The Fourth Amendment and New Technologies: Constitutional Myths and the Case for Caution, 102 Mich. L. Rev. 801, 867-76 (2004) (arguing that legislatures may be better situated to address technology-driven privacy concerns).

237   Donald A. Dripps, Criminal Procedure, Footnote Four, and the Theory of Public Choice; Or, Why Don't Legislatures Give a Damn About the Rights of the Accused?, 44 Syracuse L. Rev. 1079, 1081, 1090-92 (1993) (arguing that "[l]egislatures undervalue the rights of the accused at both the investigatory and adjudicatory stages of the criminal process" and describing the strength of the law enforcement lobby); Wasserstrom & Seidman, supra note 190, at 94-96 (identifying "the young, the black, and the poor," as being "undervalued in the political process" under certain theories); cf. Bruce A. Ackerman, Beyond Carolene Products, 98 Harv. L. Rev. 713, 728-31, 733-35 (1985) (describing "diffuse and anonymous" minorities--those that do not comprise one, discrete group with a clear, shared interest and are not easily identified as a group, such as by their appearance--that often lack a seat at the bargaining table and need protection by courts if their voice is to be heard).

238   See Kerr, supra note 236, at 885-87 (arguing that "majoritarian preferences" can be "protective of privacy" and noting that "[n]ew technologies are often used disproportionately by politically powerful groups"); Stuntz, supra note 15, 1281-87 (describing privacy protections for privileged classes).

239   See supra note 237 (describing the literature on the underrepresentation of minority groups in the political process).

240   See supra notes 26-27, 173 (noting the "long tradition" of money bail in the United States).

241   Christian Parenti, "I Hunt Men": Meet the Self-Ordained Officers of the Bail Bond Industry, 61 Progressive 21, 23 (1997) ("Nationally, bail is a $4-billion-a-year industry, netting $400 million a year in profits."); see also For Better or for Profit: How the Bail Bonding Industry Stands in the Way of Fair and Effective Pretrial Justice, Just. Pol'y Inst. 26 (Sept. 2012), http://www.justicepolicy.org/uploads/justicepolicy/documents/_for_better_or_ for_ profit_.pdf (conservatively estimating that the bail bonding industry does "$2 billion in business annually").

242   See, e.g., Douglas L. Colbert, Coming Soon to a Court Near You-- Convicting the Unrepresented at the Bail Stage, 36 Seton Hall L. Rev. 653, 707 n.318 (2006) (noting that in 1999 the powerful bail bond industry defeated legislation that would have provided counsel at the bail stage); Todd C. Barsumian, Note, Bail Bondsmen and Bounty Hunters: Re-Examining the Right to Recapture, 47 Drake L. Rev. 877, 882 n.28 (1999) (describing bondsmen in some states as a "'powerful political lobby'" (quoting John S. Goldkamp et al., Personal Liberty and Community Safety xii (1995))); Laura Sullivan, Bondsman Lobby Targets Pretrial Release Programs, Nat'l Pub. Radio, Jan. 22, 2010, http://www.npr.org/templates/story/story.php?storyId=122725849 (reporting that bondsmen spent $23,000 to oppose a county pretrial services program in Florida, with fifteen bondsmen each paying more than $5,000 to the then-county commissioner five days before the vote); Matt Tomsic, Bail Bond Companies Claim Conflict with Pretrial Release, Star News, July 24, 2010, http://www.starnewsonline.com/article/20100724/ARTICLES/100729788 (discussing the political feud between bail bondsmen and advocates for pretrial release and monitoring, and describing how "bail bond companies lobby state legislatures to limit pretrial release programs").

243   See Tim Bryce, Eric Holder vs. the Bail Bond Industry, BailSource: Nationwide Bail Bond Service, http://www.thebailsource.com/blog/eric-holder-vs-the-bail-bond-industry (last visited Sept. 2, 2013) ("If implemented in full, the pretrial programs [proposed by Attorney General Eric Holder] will inevitably eliminate the need for bail bondsmen completely.").

244   See supra notes 165, 167.

245   Bryce, supra note 243.

246   Id.

247    See supra note 28 and accompanying text.

248    Cf. Beeley, supra note 8, at 124-27 (describing defendants jailed pretrial in the 1920s because they could not afford the security and who waited for up to 223 days).

