UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

MATTHEW BRENT GOETTSCHE,
[DEFENDANT TWO REDACTED],
JOBADIAH SINCLAIR WEEKS,
JOSEPH FRANK ABEL, and
SILVIU CATALIN BALACI

Hon. Michael A. Hammer

CRIMINAL NO.:  19-cr-877-CCC

**Oral Argument Requested**

# Defendant Jobadiah Sinclair Weeks' Motion for Temporary Release Pursuant to 18 U.S.C. 3142(i)

CARLTON FIELDS

Simon Gaugush, Esq.
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, FL  33607
Telephone: 813.223.7000 (Fla.)
Facsimile:  813.229.4133 (Fla.)

and

Michael L. Yaeger, Esq.
405 Lexington Avenue, 36th Floor
New York, NY  10174
Telephone: 212.785.2577

121457550.6

# CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

DISCUSSION ................................................................................................................... 3

    A.   The Bail Reform Act allows for temporary release of pretrial detainees
         like Mr. Weeks. ........................................................................................................ 3

    B.   Avoiding exposure to a deadly virus and preserving Mr. Weeks' physical
         well-being are "compelling reasons" to grant temporary release. ...................... 4

         1.   The Coronavirus is a global pandemic .......................................................... 4

         2.   The Coronavirus is a special cause for concern in jail ................................. 8

         3.   Mr. Weeks should be temporarily released to protect his health. .............. 12

         4.   Mr. Weeks' ability to prepare a defense will be impaired if he is detained in jail
             during the pandemic. .................................................................................... 14

         5.   Mr. Weeks is not a danger to the community, and the Court's flight risk
             determination does not prevent temporary release. .................................... 17

    C.   Mr. Weeks' proposed conditions for temporary release will ensure he does not flee
         during this time of global outbreak of COVID-19 .......................................... 18

CONCLUSION ................................................................................................................ 20

i

# AUTHORITIES

## Cases

*Barker v. Wingo*,
  407 U.S. 514 (1972) ................................................................................ 14

*Benjamin v. Fraser*,
  264 F.3d 175 (2d Cir. 2001) ..................................................................... 14

*In the Matter of the Extradition of Alejandro Toledo Manrique*,
  Case No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) .......... 17

*Malloy v. Eichler*,
  860 F.2d 1179 (3d Cir. 1988) .................................................................... 3

*Perry v. Leeke*,
  488 U.S. 272, 280 (1989) ......................................................................... 14

*United States v. Barkman*,
  Case No. 3:19-cr-0052-RCJ-WGC, Order n.10 (D. Nev. Mar. 17, 2020) ................... 9

*United States v. Dupree*,
  833 F. Supp. 2d 241 (E.D.N.Y. 2011) ........................................................ 15

*United States v. Lucas*,
  873 F.2d 1279 (9th Cir. 1989) ................................................................... 14

*United States v. Persico*,
  No. 84-cr-809 (JFK), 1986 WL 3793 (S.D.N.Y. Mar. 27, 1986) ......................... 16

*United States v. Stephens*,
  No. 1:15-cr-00095-AJN, 2020 WL 129515 (S.D.N.Y. Mar. 19, 2020) ................... 16

## Statutes

18 U.S.C. § 3142(c)(1)(B)(i) ......................................................................... 3, 16

18 U.S.C. § 3142(i). ..................................................................................... 19

## Other Authorities

Alene Tchekmedyian, *More L.A. County jail inmates released over fears of coronavirus
  outbreak*, Los Angeles Times (March 19, 2020) ....................................... 9

CDC, Situation Summary, https://www.cdc.gov/coronavirus/2019-nCoV/summary.html ............ 5

121457550.6

CDC, Steps to Prevent Illness, https://www.cdc.gov/coronavirus/2019-ncov/about/prevention.html ........................................................................ 8

Declaration of Dr. Chris Beyrer, *United States v. Saldana*, Case 1:95-cr-00605-PAS, S.D. Fla. Mar. 19, 2020) ................................................................................................... 8

Declaration of Dr. Jaimie Meyer, *Velesaca v. Wolf*, 1:20-cv-01803-AKH (S.D.N.Y. Mar. 16, 2020) ............................................................................................................ 9

Department of Homeland Security, Office of Inspector General, *Issues Requiring Action at the Essex County Correctional Facility in Newark, New Jersey*, at p. 2, (Feb. 13, 2019) ............. 10

Elizabeth Cohen, *Infected people without symptoms might be driving the spread of coronavirus more than we realized*, CNN.com (Mar. 19, 2020) ................................. 11

Essex County Correctional Facility Visitation and Attorney Visits Due to COVID-19, https://essexcountynj.org/wp-content/uploads/2020/03/COVID19_VISITATION.pdf ........... 11

Federal Bureau of Prisons, Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp ................................................. 15

Joe Atmonavage, *ICE detainees go on hunger strike in N.J amid coronavirus fears, lawyers say*, NJ.com (Mar. 18, 2020) ...................................................................................... 10

