# Exhibit A

DOJ April 7, 2025 Policy Memo



**U.S. Department of Justice**

Office of the Deputy Attorney General

---

The Deputy Attorney General

*Washington, D.C. 20530*

April 7, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:              THE DEPUTY ATTORNEY GENERAL

SUBJECT:           Ending Regulation By Prosecution

    The digital assets industry is critical to the Nation's economic development and innovation. Thus, as noted in Executive Order 14178, clarity and certainty regarding enforcement policy "are essential to supporting a vibrant and inclusive digital economy and innovation in digital assets." President Trump has also made clear that "[w]e are going to end the regulatory weaponization against digital assets."

    The Department of Justice is not a digital assets regulator.  However, the prior Administration used the Justice Department to pursue a reckless strategy of regulation by prosecution, which was ill conceived and poorly executed.  The Justice Department will no longer pursue litigation or enforcement actions that have the effect of superimposing regulatory frameworks on digital assets while President Trump's actual regulators do this work outside the punitive criminal justice framework.  Rather, consistent with President Trump's directives and the Justice Department's priorities, the Department's investigations and prosecutions involving digital assets shall focus on prosecuting individuals who victimize digital asset investors, or those who use digital assets in furtherance of criminal offenses such as terrorism, narcotics and human trafficking, organized crime, hacking, and cartel and gang financing.[1]

## I.    Digital Assets Enforcement Priorities

    Executive Order 14178 tasks the Justice Department and others with "protecting and promoting" (1) "the ability of individual citizens and private-sector entities alike to access and use for lawful purposes open public blockchain networks without persecution"; and (2) "fair and open access to banking services for all law-abiding individual citizens and private-sector entities alike." In response to those taskings, the Justice Department will stop participating in regulation by prosecution in this space.  Specifically, the Department will no longer target virtual currency exchanges, mixing and tumbling services, and offline wallets for the acts of their end users or unwitting violations of regulations—except to the extent the investigation is consistent with the priorities articulated in the following paragraphs.

---

[1] This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

The policy outlined in Executive Order 14178 requires the Justice Department to prioritize investigations and prosecutions that involve conduct victimizing investors, including embezzlement and misappropriation of customers' funds on exchanges, digital asset investment scams, fake digital asset development projects such as rug pulls, hacking of exchanges and decentralized autonomous organizations resulting in the theft of funds, and exploiting vulnerabilities in smart contracts. Such enforcement actions are important to restoring stolen funds to customers, building investor confidence in the security of digital asset markets, and the growth of the digital asset industry.

Pursuant to the "total elimination" policy set forth in Executive Order 14157, entitled *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, the Justice Department will also prioritize cases involving use of digital assets in furtherance of unlawful conduct by cartels, Transnational Criminal Organizations, Foreign Terrorist Organizations, and Specially Designated Global Terrorists. For example, cartels and human trafficking and smuggling rings have increasingly turned to digital assets to fund their operations and launder the proceeds of their illicit businesses. The same is true of fentanyl production: increasingly dangerous precursors purchased from China and used in the production of fentanyl in Central and South America are often paid for using digital assets. Terrorist groups, such as Hamas and ISIS, and nation states subject to US sanctions, like North Korea, also continue to transact using digital assets in an attempt to conceal their financing from law enforcement. As part of the Justice Department's ongoing work against fentanyl trafficking, terrorism, cartels, and human trafficking and smuggling, the Department will pursue the illicit financing of these enterprises by the individuals and enterprises themselves, including when it involves digital assets, but will not pursue actions against the platforms that these enterprises utilize to conduct their illegal activities.

Ongoing investigations that are inconsistent with the foregoing should be closed. The Office of the Deputy Attorney General will work with the Criminal Division and EOUSA to review ongoing cases for consistency with this policy. All previously issued policies and directives that are inconsistent with any of the foregoing are rescinded, effective today.

