**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,
Plaintiff,

v.

JOBADIAH SINCLAIR WEEKS,
Defendant.

**Criminal No. 2:19-cr-00877-CCC**

**DEFENDANT JOBADIAH WEEKS' MOTION TO DISMISS COUNT 1 OF THE INDICTMENT**

**[FILED UNDER SEAL PURSUANT TO MOTION TO SEAL FILED CONCURRENTLY HEREWITH]**

Defendant Jobadiah Weeks ("Weeks") respectfully submits this **Motion to Dismiss Count 1** of the Indictment, in parallel with his pending motions, including his **Motion to Rescind the Plea**. Because Count 1 remains technically in abeyance as to Defendants pending resolution of the rescindment of the plea, Defendant respectfully requests that this Motion be deemed **preserved** and automatically activated upon any **reinstatement of Count 1** for further prosecution. In the event Count 1 proceeds, Defendant requests that the Court adjudicate this Motion to Dismiss on its merits pursuant to **Federal Rule of Criminal Procedure 12(b)(3)(B)**, the **Due Process Clause of the Fifth Amendment**, and related constitutional provisions.

Although Count 1 is not presently scheduled for trial due to its exclusion from Defendant's current plea agreement, the **constitutional defects** identified herein remain fully preserved and subject to judicial review. This Motion seeks to ensure that all challenges to Count 1 are properly documented in the record for purposes of **appellate review**, **collateral proceedings**, or any future reinstatement of the charge. The constitutional violations detailed herein are not mooted by plea exclusion, as they arise from the Government's original **charging decision**, **pretrial conduct**, **discovery violations**, and **systemic procedural failures** that remain subject to judicial oversight.

Beyond the procedural posture, this case implicates far broader **constitutional and institutional concerns**. The prosecution of Defendant under Count 1 exemplifies a fundamental failure of **fair notice**, **prosecutorial discretion**, and **charging integrity** during a period of legal and regulatory uncertainty in the cryptocurrency sector. At the time of the

1

Docusign Envelope ID: 5764E15A-3770-4DD2-BAB1-94C2DC26E05D

alleged conduct (2014–2017), no federal statute, regulation, or DOJ policy specifically prohibited cooperative mining pool participation or the type of promotional activity attributed to Defendant. Neither the **Department of Justice, SEC, CFTC, FinCEN, nor IRS** had issued binding guidance criminalizing such conduct by peripheral promoters or non-managerial participants in emerging crypto projects. Although Count 1 was excluded from the Defendant's plea agreement, it was never dismissed on the merits. Should the Court reinstate or proceed on Count 1, this Motion to Dismiss is preserved in full under Rule 12(b)(3)(B).

In the absence of clear regulatory standards, the Government nonetheless applied **expansive conspiracy theories** to sweep peripheral actors into felony wire fraud charges, while contemporaneously declining criminal prosecution against similarly situated actors in far larger cryptocurrency ventures. The charging decisions here were not only factually unsupported, but **institutionally inconsistent** with the Department's treatment of other market participants in comparable or more egregious fact patterns.

Compounding these constitutional deficiencies, the Government engaged in **systemic process failures** that directly impaired Defendants' ability to defend himself — including pretrial **financial deprivation** through overbroad asset seizures, persistent **discovery violations**, withholding of **exculpatory financial records**, IRS documentation, victim attribution data, **grand jury irregularities**, and delayed production of investigative materials. These cumulative failures compromised Defandants' ability to secure **effective counsel**, evaluate the Government's evidence, and exercise informed plea decision-making.

Accordingly, the defects underlying Count 1 are not limited to evidentiary insufficiency; they reflect profound violations of **due process**, **equal protection**, and **institutional accountability**. Dismissal is not only warranted as a matter of law, but necessary to preserve **constitutional integrity** and prevent the continued prosecution of criminal charges predicated on shifting regulatory theories, **selective enforcement**, and structurally unfair process.

The **constitutional and evidentiary defects** in Count 1 are not the product of later developments but were present and known to the Government from the outset. At the time of charging, the Government lacked any verified evidence of individualized victim loss attributable to Defendant; failed to obtain or disclose IRS records, financial tracing, or victim affidavits; and pursued an **expansive conspiracy theory** despite the absence of any regulatory or statutory authority that criminalized Defendant's conduct during the relevant period. The Government's actions disregarded established limits on **prosecutorial discretion**, **fair notice**, **due process**, **discovery obligations**, and **grand jury integrity**.

As such, **Count 1 was fatally defective from its inception and constitutionally void ab initio**. The Government's prosecution of Defendant under Count 1 was initiated without legal or factual foundation and in violation of **fundamental constitutional safeguards**, rendering further prosecution impermissible as a matter of law.

| | |
|---|---|
| **1. Factual Background** | **6** |
| **2. Legal Standard** | **10** |
| **3. Substantive Grounds For Dismissal** | **11** |
| 3.1 Conspiracy to commit wire fraud | 11 |
| 3.2 Absence of a Specific and Substantiated Fraud Mechanism ("How") | 14 |
| 3.3 Lack of Verified Victims and the Government's Failure to Substantiate Harm | 15 |
| 3.4 Inadequacy of the Draft PSR and Failure to Establish Victim Harm | 18 |
| 3.5 Grand Jury Irregularities and Lack of Probable Cause | 20 |
| 3.6 Pattern of Procedural Misconduct | 22 |
|     A. Systemic Discovery Failures | 22 |
|     B. Direct Impact on Plea and Defense Rights | 23 |
|     C. Institutional Pattern of Withholding and Retroactive Construction | 24 |
|     D. Cumulative Constitutional Violations | 24 |
|     E. Government Misrepresentations Regarding Discovery Compliance | 25 |
| 3.7 Count 1 Violates Due Process and Fair Notice Requirements | 25 |
| 3.8 Asset Seizures Violated Due Process and Sixth Amendment Rights | 27 |
|     A. Sweeping Asset Seizures Executed Without Judicial Safeguards | 27 |
|     B. Government's Failure to Reconcile Asset Inventories | 28 |
|     C. Financial Leverage Used to Coerce Plea Negotiations | 28 |
|     D Seizure of Servers and Unaccounted Digital Assets Violated Property Rights | 29 |
|     E. Constitutional Violations Warranting Dismissal | 30 |
| 3.9 Selective Prosecution and Disparate Treatment | 30 |
| 3.10 Improper Reliance on Co-Defendant Statements and the "Hoxie Statement" | 32 |
| 3.11 Improper Joint Detention of Co-Defendants Without Consent or Safeguards | 33 |
| 3.12 Systemic Violations of DOJ Internal Policies and Constitutional Safeguards | 35 |
| 3.13 Count 1 Was Used as Coercive Leverage in Plea Negotiations | 37 |
| 3.14 Government's Leniency Toward Key Actor Undermines Count 1 | 39 |
| 3.15 Government's Abandonment of Count 1 Shows It Was Deficient | 39 |
| 3.16 Government Misused Count 1 to Justify Delays Without Forensic Review | 41 |
| 3.17 Request for Targeted Discovery Regarding Seized Digital Asset Production | 42 |
| **4. Conclusion and Relief Requested** | **43** |
| Table of Authorities | 44 |

# 1. Factual Background

On December 10, 2019, the Government unsealed an indictment charging Defendant and others with **conspiracy to commit wire fraud (Count 1)**, **conspiracy to offer and sell unregistered securities (Count 2)**, and **conspiracy to commit money laundering (Count 3)**, among other related offenses. The charges arise from the operation of **BitClub Network ("BCN")**, a cryptocurrency-based mining cooperative that allowed members to contribute Bitcoin in exchange for participation in pooled mining rewards. The Government alleges that BCN raised approximately **$722 million** in Bitcoin contributions between April 2014 and December 2019. See Dkt. 70 at 3–5; Dkt. 75 at 2–4.

**Critically**, at the time of BCN's formation and operation (2014–2017), **no federal statute, regulation, or Department of Justice policy** directly prohibited cooperative Bitcoin mining arrangements, membership-based mining pools, or the solicitation of membership participation in such pools. Federal agencies — including **FinCEN, the IRS, the SEC, and the CFTC** — had issued only limited, inconsistent, and often nonbinding guidance concerning cryptocurrencies during this period, while DOJ had issued **no formal internal charging standards or prosecutorial policies** addressing the criminal liability of peripheral promoters or mining pool participants.

Despite this **unsettled regulatory environment**, the Government applied **sweeping conspiracy theories** to charge all individuals associated with BCN, without differentiating between founders, operators, or peripheral marketers who had no managerial authority, financial control, or corporate governance role. Defendant — who held **no equity interest** in BCN, exercised **no operational control**, and participated solely as a **peripheral marketer** — was charged alongside central operators and insiders.

The Government's account in its **pretrial detention filings** alleged that Defendant was a "**founding figure**" of BCN and participated in its growth by authorizing marketing materials and overseeing representations made to prospective investors. The Government further asserted that Defendant, along with co-defendants including **Russ Medlin** and **Joseph Frank Abel**, helped expand BCN through promotional events and online marketing to attract investors worldwide. However, as set forth in detail below, the Government has produced **no contemporaneous evidence** demonstrating that Defendant personally drafted marketing materials, exercised corporate decision-making authority, or directly communicated **material misrepresentations** to individual investors.

However, as set forth in detail below, the Government has produced no contemporaneous evidence demonstrating that Defendant personally drafted marketing materials, exercised corporate decision-making authority, or directly communicated material misrepresentations to individual investors.

**Moreover**, while Defendant has yet to receive full discovery in this matter — despite repeated requests and prolonged delays (see infra, Section 3.6) — the limited information presently available suggests that BitClub Network was at all times current on mining payouts and operated consistently with its public representations, which were prepared by others cannot by Defendant. Critically, any alleged financial harm to investors appears to have

occurred only after the Government's blanket seizure of assets and aggressive forfeiture actions. In other words, if members were ultimately deprived of funds, such deprivation resulted from Government enforcement — not Defendant's conduct.

In addition, Defendant notes that computer mining equipment—procured in part through his logistical assistance and estimated to be worth hundreds of millions of dollars in aggregate—remained operational at the time of seizure, containing substantial quantities of Bitcoin and other digital assets still within live mining cycles. To date, the Government has provided no accounting of these seized assets, nor disclosed what became of the unharvested BTC and ETH stored on the hardware. If such records exist, they remain improperly withheld despite repeated discovery requests. If they do not, then **nearly $1 billion in infrastructure and untallied cryptocurrency has effectively vanished without forensic trace, inventory, or explanation.**

### B. Lack of Victim Loss Evidence and Verified Financial Harm

The indictment asserts that BCN operated as a **multi-level marketing scheme** while **misrepresenting its Bitcoin mining operations**. However, despite these sweeping allegations, the Government has failed to produce any **sworn victim affidavits**, **tax filings**, **financial records**, or **authenticated victim statements** establishing that any specific misrepresentation caused actual **financial harm** attributable to Defendant's conduct. After more than five years since indictment, the Government has not provided a single **verified loss declaration** directly implicating Defendant.

Instead, the Government has consistently relied on **generalized, aggregate loss estimates** unsupported by **individualized victim attribution** or **causation analysis**. The only quantification of potential victim loss associated with Defendant appears in a **Draft Presentence Report (PSR)** produced nearly five years post-indictment, which identifies just **12 victims** with alleged losses totaling **$458,502.40** — a figure representing less than **0.1% of the $722 million** broadly alleged in the indictment. Even these limited figures have not been formally verified by the Department of Justice, remain uncorroborated by **IRS filings** or **financial transaction records**, and primarily reference conduct by other individuals, particularly co-defendant **Joseph Frank Abel**.

