# Exhibit A

FBI/IRS Interview Notes (April 19, 2019)

, Joby, Leo, Amjad                  Restaurant, Ritz Hotel Washington DC
                                                         4/19/2019  7:35 PM

 made introduction and left
Father Christian school teacher in CO
Mom Amway then Brad MD in Seattle – Vitamins sales all over the world – first in CO and MA and made $1M.  Took company public
"Mannatec Tech" – Powder in drinks, bars, etc…  Hope bar
"Manna Relief Ministries" distributed it worldwide
60 minutes does story on them.  TX AG sued tem for claims – 2004
Stock plummeted, made deal & stock recuperated.
Many friends had tax trouble in those days and got into anti-tax groups
USA Corporate is a Corporation – Republic & State.  US is only 10 miles around Washington DC.
14th Amendment created US Citizen.
Money used to be backed by Gold & silver, now bonds backed by birth certificates.  We are all held as collateral for all the dept.
He fell down rabbit hole with Joe Banister (former IRS-CI) protester.
Went to IMF Decoders to decode his tax files
Tried to help people quit smoking & bought electronic cigarettes from China then took back seat on it.
Writes a paragraph for each month of his life and keeps them.
Partnered with guy on energy drink "Neon" & partner ripped him off for $1M.
Read Ron Paul books and started supporting him
Went to Island and claimed it.  Libertyland  libertyland.org
Income tax is not a just tax because it implies you do not won yourself, the government owns you.
Wanted to support Ron Paul.  Registered as Republican and became a registrar and got elected to national convention from CO & met Ron Paul.
Created silver coins and released them.  Then put Ron Paul's face on coin.
Rented Limo & promoted Ron Paul in 2008 and paid $50k X 2 to rent it.  Charged on his Visa and AE cards.  Should have been on $50k.
Became friends with Ron Paul who told him to do things at local level.  Collected signatures in CO to legalize weed.
Put together $5M in silver & gold.  FBI seized it all in 2010-12
Made a time backed currency & got 100 businesses to use it and paid them 100 of this currency to use it.
Someone told him about TOR and BTC.  He gave $200 to buy BTC @ $0.85.  He was told to go to Silk Roads to purchase BTC with Green Dot Cards.  250 BTC in his account on Silk Roads around 2010.  Silk Roads account went to $50K for 250 BTC.  Silk Roads got raided & lost BTC.  Tried to get it back from FBI but did not get it back.
Friends with Roget Ver.  Free State Project for NH and meet people.
Friends with Patric Byrne from Overstock.com
Worked with IEA sub of NRG power company.  Independent Energy Alliance.

USA_19877_04006418

Signed up customers to buy solar energy.  IEA contract was stopped & NRG took customers.

Elevate Solar started solar panels on houses to generate energy.  Then wanted to mine BTC & use solar power for power.

Meet Susie Mai & Bill Tai (lives in SF) with Mai-Tai Company at a party and talked about BTC.  They ran Bitfury to mine BTC.  Kept asking to purchase a box to mine BTC and after 6 months purchased one box.  They for $1M for one box.

In 2014, a friend, John, told him about Bitclub in Vegas to mine BTC.

Met Russ who said Bitmain sold them equipment.

Joby brought Russ to Bitfury t buy data center portions.  They purchased a portion of the data center & Bitfury hosted for them (Bitclub).

Bitfury then told them they have to take position of equipment because they did not want to run the data center for them.

Bitclub had not incorporated or articles or anything, just a club to mine BTC.

Bitclub was shares in mining pool.  Joby got no answers when he asked about procedures.

You could not join because from USA, Regulators would say it was a security.

Set data centers in Georgia and other countries.

In 2018, BTC crashed and no longer worth mining.

Bitclub doesn't want to deal with Bitfury anymore because they keep coming up with new chips and they have to keep upgrading.

Russ Medlin runs MLM for Bitclub, lives in Asia

Joe Abel MLM for Bitclub, best friends with Russ.

Joby worked MLM side of Bitclub.

Bitclub ordered equipment from Bitfury but Bitfury did not want to host anymore, so Joby tried to find a new location.

Kevin Washington, son of Dennis Washington (copper mine) & Dan Burrel started company called "crypto watt." 75 megawatt plant.   Crypto watt holds title bot land & equipment.  Joby was supposed to get 3% but got ripped off.  In Butte Montana.  They, Kevin & Dan, violated contract & Bitclub got mad @ Joby for it.

Price of equipment went down because BTC dropped.  Russ & Matt Getche from CO were signers for Crypto Watt.

Matt & Russ said to shut down Georgia plant & fire the 50 employees because BTC dropped.  June 2018 power bill not paid.  Tried to get VAT refunded to pay Georgia Power Bill.

Joby got hacked by transvestite in Philippines & went to SF FBI to get help to get it back but they didn't do anything.  They did notify him they are still working on it.

Joby's name is on power bill in Georgia for Bitclub.

$285,000 power bill for June.  Average bill was $1M per month for power.  Paid 18% VAT.

Bitclub does not want the Bitfury boxes & told Joby to just sell it back to Bitfury but they don't want it back.

Joby signed up as distributor for Bitclub.

Joby bought equipment from Bitfury & sold it to Bitclub.

Bitclub would send money in BTC to Joby and he paid BTC to Bitfury.  Bitfury said they would not sell to anyone but Joby.