249    Cf. Criminal Justice Section, State Policy Implementation Project, A.B.A. 5, http://www.americanbar.org/content/dam/aba/ administrative/criminal_ justice/spip_handouts.authcheckdam.pdf (noting that "[r]eleasing low risk defendants leads to significant savings to local and state budgets" and that "[l]ast year alone, taxpayers spent $9 billion on pretrial detainees").

250    See Dan Markel & Eric J. Miller, Fire the Bail Bondsmen, Slate: The Hive (June 19, 2012, 7:03 PM), http://hive.slate.com/hive/how-can-we-fix-constitution/article/fire-the-bail-bondsmen (noting that "after heavy lobbying by the influential bail bonding industry, the legislature killed" a county's "cheap and safe" electronic monitoring system).

251    I am indebted to Professor Eric Kades for suggesting this line of argument.

252    The T.J. Hooper, 60 F.2d 737, 739-40 (2d Cir. 1932).

253    Richard Epstein suggests that radios were in fact required on tugs as a matter of custom and that "[a]t most there was some lingering transitional question." Richard A. Epstein, The Path to The T.J. Hooper: The Theory and History of Custom in the Law of Tort, 21 J. Legal Stud. 1, 35 (1992).

254    The T.J. Hooper, 60 F.2d at 740.

255    See Richard C. Ausness, ''Fasten Your Seat Belt, Orville!'': Exploring the Relationship Between State-of-the-Art, Technological and Commercial Feasibility, and the Restatement's Reasonable Alternative Design Requirement, 45 Ind. L. Rev. 669, 677-78 (2012) (explaining that "compliance with the custom of the industry is not conclusive evidence of reasonable care" in negligence cases but that this is less clear for strict liability).

256    See supra text accompanying notes 103 (Federal Pretrial Services), 129 (Strauss-Kahn); see also 18 U.S.C. § 3142 (2012) (governing release or detention of federal defendants before trial).

257    Kerr, supra note 236, at 871, 875-76.

258    See, e.g., United States v. Jones, 132 S. Ct. 945, 964 (2012) (Alito, J., concurring in the judgment) ("In circumstances involving dramatic technological change, the best solution to privacy concerns may be legislative." (citing Kerr, supra note 236, at 805-06)); see also City of Ontario v. Quon, 130 S. Ct. 2619, 2629 (2010) ("The judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear.").

259    Cf. Malcolm M. Feeley & Edward L. Rubin, Judicial Policy Making and the Modern State: How the Courts Reformed America's Prisons 207 (1998) (describing prison reform as "public policy promulgated by the courts under the grant of jurisdiction that the [Cruel and Unusual Punishment] clause provides").

260    See Daryl J. Levinson, Rights Essentialism and Remedial Equilibration, 99 Colum. L. Rev. 857, 877 (1999) (describing political opposition to federal control of school systems and scaling back of desegregation remedies); id. at 884-85 (concluding that the scope of a right may be shaped by concern over the level of federal judicial intervention necessary to secure it). But see Brown v. Plata, 131 S. Ct. 1910, 1947 (2011) (concluding that "[t]he medical and mental health care provided by California's prisons falls below the standard of decency that inheres in the Eighth Amendment" and that the remedy required a "reduction in overcrowding").

261    For an example of a sophisticated analysis of the effectiveness of various forms of pretrial release, see Eric Helland & Alexander Tabarrok, The Fugitive: Evidence on Public Versus Private Law Enforcement from Bail Jumping, 47 J.L. & Econ. 93 (2004), which analyzes data from the Bureau of Justice Statistics.

262    Bales et al., supra note 116, at 64.

263    See supra notes 127-129.

264      See, e.g., Dan Markel & Eric J. Miller, Op-Ed., Bowling, as Bail Condition, N.Y. Times, July 13, 2012, http://
www.nytimes.com/2012/07/14/opinion/not-yet-tried-but-sentenced-to-red-lobster.html (describing the use of pretrial release
conditions as a "pervasive phenomenon").

123 YLJ 1344

---

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government
                                                                                        Works.