*Jones v. United States,* 527 U.S. 373, 389 (1999) ........................................................ 4

Julia Marsh and Ben Feuerberd, NYC to begin releasing inmates amid coronavirus outbreak, The New York Post (March 18, 2020) ............................................................. 9

Knvul Sheikh et al., *How Bad Will the Coronavirus Outbreak Get? Here Are 6 Key Factors*, The New York Times (Feb. 28, 2020) .............................................................. 7

Life Care Center at Kirkland, Press Briefing: Friday, March 20, 2020 ........................................ 7

*Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/compelling ............................................................................. 3

N.J. Exec. Order No. 107 (Mar. 21, 2020) .................................................................... 15

National Institute of Health, *How COVID-19 Spreads*, https://tinyurl.com/CDC-link-How-COVID-19-spreads ......................................................................................................... 5

Sean Wei Xiang Ong, et al., *Air, Surface Environmental, and Personal Protective Equipment Contamination by Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) From a Symptomatic Patient*, JAMA (Mar. 4, 2020) ........................................................ 13

Sophia Ankel, *From kissing bans to the death penalty: Here's how seriously different countries are taking the coronavirus outbreak*, Business Insider (March 5, 2020) ................................. 18

121457550.6

The New York Times, *U.S. Coronavirus Cases Surpass 1,000: Full Map*,
https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html ................................ 5

Tony Marrero, *Hillsborough sheriff releases 164 county jail inmates to reduce coronavirus risk*,
https://www.tampabay.com/news/hillsborough/2020/03/19/hillsborough-sheriff-releases-164-
county-jail-inmates-to-reduce-coronavirus-risk/ ........................................................................ 9

Walter Pavlo, *Handling Coronavirus In Federal Prison* (March 4, 2020),
https://www.forbes.com/sites/walterpavlo/2020/03/04/handling-coronavirus-in-federal-
prison/#1bed46e32094 ............................................................................................................... 11

121457550.6

## INTRODUCTION

The coronavirus (COVID-19) has arrived in full force in New Jersey, and is already making itself felt at the Essex County Correctional Facility, where Mr. Weeks is detained pre-trial.

At last count, over 320,000 people around the globe have been infected with COVID-19, leading to at least 14,300 deaths worldwide, and there were over 1,900 positive cases in New Jersey, with more than 100 positive cases in Essex County. In an effort to curb the spread of the virus, New Jersey Governor Phil Murphy issued a "shelter in place" order on Saturday, March 21, 2020.  And people like Mr. Weeks are wondering when they are going to get sick. But in a jail environment, especially in the Essex County Correctional Facility, Mr. Weeks can't protect himself from this danger. These highly unusual circumstances warrant commonsense measures to protect Mr. Weeks' physical well-being—in this case, temporary release from pretrial detention.

Unfortunately, pretrial confinement creates the ideal environment for the transmission of contagious disease. The population of the Essex County Correctional Facility, like most jails, is in near constant flux; inmates cycle in and out, and people who work in the facilities leave and return daily.  Incarcerated people have poorer health than the general population, and even in the best of times, medical care is limited in federal pretrial detention centers.

And the virus has already affected the Essex County Correctional Facility.  ICE detainees have gone on a hunger strike due to deplorable sanitary conditions at the facility.  Mr. Weeks was disciplined last week after adjusting an air conditioning vent away from the top bunkbed where he sleeps to avoid the air from hitting him directly on the face. This was done in an effort to reduce Mr. Weeks' potential exposure to COVID-19.  He is especially concerned about a respiratory problem because for most of his life, Mr. Weeks has suffered from exercise-induced

1

asthma. After his teenage years he has not needed an asthma inhaler, but he is concerned that his condition may put him at higher risk of getting very sick from COVID-19.  Yet the people charged with keeping Mr. Weeks safe punished him for taking the most simple, temporary self-protective measure.

Mr. Weeks also has no power to follow the CDC's recommendations. He cannot stay six feet away from others; hand sanitizer remains a banned substance; and he has no mask to wear. In short, he has no control over his immediate environs.

At the same time, there are only minimal risks presented by temporary release. There is no dispute that Mr. Weeks poses absolutely no danger to the community; both the Court and the Government agree. The only possible issue is risk of flight, and this is not a pressing concern given changed circumstances. Since the Court last considered Mr. Weeks' detention status on February 14, Mr. Weeks sold his plane.  Several days prior to the hearing, Mr. Weeks terminated his JetSmarter membership, eliminating his access to private jets. And the world around Mr. Weeks has changed as well since that time. Individual airlines have suspended or reduced domestic and international flight options. Also, no reasonable person is looking to travel given the current state of the COVID-19 global pandemic.

Although Mr. Weeks does not pose a danger to the community, the spread of COVID-19 while detained at the Essex County Correctional Facility poses a real danger to him. That danger constitutes a "compelling reason" under 18 U.S.C. § 3142(i), and, accordingly, the Court should grant Mr. Weeks' temporary release from detention for the later of either a period of three weeks, or the time when health and government officials bring this virus under control.