## II.    Digital Assets Charging Considerations

Based on the foregoing priorities—while charging decisions must be based upon the facts and evidence of each particular case—federal prosecutors are directed to consider the following factors when deciding whether to pursue criminal charges involving digital assets:

Prosecutors shall prioritize cases that hold accountable individuals who (a) cause financial harm to digital asset investors and consumers; and/or (b) use digital assets in furtherance of other criminal conduct, such as fentanyl trafficking, terrorism, cartels, organized crime, and human trafficking and smuggling. Seeking accountability from individuals who perpetrate these types of wrongdoing deters future illegal activity, compensates victims, and promotes the public's confidence in the digital asset markets and broader industry. On the other hand, criminal matters premised on regulatory violations resulting from diffuse decisions made at lower levels of digital asset companies often fail to advance the priorities of the Department.

Prosecutors should not charge regulatory violations in cases involving digital assets—including but not limited to unlicensed money transmitting under 18 U.S.C. § 1960(b)(1)(A) and (B), violations of the Bank Secrecy Act, unregistered securities offering violations, unregistered

broker-dealer violations, and other violations of registration requirements under the Commodity Exchange Act—unless there is evidence that the defendant knew of the licensing or registration requirement at issue and violated such a requirement willfully. This priority is not required by law, but is being imposed as a matter of discretion, in recognition of the Justice Department's priorities and the fact that the Biden Administration created a particularly uncertain regulatory environment around digital assets.[2]

Prosecutors should not charge violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the Commodity Exchange Act, or the regulations promulgated pursuant to these Acts, in cases where (a) the charge would require the Justice Department to litigate whether a digital asset is a "security" or "commodity," and (b) there is an adequate alternative criminal charge available, such as mail or wire fraud. The following types of positions are permissible under this policy in connection with proposed prosecutions that would otherwise be consistent with the guidance in this memorandum: (i) taking the position that bitcoin or ether is a "commodity" under the Commodity Exchange Act; and (ii) filing securities fraud charges where the "security" at issue is the equity or stock in a digital asset company. Any exceptions to this policy must be approved by the Deputy Attorney General, or his designee(s). Relevant considerations for such an exception include whether the digital asset is widely accepted to be a "security" or "commodity," whether the parties to the litigation have an interest in defending the position that a digital asset is a "security" or "commodity," and whether there is no alternative criminal charge under Title 18.

### III.    Compensating Victims In The Digital Assets Space

Following the prolonged period of price decline in the digital asset market in 2022, multiple companies with custody of investors' digital assets collapsed and entered bankruptcy, including FTX, Voyager Digital, Celsius Network, Genesis Global, BlockFi, and Gemini Trust. In some instances, investor losses have been directly attributable to fraud and theft. In those cases, and others, prosecutors have been able to forfeit proceeds of criminal activity including digital assets that in some instances became worth billions of dollars. However, as a result of regulations, some digital asset investor victims have only been able to recover the value of their digital assets at the time the fraud was perpetrated. *See* 28 C.F.R. § 9.8(c). The effect: digital asset investors' losses may be calculated at a value when the digital asset market was at a lower point, and victims who bore the risk of loss are unable to benefit from corresponding gains that occurred during or after the period in which they were victimized and would otherwise have possessed the asset. Accordingly, the Office of Legal Policy and the Office of Legislative Affairs are directed to evaluate and propose legislative and regulatory changes to address this concern and improve asset-forfeiture efforts in the digital assets space.

---

[2] This guidance does not reflect a view by the Department that the criminal offense set forth in 18 U.S.C. § 1960 requires proof of willfulness in other contexts, and it casts no doubt on existing case law. Moreover, 18 U.S.C. § 1960(b)(1)(C) requires that the transmission of funds "are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity," and is therefore outside the scope of this policy.

Memorandum from the Deputy Attorney General                                          Page 4
Subject: Ending Regulation By Prosecution

### IV.     Shifting Resources Relating To Digital Assets

U.S. Attorneys' Offices will use long-recognized criminal justice tools to lead appropriate prosecutions consistent with the foregoing enforcement priorities and charging consideration. Consistent with the narrowing of the enforcement policy relating to digital assets, the Market Integrity and Major Frauds Unit shall cease cryptocurrency enforcement in order to focus on other priorities, such as immigration and procurement frauds.   The National Cryptocurrency Enforcement Team (NCET) shall be disbanded effective immediately.   The Criminal Division's Computer Crime and Intellectual Property Section (CCIPS) will continue to provide guidance and training to Department personnel and serve as liaisons to the digital asset industry.