Further compounding these deficiencies, the Government has failed to produce **basic discovery materials** critical to validating any loss attribution, including **IRS Forms 1099-B**, **IRS Form 4684 casualty loss claims**, **IRS audit worksheets**, **cryptocurrency wallet tracing reports**, **bank account records**, or any **independent forensic financial analysis**. Despite repeated formal discovery requests from Defendant's counsel beginning as early as **2020** and continuing through **2025**, the Government has withheld these critical financial documents, leaving both the Court and the defense without any **verified evidentiary foundation** to support its victim harm allegations.

In sum, the Government's continuing reliance on **unverified summaries**, **incomplete victim lists**, and **speculative loss models** — unsupported by **sworn documentation** or **individualized evidence** — underscores the **absence of any substantiated financial**

**harm** attributable to Defendant and renders the Government's case **constitutionally deficient**.

### C. Defendant's June 11, 2025 Request for Clarification

In further efforts to clarify these **factual deficiencies** prior to filing the instant motion, Defendant submitted a **formal written request** to the **United States Attorney's Office** on **June 11, 2025**. In that letter (**attached hereto as Exhibit A**), Defendant specifically requested clarification and production of evidence relating to the Government's **joint charging theory in Count 1**, the asserted **"Hoxie Statement,"** the absence of **verified victim loss data**, the lack of **contemporaneous charging evidence**, and multiple **due process violations** that remain unresolved.

To date, **no reply or acknowledgment of receipt** has been provided by the Government in response to this submission.

In its **pretrial detention arguments**, the Government broadly referenced expenditures on **real estate**, **overseas accounts**, and **personal assets** allegedly derived from investor funds, but failed to identify any **individual investor** whose funds were directly traceable to those assets or to any financial transactions specifically attributable to **Defendant**. See Dkt. 70 at 6–7.

The Government's sole attempt to quantify any victim losses allegedly tied to Defendant appears in a **Draft Presentence Report ("PSR")** prepared nearly five years after the indictment, dated **October 25, 2024**. The PSR identifies only **12 victim statements** totaling **$458,502.40** — an amount representing less than **0.1% of the Government's original allegation of $722 million** in investor losses. Notably, none of these victim statements attribute any **solicitation, communication, or misrepresentation** to Defendant. Instead, the majority of these victims reference co-defendant **Joseph Frank Abel** as the person who allegedly induced their investments. The PSR itself expressly acknowledges that **"verification from the Government is awaited."** See docket 371, Draft PSR ¶ 112.

Despite multiple years of **discovery requests** and repeated demands for supporting documentation, the Government has failed to produce any **authenticated financial records** or underlying data that could verify these loss figures or connect them to Defendant. Specifically, no **IRS tax forms** (including Forms **1099-B** or **4684**), no **IRS Criminal Investigation workpapers**, no **blockchain transaction audits**, no **cryptocurrency wallet tracing reports**, no **account ledgers**, and no **bank statements** have been disclosed to substantiate any individualized victim loss or to establish any financial harm attributable to Defendant's limited promotional activities. The absence of such basic evidentiary documentation leaves the Government's financial loss claims entirely **speculative and unsupported by admissible records**.

The Government has likewise failed to **reconcile or fully disclose inventory records** concerning assets it seized from Defendant, including **cryptocurrency holdings**, **precious**

Docusign Envelope ID: 5764E15A-3770-4DD2-BAB1-94C2DC26E05D

**metals**, and **fiat accounts**. Repeated requests for **asset tracing reports**, **chain-of-custody certifications**, and **forensic reconciliation of seized property** have gone unanswered. As a result, no reliable inventory exists which would permit the Court or the defense to independently verify the **scope, valuation, or composition** of assets the Government continues to reference in its forfeiture or restitution positions.

In sum, the Government's continuing reliance on this **incomplete and unverified Draft PSR** — unaccompanied by any **independent financial verification** — underscores the **speculative nature** of its loss theory and its failure to establish any **quantifiable victim harm** caused by Defendant's conduct in connection with Count 1.

### E. The Government's Reliance on the Unrecorded "Hoxie Statement"

The Government has also relied on an alleged and **unrecorded verbal exchange** — sometimes referred to as the **"Hoxie Statement"** — as a purported basis for asserting a **joint conspiratorial agreement** between Defendant and other charged individuals. **Defendant has repeatedly and unequivocally denied** that any such discussion ever occurred and has **certified under penalty of perjury** that neither he nor his legal counsel were asked to approve, nor did they consent to, any arrangement grouping him together with co-defendants for **charging or evidentiary purposes**. To date, the Government has failed to produce any **written, recorded, or contemporaneous documentation** of this alleged conversation. See Dkt. 403; Dkt. 406; Dkt. 443.

### F. Summary of Factual Deficiencies

In sum, while the indictment advances a **broad narrative of alleged fraud** involving the BitClub Network, the Government has failed to present any **verified or admissible evidence** establishing **financial harm** attributable to Defendant's conduct, any **materially false statements** personally made by Defendant, or any **causal connection** between Defendant's limited promotional activities and any specific **victim loss**. After more than five years of investigation and litigation, the Government has produced no **sworn victim affidavits** implicating Defendant, no **verified financial records**, no **authenticated loss calculations**, and no **individualized evidence** linking any investor decision to Defendant's alleged conduct.

The Government's **liability theory in Count 1** remains **speculative and structurally flawed**. It improperly aggregates **generalized loss figures** unsupported by **contemporaneous documentation**, retroactively attributes liability to Defendant under **expansive conspiracy theories** without individualized proof of **fraudulent intent** or **participation**, and relies heavily on **incomplete, post-indictment summaries** that fail to satisfy even minimal constitutional standards of **due process**, **evidentiary sufficiency**, or **grand jury integrity**.

As a result, the Government's theory of prosecution under Count 1 is not only **factually unsupported**, but **legally defective**. It rests on **retroactive construction of criminal liability**, the absence of **clear charging standards** applicable to mining pool promoters during the relevant period, and the Government's own **systemic failure** to produce **constitutionally required discovery materials** essential to Defendant's defense. Under these circumstances, **Count 1 cannot stand**.

# 2. Legal Standard

Under **Federal Rule of Criminal Procedure 12(b)(3)(B)**, a Defendant may move to dismiss an indictment where it:

- **Fails to state an offense;**

- **Contains a defect in the institution of the prosecution;** or

- **Violates the Constitution or laws of the United States.**

An indictment that lacks factual specificity, is unsupported by admissible evidence, or is tainted by material procedural violations must be dismissed to safeguard the defendant's constitutional rights.

The **Fifth Amendment's Due Process Clause** requires that any criminal charge be grounded in verified, reliable, and individualized evidence—not speculative summaries, generalized victim models, or retroactively constructed loss theories. The Government bears the burden of establishing probable cause based on competent, admissible facts—not assumptions, conjecture, or uncorroborated assertions.

Multiple precedents make clear:

- **United States v. Watts, 519 U.S. 148, 155 (1997):** *Due process requires evidentiary fairness and prohibits punishment or adverse determinations based on unverified conduct.*

- **United States v. Chandler, 376 F.3d 1303, 1311 (11th Cir. 2004):** *A wire fraud conspiracy requires proof of specific intent to defraud, knowing participation, and overt acts in furtherance of the conspiracy.*

- **Costello v. United States, 350 U.S. 359, 364 (1956):** *The Grand Jury may not rely on mere speculation; probable cause must rest on competent evidence presented at the time of indictment.*

Dismissal is particularly appropriate where, as here, the Government has:

- **Failed to identify or verify actual victims or individualized financial loss;**

Docusign Envelope ID: 5764E15A-3770-4DD2-BAB1-94C2DC26E05D

- **Failed to demonstrate a causal link between the alleged conduct and any substantiated financial harm;**

- **Relied on inadmissible, proffer-protected, or unsworn statements of co-defendants; and**

- **Engaged in post hoc evidentiary reconstruction rather than presenting a properly supported charging instrument.**

Accordingly, Count 1 is facially defective and must be dismissed as a matter of law.

# 3. Substantive Grounds For Dismissal

The deficiencies outlined above are not mere technical defects — they strike at the core of the Government's **constitutional burden** under both the **Fifth Amendment** and **Federal Rule of Criminal Procedure 12(b)(3)(B)**. These are not pleading deficiencies, but fundamental failures of proof, charging theory, and due process.

The following sections explain why **Count 1 must be dismissed in its entirety**, based upon:

1. **The absence of any specific and substantiated fraud mechanism** capable of supporting the elements of wire fraud conspiracy;

2. **The Government's complete failure to identify, verify, or substantiate victim harm or individualized financial loss;**

3. **Improper and defective grand jury practices** that deprived the indictment of any valid probable cause foundation;

4. **Unconstitutional reliance on inadmissible co-defendant statements**, including the so-called "Hoxie Statement"; and

5. **A systemic pattern of prosecutorial misconduct, Brady violations, and procedural irregularities** that have irreparably tainted the fairness and integrity of this prosecution.

## 3.1   Conspiracy to commit wire fraud

Count 1 of the indictment charges Defendant with **conspiracy to commit wire fraud** in violation of **18 U.S.C. § 1349**, based on allegations that Defendant and others devised and promoted a scheme to **defraud investors in BCN** through **false representations** concerning cryptocurrency mining operations. The indictment asserts that co-conspirators **manipulated mining statistics**, **fabricated payout data**, and knowingly misled investors into believing they were participating in a legitimate, profitable mining enterprise. It further

alleges that these acts caused investors to transfer over **$722 million**, framing Count 1 as a traditional fraud charge requiring proof of:

- **fraudulent intent**;

- **material misrepresentations**; and

- **actual or intended harm to identifiable victims**.

To survive dismissal under **Rule 12(b)(3)(B)**, the Government must demonstrate that the indictment is not only **facially sufficient** but also grounded in **verified and reliable factual allegations** that support each element of the offense. As established by controlling authority, **fraud-based indictments** cannot rest on **conclusory statements**, **generalized loss estimates**, or **post hoc loss models**; rather, they must identify the specific **who, what, when, and how** of the alleged fraudulent conduct, including **individualized evidence of victim harm** directly attributable to Defendant's actions.
 See *United States v. Costello*, 350 U.S. 359, 364 (1956); *United States v. Chandler*, 376 F.3d 1303, 1311 (11th Cir. 2004).

In this case, however, the Government has failed entirely to produce:

- any **verified victim affidavits**;

- any **loss declarations supported by financial records**; or

- any **tax filings, IRS audit records, or restitution documents** substantiating actual losses attributable to Defendant.

Despite repeated **formal discovery requests** over a **multi-year period**, the Government's only attempt to quantify losses consists of **generic and uncorroborated victim statements** contained in a **Draft Presentence Report** prepared nearly five years after indictment. That PSR identifies only **12 alleged victims** with loss claims totaling **$458,502.40** — a sum representing less than **0.1% of the aggregate loss** alleged in the indictment — none of whom identify Defendant as the individual who solicited or induced their investments. These **unverified figures**, unsupported by any **corroborating tax or financial documentation**, fall far short of the **constitutional standards** required to sustain criminal liability for **wire fraud conspiracy**.

**Lack of Verified Victims or Quantified Losses**
Despite repeated formal discovery requests over a multi-year period, the Government's only attempt to quantify losses consists of generic and uncorroborated victim statements, unsupported by forensic evidence, accounting records, or sworn affidavits. No independently verified victim loss schedules or substantiating materials have been produced. The Government has not provided any competent evidence establishing that persons who contributed Bitcoin to the Bitclub Network were defrauded as to the existence, nature, or performance of the mining activities promoted by others.

**Defendant's Good-Faith Contributions Saved Thousands of BTC**
Defendant also made substantial good-faith contributions that directly reduced Bitclub's operational costs and improved efficiency. He traveled to Iceland to inspect the mining

centers and confirm the functionality of Bitclub's operations. Through independent efforts, he negotiated equipment discounts with Bitfury, saving members approximately 3,000 BTC, and secured lower energy costs, which reduced operational expenditures by an additional 2,000 BTC annually. These contributions reflect logistical and financial stewardship—not fraud—and stand in direct contrast to the Government's unsupported claims of misrepresentation or deceit.