USA_19877_04006419

Joby got 3% commission on purchases from Bitfury.

Joby told Bitclub to put serial #s on each piece of machine & have them mine to owner's wallet directly.  They said no.

Boxes generate BTC & it goes to Bitclub wallet & expenses would be paid then rest to clients.

Only purchased 2 to 3 times new equipment from Bitfury.  Bitfury sent equipment in waves.  Mining earnings settled 30 days after purchase since it took time to ship and get up & running.

1 M people - $500 minimum to get in each.  Does not know about internal controls of Bitclub.  They would not answer him when he asked.

Bitclub has 1 M members but only 4 nodes.

"phasecore" box generates heat/electricity to power battery pack.  50 TB boxes.  Wants to sell to everyone.

Russ won't talk to Joby for over 1 year now.

Matt talks to Joby occasionally.

Cost 2.7 cents for electricity in MT and that service center is up and running.

No one owns Bitclub & it has 10,000 founders.

Russ (American lives in Philippines) and Matt (lives in CO) are partners.

To become a founder, you send BTC to Bitclub.  40% goes to buy equipment, 40% compensates MLM and 20% to Matt  Russ to run company and overhead.  20% pays staff and overhead.

Mined coins are used to pay electricity & rent then paid out.

For 1 day BTC from new buyers went to hacker's wallet about 1 ½ years ago this happened.

Stopped allowing Americans in 2015.  Bitclub started in 2014.

Smart contracts every 24 hours pays out of Bitclub wallets to investors.

Joby made powerful connections.  Met Prime Minister of St. Kitts & Dominica.  People come to him that have billions of $ in BTC.

Wants to get hackers & child porn people.  Can get into upper echelon of all these groups.  Give him persons of interest & he can find out stuff about them.

Gets calls of people with cash that want BTC without KYC.

Joined jetsmarter for $1,000 per month, but attracted too much attention.  Wants to be like Jason Bourne.

Cannabis people call him to process people's payments from cc to LTC to bank deposits.

Gets commissions from bringing people into Bitclub.  2 to 3 orders by Bitclub from Bitfury but took up to 15 months to fill in full, piecemeal.

Bitclub: you can see what is mined & paid out and what your team is doing.  $99 to join goes to 50 to Matt and 50 to Russ.  Can buy in at $500; $1,000; $2,000 or $3,500 to be a founder.  No limit on purchases.  10 days lag from when it is mined to paid out.  Matt did back office for Bitclub.  Formal orders between Bitclub and Joby and between Joby and Bitfury.  Joby has orders.

T mobile # was being hacked.  Joby made millions from Bitclub, but keeps getting hacked.  Primary source of income is Bitclub.

619-519-2208   jobyweeks@gmail.com

Has not referred anyone to Bitclub in 8 months. You used to get commissions when they sign-up and when they got paid from mining. Now only when they sign up. If you get 4 per day for 1,000 purchase; you can take out 2 and 2 went to reinvest. You get 10% of rebuys as commission.

Joby only had Georgia Company "Geo Servers" LLC which was a Georgia Company. Joby is 100% shareholder. Bitclub sends BTC to Joby and Joby would cash out at OSL Octagon to pay bills. Joby was getting a fee for doing this. Bitclub was primary source of income for Joby.

Roger Ver – straight good guy.

Give list of persons of interest to Joby & he will get info on them.

Joby bought house in St. Kitts next to Roger Ver & Patric Burns.

He is only a US Citizen.

There is no fiat at Bitclub.

Can get a meeting with Matt but not with Russ.

They, Bitclub, were looking at ATMs to exchange.

Joby has AE card & has a guy he pays in BTC who pays the AE for him. Guy just keeps the points.

When he purchased the house in St. Kitts, banks stopped doing business with him (Chase Bank). St. Kitts rejected his passport request. Joby figured something was up.

Imported equipment for Bitclub and thinks it was an issue.

$400k to buy house can get passport in St. Kitts but they rejected him.

Joby will be in HK and Singapore and can do things if we want. Can follow-up with guys that wanted to exchange cash to BTC. $1M cash = 22 lbs. can smuggle on private planes.

Free OS – new Silk Roads, pitching and requesting investors. Using DASH

Wants to go to conferences & get info on people in exchange for no fear of blowback. Wants to run for office. Wants no paperwork to worry about.

Now living off of savings only now. Has some investments in companies, but not paying out yet.

I told Joby "you are not working for us and we are not instructing you to do anything." You can pass into to us if you come across it.

Will be more formal with attorney if going forward.

40% really went to buy equipment by Bitclub.

Joe Abel left Bitclub. Joe got into Dunmis which is the new better Bitclub & can raise money in USA.

Joby – "I have not filed for 20 years." Started with Joe Banister. Paid Joe monthly fee for representing him if audited. Never needed and stopped paying him.

Wants to help and wants immunity going forward.

Froze Joby's / Company's bank account in Georgia because of bank account liens.

Talks via text on Facebook and regular texts.

Has contacts with OneCoin, Nick & his twin brother. They are in Dubai. German guys.