## DISCUSSION

### A.      The Bail Reform Act allows for temporary release of pretrial detainees like Mr. Weeks.

Pursuant to 18 U.S.C. § 3142(i), "[t]he judicial officer [who issued a pretrial detention order] may, by subsequent order, permit the *temporary release* of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or *for another compelling reason*." (emphasis added).  Pursuant to 18 U.S.C. § 3142(c)(1)(B)(i), a third-party custodian is "another appropriate person" who may take custody of a defendant.  *See* 18 U.S.C. § 3142(c)(1)(B)(i) (the judge presiding over a detention hearing may order that the defendant "remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court…").  In this case, Peter Gallic is an "appropriate person" who may take custody of Mr. Weeks during a term of temporary pretrial release.  Prior to Mr. Weeks' hearing on his motion to revoke the pretrial detention order issued by U.S. Magistrate Judge Matthewman in West Palm Beach, Florida, the Pretrial Services Office in Newark determined that Mr. Gallic was qualified to serve as a third-party custodian for Mr. Weeks.

Congress has not defined what constitutes a "compelling reason" under 18 U.S.C. § 3142(i), but the plain meaning of "compelling" is clear. *See Malloy v. Eichler*, 860 F.2d 1179, 1183 (3d Cir. 1988). Webster's Dictionary defines "compelling" as "forceful," "demanding attention," or "convincing."[1] The threat posed by a quickly spreading virus that may prove

---

[1]   *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/compelling (last accessed March 22, 2020).

121457550.6

deadly qualifies; it already has demanded the attention of the federal and state courts, the President, world leaders, governors, and the country at large.

The surrounding text and structure of the statute supports the same conclusion. Pursuant to § 3142(i), a judge may temporarily release a pretrial detainee if he "determines such release to be necessary for preparation of the person's defense or *for another compelling reason.*" *See* 18 U.S.C. § 3142(i). Principles of statutory construction counsel that we interpret the phrase "***another*** compelling reason" as something akin to the phrase that precedes it: "preparation for trial." *See Jones v. United States,* 527 U.S. 373, 389 (1999) ("Statutory language must be read in context and a phrase 'gathers meaning from the words around it.'"). In other words, preparing for trial is an example of the type of compelling reason contemplated by § 3142(i). And COVID-19's potential, detrimental effect on Mr. Weeks' health is of analogous importance. Further, the virus will directly impair his ability to prepare for trial.

**B.      Avoiding exposure to a deadly virus and preserving Mr. Weeks' physical well-being are "compelling reasons" to grant temporary release.**

### 1.      The Coronavirus is a global pandemic.

Coronavirus disease 2019 (COVID-19) is a global pandemic that has come to New Jersey and now poses a direct risk to Mr. Weeks if he continues to be detained during this public health crisis. Due to its alarming rate of transmission, millions are adjusting to "shelter-in-place" orders across 10 states, including a statewide order issued on March 21 by New Jersey Governor Phil Murphy. Newark Mayor Ras Baraka has identified three neighborhoods within the city as coronavirus hotspots, each a mere seven miles from the Essex County Correctional Facility currently housing Mr. Weeks. It is only a matter of time before the virus hits the Essex County Correctional Facility—if it has not already—and once it does, the outbreak will spread across the inmate and detainee population.

121457550.6

COVID-19 is a respiratory illness that spreads from person to person. Patients develop mild to severe respiratory illness within 2 to 14 days after exposure to the virus. Symptoms include fever, cough, difficulty breathing, and shortness of breath. In severe cases, the virus leads to lung lesions, pneumonia, immune hyper-reactivity (enhanced immune response), organ failure, and death.[2]

As a new disease, medical professionals are desperately trying to understand how the virus spreads.  Currently, the virus is thought to spread mainly between people who are in close contact (within 6 feet) of one another through respiratory droplets from breath, speaking, coughs, or sneezes.[3] The virus appears to be spreading easily, especially in confined areas such as nursing homes and cruise ships. As of March 22, at 1:00 p.m., "at least 29,666 people across every state, plus Washington, D.C., and three U.S. territories, have tested positive for the virus" and at least 377 Americans have died from the virus.[4]

---

[2]   *See* CDC, Situation Summary, https://www.cdc.gov/coronavirus/2019-nCoV/summary.html. (*Exhibit A*).

[3]   *See* National Institute of Health, *How COVID-19 Spreads*, https://tinyurl.com/CDC-link-How-COVID-19-spreads (*Exhibit B*).

[4]   *See* The New York Times, *U.S. Coronavirus Cases Surpass 1,000: Full Map*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html. (*Exhibit C*).

121457550.6



Source: https://coronavirus.jhu.edu/map.html

New York and New Jersey are two of the hotspots in the United States for infections of COVID-19.  In particular, there are 1,914 positive cases in New Jersey, with 20 deaths.  That number will continue to rise.