### V.     The President's Working Group on Digital Asset Markets

The Justice Department will fully participate in President Trump's Working Group on Digital Asset Markets, which was established in Executive Order 14178, via attorneys designated by the Justice Department's senior leadership.   As directed by President Trump, the Department's designees will identify and make recommendations regarding regulations, guidance documents, orders, or other items that affect the digital asset sector.   Additionally, the Department will participate in the preparation of a report to President Trump recommending regulatory and legislative proposals that advance the policies and priorities set forth in the President's Executive Order.  Following the submission of the report, the Justice Department will take all steps necessary to implement the recommendations in the report that President Trump adopts.

# Exhibit B

United States v. Storm Dkt 149 Storm Government Letter
(with page reference highlighted)



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza*
*38th Floor*
*New York, New York 10278*

May 21, 2025

**BY ECF & EMAIL**

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    ***United States v. Roman Storm*, 23 Cr. 430 (KPF)**

Dear Judge Failla:

    The Government respectfully submits this letter in response to the defendant's May 16, 2025 letter motion alleging that the Government has not met its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) (the "Motion"). The defendant claims that the Government was required to disclose in this case records that it disclosed in a separate case, *United States v. Rodriguez*, No. 24 Cr. 82 (RMB) (the "*Rodriguez* Disclosures"). The Motion seeks: (1) "any information suggesting that Tornado Cash would not qualify as a 'money transmitting business,' including any communications with [the Financial Crimes Enforcement Network ("FinCEN")];" (2) the *Rodriguez* Disclosures and "any other related *Brady* materials that may have been produced in discovery to the defense [in *Rodriguez*];" and (3) "the date [the] prosecution team [in this case] learned of the information in those disclosures." Those requests should be denied because the records that the defendant seeks contain opinions—not facts—which do not constitute *Brady* material under the law. Even if the informal opinions of two individual FinCEN employees constituted *Brady* material in the *Rodriguez* matter (which they do not), the *Rodriguez* Disclosures are legally and factually irrelevant to this case. And even if the Rodriguez materials were somehow relevant to this case (which they are not), the defense is already in possession of the *Rodriguez* disclosures. And as the Government has already explained to the defense, there are no similar materials in this case.

    The *Rodriguez* Disclosures concern an August 2023 phone call between the prosecutors in that case and two employees of FinCEN. During that call, the two employees stated that they could not predict whether FinCEN's Policy Committee would find that Samourai Wallet, which is a cryptocurrency business at issue in the *Rodriguez* case but not at issue in this case, would qualify as a money services business ("MSB") under FinCEN's regulations. The employees further stated

that, in their opinion, FinCEN guidance "would strongly suggest that Samourai is not acting as a MSB."[1]

On May 8, 2025, the defense sent a letter to the Government in which it requested the disclosures that it now seeks in the Motion. (Motion Ex. C, Dkt. 148-3). On May 12, 2025, the Government sent the defense a letter in which it explained—in detail—why the *Rodriguez* Disclosures are not *Brady* material. A copy of the Government's letter is attached to the Motion. (Motion Ex. D, Dkt. 148-4). The Government will not repeat its arguments in full here, but in short, the Government's letter explained that opinions, including those set forth in the *Rodriguez* Disclosures, do not constitute *Brady* material. (Motion Ex. D, Dkt. 148-4 at 3-5 (citing, *inter alia*, *United States v. Carroll*, No. 19 Cr. 545 (CM), 2020 WL 1862446, at *10 (S.D.N.Y. Apr. 14, 2020) ("The thoughts and impressions of SEC staff concerning its case and investigation are not *Brady* material. The evidence that matters is not an attorney's opinion, but the underlying facts."); *United States v. Redcorn*, 528 F.3d. 727, 744 (10th Cir. 2008) (rejecting *Brady* claim in health insurance fraud case in connection with post-trial disclosures regarding an email by a state insurance official suggesting a corporate officer and shareholder could not steal from his own company because, as a "legal opinion," it was "inadmissible and incorrect"); *United States v. NYNEX Corp.*, 781 F. Supp. 19, 25-26 (D.D.C. 1991) (explaining that "[a] particular government attorney's opinion as to the strength or weakness of a NYNEX argument, or as to the clarity or meaning of the decree" is not material to guilt or punishment because it does not "preclude a contrary argument during litigation by the government or bind a court's ruling")). In the Motion, the defendant simply dismisses the Government's position on this issue without citation to any authority and declares that the *Rodriguez* Disclosures are "clearly *Brady*." (Dkt. 148 at 5). That is incorrect for the reasons given in the Government's letter.