### Bitclub Generated Verifiable Mining Output

The Bitclub Network demonstrably mined over 92,000 BTC and 500,000 ETH during its operational years—output that is verifiable via public blockchain explorers. At the time Defendant became active in the project, mining was fully underway, and pools had already produced substantial payouts to members. The Government has produced no evidence contradicting these facts and has not presented a single verified victim claiming they were misled about mining activity itself. These facts reinforce that Defendant's conduct occurred in the context of a functioning enterprise with real outputs—not a fictitious or fraudulent scheme.

### The Real Economic Victims Were the Miners, Not Outsiders

In reality, the only individuals who suffered massive financial losses were Bitclub's internal miners and contributors—those who provided the Bitcoin capital to acquire equipment, pay for energy, and sustain mining operations. During its peak year, Bitclub was generating approximately 50 BTC per day. Over just a single 12-month period, that amounts to more than 18,000 BTC, which—at today's valuation exceeding $100,000 per coin—represents a total generated value of over $1.8 billion USD. None of that was recovered by the miners. The Government has failed to present a single verified outside victim claiming they were defrauded about mining, equipment, or payouts. In fact, the miners—like Defendant—should be regarded as the only economic victims, having lost far more than any passive participant. Prosecuting individuals like Defendant under a wire fraud theory—when they suffered the greatest financial losses and no verified external victims have been identified—fails both as a matter of law and as a matter of prosecutorial fairness.

### Government Seizure—Not Defendant's Conduct—Caused Any Shortfall

Moreover, Defendant strongly contests the notion that any alleged losses were caused by his conduct. To the extent any losses occurred, they are directly attributable to the Government's seizure and forced shutdown of nearly $1 billion in operational Bitcoin mining infrastructure. This equipment—which was actively generating returns consistent with the platform's mining disclosures—was rendered inoperative by the Government's intervention. It is the abrupt halt in mining, not any act or omission by Defendant, that explains any alleged failure to deliver payouts. Accordingly, any losses suffered by members were caused by law enforcement disruption, not fraud or misrepresentation.

Accordingly, as detailed further in the following subsections, **Count 1 must be dismissed** for lack of both **factual and legal sufficiency**, as it rests on **speculative allegations**, **retroactively constructed liability theories**, **procedurally improper charging practices**, and **constitutional violations** that render further prosecution impermissible.

## 3.2 Absence of a Specific and Substantiated Fraud Mechanism ("How")

To sustain a **wire fraud conspiracy charge under 18 U.S.C. § 1349**, the Government must do more than allege the existence of a scheme. It must present a **clear, supported narrative** of how the fraud was executed — the **specific misrepresentations or deceptive conduct**, how they were communicated, and how they induced reliance and extracted money from victims. **Conclusory language or generic labels like "fraudulent scheme" are not sufficient** under **Rule 12(b)(3)(B)** or the **Due Process Clause of the Fifth Amendment.**

Here, **Count 1** of the indictment rests on sweeping allegations that **Defendant** and others operated BCN through false pretenses and promotional tactics, but fails to specify the mechanism by which those deceptions were executed. For example, the indictment does not identify:

- **What specific statements (oral or written) were false and materially misleading;**

- **Where and when such statements were made, and through which communication channels;**

- **Who specifically made or received these statements, including any named investor;**

- **Which wire transmissions were used in furtherance of the fraud (e.g., particular emails, websites, financial transfers, or promotional videos), and on what dates;**

- **How such conduct deceived victims into parting with money or cryptocurrency, rather than relying on independent investor decisions or general marketing.**

In established precedent, courts have required the prosecution to set forth not just a general fraudulent theme but the **operational detail** of the alleged scheme. See *United States v. Chandler*, 376 F.3d 1303, 1311 (11th Cir. 2004) (**wire fraud conspiracy requires a "specific intent to defraud" and "knowingly joined conspiracy with that intent"**); *United States v. Weatherspoon*, 581 F.2d 595, 601 (7th Cir. 1978) (**"scheme must involve a material misrepresentation or concealment"**).

Moreover, **post-indictment theories of loss**, including investigative materials created after plea negotiations or inserted into unrelated filings, **do not retroactively supply the factual specificity required at the charging stage**. The use of **unverified summaries** — such as the **draft Pre-Sentence Report (PSR) for Defendant** — **cannot substitute for properly documented acts of fraud.**

Crucially, even if promotional materials were misleading in tone or substance, the Government must still **connect the deceptive conduct to specific losses incurred by specific individuals**. Without that **causal link**, the theory of wire fraud remains speculative.

12

Accordingly, the Government's failure to articulate the **"how"** of the alleged conspiracy in **Count 1** undermines the indictment's legal sufficiency. The alleged acts must be causally tied to **losses sustained by identifiable victims** — the **"who," "what," and "when"** of the alleged fraud. The absence of this victim-related detail is addressed in the next subsection.

**This failure to allege specific false statements, their context, and their connection to identifiable victims renders Count 1 facially deficient.** Courts have repeatedly held that an indictment must do more than parrot statutory language — it must **"set forth the essential facts constituting the offense."** *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000); see also *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (**"[A]n indictment may be dismissed where it fails to allege conduct that constitutes a criminal offense."**).

**In the alternative, and if the Government disputes this deficiency, Defendant respectfully requests that the following questions be addressed on the record:**

- **What specific false statements form the basis of the alleged wire fraud conspiracy, and who made them?**

- **To whom were these statements communicated, and by what means (email, website, social media, in-person)?**

- **Which wire transactions were used to execute or further the fraud, and when did they occur?**

- **What is the Government's evidence that any investor relied on the alleged misrepresentations in deciding to invest?**

- **How has the Government linked any of these acts to losses incurred by victims specifically tied to Defendant's conduct?**

Unless the Government can answer these questions with specificity, **Count 1 cannot meet the constitutional and statutory threshold for wire fraud conspiracy.**

## 3.3 Lack of Verified Victims and the Government's Failure to Substantiate Harm

A **wire fraud conspiracy charge under 18 U.S.C. § 1349** must be grounded in more than abstract allegations of dishonesty. It requires the Government to demonstrate the existence of **actual or intended victims**, the **loss of money or property**, and a **causal connection between that loss and Defendant's conduct**. These elements are indispensable. **Without victims, the charge collapses into an empty theory of economic disapproval—which is not a crime under federal law.**

Despite initiating this case in 2019, the Government has **never provided affidavits, IRS filings, declarations of loss, or verified financial documentation** to support its claim that "thousands of victims" were harmed. As the Government itself summarized:

> *"Through the efforts of the co-conspirators, including Weeks, BCN took in hundreds of millions of dollars from investors."* (Dkt. 417, at 2).

Yet no verified supporting victim data has ever been disclosed to substantiate this claim, despite multiple opportunities and defense requests.

This failure is not due to lack of opportunity. The Government publicly solicited victim submissions via its website in December 2019, shortly after the indictment was unsealed. As early as mid-2020, **defense counsel repeatedly requested that the Government identify the victims associated with Count 1 and produce corresponding documentation**. These requests were renewed over the years, including by **Defendant**, who again raised the issue in his April 25, 2025 submission to the Court, emphasizing that **no verified victim list had ever been disclosed by the Government.**
 *(See Dkt. 443, Notice of Supplemental Authority, May 30, 2025).*

**To date, and despite more than five years of procedural opportunity, the Government has failed to identify a single verified victim of wire fraud attributable to Defendant.**

### A. No Affidavits, Restitution Forms, or Verified IRS Documentation

As of the latest filings, including the Draft PSR submitted in connection with Defendant's prior plea, the only identifiable restitution claims relate to Count 2, and even those are limited in both scope and verification — **12 victims totaling $458,502.40**, which constitutes less than **0.1%** of the $722 million alleged. The Probation Office itself acknowledges that "verification from the Government is awaited."
 *(See docket 371, Draft PSR, Oct. 25, 2024,    112 n.2).*

Notably, many of the victim statements in that report relate not to Defendant, but rather to co-defendant Joseph Frank Abel, and primarily concern promotional conduct under the securities charge (Count 2), not wire fraud under Count 1.

**Although the Government has referenced estimated tax losses in plea negotiations, proffers, and asset forfeiture submissions, it has never produced the underlying IRS records or detailed audit materials supporting these calculations.** No Form 1099-Bs, Form 4684 loss claims, or IRS audit files have been disclosed, nor has the Government identified how payouts from BitClub Network were treated for tax purposes for either the entity or its members.

**Moreover, despite repeatedly citing tax-related loss theories, the Government never charged Defendant with any tax offenses or sought restitution related to tax-based victim harm under Count 1.** The absence of complete IRS documentation further underscores the lack of verified loss and causation essential to sustain the fraud charge.

**In the alternative, should the Government dispute these deficiencies, Defendant respectfully requests that the following questions be addressed on the record:**

- **Has the Department of Justice verified any of the 12 victim declarations cited in the Draft PSR through sworn affidavits, transactional documentation, bank records, cryptocurrency wallet audits, or IRS filings?**

- **What is the legal and factual basis for attributing these alleged victim losses to Defendant, when none of the identified victims directly reference Defendant as the person who solicited, communicated with, or induced their investments?**

- **Why has the Government failed to produce the underlying financial records — including IRS Forms 1099-B, 4684, audit worksheets, account statements, or cryptocurrency transaction ledgers — to substantiate any of the loss amounts asserted?**

- **What specific conduct by Defendant — including any statement, action, or communication — is alleged to have directly caused the $458,502.40 in purported losses identified in the Draft PSR?**

- **Since the filing of the Draft PSR in October 2024, what steps has the Government taken, if any, to verify, finalize, or correct these restitution figures — and why has this process remained incomplete more than five years after indictment?**

## B. No Victim Data Despite Public Outreach and Defense Requests

Under the **Mandatory Victims Restitution Act**, prosecutors are obligated to verify claimed losses and make those materials available to the defense and the Court when seeking conviction and sentencing on a fraud charge. Yet here, the record is devoid of any verified documentation of loss tied to Count 1 — even after:

- **The DOJ's own public solicitation of victim statements in December 2019;**

- **Multiple defense requests beginning in 2020;**

- **And renewed inquiries raised by Defendant as recently as April 2025, again requesting identification and substantiation of alleged victims.**

Instead of specific, individualized evidence, the Government continues to rely on **aggregate loss figures** drawn from a **draft PSR**, unsupported by **sworn declarations** or **transactional data**, and not tied to Defendant's conduct under Count 1.

## C. Indictment Cannot Stand Without Victim Harm

In **United States v. Weatherspoon**, 581 F.2d 595 (7th Cir. 1978), the court held that the essence of wire fraud is the **intentional deprivation of money or property by deception**. Similarly, in **Chandler**, 376 F.3d 1303 (11th Cir. 2004), the court emphasized that the indictment must **link specific conduct to specific harm**. Here, the indictment alleges a **$722 million scheme** but presents **no competent evidence of even a single verified victim attributable to Defendant**.

**This is not a technical omission — it strikes at the heart of the Government's burden of proof. Without victims, there is no fraud. Without loss, there is no scheme. Without verification, there is no jurisdictional basis to proceed under the charged statute.**

Accordingly, the **absence of verified victims** — despite years of opportunity and statutory obligation — **renders Count 1 legally and constitutionally deficient.** It must be dismissed under **Rule 12(b)(3)(B)** and **fundamental due process principles.**

## 3.4   Inadequacy of the Draft PSR and Failure to Establish Victim Harm

The Government's case in **Count 1** alleges a sweeping wire fraud conspiracy involving more than **$700 million** in investor funds. Yet despite the scale and scope alleged, the Government has failed to produce any reliable or verified evidence of actual victim loss, as required under both **Rule 12(b)(3)(B)** and prevailing standards of **due process**. The only attempt at quantifying loss or identifying victims is found in the **Draft Presentence Investigation Report ("PSR") for co-defendant Jobadiah Weeks**, which is not sworn, not tailored to Defendant, and lacks a legally sufficient foundation. (See Dkt. No. 371, Draft PSR dated October 25, 2024.)