USA_19877_04006421

Wants encrypted way to communicate with us.  Will be on cruise with family from HK.                                                    10:54 PM end

USA_19877_04006422

# Exhibit B

IRS Notice 2014-21

Notice 2014-21

SECTION 1. PURPOSE

This notice describes how existing general tax principles apply to transactions using virtual currency.  The notice provides this guidance in the form of answers to frequently asked questions.

SECTION 2. BACKGROUND

The Internal Revenue Service (IRS) is aware that "virtual currency" may be used to pay for goods or services, or held for investment.  Virtual currency is a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value.  In some environments, it operates like "real" currency -- i.e., the coin and paper money of the United States or of any other country that is designated as legal tender, circulates, and is customarily used and accepted as a medium of exchange in the country of issuance -- but it does not have legal tender status in any jurisdiction.

Virtual currency that has an equivalent value in real currency, or that acts as a substitute for real currency, is referred to as "convertible" virtual currency.  Bitcoin is one example of a convertible virtual currency.  Bitcoin can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other real or virtual currencies.  For a more comprehensive description of convertible virtual currencies to date, see Financial Crimes Enforcement Network (FinCEN) *Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (FIN-2013-G001, March 18, 2013).

SECTION 3. SCOPE

In general, the sale or exchange of convertible virtual currency, or the use of convertible virtual currency to pay for goods or services in a real-world economy transaction, has tax consequences that may result in a tax liability.  This notice addresses only the U.S. federal tax consequences of transactions in, or transactions that use, convertible virtual currency, and the term "virtual currency" as used in Section 4 refers only to convertible virtual currency.  No inference should be drawn with respect to virtual currencies not described in this notice.

The Treasury Department and the IRS recognize that there may be other questions regarding the tax consequences of virtual currency not addressed in this notice that warrant consideration.  Therefore, the Treasury Department and the IRS request comments from the public regarding other types or aspects of virtual currency transactions that should be addressed in future guidance.

Comments should be addressed to:

Internal Revenue Service
Attn:  CC:PA:LPD:PR (Notice 2014-21)
Room 5203
P.O. Box 7604
Ben Franklin Station
Washington, D.C. 20044

or hand delivered Monday through Friday between the hours of 8 A.M. and 4 P.M. to:

Courier's Desk
Internal Revenue Service
Attn:  CC:PA:LPD:PR (Notice 2014-21)
1111 Constitution Avenue, N.W.
Washington, D.C. 20224

Alternatively, taxpayers may submit comments electronically via e-mail to the following address: Notice.Comments@irscounsel.treas.gov.  Taxpayers should include "Notice 2014-21" in the subject line.  All comments submitted by the public will be available for public inspection and copying in their entirety.

For purposes of the FAQs in this notice, the taxpayer's functional currency is assumed to be the U.S. dollar, the taxpayer is assumed to use the cash receipts and disbursements method of accounting and the taxpayer is assumed not to be under common control with any other party to a transaction.

SECTION 4. FREQUENTLY ASKED QUESTIONS

**Q-1:  How is virtual currency treated for federal tax purposes?**

**A-1:**  For federal tax purposes, virtual currency is treated as property.  General tax principles applicable to property transactions apply to transactions using virtual currency.

**Q-2:  Is virtual currency treated as currency for purposes of determining whether a transaction results in foreign currency gain or loss under U.S. federal tax laws?**

**A-2:**  No.  Under currently applicable law, virtual currency is not treated as currency that could generate foreign currency gain or loss for U.S. federal tax purposes.

**Q-3:  Must a taxpayer who receives virtual currency as payment for goods or services include in computing gross income the fair market value of the virtual currency?**

**A-3:**  Yes.  A taxpayer who receives virtual currency as payment for goods or services must, in computing gross income, include the fair market value of the virtual currency,

measured in U.S. dollars, as of the date that the virtual currency was received.  See Publication 525, *Taxable and Nontaxable Income,* for more information on miscellaneous income from exchanges involving property or services.

**Q-4:  What is the basis of virtual currency received as payment for goods or services in Q&A-3?**

**A-4:**  The basis of virtual currency that a taxpayer receives as payment for goods or services in Q&A-3 is the fair market value of the virtual currency in U.S. dollars as of the date of receipt.  See Publication 551, *Basis of Assets,* for more information on the computation of basis when property is received for goods or services.

**Q-5:  How is the fair market value of virtual currency determined?**

**A-5:**  For U.S. tax purposes, transactions using virtual currency must be reported in U.S. dollars.  Therefore, taxpayers will be required to determine the fair market value of virtual currency in U.S. dollars as of the date of payment or receipt.  If a virtual currency is listed on an exchange and the exchange rate is established by market supply and demand, the fair market value of the virtual currency is determined by converting the virtual currency into U.S. dollars (or into another real currency which in turn can be converted into U.S. dollars) at the exchange rate, in a reasonable manner that is consistently applied.

**Q-6:  Does a taxpayer have gain or loss upon an exchange of virtual currency for other property?**

**A-6:**  Yes.  If the fair market value of property received in exchange for virtual currency exceeds the taxpayer's adjusted basis of the virtual currency, the taxpayer has taxable gain.  The taxpayer has a loss if the fair market value of the property received is less than the adjusted basis of the virtual currency.  See Publication 544, *Sales and Other Dispositions of Assets*, for information about the tax treatment of sales and exchanges, such as whether a loss is deductible.