121457550.6

Source: https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml

To show the disease's swift rate of spread, at the start of March 2020, only 70 cases had been reported in the United States. *See Exhibit C*. Now that number has grown to almost 30,000 in a few weeks.  The virus permeates through the population quickly, quietly, and exponentially.

Early research suggests that each COVID-19 patient can infect between 2 and 4 people without effective containment measures. To put this in context, a group of five infected people could spread the virus to over 368 people in five cycles of infection. By comparison, flu patients tend to infect an average of 1.3 individuals. Despite the seeming insignificance of that difference, the result is striking: only about 45 people would be infected by the flu, as opposed to 368 people with COVID-19, in the same scenario.[5]

The spread of COVID-19 at the Life Care Center of Kirkland, the Washington nursing home linked to some of the initial U.S. coronavirus cases, highlights the speed of outbreak of COVID-19. Of the 120 patients residing at the Kirkland facility as of February 19, 2020, 33 of those patients have died, with 29 testing positive for COVID-19. Also, over half of the 120 patients have been transferred to hospitals with acute symptoms related to COVID-19. In some cases, patients transitioned from asymptomatic to having acute symptoms within hours. As of March 20, approximately 42 patients remain at Life Care, with 31 testing positive for COVID-19.[6] This scenario is especially alarming because, unlike the employees of a prison or jail, the Life Care employees are trained healthcare professionals, knowledgeable of "best practices" for

---

[5]  *See* Knvul Sheikh et al., *How Bad Will the Coronavirus Outbreak Get? Here Are 6 Key Factors*, The New York Times (Feb. 28, 2020),https://tinyurl.com/NYT-how-bad-will-the-coronavi. (*Exhibit D*).

[6]  *See* Life Care Center at Kirkland, Press Briefing: Friday, March 20, 2020, https://lcca.com/downloads/kirkland/Kirkland-Update-03202020.pdf. (*Exhibit E*).

121457550.6

curbing the spread of disease. In contrast, jail guards are, through no fault of their own, ill-equipped to handle virus outbreaks, especially one as contagious as COVID-19. Jails are designed and guards are trained to control violence, not infectious disease.

In an infectious disease outbreak, health experts recommend separating sick patients from others to prevent the disease from spreading. This virus's high rate of transmission means containment measures are critical.

### 2.    The Coronavirus is a special cause for concern in jail.

According to the CDC, the most effective preventative measure (aside from not coming into contact with the virus) is washing hands with soap and water. If soap and water are not readily available, use of hand sanitizer that contains at least 60% alcohol is recommended.[7] But these measures are "extremely difficult" in a jail or prison setting.[8] Indeed, jails create the ideal environment for the transmission of contagious disease:

> Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore

---

[7]    *See* CDC, Steps to Prevent Illness, https://www.cdc.gov/coronavirus/2019-ncov/about/prevention.html (*Exhibit F*).

[8]    *See* Declaration of Dr. Chris Beyrer, *United States v. Saldana*, Case 1:95-cr-00605-PAS, S.D. Fla. Mar. 19, 2020) ¶ 17 ("While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain."). (*Exhibit G*).

dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.[9]

It is hard to imagine it being feasible to transport such a group with 6 feet in-between its constituents.

Localities around the United States are already taking steps to reduce jail populations in light of the pandemic. *United States v. Barkman*, Case No. 3:19-cr-0052-RCJ-WGC, Order n.10 (D. Nev. Mar. 17, 2020) (recognizing that certain districts and/or officials in New York, Ohio, and Texas have called for such reductions). The Los Angeles County Sheriff's Department has reduced its inmate population by 6% in the last three weeks and District Attorney Jackie Lacey said her office will consider reducing bail for thousands of nonviolent offenders.[10] After a prisoner and an employee of Rikers Island prison tested positive for coronavirus, New York City's Mayor announced plans to identify and release high-risk inmates from the City's prisons.[11] On March 19, 2020, Hillsborough County, Florida announced the release of more than 160 low-level, non-violent inmates from jail as a precautionary measure.[12] Mr. Weeks is likewise a non-violent offender who warrants temporary release.

---

[9]    *See* Declaration of Dr. Jaimie Meyer, *Velesaca v. Wolf*, 1:20-cv-01803-AKH (S.D.N.Y. Mar. 16, 2020) at ¶ 9. (*Exhibit H*).

[10]    *See* Alene Tchekmedyian, *More L.A. County jail inmates released over fears of coronavirus outbreak*, Los Angeles Times (March 19, 2020). (*Exhibit I*).

[11]    *See* Julia Marsh and Ben Feuerberd, NYC to begin releasing inmates amid coronavirus outbreak, The New York Post (March 18, 2020), https://nypost.com/2020/03/18/nyc-to-begin-releasing-inmates-amid-coronavirus-outbreak/. (*Exhibit J*).