Even if the opinions of an agency's staff could constitute *Brady* material (which they do not), the *Rodriguez* Disclosures do not bear on the remaining charges in this case. As described previously and again below, FinCEN's regulations and related guidance are only implicated in a Section 1960 charge that alleges a violation of Section 1960(b)(1)(B), which cross-references 31 U.S.C. § 5330 and its implementing regulations. As set forth in the Government's May 15, 2025 letter to the Court, the Government will not proceed to trial on the first object of the conspiracy charged in Count Two of the Superseding Indictment, alleging a failure to register under Title 18 U.S.C. § 1960(b)(1)(B). (Dkt. 144). Accordingly, the only charge[2] to which the *Rodriguez* Disclosures were even possibly relevant is no longer part of the case.[2]

---

[1] The *Rodriguez* Disclosures can be found embedded in and attached to a letter publicly filed by the defense in *Rodriguez* on May 5, 2025 (the "*Rodriguez* Letter"), which is also attached to the Defendant's Motion in this case. (*See* Motion Ex. A, Dkt. 148-1). Judge Berman, who is presiding over the *Rodriguez* matter, has not yet opined on the significance, if any, of the *Rodriguez* Disclosures and has indicated that he will only do so in the context of deciding any pretrial motions filed in that matter, which are currently due on May 29, 2025. (*See Rodriguez* Dkt. 90).

[2] The defendant asserts that "Government has already expressed its intent to call FinCEN employees as witnesses, and the material at issue is useful for impeachment purposes." (Dkt. 148 at 5-6). However, the Government only intended to call a FinCEN witness to establish that the Tornado Cash service had not registered with FinCEN, which testimony would have been relevant

The *Rodriguez* Disclosures are irrelevant to the remaining object of Count Two, under 18 U.S.C. § 1960(b)(1)(C), which criminalizes the knowing transmission of crime proceeds. The *Rodriguez* Disclosures set forth the opinion of two FinCEN employees regarding the application of FinCEN guidance to Samourai Wallet. The very title of the relevant FinCEN guidance makes clear that it is about the "Application *of FinCEN's Regulations* to Certain Business Models Involving Convertible Virtual Currencies." May 9, 2019 FinCEN Guidance at 1 (emphasis added). But the question under Section 1960(b)(1)(C) is not whether the Tornado Cash service is an MSB and therefore required to register *under FinCEN regulations*; the question is whether it is a "money transmitting" business *as defined in Section 1960(b)(2)*. And indeed, the FinCEN employees did not opine in the Samourai Wallet case about the knowing transmission of criminal proceeds; their opinion was expressly about FinCEN's regulations as interpreted in FinCEN's guidance. The Court recognized this distinction when it denied the defendant's motion to dismiss. (*See* Sept. 26, 2024 Hearing Tr. at 20:16-18 (stating, with regard to the defendant's position that "the definitions of 'money transmitting' in Sections 1960 and 5330 are co-extensive," that "I do not believe that to be the case"); *see also* Gov. Opp. to MTD, Dkt. 53 at 19 & n.4 (describing the distinction between the definitions applicable to Section 1960(b)(1)(B) and 1960(b)(1)(C) in detail); May 9, 2019 FinCEN Guidance at 1 (purpose of guidance is to "remind persons subject to the Bank Secrecy Act (BSA)"—*i.e.*, not Section 1960 (b)(1)(C)—about "how FinCEN regulations relating to money services businesses (MSBs) apply to certain business models"). The defendant does not—because he cannot—even attempt to square the Court's prior holding with his position in the Motion.