The PSR report suffers from several critical deficiencies:

**Generic and Unsworn Numbers:**
 The report provides only a total of **12 victim declarations**, collectively amounting to **$458,502.40** in claimed losses. This figure stands in sharp contrast to the indictment's allegation that the conspiracy took in over **$722 million** from "thousands of victims." No sworn affidavits are included, and the restitution numbers are based on contemporaneous Bitcoin valuations, not actual purchase or transaction records. For example, "Victim-7-R.S." calculates loss using a **$62,400/BTC exchange rate current as of early 2024**—not at the time of the alleged fraud.

**Lack of Verification by the Government:**
 In **Footnote 2 to Paragraph 112**, the PSR explicitly states that **"verification from the Government is awaited."** There is no indication that the Department of Justice or law enforcement has confirmed the accuracy of the claimed losses through account records, transaction ledgers, wallet audits, or interviews. The lack of such verification violates the **Mandatory Victims Restitution Act's** requirements for actual, demonstrable, and causally linked losses.

**No Attribution to Defendant:**
 The statements collected in the PSR are not directed at **Defendant**. Most of the victims name **Joseph Frank Abel** as the person who induced their investment, with no mention of Defendant's involvement. Several victims specifically refer to attending recruitment events hosted by Mr. Abel and his wife. There is no claim of personal solicitation, communication, or misrepresentation by **Defendant** himself.

16

**Moreover**, even if these statements by **Mr. Abel** could be attributed to Defendant through a theory of **conspiracy liability**, it remains entirely unclear whether such statements caused any actual **financial loss** to these victims. If the Government had not terminated ongoing **BCN operations** through **asset seizures**, continued mining activities may have generated sufficient returns to satisfy **investor payouts** and even produce substantial gains. Any **loss calculations** must therefore be discounted by both:

(i) losses attributable to the Government's own **enforcement actions**, and

(ii) the substantial amounts of **Bitcoin** still contained within the seized computer mining assets, the full value of which remains unknown due to the Government's failure to produce reconciled **post-seizure inventory** and **asset tracing records**.

**Restitution Not Finalized:**
While the plea agreement in **Count 2** includes an agreement to pay restitution, the PSR states in **Paragraph 129** that **"no restitution amount has been agreed upon."** This internal contradiction further undermines the credibility of the figures and makes clear that no judicially cognizable loss amount has been established.

**Absence of "Who, What, and When" Details:**
The PSR does not provide any meaningful breakdown of which victim was harmed, what conduct caused that harm, or when the loss occurred. Without this linkage, the PSR does not support the allegation that a specific misrepresentation by **Defendant** led to an identifiable financial loss—an essential element of wire fraud under **United States v. Weatherspoon, 581 F.2d 595, 601 (7th Cir. 1978).**

Taken together, these deficiencies confirm that the **Draft PSR cannot supply the evidentiary foundation for Count 1**. It offers neither verified losses nor attribution to **Defendant**, and its reliance on generic, speculative data is insufficient to satisfy the legal requirements for proceeding with a fraud charge. The lack of identifiable victim harm demands dismissal of **Count 1** — or, at minimum, an evidentiary hearing to test the sufficiency of the Government's factual foundation.

The Supreme Court and multiple circuits have emphasized that **wire fraud must involve not only deception, but a specific intent to cause financial harm**.
**"It is not enough that the defendant intended to deceive; he must also intend to harm."**
*United States v. Takhalov*, 827 F.3d 1307, 1312 (11th Cir. 2016).
Mere deception without proof of material harm is insufficient to sustain a fraud conviction.
See also *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) (fraud requires misrepresentations "reasonably calculated to deceive persons of ordinary prudence").

In the alternative, should the Government dispute these deficiencies, **Defendant respectfully requests that the following questions be addressed on the record:**

17

- **Has the Department of Justice verified any of the 12 victim declarations listed in the Draft PSR through transactional or documentary evidence?**

- **What is the evidentiary basis for including those specific victims in a report tied to Defendant, given that none reference him directly?**

- **Why has no IRS Form 4684, 1099-B, bank statement, or cryptocurrency ledger been produced to support any of the claimed losses?**

- **What specific conduct by Defendant allegedly caused the $458,502.40 in losses claimed by the 12 individuals cited in the PSR?**

- **What efforts, if any, has the Government made to finalize restitution figures since the Draft PSR was filed—and why have they failed to do so over five years after indictment?**

**Unless the Government can answer these questions with particularized evidence, Count 1 cannot constitutionally proceed.**

# 3.5 Grand Jury Irregularities and Lack of Probable Cause

The indictment in this case—particularly as to **Count 1 (Conspiracy to Commit Wire Fraud)**—is fatally flawed because no credible, verified evidence of loss or victim harm was ever presented to the grand jury. The Government's reliance on unverified victim lists, untested loss figures, and post-indictment narrative summaries fails to meet the constitutional requirement that indictments be based on **probable cause supported by competent evidence**, not conjecture or generalized suspicion.

This standard is well-settled. As the Supreme Court held in **Costello v. United States, 350 U.S. 359, 364 (1956)**, a criminal indictment must be supported by **"probable cause to believe the defendant has committed a crime,"** and that belief must be grounded in evidence actually presented to the Grand Jury, not post hoc embellishments or reconstructed exhibits.

Here, the same grand jury that indicted **Defendant** also indicted co-defendant **Matthew Goettsche**, and there is now substantial reason to believe that no verified victim evidence was ever shown to that Grand Jury:

- **In multiple filings, Defendant affirmed that not one victim affidavit, declaration of loss, or IRS record was presented during the grand jury process.**

- **In March 2025 motions (Dkt. 403 & 406), Defendant sought disclosure of grand jury transcripts and exhibits, asserting that they omitted exculpatory information and that evidence supporting loss claims was only generated long after the charging decision.**

- **Defendant reasserts the necessity of full grand jury transcript review, as previously requested in Dkt. 403 and Dkt. 406, to determine whether Count 1 was supported by any verified evidence at the time of indictment.**

- **In particular, Defendant noted that the Government has relied on a Streamlined Special Agent's Report (SAR) to support certain loss claims, yet that SAR was undated and appears to have been created only after Defendant entered plea negotiations—well after the indictment was returned.** While the SAR appears to relate primarily to Defendant's tax plea and **Count 2**, its retroactive timing raises broader concerns about the Government's failure to present contemporaneous evidence of victim loss during the charging phase.

- **Further confirming this deficiency, the Government continues to cite a Draft Presentence Report (docket 371) prepared in late 2024—five years after the indictment—as its only basis for quantifying losses or referencing victims.** That report includes just **12 unverified victim declarations**, none of which implicate **Defendant**, and **Paragraph 112** expressly admits that **"verification from the Government is awaited."**
  (See **docket 371, Draft PSR, ¶112**; see also **Dkt. 403 and 406** (Defendant's Grand Jury & Discovery Motions)).

The reliance on speculative summaries and post-indictment material—rather than presenting verified, documentary evidence to the grand jury at the time of indictment—renders **Count 1** constitutionally deficient. It demonstrates a **structural failure** to satisfy the Government's burden under the **Fifth Amendment** and **Federal Rule of Criminal Procedure 6**.

Accordingly, **Count 1 must be dismissed under Rule 12(b)(3)(B)** as it is unsupported by evidence presented to the grand jury establishing probable cause, victim loss, or fraudulent conduct attributable to **Defendant**.

In the alternative, and in the event the Government disputes the factual basis of this motion, **Defendant respectfully requests that the following questions be addressed on the record:**

- **What documentary evidence of victim loss, if any, was presented to the Grand Jury that returned Count 1?**

- **Were any affidavits, declarations of loss, tax forms, or supporting materials included with the grand jury submission for Count 1?**

- **Has the Government, to this day, verified any loss associated with Count 1 attributable specifically to Defendant?**

- **What is the date of creation and purpose of the Streamlined Special Agent's Report (SAR), and was it relied on to establish probable cause for Count 1?**

- **Why has the Government failed to provide the list of Count 1 victims requested by defense counsel since 2020?**

**Should the Government be unable to answer these questions with specificity and evidentiary support, dismissal of Count 1 is not only proper, but constitutionally required.**

# 3.6 Pattern of Procedural Misconduct

Beyond the evidentiary deficiencies discussed above, this case reflects a pervasive pattern of procedural misconduct and constitutional violations that have tainted every phase of Defendant's prosecution. The Government's discovery failures, improper evidentiary practices, and cumulative disregard for Defendant's constitutional rights have denied Defendant the opportunity to evaluate the Government's evidence, prepare an adequate defense, file appropriate pretrial motions, and make fully informed decisions regarding plea negotiations.

## A. Systemic Discovery Failures

Throughout the multi-year pendency of this case, the Government has repeatedly failed to comply with its discovery obligations under **Brady v. Maryland**, 373 U.S. 83 (1963); **Giglio v. United States**, 405 U.S. 150 (1972); **United States v. Bagley**, 473 U.S. 667 (1985); and **Rule 16 of the Federal Rules of Criminal Procedure**. Despite multiple defense requests extending over several years, the Government has failed to timely produce numerous categories of **exculpatory**, **material**, and **essential discovery**, including:

- **IRS Forms 1099-B** reflecting cryptocurrency dispositions allegedly relevant to investor loss calculations;

- **IRS Forms 4684** identifying casualty or theft loss claims submitted by alleged victims;

- **IRS Criminal Investigation audit workpapers** and financial analyses relating to loss attribution;

- **Blockchain wallet audits, transactional ledgers, and cryptocurrency tracing models** necessary to verify whether investor funds were transferred, pooled, or lost;

- **Bank account statements** for relevant financial institutions or alleged victims;

- **Suspicious Activity Reports (SARs)** and investigative summaries compiled by financial institutions and regulatory agencies;

- **Internal DOJ charging decision records, inter-agency correspondence, and policy memoranda** concerning the prosecutorial discretion exercised in this case;

- **Victim attribution data, individualized loss calculations, and supporting documentation** necessary to establish any causal link between Defendant's conduct and alleged victim harm;

- **Grand jury exhibit lists, victim identification records, and financial evidence** presented to establish probable cause;

- **Internal loss attribution formulas, worksheets, and models** used to generate aggregate loss figures cited in the indictment and during plea negotiations;

- **Discovery materials previously produced to prior counsel but withheld from Defendant** following his invocation of pro se rights.

The Government's continued withholding of these critical materials directly impaired Defendant's ability to:

- test the Government's financial theories;

- challenge causation and individualized loss attribution;

- assess viable trial defenses;

- evaluate plea exposure and sentencing posture;

- and file dispositive pretrial motions challenging the **sufficiency of the indictment**, **grand jury integrity**, **evidentiary foundation**, and **constitutional violations**.

## B. Direct Impact on Plea and Defense Rights

The Government's discovery misconduct was not harmless. The undisclosed materials directly affected core elements of **Count 1**, including:

- whether any victims suffered losses attributable to Defendant's conduct;

- whether Defendant engaged in any **fraudulent representations**;

- whether investor funds were in fact lost; and

- whether the Government's loss calculations reflected valid and substantiated financial harm.

Deprived of access to these critical materials, Defendant was denied the very evidence necessary to assess whether any crime occurred under the Government's charged theory.

Without full discovery, Defendant was placed in an untenable position during **plea negotiations**. The Government's continued refusal to disclose exculpatory discovery enabled it to present **speculative and inflated loss models** while simultaneously depriving Defendant of any opportunity to independently test, refute, or verify those claims prior to entering into a plea agreement. As a result, Defendant was exposed to extreme sentencing risk based entirely on unverified and unsupported financial harm calculations.