**Q-7:  What type of gain or loss does a taxpayer realize on the sale or exchange of virtual currency?**

**A-7:**  The character of the gain or loss generally depends on whether the virtual currency is a capital asset in the hands of the taxpayer.  A taxpayer generally realizes capital gain or loss on the sale or exchange of virtual currency that is a capital asset in the hands of the taxpayer.  For example, stocks, bonds, and other investment property are generally capital assets.   A taxpayer generally realizes ordinary gain or loss on the sale or exchange of virtual currency that is not a capital asset in the hands of the taxpayer.  Inventory and other property held mainly for sale to customers in a trade or

business are examples of property that is not a capital asset.  See Publication 544 for more information about capital assets and the character of gain or loss.

**Q-8:  Does a taxpayer who "mines" virtual currency (for example, uses computer resources to validate Bitcoin transactions and maintain the public Bitcoin transaction ledger) realize gross income upon receipt of the virtual currency resulting from those activities?**

**A-8:**  Yes, when a taxpayer successfully "mines" virtual currency, the fair market value of the virtual currency as of the date of receipt is includible in gross income.  See Publication 525, *Taxable and Nontaxable Income*, for more information on taxable income.

**Q-9:  Is an individual who "mines" virtual currency as a trade or business subject to self-employment tax on the income derived from those activities?**

**A-9:** If a taxpayer's "mining" of virtual currency constitutes a trade or business, and the "mining" activity is not undertaken by the taxpayer as an employee, the net earnings from self-employment (generally, gross income derived from carrying on a trade or business less allowable deductions) resulting from those activities constitute self-employment income and are subject to the self-employment tax.  See Chapter 10 of Publication 334, *Tax Guide for Small Business*, for more information on self-employment tax and Publication 535, *Business Expenses,* for more information on determining whether expenses are from a business activity carried on to make a profit.

**Q-10:  Does virtual currency received by an independent contractor for performing services constitute self-employment income?**

**A-10:**  Yes.  Generally, self-employment income includes all gross income derived by an individual from any trade or business carried on by the individual as other than an employee.  Consequently, the fair market value of virtual currency received for services performed as an independent contractor, measured in U.S. dollars as of the date of receipt, constitutes self-employment income and is subject to the self-employment tax. See FS-2007-18, April 2007, *Business or Hobby? Answer Has Implications for Deductions,* for information on determining whether an activity is a business or a hobby.

**Q-11:  Does virtual currency paid by an employer as remuneration for services constitute wages for employment tax purposes?**

**A-11:**  Yes.  Generally, the medium in which remuneration for services is paid is immaterial to the determination of whether the remuneration constitutes wages for employment tax purposes.  Consequently, the fair market value of virtual currency paid as wages is subject to federal income tax withholding, Federal Insurance Contributions

Act (FICA) tax, and Federal Unemployment Tax Act (FUTA) tax and must be reported on Form W-2, *Wage and Tax Statement*.  See Publication 15 (Circular E), *Employer's Tax Guide*, for information on the withholding, depositing, reporting, and paying of employment taxes.

**Q-12:  Is a payment made using virtual currency subject to information reporting?**

**A-12:**  A payment made using virtual currency is subject to information reporting to the same extent as any other payment made in property.  For example, a person who in the course of a trade or business makes a payment of fixed and determinable income using virtual currency with a value of $600 or more to a U.S. non-exempt recipient in a taxable year is required to report the payment to the IRS and to the payee.  Examples of payments of fixed and determinable income include rent, salaries, wages, premiums, annuities, and compensation.

**Q-13:  Is a person who in the course of a trade or business makes a payment using virtual currency worth $600 or more to an independent contractor for performing services required to file an information return with the IRS?**

**A-13:**  Generally, a person who in the course of a trade or business makes a payment of $600 or more in a taxable year to an independent contractor for the performance of services is required to report that payment to the IRS and to the payee on Form 1099-MISC, *Miscellaneous Income*.  Payments of virtual currency required to be reported on Form 1099-MISC should be reported using the fair market value of the virtual currency in U.S. dollars as of the date of payment.  The payment recipient may have income even if the recipient does not receive a Form 1099-MISC.  See the Instructions to Form 1099-MISC and the General Instructions for Certain Information Returns for more information.  For payments to non-U.S. persons, see Publication 515, *Withholding of Tax on Nonresident Aliens and Foreign Entities*.

**Q-14:  Are payments made using virtual currency subject to backup withholding?**

**A-14:**  Payments made using virtual currency are subject to backup withholding to the same extent as other payments made in property.  Therefore, payors making reportable payments using virtual currency must solicit a taxpayer identification number (TIN) from the payee.  The payor must backup withhold from the payment if a TIN is not obtained prior to payment or if the payor receives notification from the IRS that backup withholding is required.  See Publication 1281, *Backup Withholding for Missing and Incorrect Name/TINs,* for more information*.*

**Q-15:  Are there IRS information reporting requirements for a person who settles payments made in virtual currency on behalf of merchants that accept virtual currency from their customers?**

**A-15:**  Yes, if certain requirements are met.  In general, a third party that contracts with a substantial number of unrelated merchants to settle payments between the merchants and their customers is a third party settlement organization (TPSO).  A TPSO is required to report payments made to a merchant on a Form 1099-K, *Payment Card and Third Party Network Transactions*, if, for the calendar year, both (1) the number of transactions settled for the merchant exceeds 200, and (2) the gross amount of payments made to the merchant exceeds $20,000.  When completing Boxes 1, 3, and 5a-1 on the Form 1099-K, transactions where  the TPSO settles payments made with virtual currency are aggregated with transactions where the TPSO settles payments made with real currency to determine the total amounts to be reported in those boxes. When determining whether the transactions are reportable, the value of the virtual currency is the fair market value of the virtual currency in U.S. dollars on the date of payment.