[12]    *See* Tony Marrero, *Hillsborough sheriff releases 164 county jail inmates to reduce coronavirus risk*, https://www.tampabay.com/news/hillsborough/2020/03/19/hillsborough-sheriff-releases-164-county-jail-inmates-to-reduce-coronavirus-risk/. (*Exhibit K*).

As for Mr. Weeks, the Essex County Correctional Facility, in particular, has an exceptionally poor record of maintaining detainee health. For years, civil rights activists and families of prisoners have been demanding more oversight and better conditions at the jail, which has regularly seen accusations of stomach-churning health and safety risks. Most recently, in February 2019, the Department of Homeland Security (DHS) reported that it found "serious issues relating to safety, security, and environmental health" at the Essex County Correctional Facility, which "represent *significant threats to detainee health* and safety."[13] During a July 2018 inspection, investigators with the DHS Office of Inspector General found leaks causing mold and mildew growth "in every housing unit holding detainees." *Exhibit L* at 7. DHS determined that the spread of mold and mildew could lead to "serious health issues." Shower stalls evidencing lack of "basic maintenance and upkeep" throughout the facility were "unsanitary." *Id.* at 7-8. The report also noted multiple food safety concerns that could lead to detainee health problems, including "raw, spoiled, or expired" meat, "raw chicken," "expired and moldy bread," and "hamburgers that were foul smelling and unrecognizable." *Id.* at 4-7. At a minimum, these conditions reflect neglect of and a lack of concern for detainee health, even in the best of times at the Essex County Correctional Facility.  Adding a highly contagious virus to the mix results in a recipe for disaster. In fact, the conditions have deteriorated to such an extent that detainees at the Essex County Correctional Facility have now organized a hunger strike.[14]

---

[13]  *See* Department of Homeland Security, Office of Inspector General, *Issues Requiring Action at the Essex County Correctional Facility in Newark, New Jersey*, at p. 2, (Feb. 13, 2019), *available at* https://www.oversight.gov/sites/default/files/oig-reports/OIG-19-20-Feb19.pdf. (*Exhibit L*).

[14]  *See* Joe Atmonavage, *ICE detainees go on hunger strike in N.J amid coronavirus fears, lawyers say*, NJ.com (Mar. 18, 2020), https://www.nj.com/coronavirus/2020/03/we-would-rather-die-on-the-outside-than-in-here-ice-detainees-go-on-hunger-strike-in-nj-amid-coronavirus-fears-lawyers-say.html. (*Exhibit M*).

Moreover, the Essex County Correctional Facility's COVID-19 preventative measures do little to protect the health of detainees. Visiting attorneys must go through a medical screening whereby an in-ear temperature reading of 100.4 degrees warrants further screening,[15] but such screenings fail to address asymptomatic or mildly symptomatic carriers of the virus.[16] The facility also prevents attorneys from bringing hand sanitizer to their clients, a measure needed to facilitate a safe and healthy visit.

Given the noted risks of illness through inadequate food service and environmental safety at the Essex County Correctional Facility, a swift outbreak of COVID-19 at the facility is virtually inevitable. Indeed, the warning that prisons will be breeding grounds for this looming virus has already been sounded.[17] And, as the Third Circuit has expressed, an inmate's health is of such importance that the Constitution protects it. *See Young v. Quinlan*, 960 F.2d 351, 361-62 (3d Cir. 1992) (confirming that the Eighth Amendment protects prisoner's health and well-being while incarcerated by placing an affirmative duty upon prison officials to protect those within its control).

---

[15] *See* Essex County Correctional Facility Visitation and Attorney Visits Due to COVID-19, https://essexcountynj.org/wp-content/uploads/2020/03/COVID19_VISITATION.pdf. (*Exhibit N*).

[16] *See* Elizabeth Cohen, *Infected people without symptoms might be driving the spread of coronavirus more than we realized*, CNN.com (Mar. 19, 2020), https://www.cnn.com/2020/03/14/health/coronavirus-asymptomatic-spread/index.html. (*Exhibit O*).

[17] *See* Walter Pavlo, *Handling Coronavirus In Federal Prison* (March 4, 2020), https://www.forbes.com/sites/walterpavlo/2020/03/04/handling-coronavirus-in-federal-prison/#1bed46e32094. (*Exhibit P*).

### 3.     <u>Mr. Weeks should be temporarily released to protect his health.</u>

For most of his life, Mr. Weeks has suffered from exercise-induced asthma.  Through his teenage years, Mr. Weeks needed an asthma inhaler.  Later in life, Mr. Weeks was able to manage this condition with various medical supplements.  The CDC warns that "[p]eople with asthma may be at higher risk of getting very sick from COVID-19.  COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease.  There is currently no specific treatment for or vaccine to prevent COVID-19.  The best way to prevent illness is to avoid being exposed to this virus." *See* https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/asthma.html. The CDC further warns that, "[a]s more cases of COVID-19 are discovered and our communities take action to combat the spread of disease, it is natural for some people to feel concerned or stressed. Strong emotions can trigger an asthma attack. Take steps to help yourself cope with stress and anxiety." *Id.*  This pre-existing condition puts Mr. Weeks at greater risk of danger than most people in the general population.