Similarly, regarding Count One, which charges a money laundering conspiracy under 18 U.S.C. § 1956(h), the defendant argues that "if Tornado Cash is not [an MSB], then it does not fit *one of the definitions* of a 'financial institution' relied upon by the government." (Motion at 7) (emphasis added). That issue is also no longer relevant to this case, however. In light of its decision not to proceed on the (b)(1)(B) prong of Count Two and in an abundance of caution regarding the definition of "financial institution" in the money laundering statute, the Government also does not intend to proceed on its "financial institution" theory of Count One. But that does not mean that there is nothing left of Government's money laundering conspiracy count; rather, the Government also alleges that the financial transactions affected interstate or foreign commerce and involved the movement of funds by wire or other means. 18 U.S.C. § 1956(c)(4)(A); *see* Dkt. 53 at 37 ("But even assuming *arguendo* that the Court were to accept the defendant's arguments on Count Two and hold, as a matter of law, that the Tornado Cash service was not a money transmitting business, that would form no basis to dismiss the money laundering count."). The Court recognized this alternative money laundering theory in its order denying the defendant's motion to dismiss and suggested that the Government may have needed to "clean up confusion in a superseding charging instrument" with respect to that theory—which the Government did by obtaining the Superseding Indictment. (*See* Sept. 26, 2024 Hearing Tr. at 26).

Beyond these legal flaws in the defendant's argument, there are fatal factual problems, as well. The *Rodriguez* Disclosures are not factually relevant to this case. In no way can they constitute *Brady* material as to the defendant's Tornado Cash service because the two FinCEN employees provided their informal opinion in response to a fact-specific description of how

only to the Section 1960(b)(1)(B) object of Count Two. Accordingly, the Government no longer intends to call a witness from FinCEN.

Samourai Wallet operated that was provided to them by the Government. Tornado Cash simply was not part of the conversation. While Samourai Wallet and the Tornado Cash service may share some superficial similarities, they operated quite differently. Much as he has all along, the defendant says that the Court need only focus on the fact that both Samourai Wallet and Tornado Cash had non-custodial elements, and repeats arguments that have been extensively briefed and that this Court has already rejected about the supposed lack of control over the funds deposited in these services. The details matter. So even if the informal opinions of two FinCEN staff members might potentially bear on whether the defendants in the *Rodriguez* case had a good faith belief that their mixing service did not need to register with FinCEN or implement anti-money laundering controls (*see Rodriguez* Dkt. 89 at 2), it does not follow that those opinions somehow bear on the defendant's understanding of the need for his mixing service to be federally registered and compliant.

As for interactions with FinCEN in this case, there were no such interactions comparable to those described in the *Rodriguez* Disclosures. As the Government has repeatedly explained to the defense in this case, the Government has neither sought nor obtained an opinion from any employee at FinCEN—or any other government agency—regarding whether the Tornado Cash service is subject to registration obligations. Such an opinion—especially an informal opinion offered by employees who expressly disclaim to be speaking for the agency—would not be legally admissible and would not constitute *Brady* material. That is all the more so now that the Government has informed the defense and the Court that it does not intend to proceed on any theory premised on the defendant's failure to register with FinCEN as a MSB.

In sum, the Motion should be denied because, as the Court concluded about the defendant's last request for purported *Brady* materials, the Motion seeks records that are "neither relevant nor exculpatory." (Dkt. 137 at 5 (denying the defendant's motion at Dkt. 130) (internal quotation marks omitted)).

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
Benjamin A. Gianforti
Thane Rehn
Ben Arad
Assistant United States Attorneys
(212) 637-2490

Kevin Mosley
Special Assistant United States Attorney

cc: Brian Klein, Esq., Keri Axel, Esq., & David Patton, Esq. (by ECF & email)

# Exhibit C:

United States v. Pilipis Decision