Further exacerbating these constitutional violations, the Government failed to provide full discovery after Defendant invoked his pro se rights. Discovery materials previously produced to Defendant's former counsel were not re-produced to Defendant directly, thereby preventing Defendant from independently reviewing the Government's loss theories,

21

Docusign Envelope ID: 5764E15A-3770-4DD2-BAB1-94C2DC26E05D

preparing proper pretrial motions, and fully investigating the factual record necessary to assert available defenses.

## C. Institutional Pattern of Withholding and Retroactive Construction

The discovery failures at issue here were not isolated mistakes. They reflect a **deliberate and ongoing pattern** in which the Government substituted **retroactively constructed financial models**, **speculative loss calculations**, and **incomplete victim summaries** in place of contemporaneous documentary evidence that the Government either failed to obtain or affirmatively elected not to disclose. This pattern allowed the Government to sustain its prosecution by relying on **unverified summaries**, rather than satisfying its **constitutional burden** to disclose, verify, and substantiate its loss theories with actual evidence.

By denying Defendant access to **financial records**, **victim documentation**, **IRS filings**, and **investigative workpapers** essential to testing the Government's claims, the Government obstructed Defendant's ability to properly challenge key elements of the offense, including:

- **loss**
- **causation**
- **material misrepresentation**, and
- **intent**.

## D. Cumulative Constitutional Violations

Collectively, these discovery failures violated Defendant's rights under:

- the **Due Process Clause of the Fifth Amendment**;
- the **Sixth Amendment right to effective assistance of counsel**;
- the **Fifth Amendment right to confront the Government's evidence and prepare a defense**; and
- the Government's mandatory obligations under **Brady**, **Giglio**, **Rule 16**, and prevailing constitutional discovery standards.

These violations not only denied Defendant access to the information required to meaningfully assess the merits of the Government's case, but also directly impaired the fairness of **plea negotiations**, **grand jury proceedings**, **pretrial motion practice**, and **trial preparation**.

Accordingly, the Government's pervasive discovery violations constitute an independent ground for **dismissal of Count 1** under **Rule 12(b)(3)(B)(v)**, as they have **irreparably tainted** the fairness of these proceedings and denied Defendant his **fundamental constitutional rights**.

## E. Government Misrepresentations Regarding Discovery Compliance

In addition to the above failures, the Government repeatedly made **affirmative misrepresentations** to both the Court and defense concerning its alleged compliance with discovery obligations. Notably, in the period leading up to **February 18, 2025**, the Government represented that it had fully satisfied its disclosure duties under **Brady** and **Rule 16**, while knowingly withholding **material exculpatory evidence** that Defendant ultimately obtained only through his independent **pro se efforts**.

The Government further relied on **exaggerated and unsubstantiated "flight risk" assertions** to oppose Defendant's release — claims that were directly contradicted by **internal Government communications** never disclosed to the defense. These affirmative misrepresentations not only **aggravated the underlying discovery violations**, but also **misled the Court** and obstructed Defendant's ability to fully litigate his **constitutional rights**.[1]

# 3.7 Count 1 Violates Due Process and Fair Notice Requirements

The Government's prosecution of Defendant under **Count 1** violates the constitutional principle of **fair notice** and the prohibition against **retroactive criminalization**. The **Due Process Clause of the Fifth Amendment** requires that individuals receive **clear notice**, through existing statutes or settled legal precedent, that their conduct is criminal at the time it is undertaken.
 See *Bouie v. City of Columbia*, 375 U.S. 347, 350–52 (1964); *United States v. Lanier*, 520 U.S. 259, 266 (1997); *Rogers v. Tennessee*, 532 U.S. 451, 457 (2001).

---

[1] As a related and highly relevant matter for both selective and malicious prosecution claims, the Government's inconsistent administration of pretrial detention decisions remains unresolved. For example, while Defendant Weeks was subjected to highly restrictive monitored release and prolonged ankle bracelet monitoring, co-defendant Silviu Catalin Balaci was charged but promptly released to continue working in Germany. Joseph Abel, charged with identical conduct, remains under monitored house arrest in the United States, but under significantly less restrictive conditions than Defendant Weeks. In contrast, Russ Medlin, a central figure and financial beneficiary of BitClub Network's operations, remains abroad in Indonesia and has not been extradited or prosecuted. Meanwhile, other managerial participants — including Richard J. Oh, Jason Vause, Francisco Rojo, and Ayodele Onesimus Adeoye — were never charged or subjected to any pretrial restraint. These disparities highlight the Government's arbitrary and selective application of detention, charging decisions, and enforcement priorities against similarly situated individuals within the same factual context.

At the time Defendant engaged in the conduct underlying **Count 1** — between approximately **2014 and 2017** — no federal statute, regulation, or published **Department of Justice policy** existed that criminalized participation in, or promotion of, cooperative Bitcoin mining pools such as **BitClub Network**. During that period:

- The **Department of Justice** had no internal policies or published guidance addressing criminal exposure for mining pool promoters or participants;

- **FinCEN's 2013 guidance** excluded personal miners and cooperative mining pool members from registration as money services businesses;

- The **SEC's DAO Report** — its first formal guidance applying securities law principles to cryptocurrency offerings — was not issued until **mid-2017**, after the relevant conduct began;

- The **CFTC** asserted only limited jurisdiction over derivative crypto products, not cooperative mining pools or marketing activity;

- The **IRS** issued no guidance suggesting that participation in mining pools, as structured here, would trigger criminal exposure beyond ordinary tax reporting obligations.

Defendant, who acted solely as a **peripheral marketer** without ownership interest or managerial control, had no reasonable basis to anticipate that his limited promotional activity for **BCN** would later form the basis of felony criminal charges. No regulatory framework or agency guidance at the time provided any **clear warning** that such conduct could constitute **wire fraud** or trigger sweeping **conspiracy liability**.

Rather than prosecuting pursuant to established legal standards, the Government **retroactively constructed conspiracy theories** years later, using novel legal arguments unsupported by contemporaneous law, guidance, or prosecutorial standards. In doing so, the Government not only eliminated the **fair notice protections** guaranteed under the Constitution, but also collapsed any meaningful distinction between core actors and peripheral participants, treating all individuals alike regardless of role, knowledge, or intent.

As the Supreme Court explained in **Lanier**:

> "*A deprivation of the right to fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face.*"
> *United States v. Lanier*, 520 U.S. 259, 266 (1997).

Similarly, in **Bouie**, the Court emphasized that individuals may not be held criminally liable where they lacked **fair warning** that their conduct was prohibited at the time of commission:

> "*When a statute on its face does not clearly cover the conduct at issue, and the courts later interpret it to do so, the effect is to punish conduct that could not have been known to be unlawful when undertaken.*"
> *Bouie*, 375 U.S. at 352.

24

The Government's application of **sweeping conspiracy and wire fraud charges** to conduct occurring during a period of **regulatory uncertainty** — absent statutory authority, agency guidance, or prior criminal precedent — violates these **constitutional protections**. **Prosecutorial discretion** cannot substitute for the **clear notice** required by the **Due Process Clause**.

Moreover, the Government's charging decisions in this case further highlight the absence of any **coherent prosecutorial standard**. While Defendant faces felony charges carrying decades of imprisonment, similarly situated participants in larger cryptocurrency projects — including **Tezos**, **EOS**, **Ripple**, and **Ethereum** — engaged in promotional and fundraising activities on a vastly greater scale without facing criminal prosecution. These disparities further illustrate that the criminal standards applied to Defendant were neither settled nor consistently enforced at the time of the alleged conduct.

The **retroactive expansion of criminal liability** in this case renders **Count 1 constitutionally void and legally defective**. The Government's failure to provide clear advance notice that Defendant's promotional activities for a Bitcoin mining pool could expose him to felony **wire fraud conspiracy** charges violates fundamental principles of **due process** and **fair notice**. Accordingly, dismissal is warranted under **Rule 12(b)(3)(B)(v)** and the **Due Process Clause**.

# 3.8 Asset Seizures Violated Due Process and Sixth Amendment Rights

In addition to the **procedural misconduct** and **discovery violations** outlined above, the Government employed **aggressive pretrial asset seizure tactics** that deprived Defendant of the **financial resources** necessary to retain **independent counsel**, secure **expert forensic assistance**, conduct **financial analysis**, and mount an **effective defense** — all in violation of Defendant's **Fifth and Sixth Amendment rights**.

## A. Sweeping Asset Seizures Executed Without Judicial Safeguards

Following Defendant's arrest, the Government executed **broad pretrial seizure orders** freezing virtually all assets associated with Defendant, including:

- **fiat currency accounts (personal and business)**;
- **multiple cryptocurrency wallets and storage devices**;
- **precious metals**;
- **personal property**;
- **business records and digital files**.

25

Docusign Envelope ID: 5764E15A-3770-4DD2-BAB1-94C2DC26E05D

The Government failed to distinguish between **tainted and untainted assets**, instead seizing all accessible funds without conducting any **meaningful forensic audit** or **independent asset tracing analysis** to determine whether seized property was legally connected to any alleged unlawful conduct. These seizures extended far beyond any proceeds directly linked to alleged victims and encompassed substantial amounts of **untainted funds** that Defendant would have otherwise used for **legal representation and defense preparation**.

## B. Government's Failure to Reconcile Asset Inventories

Despite repeated **defense requests** over several years, the Government has failed to produce:

- a **reconciled forensic audit** of seized assets;

- complete **chain-of-custody documentation**;

- verification of **cryptocurrency wallet balances and transaction histories**;

- reconciled **Memoranda of Activity reports** corresponding to all seized items;

- **financial records** identifying the precise composition and value of seized property.

The Government has repeatedly revised its asset disclosures **post hoc**, producing **inconsistent inventory lists**, omitting certain seized property entirely, and failing to account for **missing cash and cryptocurrency balances** identified by defense reviews. This incomplete and ever-shifting asset record undermines confidence in the **integrity of the forfeiture process**, creates material **due process concerns**, and leaves unresolved substantial questions regarding the full extent of seized property and the availability of **untainted funds for defense use**.

## C. Financial Leverage Used to Coerce Plea Negotiations

By depriving Defendant of access to his own financial resources, the Government created extraordinary **pretrial leverage** that directly distorted **plea negotiations** and impaired Defendant's ability to fully evaluate and contest the Government's case. The complete exhaustion of available defense funds:

- prevented Defendant from retaining **independent counsel of choice**;

- eliminated the ability to retain **forensic accountants, tax experts, and financial investigators** necessary to analyze complex financial records and challenge loss models;

- obstructed Defendant's ability to evaluate **loss calculations**, **victim attribution data**, and **IRS audit materials** that remained undisclosed;

- and forced Defendant to enter plea negotiations without access to the very **discovery materials** necessary to independently assess the factual basis for any plea agreement.

These financial deprivation tactics directly violated Defendant's **Sixth Amendment right to counsel** and **Fifth Amendment due process protections**, which prohibit the Government from using **financial coercion** to obtain tactical advantages in criminal prosecutions. See *Luis v. United States*, 578 U.S. 5, 16–17 (2016) (recognizing constitutional right to access untainted assets necessary to retain defense counsel); *United States v. Monsanto*, 491 U.S. 600, 615 (1989); *Caplin & Drysdale v. United States*, 491 U.S. 617, 626 (1989).

Throughout the pretrial phase, Defendant was afforded no meaningful opportunity to challenge the **scope or propriety** of the Government's asset seizures. The Government's asset restraint orders were obtained without affording Defendant access to sufficient discovery to challenge whether the seized assets were actually **traceable to alleged unlawful conduct**. Nor was any judicial inquiry conducted to ensure that sufficient **untainted assets** remained available to fund a **constitutionally adequate defense**.

At no point was Defendant afforded an **evidentiary hearing** to challenge the **scope, accuracy, or legal sufficiency** of the Government's asset seizure orders, nor was any factual record developed to establish whether sufficient untainted funds remained available to satisfy **Sixth Amendment** requirements for **effective defense preparation**.