See The Third Party Information Reporting Center, http://www.irs.gov/Tax-Professionals/Third-Party-Reporting-Information-Center, for more information on reporting transactions on Form 1099-K.

**Q-16:  Will taxpayers be subject to penalties for having treated a virtual currency transaction in a manner that is inconsistent with this notice prior to March 25, 2014?**

**A-16:**  Taxpayers may be subject to penalties for failure to comply with tax laws.  For example, underpayments attributable to virtual currency transactions may be subject to penalties, such as accuracy-related penalties under section 6662.  In addition, failure to timely or correctly report virtual currency transactions when required to do so may be subject to information reporting penalties under section 6721 and 6722.  However, penalty relief may be available to taxpayers and persons required to file an information return who are able to establish that the underpayment or failure to properly file information returns is due to reasonable cause.

SECTION 5. DRAFTING INFORMATION

The principal author of this notice is Keith A. Aqui of the Office of Associate Chief Counsel (Income Tax & Accounting).  For further information about income tax issues addressed in this notice, please contact Mr. Aqui at (202) 317-4718; for further information about employment tax issues addressed in this notice, please contact Mr. Neil D. Shepherd at (202) 317- 4774; for further information about information reporting issues addressed in this notice, please contact Ms. Adrienne E. Griffin at (202) 317-6845; and for further information regarding foreign currency issues addressed in this notice, please contact Mr. Raymond J. Stahl at (202) 317- 6938.  These are not toll-free calls.

# Exhibit C

DOJ Blanche Memo on Crypto Charging

U.S. **Department of Justice**

Office of the Deputy Attorney General

---

The Deputy Attorney General                    *Washington, D.C. 20530*

April 7, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:                THE DEPUTY ATTORNEY GENERAL

SUBJECT:           Ending Regulation By Prosecution

      The digital assets industry is critical to the Nation's economic development and innovation. Thus, as noted in Executive Order 14178, clarity and certainty regarding enforcement policy "are essential to supporting a vibrant and inclusive digital economy and innovation in digital assets." President Trump has also made clear that "[w]e are going to end the regulatory weaponization against digital assets."

      The Department of Justice is not a digital assets regulator.  However, the prior Administration used the Justice Department to pursue a reckless strategy of regulation by prosecution, which was ill conceived and poorly executed.  The Justice Department will no longer pursue litigation or enforcement actions that have the effect of superimposing regulatory frameworks on digital assets while President Trump's actual regulators do this work outside the punitive criminal justice framework.  Rather, consistent with President Trump's directives and the Justice Department's priorities, the Department's investigations and prosecutions involving digital assets shall focus on prosecuting individuals who victimize digital asset investors, or those who use digital assets in furtherance of criminal offenses such as terrorism, narcotics and human trafficking, organized crime, hacking, and cartel and gang financing.[1]

## I.    Digital Assets Enforcement Priorities

      Executive Order 14178 tasks the Justice Department and others with "protecting and promoting" (1) "the ability of individual citizens and private-sector entities alike to access and use for lawful purposes open public blockchain networks without persecution"; and (2) "fair and open access to banking services for all law-abiding individual citizens and private-sector entities alike." In response to those taskings, the Justice Department will stop participating in regulation by prosecution in this space.  Specifically, the Department will no longer target virtual currency exchanges, mixing and tumbling services, and offline wallets for the acts of their end users or unwitting violations of regulations—except to the extent the investigation is consistent with the priorities articulated in the following paragraphs.

---

[1] This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

The policy outlined in Executive Order 14178 requires the Justice Department to prioritize investigations and prosecutions that involve conduct victimizing investors, including embezzlement and misappropriation of customers' funds on exchanges, digital asset investment scams, fake digital asset development projects such as rug pulls, hacking of exchanges and decentralized autonomous organizations resulting in the theft of funds, and exploiting vulnerabilities in smart contracts. Such enforcement actions are important to restoring stolen funds to customers, building investor confidence in the security of digital asset markets, and the growth of the digital asset industry.

Pursuant to the "total elimination" policy set forth in Executive Order 14157, entitled *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, the Justice Department will also prioritize cases involving use of digital assets in furtherance of unlawful conduct by cartels, Transnational Criminal Organizations, Foreign Terrorist Organizations, and Specially Designated Global Terrorists. For example, cartels and human trafficking and smuggling rings have increasingly turned to digital assets to fund their operations and launder the proceeds of their illicit businesses. The same is true of fentanyl production: increasingly dangerous precursors purchased from China and used in the production of fentanyl in Central and South America are often paid for using digital assets. Terrorist groups, such as Hamas and ISIS, and nation states subject to US sanctions, like North Korea, also continue to transact using digital assets in an attempt to conceal their financing from law enforcement. As part of the Justice Department's ongoing work against fentanyl trafficking, terrorism, cartels, and human trafficking and smuggling, the Department will pursue the illicit financing of these enterprises by the individuals and enterprises themselves, including when it involves digital assets, but will not pursue actions against the platforms that these enterprises utilize to conduct their illegal activities.