Recent data from the CDC reflects that the danger to people under the age of 65 is greater than initially understood.  According to the CDC, as reported Sunday morning, March 22, on Meet the Press, 48% of intensive care unit patients infected with COVID-19 up through the middle of March 2020, were <u>under</u> the age of 65.  And 20% of fatalities are from this younger age group.  So, COVID-19 does not just pose a danger to the elderly, as some people wrongfully assume.

Pretrial detainees have a substantive due process interest in freedom from deliberate indifference to their medical needs.  *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 581–82 (3d Cir. 2003).  Since his detention, Mr. Weeks has experienced a decline in overall health. In the past, Mr. Weeks has managed his health with supplements and various medical

12

procedures. However, he has been unable to receive these supplements and medical treatments while in jail. On three occasions, Mr. Weeks put in a request to be seen by a doctor to raise his concern about indigestion. But no doctor came. When Mr. Weeks looked into his unanswered requests, he learned that each request was closed out as if he had seen the doctor, when he had not. Only after undersigned counsel complained to a jail official on Friday, March 6, did Mr. Weeks receive a visit from a doctor. Although Mr. Weeks was able to see a doctor, the doctor refused to change Mr. Weeks' diet to prevent his indigestion and instead offered pills to treat the symptoms of his indigestion. This treatment over prevention approach by the jail simply won't cut it when it comes to COVID-19. The threat is too imminent.

Further, Mr. Weeks was disciplined when he attempted to redirect the air vent in his prison cell away from blowing in his face while lying in his bunk. As noted by Dr. Meyer, the virus can be transmitted to detainees due to air flow throughout the facility. *See Exhibit H*. In fact, traces of the virus found in a Singapore hospital air vent led scientists to believe the disease could be spread through air-conditioning units.[18] The correctional staff at the Essex County Correctional Facility blatantly disregarded the risk of exposure to Mr. Weeks by imposing disciplinary actions when Mr. Weeks took reasonable action to minimize his exposure. Their ignorance or indifference is inexcusable.

As the CDC has recommended, the best way to protect oneself in this pandemic-striven environment is to avoid exposure to the virus altogether. *See Exhibit F*. That is essentially

---

[18]  *See* Sean Wei Xiang Ong, et al., *Air, Surface Environmental, and Personal Protective Equipment Contamination by Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) From a Symptomatic Patient*, JAMA (Mar. 4, 2020), https://jamanetwork.com/journals/jama/fullarticle/2762692. (*Exhibit Q*).

impossible in the prison system, but it is possible if the Court were to grant Mr. Weeks

temporary release while this virus gets contained.

### 4.   Mr. Weeks' ability to prepare a defense will be impaired if he is detained in jail during the pandemic.

Pursuant to 18 U.S.C. § 3142(i), "[t]he judicial officer [who issued a pretrial detention

order] may, by subsequent order, permit the temporary release of the person, in the custody of a

United States marshal or another appropriate person, to the extent that the judicial officer

determines such release to be ***necessary for preparation of the person's defense*** or for another

compelling reason." (emphasis added).

Pretrial detention hinders a defendant's ability to prepare for trial under normal

conditions. *See Barker v. Wingo*, 407 U.S. 514, 533 (1972) (acknowledging that a pretrial

detainee "is hindered in his ability to . . . prepare his defense").  This case is one that involves

numerous factual and legal questions, and a tremendous volume of discovery. In the absence of a

global pandemic, limited access to electronic records, frequent scheduled and unscheduled

lockdowns, and reduced access to counsel make preparing a defense in a complex case extremely

difficult. That is in the best of circumstances. Here, in the midst of a global pandemic, preparing

Mr. Weeks for trial has even more challenges. Visitation hours at the jail have been reduced and

there are no visits on Sundays.  Moreover, pretrial detention conditions may violate the Sixth

Amendment when "they unreasonably burden[ ] the inmate's opportunity to consult with his

attorney and to prepare his defense," *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir. 2001)

(evaluating constitutionality of restrictions placed on attorneys visiting clients at Rikers Island),

or when they result in the "actual or constructive denial of the assistance of counsel altogether."

*United States v. Lucas*, 873 F.2d 1279, 1280 (9th Cir. 1989) (quoting *Perry v. Leeke*, 488 U.S.

272, 280 (1989)).  It is unclear how the recent shelter in place order in effect for New Jersey will

14

further hinder counsel's access to Mr. Weeks, but it is to be expected that the order will place further strain on jails as guards and other staff will have to attend to personal and family needs.