The Government's refusal to reconcile seizure inventories or produce complete financial records further compounded these constitutional violations, and denied Defendant the opportunity to petition the Court for the release of **untainted funds** under governing **due process standards**. The resulting **financial deprivation** not only obstructed Defendant's defense preparation, but fundamentally altered the balance of **plea negotiations** and **trial risk assessments** in a manner prohibited by **constitutional principles**.

## D Seizure of Servers and Unaccounted Digital Assets Violated Property Rights

While the Government seized the servers and digital infrastructure of BitClub Network in December 2019, it did not immediately terminate backend operations. Despite years of litigation and repeated defense requests, the Government has failed to produce any forensic records, transaction logs, or documentation accounting for the Bitcoin (BTC) and Ethereum (ETH) that remained stored on the seized servers.

There is no indication that the seized cryptocurrency — including an estimated **50 BTC and 360 ETH per day** at the time of seizure — was lawfully forfeited, returned to any BCN members, or held in a segregated manner. Over more than 1,800 days of government control, this equates to a potential deprivation exceeding **90,000 BTC and 650,000 ETH**. Even based on conservative historical averages, the value exceeds

**$1.8 billion**. However, with Bitcoin trading above **$100,000 per BTC** as of June 2025, the current estimated loss now **exceeds $9 billion**, with **no restitution, no reporting, and no lawful forfeiture ever completed or disclosed by the Government**. This continuing opacity and deprivation of digital property constitute a grave and ongoing violation of Defendant's and BCN members' Fifth Amendment rights.

The absence of audit trails, inventory disclosure, or victim restitution further undermines the premise of Count 1 and reinforces the systemic due process violations at the heart of this prosecution.

## E. Constitutional Violations Warranting Dismissal

The Government's use of **pretrial asset seizures** as a mechanism of financial leverage constitutes an independent violation of Defendant's:

- **Fifth Amendment Due Process Clause**;

- **Sixth Amendment right to counsel and effective assistance of counsel**;

- constitutional right to **equal access to available untainted assets** for defense preparation; and

- right to **meaningful judicial process** prior to the deprivation of property necessary to fund a defense.

Accordingly, the Government's **pretrial asset seizure strategy**, as executed in this case, renders **Count 1 constitutionally defective** and independently warrants **dismissal**.

# 3.9 Selective Prosecution and Disparate Treatment

Defendant is among the few individuals in the **BitClub Network ("BCN") prosecution** who has actively challenged the Government's charges and now seeks to withdraw his plea based on **profound procedural, evidentiary, and constitutional violations**. Despite this, the Government has offered no explanation for why other **similarly situated individuals** — including early insiders who played leading roles in founding, promoting, and operating **BCN** — were never charged, were granted immunity, or received substantially more favorable resolutions. This **disparate treatment** raises serious concerns of **selective prosecution** in violation of the **Fifth Amendment's Due Process Clause** and the **Equal Protection principles** incorporated therein.

The Government's charging decisions have not been based on any **individualized assessment** of Defendant's culpability, level of involvement, financial gain, or managerial authority. Numerous individuals who engaged in similar or more central conduct — including **recruitment**, **marketing**, **investor solicitation**, **public presentations**, and receipt of investor funds — were either granted **cooperation status**, permitted to avoid felony charges

altogether, or entirely declined for prosecution. In stark contrast, Defendant — who held **no equity ownership**, exercised **no managerial authority**, and was a **peripheral marketer** — continues to face the most severe charge available under **Count 1**: a **wire fraud conspiracy** carrying up to **20 years of imprisonment**.

This pattern is further aggravated when viewed against the Government's charging posture in contemporaneous **cryptocurrency prosecutions**. Unlike **BCN**, where peripheral promoters such as Defendant have been subjected to sweeping **conspiracy liability**, the Government declined to bring criminal charges against individuals in other major cryptocurrency ventures — including **Tezos**, **EOS**, **Ripple**, and **Ethereum** — where founders and primary promoters raised exponentially greater sums from investors but resolved allegations through regulatory settlements without criminal prosecution. These **charging disparities** underscore the absence of any **principled prosecutorial standard** and reflect an exercise of **unchecked charging discretion** applied inconsistently across similarly situated participants in emerging cryptocurrency markets.

The absence of **verified victim affidavits**, **IRS documentation**, or **substantiated transactional loss records** further suggests that the Government leveraged **speculative loss theories** and exaggerated financial exposure as a **tactical coercive mechanism** to pressure defendants into plea agreements rather than proceed to trial. The resulting exposure to **lengthy prison sentences** — disconnected from any verified financial harm — created an environment where plea agreements were driven not by actual culpability or evidence, but by the enormous risk of defending oneself against **speculative loss models** unsupported by individualized proof.

Such conduct violates the constitutional obligation of **even-handed law enforcement**. Charging decisions based upon **cooperation status**, **tactical leverage**, or **plea posture** — rather than actual evidence of individualized wrongdoing — constitute impermissible **selective prosecution**.
See *Wayte v. United States*, 470 U.S. 598, 608 (1985); *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

Accordingly, the Government's **disparate treatment** of Defendant, combined with its failure to present **verified evidence** of individualized financial harm or fraudulent conduct directly attributable to him, provides independent grounds for **dismissal of Count 1**. This Court's supervisory responsibility warrants close scrutiny of both the **fairness** and **institutional integrity** of the Government's prosecution.

In the alternative, should the Government dispute the inference of **selective prosecution** or improper charging discretion, Defendant respectfully requests that the following threshold questions be addressed on the record:

- What specific criteria were applied to determine which individuals involved in **BCN** were charged and which were not?

- Why were early founders, major promoters, or public-facing recruiters not charged alongside Defendant?

- Were any charging decisions conditioned upon a defendant's willingness to **plead guilty** or **cooperate with the Government**?

- Has the Government granted **immunity**, **deferred prosecution**, or **declined prosecution** for any similarly situated individuals, and if so, on what factual or legal basis?

- How does the Government justify continuing to prosecute Defendant under **Count 1** in the complete absence of **verified victim evidence** directly linked to his conduct?

The Government's inability or refusal to answer these questions would further demonstrate that **Count 1** rests on **selective, unjustified, and unconstitutional charging decisions**. **Dismissal is therefore warranted.**

## 3.10 Improper Reliance on Co-Defendant Statements and the "Hoxie Statement"

The Government's theory under **Count 1** improperly relies, at least in part, on an **unverified and unrecorded verbal exchange** — referred to as the alleged **"Hoxie Statement"** — as purported evidence of a joint conspiratorial understanding between Defendant and co-defendant **Matthew Goettsche**. The Government's attempt to use this alleged conversation to imply joint criminal liability is both **procedurally defective** and **constitutionally impermissible**.

**Critically, the "Hoxie Statement" is entirely unsubstantiated.** The Government has never produced any written memorialization, transcript, recording, contemporaneous notes, or documentary evidence to establish that such a conversation ever occurred. No record exists demonstrating that Defendant or his legal counsel were ever asked to consent, nor did they consent, to any agreement grouping Defendant with other co-defendants for joint charging purposes. **Defendant has repeatedly and unequivocally denied under oath** that any such conversation took place or that any agreement to join liability with other defendants was ever requested or given.

The Government's reliance on this **unverified oral assertion** directly violates Defendant's constitutional **confrontation rights**. Statements attributed to co-defendants, made outside of any formal proceeding, and never subject to cross-examination, are inadmissible against Defendant under both the **Confrontation Clause of the Sixth Amendment** and settled Supreme Court precedent.
 See *Bruton v. United States*, 391 U.S. 123 (1968); *Crawford v. Washington*, 541 U.S. 36 (2004). The Government may not circumvent these protections by introducing purported statements never memorialized, corroborated, or disclosed for adversarial testing.

Moreover, any reliance on **proffer-derived statements** or informal **post-arrest discussions** not subject to counsel's review would constitute a further violation of **Department of Justice internal proffer protocols** and constitutional safeguards protecting the voluntariness and admissibility of defendant statements. The circumstances surrounding the Government's

reliance on the **Hoxie Statement** appear designed to retroactively construct joint liability theories rather than reflect any contemporaneous or knowing agreement by Defendant.

Additionally, this evidentiary defect cannot be viewed in isolation. It forms part of a broader pattern in which the Government has substituted **speculative loss models**, **unverified financial claims**, **incomplete discovery**, and **post hoc evidentiary theories** in place of contemporaneous and admissible charging evidence. The reliance on the **Hoxie Statement** highlights the Government's ongoing failure to meet its **constitutional burden** to establish individualized evidence of Defendant's intent, conduct, or participation in any knowing agreement to commit fraud.

Accordingly, any continued use by the Government of the alleged **Hoxie Statement** or related co-defendant statements as a foundation for **Count 1** is improper and violates Defendant's constitutional rights. These statements are **inadmissible**, unsupported by any independent evidence, and cannot serve as a substitute for the Government's failure to establish actual facts of fraudulent conduct or conspiratorial agreement attributable to Defendant.

In the alternative, should the Government continue to rely on this theory, Defendant respectfully requests that the following threshold questions be addressed on the record:

- Can the Government produce any **written, recorded, or memorialized evidence** that Defendant or his legal counsel were ever asked to consent to joint charging or grouping with co-defendant **Matthew Goettsche**?

- Was Defendant or his counsel ever given an opportunity to confirm, deny, or respond to the alleged **Hoxie Statement**?

- Has the Government produced any **admissible evidence** that Defendant personally acknowledged any joint criminal agreement with **Mr. Goettsche**?

- What independent, contemporaneous evidence — apart from the disputed **Hoxie Statement** — does the Government rely on to assert joint criminal liability against Defendant in **Count 1**?

- Were any **proffer-derived or informal statements** by Defendant presented to the grand jury or otherwise used to support the indictment in this matter?

Absent admissible evidence establishing these foundational questions, the Government's reliance on this theory cannot withstand **constitutional scrutiny**. **Count 1 must therefore be dismissed.**

## 3.11 Improper Joint Detention of Co-Defendants Without Consent or Safeguards

In addition to its improper reliance on the unverified **"Hoxie Statement,"** the Government further violated Defendant's constitutional rights by placing **Defendant Weeks** and

co-defendant **Matthew Goettsche** in joint detention and transportation following their arrests on **December 10, 2019**. These joint confinement arrangements were implemented **without notice to, consent from, or consultation with Defendant's legal counsel**. No protective measures or procedural safeguards were established to prevent improper government contact, indirect elicitation of statements, or the creation of potential **evidentiary contamination** between co-defendants[2].

Despite multiple formal requests for disclosure, the Government has failed to produce any documentation identifying:

- who authorized this joint detention;
- whether defense counsel was consulted or notified;
- whether any restrictions or monitoring protocols were implemented to prevent improper indirect interrogation or evidentiary taint.

Nor has the Government disclosed whether any information derived from these joint detention periods was later utilized to support its **charging theories, plea negotiations, or sentencing recommendations**.

By placing Defendant in prolonged joint confinement with a cooperating or separately situated co-defendant, the Government created an inherently **coercive environment** that violated Defendant's:

- **Sixth Amendment right to counsel**;
- **Fifth Amendment due process protections**; and
- constitutional right against **compelled self-incrimination**.

This joint detention arrangement effectively enabled **improper indirect interrogation** outside the presence of counsel, and created an evidentiary record vulnerable to contamination — particularly given the absence of any independent record establishing what, if any, communications occurred or how such communications may have influenced the Government's evolving case theory.