Ongoing investigations that are inconsistent with the foregoing should be closed. The Office of the Deputy Attorney General will work with the Criminal Division and EOUSA to review ongoing cases for consistency with this policy. All previously issued policies and directives that are inconsistent with any of the foregoing are rescinded, effective today.

## II.    Digital Assets Charging Considerations

Based on the foregoing priorities—while charging decisions must be based upon the facts and evidence of each particular case—federal prosecutors are directed to consider the following factors when deciding whether to pursue criminal charges involving digital assets:

Prosecutors shall prioritize cases that hold accountable individuals who (a) cause financial harm to digital asset investors and consumers; and/or (b) use digital assets in furtherance of other criminal conduct, such as fentanyl trafficking, terrorism, cartels, organized crime, and human trafficking and smuggling. Seeking accountability from individuals who perpetrate these types of wrongdoing deters future illegal activity, compensates victims, and promotes the public's confidence in the digital asset markets and broader industry. On the other hand, criminal matters premised on regulatory violations resulting from diffuse decisions made at lower levels of digital asset companies often fail to advance the priorities of the Department.

Prosecutors should not charge regulatory violations in cases involving digital assets—including but not limited to unlicensed money transmitting under 18 U.S.C. § 1960(b)(1)(A) and (B), violations of the Bank Secrecy Act, unregistered securities offering violations, unregistered

Memorandum from the Deputy Attorney General                                                    Page 3
Subject: Ending Regulation By Prosecution

broker-dealer violations, and other violations of registration requirements under the Commodity Exchange Act—unless there is evidence that the defendant knew of the licensing or registration requirement at issue and violated such a requirement willfully. This priority is not required by law, but is being imposed as a matter of discretion, in recognition of the Justice Department's priorities and the fact that the Biden Administration created a particularly uncertain regulatory environment around digital assets.[2]

Prosecutors should not charge violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the Commodity Exchange Act, or the regulations promulgated pursuant to these Acts, in cases where (a) the charge would require the Justice Department to litigate whether a digital asset is a "security" or "commodity," and (b) there is an adequate alternative criminal charge available, such as mail or wire fraud. The following types of positions are permissible under this policy in connection with proposed prosecutions that would otherwise be consistent with the guidance in this memorandum: (i) taking the position that bitcoin or ether is a "commodity" under the Commodity Exchange Act; and (ii) filing securities fraud charges where the "security" at issue is the equity or stock in a digital asset company. Any exceptions to this policy must be approved by the Deputy Attorney General, or his designee(s). Relevant considerations for such an exception include whether the digital asset is widely accepted to be a "security" or "commodity," whether the parties to the litigation have an interest in defending the position that a digital asset is a "security" or "commodity," and whether there is no alternative criminal charge under Title 18.

### III.    Compensating Victims In The Digital Assets Space

Following the prolonged period of price decline in the digital asset market in 2022, multiple companies with custody of investors' digital assets collapsed and entered bankruptcy, including FTX, Voyager Digital, Celsius Network, Genesis Global, BlockFi, and Gemini Trust. In some instances, investor losses have been directly attributable to fraud and theft. In those cases, and others, prosecutors have been able to forfeit proceeds of criminal activity including digital assets that in some instances became worth billions of dollars. However, as a result of regulations, some digital asset investor victims have only been able to recover the value of their digital assets at the time the fraud was perpetrated. *See* 28 C.F.R. § 9.8(c). The effect: digital asset investors' losses may be calculated at a value when the digital asset market was at a lower point, and victims who bore the risk of loss are unable to benefit from corresponding gains that occurred during or after the period in which they were victimized and would otherwise have possessed the asset. Accordingly, the Office of Legal Policy and the Office of Legislative Affairs are directed to evaluate and propose legislative and regulatory changes to address this concern and improve asset-forfeiture efforts in the digital assets space.

---

[2] This guidance does not reflect a view by the Department that the criminal offense set forth in 18 U.S.C. § 1960 requires proof of willfulness in other contexts, and it casts no doubt on existing case law. Moreover, 18 U.S.C. § 1960(b)(1)(C) requires that the transmission of funds "are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity," and is therefore outside the scope of this policy.

Memorandum from the Deputy Attorney General                                        Page 4
Subject: Ending Regulation By Prosecution

### IV.    Shifting Resources Relating To Digital Assets

U.S. Attorneys' Offices will use long-recognized criminal justice tools to lead appropriate prosecutions consistent with the foregoing enforcement priorities and charging consideration. Consistent with the narrowing of the enforcement policy relating to digital assets, the Market Integrity and Major Frauds Unit shall cease cryptocurrency enforcement in order to focus on other priorities, such as immigration and procurement frauds.    The National Cryptocurrency Enforcement Team (NCET) shall be disbanded effective immediately.    The Criminal Division's Computer Crime and Intellectual Property Section (CCIPS) will continue to provide guidance and training to Department personnel and serve as liaisons to the digital asset industry.