The obstacles posed by the current public health crisis to the preparation of Mr. Weeks' defense also constitute a compelling reason under section 3142(i). *See United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011) (providing that the Court "may . . . permit the temporary release of [a] person, in the custody of a[n] . . . appropriate person, to the extent [it] determines such release to be necessary for preparation of the person's defense"). The spread of COVID-19 throughout New Jersey, and the country, compelled the Federal Bureau of Prisons ("BOP") to suspend all visits—including legal visits, except as allowed on a case-by-case basis—until further notice.[19]

Although the Essex County Correctional Facility has not currently suspended all in-person legal visits at this time, the likelihood of such a suspension is high, given the statewide "shelter in place" order announced on March 21.[20] As of Friday, March 20, the Essex County Correctional Facility's revised attorney visitation guidelines severely limit attorney visits, allowing guards complete discretion on a "case-by-case basis," after the attorney "communicate[s] the need and reason for the contact visit to the Visit Sergeant." *See Exhibit N*. In other words, there is no guarantee that counsel will be granted access to Mr. Weeks. It was also brought to undersigned counsel's attention on March 21 that the jail is contemplating a 23-

---

[19]   *See* Federal Bureau of Prisons, Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp (explaining that "legal visits will be suspended for 30 days" nationwide and that "case-by-case accommodation will be accomplished at the local level").

[20]   *See* N.J. Exec. Order No. 107 (Mar. 21, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf. (*Exhibit R*).

hour lockdown for pretrial detainees to prevent inmate exposure to COVID-19; this remains unconfirmed, however.

If placed in perpetual lockdown, Mr. Weeks will be unable to assist in the review of discovery, which, as represented by the government, amounts to almost 2 million records. Mr. Weeks cannot access this information electronically; he cannot participate in an online/virtual meeting with counsel. In short, continued detention of Mr. Weeks during this pandemic cripples his ability to participate in the development of his defense. And waiving speedy trial and prolonging Mr. Weeks' pretrial detention is not the answer to this problem.

Thus, the current circumstances compel Mr. Weeks' temporary release. *See, e.g., United States v. Stephens*, No. 1:15-cr-00095-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (Nathan, J.) (granting temporary release after finding the defendant's inability to prepare for trial amid the BOP lockdown could hamper his defense) (citing *United States v. Persico*, No. 84-cr-809 (JFK), 1986 WL 3793, at *1 (S.D.N.Y. Mar. 27, 1986) (compiling temporary release orders of defendants "to facilitate the defendants' expeditious preparation for trial" where "[t]he concern in each case was that, given the admittedly limited access to telephones and attorney conference rooms at the detention facilities, the effective preparation of a defense might have been impossible in the short time available before the commencement of trial")).

Pursuant to 18 U.S.C. § 3142(c)(1)(B)(i), a third-party custodian is an "appropriate person" who may take custody of a defendant. *See* 18 U.S.C. § 3142(c)(1)(B)(i) (the judge presiding over a detention hearing may order that the defendant "remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court"). In this case, Peter Gallic may take custody of Mr. Weeks. Prior to Mr. Weeks' hearing on his motion to revoke the pretrial detention order issued by U.S. Magistrate

Judge Matthewman in West Palm Beach, Florida, the Pretrial Services Office in Newark

determined that Mr. Gallic was qualified to serve as a third-party custodian for Mr. Weeks.

### 5. Mr. Weeks is not a danger to the community, and the Court's flight risk determination does not prevent temporary release.

First, everyone agrees that Mr. Weeks is not a danger to the community. Second, whether

Mr. Weeks is considered a flight risk by the Court is largely irrelevant in the context of §

3142(i). Temporary release under § 3142(i) is only available to defendants who are either a flight

risk, a danger to the community, or both. Thus, while the Court may wish to consider flight risk

issues in assessing whether to grant or deny a request for temporary release, it should not weigh

the issue heavily because Congress has already provided that courts can grant temporary release

where detainees are found to be a flight risk.

Notwithstanding the Court's prior ruling on risk of flight, circumstances have changed to

minimize any perceived risk.  There is nowhere for Mr. Weeks to go. *See, e.g.*, *In the Matter of

the Extradition of Alejandro Toledo Manrique*, Case No. 19-mj-71055-MAG-1 (TSH), 2020 WL

1307109, at *1 (N.D. Cal. Mar. 19, 2020) ("The Court's concern was that Toledo would flee the

country, but international travel is hard now. Travel bans are in place, and even if Toledo got into

another country, he would most likely be quarantined in God-knows-what conditions, which

can't be all that tempting. Also, international travel would itself pose a risk of infection by likely

putting Toledo in contact with people in close quarters. Maybe the risk of COVID-19 is worth it

if he can make a run for it and get away. The government says he faces the prospect of life in

prison if he is convicted in Peru. But escape is riskier and more difficult now.").  He doesn't own

a plane.  He doesn't have access to a private plane.  He doesn't have a JetSmarter membership

anymore.  And a travel ban has been put in place that guarantees Mr. Weeks is not traveling

someplace abroad.