Such joint detention and unsupervised contact between co-defendants are especially problematic where the Government later seeks to rely on alleged **"understandings," informal conversations, or ambiguous attributions of joint liability** as part of its conspiracy theory. Courts have repeatedly recognized that placing unrepresented or

---

[2] Defendant was arrested during the height of the COVID-19 pandemic, when access to legal counsel was severely limited due to lockdowns, suspended legal visits, and institutional movement restrictions. He was **placed and transported with co-defendants** immediately following his arrest, and subjected to **10–20 prison transfers** across multiple jurisdictions. At one point, he was housed in the **same cell as co-defendants**, and **the Government recorded their conversations**, despite all parties being represented by counsel. These recordings were not disclosed in advance, nor were any procedural safeguards implemented. The combination of coerced proximity, surveillance, and denial of legal access materially impaired Defendant's Sixth Amendment rights and compounded the coercive effects that tainted the plea process.

Docusign Envelope ID: 5764E15A-3770-4DD2-BAB1-94C2DC26E05D

separately represented co-defendants together without protective measures or defense consent presents a **substantial risk of constitutional violation**.
See *United States v. Henry*, 447 U.S. 264 (1980) (Government may not deliberately create situations likely to elicit incriminating statements outside the presence of counsel); *Massiah v. United States*, 377 U.S. 201 (1964).

The Government's failure to secure appropriate safeguards or obtain counsel's consent for joint detention constitutes not only a serious violation of Defendant's **Sixth Amendment right to counsel**, but also a **due process violation** that further taints the fairness of these proceedings. Any information derived directly or indirectly from this unsupervised joint confinement must be deemed **inadmissible**.

Accordingly, Defendant respectfully requests that, in the alternative, the following threshold questions be addressed on the record:

- Who authorized the placement of Defendant Weeks and co-defendant Goettsche in **joint detention and transportation**?

- Was Defendant's legal counsel ever **consulted, advised, or notified** of these arrangements?

- Were any communications between Defendant Weeks and co-defendant Goettsche **monitored, recorded, or reported** to Government agents or prosecutors?

- Has the Government utilized any **statements, admissions, or information** potentially derived from this joint detention period in support of its **charging theory or evidentiary presentation for Count 1**?

- What measures, if any, were implemented to prevent **evidentiary contamination** or improper elicitation of statements during joint confinement?

In the absence of satisfactory answers to these fundamental questions, Defendant respectfully submits that the Government's reliance on any information obtained through these **joint detention arrangements** renders **Count 1 constitutionally defective** and warrants **dismissal**.

## 3.12 Systemic Violations of DOJ Internal Policies and Constitutional Safeguards

The constitutional and procedural violations underlying **Count 1** extend well beyond isolated evidentiary defects. This prosecution reflects a broader, **systemic failure** to comply with **Department of Justice internal policies**, binding discovery obligations, constitutional protections, and long-established principles governing prosecutorial discretion in emerging financial enforcement matters.

Throughout this prosecution, the Government repeatedly disregarded its mandatory disclosure obligations under **Brady v. Maryland**, 373 U.S. 83 (1963); **Giglio v. United**

**States**, 405 U.S. 150 (1972); and **Federal Rule of Criminal Procedure 16** by withholding critical exculpatory and material discovery for years, including:

- **Verified financial records** demonstrating the absence of actual victim losses directly attributable to Defendant;

- **IRS tax filings** (Forms **1099-B**, **4684**), audit workpapers, and loss attribution models necessary to independently validate or refute the Government's post-indictment loss calculations;

- **Cryptocurrency wallet audits**, **blockchain tracing reports**, **bank account records**, and **seized asset inventories** essential to establish whether any investor funds were actually traceable to alleged misconduct;

- **Internal DOJ memoranda, charging decision records, and agency correspondence** reflecting the Government's evolving legal theories and post-indictment charging expansions;

- **Victim identification data** and **sworn victim affidavits** required to establish causation, loss, and harm necessary for any valid wire fraud conspiracy prosecution.

Despite repeated formal requests, these essential discovery materials were not timely disclosed during **plea negotiations**, pretrial proceedings, or even in advance of sentencing recommendations. The Government's prolonged withholding of material discovery deprived Defendant of the ability to meaningfully evaluate the evidence, assert available defenses, and prepare constitutionally adequate pretrial motions.

Compounding these discovery violations, the Government simultaneously executed **overbroad pretrial asset seizures** that deprived Defendant of untainted financial resources necessary to:

- retain independent counsel;

- secure expert forensic financial analysis; and

- conduct proper defense investigation.

The seizure of Defendant's **fiat currency**, **cryptocurrency holdings**, **precious metals**, and **business records** extinguished his ability to mount a constitutionally adequate defense, directly violating his **Fifth and Sixth Amendment rights**. No meaningful judicial process was provided to challenge these seizures prior to plea negotiations, and the Government repeatedly failed to reconcile inventory records to verify the scope, chain of custody, or value of seized property.

Further aggravating these violations, the Government pursued novel and expansive conspiracy theories without the benefit of:

- any pre-existing DOJ policy guidance;

34

- any published agency standards governing criminal exposure for mining pool promoters;

- or any settled statutory or regulatory authority criminalizing the conduct charged in **Count 1** at the time it occurred.

As a result, Defendant — who held **no equity ownership**, exercised **no managerial control**, and had no operational authority — was charged with felony wire fraud conspiracy while similarly situated promoters, founders, and participants in other major cryptocurrency ventures faced no criminal prosecution. The absence of coherent charging standards led to **arbitrary and inconsistent prosecutorial outcomes**, in violation of Defendant's **due process** and **equal protection** rights.

The Government's reliance on:

- **unverified co-defendant statements**,

- **unrecorded oral conversations** (including the disputed **"Hoxie Statement"**),

- joint detention arrangements implemented without defense counsel's consent, and

- retroactively constructed evidentiary theories

further underscores a systemic failure to safeguard Defendant's **confrontation rights**, **due process protections**, and the integrity of the **grand jury process** itself. The record demonstrates that speculative, incomplete, and after-the-fact loss models were improperly substituted for contemporaneous evidence constitutionally required to support probable cause under **Costello v. United States**, 350 U.S. 359 (1956).

Taken collectively, these cumulative violations establish a **deeply flawed prosecution** that fails to meet fundamental **constitutional**, **procedural**, and **institutional standards**. The **structural due process violations** presented in this case are not isolated mistakes but reflect systemic prosecutorial misconduct that has rendered continued prosecution of **Count 1** fundamentally unconstitutional. **Dismissal is both warranted and necessary** to safeguard Defendant's constitutional rights and preserve the integrity of the judicial process.

## 3.13 Count 1 Was Used as Coercive Leverage in Plea Negotiations

**Count 1 of the Indictment**—charging **wire fraud conspiracy under 18 U.S.C. § 1349** and carrying a **20-year statutory maximum**—was used by the Government **not merely as a charging instrument, but as a coercive tool** to pressure Defendant into pleading guilty to lesser counts and **waiving critical constitutional rights**.

The record demonstrates that the Government **maintained Count 1 through the plea negotiation phase** and then moved to dismiss it **only after securing Defendant's guilty plea** to other charges. See Dkt. 417 (Government Opposition) (stating that *"the Government*

*consented to Weeks' release, citing a diminished flight risk resulting from Weeks' guilty plea and the dismissal of Count One of the Indictment, which carried a 20-year maximum sentence"*). This confirms that the Government **used Count 1's sentencing exposure as leverage**—**not based on its merits**, but as **bargaining pressure** to induce the plea and justify detention.

[3]The Supreme Court has acknowledged that **plea bargaining inherently involves prosecutorial discretion**, but it has also recognized that using the threat of more serious charges as leverage may raise **due process concerns**. In *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), the Court held that prosecutors may encourage guilty pleas by threatening more serious charges, but emphasized that such leverage **must not violate fundamental fairness** or be employed **vindictively**.

In this case, the Government's use of Count 1 appears **not only tactical but coercive**—particularly where, as here, the **underlying conduct was not clearly criminalized during the relevant period**, **no verified victims or losses were ever substantiated**, and **Count 1 was later dismissed without adjudication.**[4] The **disproportionate sentencing risk created by Count 1**, coupled with the Government's **refusal to disclose full discovery before plea execution**, created a **coercive environment** that **undermined Defendant's ability to exercise his rights voluntarily and intelligently**.

Accordingly, this Court should consider the **use of Count 1 as coercive leverage** not only as context for the constitutional defects in the charging decision, but as an **independent basis for dismissal** under the **Due Process Clause** and **Rule 12(b)(3)(B)(v)**.

---

[3] See Dkt. 417, Government's Opposition to Motion for Release (May 2025), at 3–4 (acknowledging that "the Government consented to Weeks' release, citing a diminished flight risk resulting from Weeks' guilty plea and the dismissal of Count One of the Indictment, which carried a 20-year maximum sentence"). This confirms that the Government expressly linked Count 1's dismissal to the entry of a guilty plea—highlighting its function as a coercive tool rather than a charge grounded in trial-ready evidence.

[4] Count 1 of the Indictment, alleging conspiracy to commit wire fraud under 18 U.S.C. § 1349, was dismissed pursuant to the plea agreement following Defendant's guilty plea to other counts. See Gov't Opp. to Motion to Modify Bail, Dkt. 417 at 3. However, the dismissal was procedural and not adjudicated on the merits; no judicial findings were made regarding the sufficiency, legality, or constitutional validity of the charge. Accordingly, all defects raised herein remain preserved for review should Count 1 be reinstated or otherwise revived in future proceedings. See Fed. R. Crim. P. 12(b)(3)(B); cf. *United States v. Olano*, 507 U.S. 725, 733–34 (1993).

## 3.14 Government's Leniency Toward Key Actor Undermines Count 1

The **disparate treatment of Gordon Brad Beckstead**—who managed BCN's internal financial records and prepared false tax returns for its principal founder—**further illustrates the Government's selective and inconsistent charging strategy**. Rather than indict Beckstead in the main BCN case (**No. 19-cr-877**), the Government created a \*\*separate proceeding (**No. 22-cr-204**), allowed him to **waive indictment**, and resolved his case through a **negotiated Information** and a **discreet plea agreement**.

This procedural decision enabled the Government to **quietly dispose of one of the scheme's most financially integrated actors**—one who helped conceal and process proceeds from the very conduct alleged in Count 1—while **aggressively prosecuting peripheral promoters** such as Defendant. **Beckstead's role was not tangential**; he **aided the preparation of materially false tax returns**, **knowingly misrepresented BitClub's financial flows**, and **worked directly with its founder, Matthew Goettsche**, to facilitate **systemic concealment**.

By contrast, Defendant **had no role in the back-end accounting**, **received no special immunity**, and **was not charged with any willful tax misconduct until after Beckstead's plea was finalized**. The Government's decision to segregate Beckstead's case allowed it to **avoid exposing the inconsistency of its charging narrative in Count 1**, **shield its leniency from public scrutiny**, and **preserve its theory of criminal intent against less involved individuals**. This **arbitrary charging divide**, particularly when used to **shield a more culpable financial actor**, **reinforces Defendant's claim that Count 1 was used not as a neutral tool of justice, but as a coercive and selectively applied pressure mechanism in violation of the Due Process Clause**.

## 3.15 Government's Abandonment of Count 1 Shows It Was Deficient

The **pattern of plea agreements** in this case reveals that the Government **consistently dismissed or avoided Count 1—conspiracy to commit wire fraud—across all defendants** who resolved their cases via plea, **regardless of their degree of involvement**. This conduct **strongly suggests that Count 1 was legally or evidentially weak** and used primarily as a **coercive lever in plea negotiations** rather than a **sustainable charge intended for trial**.