### V.    The President's Working Group on Digital Asset Markets

The Justice Department will fully participate in President Trump's Working Group on Digital Asset Markets, which was established in Executive Order 14178, via attorneys designated by the Justice Department's senior leadership.    As directed by President Trump, the Department's designees will identify and make recommendations regarding regulations, guidance documents, orders, or other items that affect the digital asset sector.    Additionally, the Department will participate in the preparation of a report to President Trump recommending regulatory and legislative proposals that advance the policies and priorities set forth in the President's Executive Order.  Following the submission of the report, the Justice Department will take all steps necessary to implement the recommendations in the report that President Trump adopts.

# Exhibit D

Dkt. 159: Complex Case Motion

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Claire C. Cecchi |
| v. | Criminal No.  19-877 |
| MATTHEW BRENT GOETTSCHE | COMPLEX CASE ORDER & ORDER FOR CONTINUANCE |

This matter having come before the Court on the application of the United States, by Craig Carpenito, United States Attorney for the District of New Jersey (by Jamie L. Hoxie and Anthony P. Torntore, Assistant U.S. Attorneys, appearing); for an order granting a continuance of proceedings in the above-captioned matter; and for good cause shown,

IT IS THE FINDING OF THIS COURT that this action should be continued for the following reasons:

1.     This case is an unusual or complex case within the meaning of the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(B)(ii), in light of the number of defendants, the nature of the prosecution, and the existence of novel questions of fact and law such that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within 70 days.

2.     As the Court has relayed in its prior complex case orders, the discovery in this case is voluminous, consisting of millions of electronic records, several different images and extractions of over 80 digital devices that have been seized, and the reconstitution and review of copies of website servers.  Additionally, on November 6, 2020, Goettsche produced

1

approximately 4,300 records to the Government.  Additional time is necessary to ensure that, taking into account the exercise of diligence, the parties have sufficient time to review and inspect discovery and further investigate the charges in this matter.

3.     The parties in this action are undertaking a process designed to reasonably protect the defendants' attorney-client privilege (the "Filter Process").  As a result of the Filter Process, on October 30, 2020, Goettsche asserted privilege over approximately 774 records.  The Government is in the process of determining whether it will seek to challenge any of these assertions of privilege.  Moreover, the Government anticipates that over 262,000 records that were previously caught in Goettsche's Filter Process will soon be released back to the prosecution team for review and production.  Additional time is necessary to ensure that, taking into account the exercise of diligence, the parties have sufficient time to review and inspect these records that have been caught up in the Filter Process and the Government has sufficient time to determine whether Goettsche's privilege assertions should be challenged.

4.     The Government anticipates that expert testimony will be introduced in its case-in-chief at trial.  The parties have not yet disclosed expert witnesses or a summary of the testimony, which the Government believes will be complex given the nature of the prosecution.

5.     As a result of the foregoing, pursuant to 18 U.S.C. § 3161(h)(7)(A)

and (h)(7)(B)(ii) and (iv), the ends of justice served by the granting of this continuance outweigh the best interests of the public and the defendant in a speedy trial.

IT IS, therefore, on this the 12th day of November, 2020,

(1)    ORDERED that this action be, and hereby is, continued from November 15, 2020 to March 4, 2021, and it is further

(2)    ORDERED that the period from November 15, 2020 through March 4, 2021 be and hereby is excluded in computing time under the Speedy Trial Act of 1974, 18 U.S.C. § 3161 *et seq.*

_____
Honorable Claire C. Cecchi
United States District Judge

3

# Exhibit E

Dkt. 185: Continued Complex Designation

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Claire C. Cecchi |
| v. | Criminal No. 19-877 |
| MATTHEW BRENT GOETTSCHE | ORDER FOR CONTINUANCE |

This matter having come before the Court on the joint application of the United States, by Rachael A. Honig, Acting United States Attorney for the District of New Jersey (by Jamie L. Hoxie and Anthony P. Torntore, Assistant U.S. Attorneys, appearing), and defendant MATTHEW BRENT GOETTSCHE (Rodney Villazor, Esq., Andrew Lourie, Esq., and Benjamin Sauter, Esq., appearing), for an order granting a continuance of proceedings in the above-captioned matter; and the defendant being aware that he has the right to have this matter brought to trial within 70 days of the date of his appearance before a judicial officer of this court pursuant to 18 U.S.C. § 3161(c)(1); and the defendant having consented to such continuance and having waived such right; and for good cause shown,

IT IS THE FINDING OF THIS COURT that this action should be continued for the following reasons:

1.     This case is an unusual or complex case within the meaning of the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(B)(ii), in light of the number of defendants, the nature of the prosecution, and the existence of novel questions

1

of fact and law such that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within 70 days.

2.  The discovery in the case is voluminous, consisting of, among other things, the review of nearly two million electronic records, several different images and extractions of digital devices, and the reconstitution and review of copies of website servers, and additional time is necessary to ensure that, taking into account the exercise of diligence, defense counsel has sufficient time to review and inspect discovery and further investigate the charges in this matter.

3.    As a result of the foregoing, pursuant to 18 U.S.C. § 3161(h)(7)(A) and (h)(7)(B)(ii) and (iv), the ends of justice served by the granting of this continuance outweigh the best interests of the public and the defendant in a speedy trial.