In this current pandemic climate, it would be exceedingly difficult for Mr. Weeks to travel to another country. No U.S. Citizen can travel to Europe, and international travel, in general, has been curtailed and cautioned against. Even if Mr. Weeks could get himself on a plane to another country (which he will not), many countries have instituted stiffer visitor and border-crossing policies in the wake of this virus.[21]   Moreover, Mr. Weeks does not want to get sick. He understands that flying, particularly for long periods of time, and overseas, is cautioned against for someone with underlying health conditions. He would not knowingly put himself in dangers way, if nothing else, for the sake of his wife and new baby.

### C.   Mr. Weeks' proposed conditions for temporary release will ensure he does not flee during this time of global outbreak of COVID-19.

As offered in Mr. Weeks' motion to revoke the pretrial detention order (Dk. 12), with a few modifications to account for changed circumstances and the need for only temporary release,[22] the following conditions will ensure Mr. Weeks will return to jail for the later of either three weeks after the Court's temporary order of release, or the time when COVID-19 is contained:

> 1. **Secured Bond** - Jobadiah Weeks and his family members will post a secured bond.  It will be signed by Jobadiah Weeks, Stephanie Weeks (his wife), Nat Weeks (his father), and Silence Weeks (his mother), collateralized by the following properties:
>
>    A.  The family home in Arvada, Colorado (Nat and Silence Weeks)
>    B.  The family log cabin in Buena Vista, Colorado (Nat and Silence Weeks)
>    C.  The Sangre de Cristo Ranch in Coaldale, Colorado (Jobadiah Weeks)

---

[21]   Sophia Ankel, *From kissing bans to the death penalty: Here's how seriously different countries are taking the coronavirus outbreak*, Business Insider (March 5, 2020), https://www.businessinsider.com/coronavirus-how-us-china-italy-other-countries-handling-outbreaks-2020-3.

[22]   One of those changes includes not listing the sale of Mr. Weeks' airplane and aircraft membership. This is because Mr. Weeks has already divested himself of his airplane and cancelled his membership in JetSmarter.

121457550.6

2. **Third-Party Custodian** - Mr. Weeks will be released to the custody of his close friend Peter Gallic, who lives in Far Hills, New Jersey.[23]

3. **Home Detention** - Mr. Weeks will be subject to home detention at Peter Gallic's house in Far Hills, New Jersey.

4. **GPS Monitoring** - Mr. Weeks will wear an electronic monitoring device issued by the Pretrial Services Office, and will follow all conditions that Pretrial specifies.

5. **Third-Party Monitoring Service** - Mr. Weeks will be subject to, and incur the cost of, additional monitoring by a third-party service, such as Shadowtrack. Shadowtrack will use cell tower triangulation, voice verification, and facial recognition to ensure Mr. Weeks is at the detention location.

6. **Travel Restrictions** - Mr. Weeks' travel will be restricted to the District of New Jersey.

7. **Surrender of Passport** – Mr. Weeks has already surrendered his passports. Mr. Weeks' wife, Stephanie Weeks, will surrender her passport and her daughter's passport to undersigned counsel (or Pretrial Services) for the duration of Mr. Weeks' temporary release.

8. **Extradition Waivers** – Mr. Weeks will provide the Court with extradition waivers for any country requested by the Court, Pretrial Services, or the government.

9. **Any Other Conditions Imposed by the Court or recommended by the Pretrial Services Office**.

These conditions will ensure Mr. Weeks will not flee while on temporary release and will return to the Essex County Correctional Facility at the later date of either (a) three weeks from the Court's order, or (b) once COVID-19 is deemed contained. In addition to Mr. Weeks' release conditions, the fact that he is not a danger to the community and his risk of flight has substantially lessened, the Court should find that Mr. Weeks' temporary release is necessary for the compelling reasons of the need to prepare for trial and protect his physical well-being.

---

[23] Pretrial Services has deemed Mr. Gallic an "appropriate person" to watch over Mr. Weeks in the event he is released from jail. *See* 18 U.S.C. § 3142(i).

## CONCLUSION

For the foregoing reasons, this Court should temporarily release Mr. Weeks pursuant to 18 U.S.C. § 3142(i) for the later of either a period of three weeks, or until health and government officials bring the virus under control.  Because of the urgency of this matter, Mr. Weeks is respectfully requesting an expedited hearing on this motion.

Dated:  March 23, 2020                                    CARLTON FIELDS

                                                          */s/ Simon Gaugush*
                                                          Simon Gaugush, Esq.
                                                          Fla. Bar No. 0440050
                                                          4221 W. Boy Scout Blvd., Ste. 1000
                                                          Tampa, FL  33607
                                                          Telephone: 813.223.7000 (Fla.)
                                                          Facsimile:  813.229.4133 (Fla.)

                                                          and

                                                          Michael L. Yaeger, Esq.
                                                          405 Lexington Avenue, 36th Floor
                                                          New York, NY  10174
                                                          Telephone: 212.785.2577

                                                          *Counsel for Defendant Jobadiah Weeks*

121457550.6

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 23, 2020, I filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will serve an electronic copy to all counsel of record.

*/s/ Simon Gaugush*
Simon Gaugush, Esq.

121457550.6