In at least **three separate plea agreements**, the Government **dropped Count 1 or omitted it entirely** once cooperation or a guilty plea was secured. Notably, **defendants with substantial operational roles**—such as **preparing false tax returns (Abel)**, **laundering proceeds (Beckstead)**, and **managing BCN's infrastructure and fraudulent displays**

**(Balaci)**—**were never forced to defend against Count 1 at trial**. Instead, the Government **systematically withdrew the charge**, as shown  below.[5]

| Defendant | Charged in Count 1 (Wire Fraud Conspiracy)? | Plea Agreement Charges | Count 1 Outcome | Plea Agreement Docket Number |
|---|---|---|---|---|
| Silviu Catalin Balaci | Yes | Conspiracy under 18 U.S.C. § 371 via Information | Dismissed per plea agreement | Dkt. 112 (19-cr-877) |
| Joseph Frank Abel | Yes | Tax offense under 26 U.S.C. § 7206(1) via Information | Dismissed per plea agreement | Dkt. 124 (19-cr-877) |
| Gordon Brad Beckstead | Not in original indictment | Money laundering (18 U.S.C. § 1956(h)) and aiding false tax return (26 U.S.C. § 7206(2)) | Avoided entirely (charged separately) | Dkt. 10 (22-cr-204) |
| Jobadiah Weeks | Yes | Count 2 (securities) and separate tax offense | Dismissed per plea agreement | Plea acknowledged in Dkt. 417; original not on public docket |

This consistent avoidance of Count 1 reveals more than convenience—it reflects that the Government lacked confidence in the charge's validity. Not once has the United States sought to defend Count 1 on the merits in any defendant's case. Instead, Count 1 has functioned as a **tool of pressure**, applied to secure pleas and then discarded. Particularly when considered alongside the shifting factual narratives and lack of verified victims, this pattern supports the conclusion that Count 1 was **legally defective from the outset**, not merely deprioritized. Its continued presence in the indictment—solely for leverage—violates principles of prosecutorial fairness and due process under the Fifth Amendment.

*Defendant anticipates filing a separate motion to dismiss Count 2 of the Indictment, which will further demonstrate that the Government's theory of criminal liability lacked clarity, statutory basis, and prosecutorial consistency. That motion will expand upon the constitutional defects underlying both charges and should be read in conjunction*

---

[5] See *Plea Agreement*, United States v. Silviu Catalin Balaci, Dkt. 112, No. 2:19-cr-00877-CCC (D.N.J. July 9, 2020); *Plea Agreement*, United States v. Joseph Frank Abel, Dkt. 124, No. 2:19-cr-00877-CCC (D.N.J. Sept. 3, 2020); *Plea Agreement*, United States v. Gordon Brad Beckstead, Dkt. 10, No. 2:22-cr-00204-CCC (D.N.J. Mar. 24, 2022); see also Dkt. 417 (Gov't Memo confirming dismissal of Count 1 in Weeks' case).

*with the present filing. Both counts were presented as interchangeable leverage to induce a plea, despite neither having a legally sustainable foundation.*

Accordingly, this Court should consider the Government's strategic abandonment of Count 1 as further evidence that it lacked legal merit and should be dismissed under Rule 12(b)(3)(B).

## 3.16 Government Misused Count 1 to Justify Delays Without Forensic Review

Despite dismissing Count 1 in multiple plea agreements—confirming its lack of prosecutorial viability—the Government continued to invoke that same charge as justification for prolonged "complex case" continuances under the Speedy Trial Act. In its November 12, 2020 filing (Dkt. 159), the Government claimed that Count 1 and the associated digital evidence raised "novel questions of fact and law" and required additional time due to the volume of digital forensics and discovery. Yet the Government's actual conduct sharply contradicts that claim.

As relates to Defendant, the Government **performed no meaningful digital forensic analysis at all**. The digital devices seized from Defendant in 2019—including his phones and computers—were never properly imaged, reviewed, or disclosed in accordance with Rule 16. The Government's own productions over the past five years confirm that **no forensic chain-of-custody records, device logs, or decrypted data** have ever been provided, despite multiple formal requests and court filings. Most recently, in the June 6, 2025 filing (Dkt. 446), Defendant again detailed the Government's failure to conduct or disclose any forensic review of these devices, including materials potentially exculpatory under *Brady*.[6]

The contradiction is stark: the Government delayed proceedings and cited digital forensics to obtain "complex case" protection under § 3161(h)(7), while at the same time **declining to conduct that very forensic review**, even when directly requested. This reflects a pattern of procedural misuse—**retaining the strategic benefits of complexity and delay while avoiding the disclosure and burden of proving the core charge**.

The Court should view this behavior as further evidence of the prosecution's coercive and unjustified deployment of Count 1. Not only was it dismissed in every plea agreement without being litigated, but it was also used to withhold forensic evidence and delay resolution under false pretenses.

---

[6] See, e.g., Dkt. 403 (Motion to Compel Discovery), Dkt. 406 (Motion for Return of Seized Property), Dkt. 417 (Government acknowledgment of Count 1 dismissal), and Dkt. 446 (June 6, 2025 Supplemental Filing identifying persistent failure to conduct or disclose digital forensic analysis). Despite multiple requests, the Government has not produced forensic imaging logs, device indexes, or analytical results from any of the devices seized from Weeks in December 2019.

## 3.17 Request for Targeted Discovery Regarding Seized Digital Asset Production

As a direct consequence of the forensic failures and evidentiary gaps outlined in §3.16, Defendant respectfully submits the following targeted discovery requests to clarify the current status, location, and disposition of the digital assets seized in connection with Count 1.

In light of the Government's continued failure to provide forensic documentation or transactional records related to the December 2019 seizure of BitClub Network's (BCN) mining infrastructure, Defendant respectfully requests that the Court compel specific disclosures essential to evaluating the scale, location, and legal status of any post-seizure cryptocurrency production. These records are directly relevant to Defendant's due process, restitution, and property rights, and are independently discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963), *Fed. R. Crim. P.* 16, and the Fifth and Sixth Amendments.

Accordingly, Defendant requests the Government be directed to disclose the following:

1. **Identify whether the BCN mining servers and/or associated wallets continued to operate and mine digital assets (including BTC and ETH) after the Government seized the equipment in or around December 2019, and if so, specify the date on which all such mining activity ceased.**

2. **State the locations at which any BCN servers, mining nodes, cold storage wallets, or digital infrastructure were held, operated, stored, or accessed while in Government custody.**

3. **Produce all transaction logs, mining pool records, wallet access credentials, chain-of-custody reports, and forensic imaging related to the seized servers and digital assets.**

4. **Identify all amounts of BTC and ETH (or other digital assets) mined, received, or transferred after the date of seizure, including wallet addresses, transaction hashes, and current asset disposition.**

5. **Provide documentation showing whether any portion of the seized cryptocurrency has been sold, forfeited, returned, or otherwise liquidated, and if so, to whom and by what legal authority.**

6. **If the Government asserts that such records do not exist, provide a sworn explanation of the procedures followed to secure, inventory, and track the seized digital assets, and state whether any mining hardware or software was destroyed, transferred, or accessed without audit controls.**

These requests are narrowly tailored to clarify the disposition of potentially billions of dollars in seized cryptocurrency and the constitutional consequences of its continued withholding or undocumented handling. Defendant respectfully submits that the requested information is essential to any fair adjudication of Count 1 and the larger claims of prosecutorial overreach and due process violations raised herein.

# 4.    Conclusion and Relief Requested

For the foregoing reasons, Defendant respectfully requests that the Court dismiss **Count 1** in its entirety pursuant to **Federal Rule of Criminal Procedure 12(b)(3)(B)(v)**, the **Due Process Clause of the Fifth Amendment**, and the Court's supervisory powers. The Government's prosecution of **Count 1** is constitutionally defective on multiple independent and compounding grounds, including:

- The absence of any **verified victims**, **sworn loss declarations**, or substantiated evidence of **individualized financial harm** attributable to Defendant;

- The failure to present any admissible evidence of **fraudulent conduct**, **material misrepresentations**, or direct **causation** linking Defendant's conduct to any alleged victim loss;

- Systematic violations of Defendant's constitutional **discovery rights** through the withholding of **exculpatory evidence**, **IRS records**, **financial tracing reports**, **blockchain audits**, **asset inventories**, and **Brady material**;

- Improper reliance on uncorroborated and inadmissible **co-defendant statements**, including the unverified **"Hoxie Statement,"** and retroactively constructed **post-indictment loss models**;

- **Retroactive criminalization** of conduct that was not prohibited at the time of commission, in violation of the **fair notice doctrine** and the **Due Process Clause of the Fifth Amendment**;

- **Selective prosecution** based on inconsistent charging practices applied arbitrarily across similarly situated actors in comparable cryptocurrency ventures;

- The Government's use of sweeping **pretrial asset seizures** that financially deprived Defendant of the resources necessary to retain **independent counsel**, secure **expert assistance**, and prepare an adequate defense, in violation of his **Fifth and Sixth Amendment rights**.

Collectively, these constitutional violations establish that **Count 1** was fatally defective from inception and constitutionally **void ab initio**. The Government initiated prosecution without legal authority, factual foundation, or constitutional compliance, and in knowing disregard of Defendant's rights under the **Fifth and Sixth Amendments**. Further prosecution under **Count 1** is therefore impermissible as a matter of law.

A motion to dismiss Count 2 will be filed shortly and will highlight the same foundational flaws—particularly the Government's reliance on vague regulatory theories and absence of criminal intent evidence. Count 1, like Count 2, cannot withstand scrutiny under Rule 12(b)(3)(B) and must be dismissed to preserve due process and avoid future prejudice.

Accordingly, Defendant respectfully requests that the Court **dismiss Count 1 with prejudice** and grant all further relief necessary to safeguard Defendant's **constitutional rights** and to preserve the integrity of the judicial process.

This Motion is preserved under Rule 12(b)(3)(B) and respectfully submitted for ruling if Count 1 is reinstated.

# Table of Authorities

## Cases

- **Brady v. Maryland**, 373 U.S. 83 (1963)

- **Bruton v. United States**, 391 U.S. 123 (1968)

- **Costello v. United States**, 350 U.S. 359 (1956)

- **Crawford v. Washington**, 541 U.S. 36 (2004)

- **Roviaro v. United States**, 353 U.S. 53 (1957)

- **Wayte v. United States**, 470 U.S. 598 (1985)

- **United States v. Armstrong**, 517 U.S. 456 (1996)

- **United States v. Bordenkircher**, 434 U.S. 357 (1978)

- **United States v. Olano**, 507 U.S. 725 (1993)

- **United States v. Watts**, 519 U.S. 148 (1997)

- **United States v. Chandler**, 376 F.3d 1303 (11th Cir. 2004)

- **United States v. Takhalov**, 827 F.3d 1307 (11th Cir. 2016)

- **United States v. Regent Office Supply Co.**, 421 F.2d 1174 (2d Cir. 1970)

- **United States v. Pirro**, 212 F.3d 86 (2d Cir. 2000)

- **United States v. Sharpe**, 438 F.3d 1257 (11th Cir. 2006)

- **United States v. Weatherspoon**, 581 F.2d 595 (7th Cir. 1978)

- **United States v. Chapman**, 524 F.3d 1073 (9th Cir. 2008)

## Statutes and Rules

- 18 U.S.C. § 1349

- 18 U.S.C. § 3161(h)(7)(B)(ii)

- 26 U.S.C. § 7206(1)

- 26 U.S.C. § 7206(2)

- Fed. R. Crim. P. 12(b)(3)(B)

## Sentencing Guidelines

- U.S.S.G. § 1B1.3

- U.S.S.G. § 2T1.1

- U.S.S.G. § 2T4.1

- U.S.S.G. § 3D1.2(d)

- U.S.S.G. § 3D1.3(b)

- U.S.S.G. § 3E1.1(a)

- U.S.S.G. § 3E1.1(b)

**Respectfully submitted,**

/s/ Jobadiah Weeks
**Jobadiah Sinclair Weeks**
Pro Se Defendant
2301 Collins Avenue
Miami Beach, FL 33139
Email: silenceweeks1@gmail.com
**Electronically Signed via DocuSign**



Signed by:
Joby Weeks
87866A420DB4490...

Dated: June 18, 2025

43