IT IS, therefore, on this ____26____ day of February, 2021,

(1)    ORDERED that this action be, and hereby is, continued until July 16, 2021, and it is further

(2)    ORDERED that the period from the date of this order through July 16, 2021 be and it hereby is excluded in computing time under the Speedy Trial Act of 1974, 18 U.S.C. § 3161 *et seq.*

_____
Honorable Claire C. Cecchi
United States District Judge

2

Consented to as to form and entry:


S/ JAMIE L. HOXIE
Jamie L. Hoxie
Anthony P. Torntore
Assistant U.S. Attorneys


_____
Rodney Villazor, Esq.
Andrew Lourie, Esq.
Benjamin Sauter, Esq.
Counsel for Defendant Matthew Brent Goettsche

3

# Exhibit F

September 5, 2024 Records Request Letter

# STONE ▪ MAGNANINI

## COMPLEX LITIGATION

September 5, 2024

**VIA EMAIL**
AUSA Anthony Torntore
United States Attorney's Office
  for the District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov

      Re:    <u>United States v. Jobadiah Weeks</u> (19-cr-877-CCC)

Dear AUSA Torntore:

      As you are aware, we are currently preparing to meet with you to discuss our position on Mr. Weeks' sentencing matters, including reaching an amicable resolution regarding restitution. To that end, we are investigating the underlying calculations referenced in Mr. Weeks' plea agreement pertaining to the relevant loss amounts as well as investigating the value of Mr. Weeks' assets that were seized by the government that remain in its possession.

      On July 22, 2024, you emailed me an IRS memorandum, dated October 8, 2020, described as "[e]valuation of grand jury expansion request and special agent's report." Page 6 of the memorandum explains in a footnote that "[a] streamlined SAR was created and supplemented with documents which corroborate the allegations in the SAR…" which includes "copies of… interviews…." A footnote on page 8 references a "tax loss appendix." We respectfully request that you kindly produce to us a copy of the following items referenced in the October 8 memorandum:

      1.      The "streamlined SAR."

      2.      The tax loss appendix.

      3.      "[C]opies of… interviews" in whatever form, including, but not limited to, transcripts, summaries or other reports.

      To gain an understanding of the IRS's interpretation of the transfers and payments reflected in the cryptocurrency wallets owned by Mr. Weeks we respectfully further request the following information:

1.      A detailed transaction history for the cryptocurrency wallets identified as belonging to Mr. Weeks, specifically "1Joby" and "19rFx." We believe that this should include all incoming and outgoing transactions, along with corresponding dates, transaction amounts and the parties involved.

2.      Among the items seized by the government is a computer containing a JAXX wallet. Please provide us with all records that set forth the current status of the cryptocurrency stored in the JAXX wallet and other wallets and hardware seized by the government (*e.g.*, Trezor and Ledger), including the wallet addresses associated with the seized hardware.

3.      All records documenting the results of "blockchain tracing analysis" conducted on the transactions involving Mr. Weeks' cryptocurrency wallets.

4.      On the day of Mr. Weeks' arrest two wallets on Mr. Weeks' computer were seized. The first, beginning "1Bzq5" had a balance of approximately 3.67 BTC. The second, beginning "1A9D3" had a balance of 5.00 BTC. It appears that on November 17, 2022, approximately 8.67 BTC was transferred from Mr. Weeks' wallets to a wallet beginning with "14YyA." Could you kindly indicate if this is a government controlled crypto-wallet and, if so, please provide any documents setting forth the procedures followed by the government to transfer these funds and, if the Bitcoin was liquidated, please provide us with the amounts recovered.

In order to determine the validity and the underlying basis for the analysis in the IRS memorandum, we request documents sufficient to show the following:

1.      BCN membership list.

2.      BCN membership agreements.

3.      Records indicating how the IRS viewed the relationship between BCN leadership and its members in terms of tax liability and responsibility.

4.      Records indicating how the IRS classified BCN and on what basis.

5.      Records that BCN applied for or organized under a specific tax classification, such as a for-profit or non-profit organization.

6.      Records that indicate how the IRS determined the tax obligations of BCN, particularly in relation to its business activities.

7.      Records indicating whether the IRS classified earnings from BCN as wages, commissions, or other forms of taxable income for its members.

**STONE ⬛ MAGNANINI**

COMPLEX LITIGATION

8.    Records related to any audits or other reviews of BCN before Mr. Weeks was arrested.

9.    Records indicating whether the IRS considered Mr. Weeks an employee, independent contractor, or other classification, within BCN.

10.   Records that support the classification of Mr. Weeks' earnings from BCN as taxable income.

11.   Records indicating whether the IRS determined that BCN was responsible for withholding and payment of employment taxes for individuals such as Mr. Weeks.

12.   Records relating to BCN policies or practices for paying employment taxes or classifying its members and leadership correctly for tax purposes.

13.   Underlying records used to support the IRS assessment of Mr. Weeks' tax liability.

14.   Correspondence or other communications between the IRS and BCN, or its members, discussing their tax obligations or the IRS's expectations.

15.   Third party information or reports used to determine the tax obligations of BCN and its members.

We also request the following records:

1.    Any and all interview (*e.g.*, proffer sessions) transcripts and/or interview summaries or reports from any co-defendant in this matter.

Thank you for your attention to this matter and please do not hesitate to contact me if you require any additional information to assist us with this request.

Respectfully submitted,

*/s/ David Stone*
David S. Stone
Managing Partner