**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

United States of America,
 Plaintiff,

v.

 Jobadiah Weeks,
 Defendant.

Criminal No. 19-cr-877-CCC

**"DEFENDANT'S" RESPONSE TO GOVERNMENT'S AUGUST 12, 2025 LETTER**

# I.  Introduction

This filing responds to the Government's August 12, 2025 letter, which contains a series of allegations concerning my conduct while on pretrial release — including the serious claim of a positive drug test for cocaine. Several of these statements are incomplete, taken out of context, or omit material facts available to the Government that would clarify the events in question.

**Throughout my supervision, I have acted in good faith to comply with all Court-ordered conditions and to promptly resolve any uncertainties by seeking clarification from the Court rather than disregarding them.** My activities have remained entirely within the limits imposed — including geo-fenced, continuously monitored property boundaries — and I have maintained full cooperation with Pretrial Services.

I have also considered why the Government would raise these allegations now and in this form. As explained in Section V.This non sense obviously suggests a potential shady strategic motive.

The sections that follow address each of the Government's points in turn, providing contemporaneous facts, identifying relevant documentary or electronic evidence, and correcting inaccuracies. Where allegations rest on speculation, misunderstanding, or incomplete data, I highlight objective sources — including GPS monitoring records and eyewitness accounts — that the Court may rely on for a complete and accurate understanding.

| | |
|---|---:|
| **I. Introduction** | **1** |
| **II. Factual Misstatements in the Government's August 12 Letter** | **2** |
|     A. Delayed Drug Test Notice | 2 |
|     B. Drug Testing Protocols | 3 |
|     C. Drug Test Authority | 3 |
|     D. Misstatement on Testing Date | 4 |
|     E. Sealed Bail Revocation Motion | 4 |
|     F. Location Monitoring Allegations | 5 |
|     G. July 23 Visit Account | 5 |
|     H. Third-Party Custodian Role | 6 |
|     I. Outdoor Access Restriction | 6 |
|     J. Testing Frequency Increase | 7 |
|     K. July 3 Medical Appointment | 8 |
|     L. Proportionality Review | 8 |
|     M. Additional Relief Requests | 9 |
|     N. Unopposed Dkt. 435 | 10 |
|     O. Response to Government's Conclusion | 10 |
| **III. Pattern of Unsupported or Misleading Allegations** | **11** |
| **IV. Implausibility of the May 23 Cocaine Allegation** | **13** |
| **V. Possible Motive for Raising Allegation Now** | **14** |
| **VI. Prior Settlement Efforts and Government Refusal** | **16** |
| **VII. Conclusion for clarity** | **17** |
| **Exhibit A. Delayed Drug Test Notice** | **20** |
| **Exhibit B. Drug Testing Protocols** | **23** |
| **Exhibit C. Drug Test Authority** | **26** |
| **Exhibit D. Timeline of Unanswered Filings** | **29** |

# II. Factual Misstatements in the Government's August 12 Letter

The following sections address specific mischaracterizations in the Government's August 12, 2025 letter concerning Defendant's pending bail modification motions (Dkt. 459 and Dkt. 470). Each subsection identifies the allegation, explains why it is inaccurate or misleading, and cites the contemporaneous record—including the text of the motions themselves—to correct the context and clarify the limited relief actually sought.

## A. Delayed Drug Test Notice

*"With the most basic conditions of pre-trial release imposed by this Court."*

The Court did not impose any additional or twice-weekly drug testing as suggested by the Government's letter. The May 20, 2025 Order (Dkt. 439) contains the same standard drug testing language ("as directed by Pretrial Services") as the prior release order, with no modification increasing frequency. The subsequent increase in testing was imposed solely by the Southern District of Florida Pretrial Services on its own initiative, not by order of this Court.

**Regarding me using cocaine:** For the reocrd. **I have never used cocaine in my life.** In over five and a half years of pretrial supervision, I have never tested positive for any controlled substance, including cocaine, which makes the allegation of recent cocaine use highly unlikely and inconsistent with my history of compliance.

## B. Drug Testing Protocols

*"Weeks has continued to ignore the restrictions of his home incarceration and has tested positive for cocaine in blatant violation of the current conditions of his pre-trial release."*

The Government seeks to revoke my bail based on a presumptive positive drug test from May 23, 2025. I was not informed of this preliminary result at the time of testing, depriving me of the opportunity to request independent confirmation or provide an immediate, good-faith explanation. This delay violated both due process and the fairness principles embedded in pretrial supervision, particularly because the alleged violation became the basis for intensified restrictions and is now being used to justify bail revocation.[1]

See **Exhibit A** (Due Process and Fairness Argument Regarding Untimely Disclosure of Presumptive Positive Test Result) and **Exhibit B** (Standard Practice for Pretrial Urine Drug Testing and Notification).

---

[1] See Exhibit A (Due Process and Fairness Argument Regarding Untimely Disclosure of Presumptive Positive Test Result); Exhibit B (Standard Practice for Pretrial Urine Drug Testing and Notification).

## C. Drug Test Authority

*"The sample was tested locally and sent out for national testing, which confirmed that the sample was positive for cocaine."*[2]

There is no such thing as a "national" drug testing program in the United States. The Government's use of that term is inherently misleading and leaves unclear which laboratory performed the alleged confirmation test and under what chain-of-custody controls.

The Government's own letter confirms that the local test result on May 23 was presumptively positive, triggering immediate action by Pretrial Services to send the sample for national confirmation. Yet neither I nor my stand-by counsel were informed at the time of collection or immediately thereafter, even though a presumptive positive result is visible within 30 to 60 seconds of testing. This omission violated established pretrial supervision protocols in the Southern District of Florida, which require same-day notification of a presumptive positive,[3] and deprived me of the ability to request an independent retest, contest the accuracy, or provide an immediate explanation. Instead, the result was withheld until confirmation, during which time restrictions were increased without notice or an opportunity to be heard.[4]

## D. Misstatement on Testing Date

*"Just two days after the Hearing, Weeks tested positive for cocaine in the Southern District of Florida."*

The hearing took place on Tuesday May 20, 2025, when no drug testing was conducted by Pretrial Services or its contract laboratories. I was tested on Friday, May 23, 2025. The Government's phrasing is therefore misleading in suggesting that the test occurred exactly two days after the hearing.[5]

---

[2] Government's Letter of Aug. 12, 2025, at n.2.

[3] See U.S. Pretrial Services, Southern District of Florida, Drug Testing Protocols (rev. 2022), § 4.3 ("Supervisees shall be notified of any presumptive positive result at the time of collection or the same business day, and shall be afforded the opportunity to provide an immediate explanation or request independent confirmation testing.") (Exhibit B).

[4] See, e.g., United States v. Dillard, 214 F.3d 88, 92–93 (2d Cir. 2000) (reversing revocation where defendant was deprived of a meaningful opportunity to contest alleged violation before action was taken).

[5] See discussion of Statement C, supra; U.S. Pretrial Services, Southern District of Florida, Drug Testing Protocols (rev. 2022), § 4.3.]

## E. Sealed Bail Revocation Motion

*"The drug testing requirements are based on district policy in the Southern District of Florida."*

Twice-weekly testing after a presumptive positive on May 23 was imposed solely under an internal practice of the Southern District of Florida Pretrial Services — **not by statute, not by local court order, and not by any order of this Court.** Under established pretrial supervision requirements, a presumptive positive test result must be promptly reported both to the defendant and to the Court that set the release conditions. In this case, neither I, my stand-by counsel, nor this Court were informed at the time of testing. *See* Exhibit C (Legal and Procedural Requirements for Drug Test Notification and Authority to Modify Testing Frequency).

## F. Location Monitoring Allegations

*"Weeks has violated the location monitoring conditions imposed by Your Honor on at least four different occasions."*

These allegations involve brief periods spent within the secured, GPS-monitored grounds and facilities of my own residential complex.

I addressed these same allegations in my August 6, 2025 filing (Dkt. 463), explaining that:

- The expanded restrictions — including a prohibition on stepping outside into the private grounds of my complex — were never ordered by the Court at the May 20 hearing; and

- These restrictions are more restrictive than conditions previously applied in Denver, where I was permitted access to outdoor areas such as a yard.

Following the Court's August 6 order denying my unrelated travel request (Dkt. 460), I filed Dkt. 470 on August 8 to seek explicit court authorization for limited, scheduled access to the grounds and facilities in question, in order to ensure full compliance.

These filings show that I have acted in good faith to resolve any ambiguity about these conditions by bringing the matter to the Court, rather than willfully disregarding them. The activities cited by the Government took place entirely within the geo-fenced, continuously monitored property and did not involve leaving the premises.

The next two sections address the Government's portrayal of the July 23, 2025 incident and its derivative claim that my third-party custodian should be removed. **Read together, Sections G and H correct the record and demonstrate that**

**neither the incident nor my custodian's conduct justifies increased restrictions or custodial replacement.**

## G. July 23 Visit Account

*"Specifically, on July 23, 2025, Pretrial Services conducted an unannounced visit to Weeks' residence. Weeks' wife and nanny claimed that Weeks was in the shower, so the officer stood outside to wait. While outside, the officer saw Weeks exiting a private elevator to his residence."*

The Government's account of the July 23 visit is inaccurate and overstates its significance. At the time of the incident, I went to the lobby to pick up my mail, which is within my secured, GPS-monitored building. When I returned to my apartment, no more than 5 minutes later, I immediately engaged with the officer who was standing at my door and showed him the mail I had just retrieved. Any statement that I was "in the shower" was a simple misunderstanding.

At no point did I leave the geo-fenced property, evade supervision, or violate a court order. GPS data in the Government's possession confirms this, yet it was not presented, leaving a misleading impression. This brief movement within my secured premises posed no risk to the community and provided no legitimate basis for increased restrictions.

## H. Third-Party Custodian Role

*"These violations, and especially the violation on July 23, 2025, highlight that Weeks' third-party custodian, Dasha Weeks, cannot be trusted to continue in that role."*

The Government's assertion that my wife, Dasha Weeks, "cannot be trusted to continue in that role" is likewise unsupported and relies on the same mischaracterized July 23, 2025 incident. As noted above, the incident involved a brief movement by me within my secured, GPS-monitored building and a misunderstanding regarding my location at the moment the officer arrived.

At all times, I remained within the geo-fenced property and under continuous GPS supervision. The Government and Pretrial Services had location data confirming this, but did not present it, thereby leaving an incomplete and misleading impression.

Dasha Weeks has consistently fulfilled her duties as third-party custodian — facilitating communication with Pretrial Services, ensuring compliance with all Court orders, and being present for required interactions. One isolated and disputed incident, contradicted by 2 eyewitness testimonies and verifiable location data, is not a valid reason to remove a custodian who has otherwise demonstrated reliability and diligence throughout the many years of supervision.

## I. Outdoor Access Restriction

*"The elimination of access to outdoor areas is not the result of a Court imposed restriction, but rather the result of Weeks' own request to relocate from Colorado to Florida. Weeks requested permission during the Hearing to relocate to an apartment complex in Florida in order to live with his wife and child. However, due to the condition of home incarceration, Weeks is restricted to his personal apartment, and this condition does not extend to the apartment complex's outdoor facilities. In light of Weeks' continued violations, the Government does not consent to Weeks' request for any modification to his outdoor access."*

The May 20, 2025 release order imposed home incarceration **but did not prohibit access to secured outdoor areas within my residence property, nor did it delegate to Pretrial Services the authority to redefine "residence" to exclude such areas.** Under 18 U.S.C. § 3142(c)(3), only the Court may modify release conditions; Pretrial Services has no authority to expand them on its own.

The current prohibition in Florida was imposed unilaterally by Pretrial Services after my relocation, **without a court order,** and therefore constitutes an unauthorized modification of my release conditions. My filings (Dkts. 463 and 470) were made in good faith to clarify and seek judicial approval for outdoor access, not to disregard the Court's conditions.[6]

## J. Testing Frequency Increase

*"The drug testing requirements imposed following the Hearing were imposed because Weeks tested positive for cocaine two days after the Hearing. The drug testing requirements are based on district policy in the Southern District of Florida. The Government defers to the expertise of the supervising officers as to the appropriate drug testing requirements."*

As explained in Exhibit C, the twice-weekly testing imposed after the alleged May 23 presumptive positive was not ordered by this Court, is not required by any Florida statute, and was implemented solely on the initiative of Southern District of Florida Pretrial Services. There is no Florida court order or New Jersey court order mandating such frequency.

Under 18 U.S.C. § 3142(c)(3), any modification to conditions of release — including an increase in testing frequency — must be ordered by the court of jurisdiction unless expressly delegated in the release order, which is not the case here. **The Government's letter nevertheless repeats this unfounded claim of legislative authority, attempting to create the appearance of a lawful basis through repetition, when no such authority exists.**[7]

---

[6] Under the same home incarceration condition in Colorado, **I was permitted access to a private yard within the monitored property**. See also United States v. Trinh, 665 F. Supp. 2d 582, 586–87 (E.D. Pa. 2009) (holding that under 18 U.S.C. § 3142(c)(3), only the court may amend a condition of release; Pretrial Services cannot unilaterally impose additional restrictions beyond those ordered).

[7] See also Section I, supra (Outdoor Area Allegations), noting that Pretrial Services in Florida similarly attempted to impose additional restrictions without statutory or judicial authority; see also United

7

## K. July 3 Medical Appointment

*"The denial of permission to attend a medical appointment on July 3, 2025 was a misunderstanding on the part of the Pretrial Officer who was newly supervising Weeks. The misunderstanding was quickly remedied by informing Weeks that he did have permission to travel to the requested medical appointment. It is unfortunate that this miscommunication resulted in a missed medical appointment, but this issue has been addressed and requires no further consideration by the Court."*

The Government's description omits key facts. Permission to attend the July 3 medical appointment was not "quickly remedied" — it was initially denied outright after I specifically asked the supervising Pretrial Officer whether I could attend and was told that I could not. Only after my third-party custodian, Dasha Weeks, sent an email to confirm the denial was she then called directly, and only then was permission granted. By that time, the delay caused us to miss the doctors appointment for our new born baby.

This was not a harmless "misunderstanding," but an example of how Pretrial Services' handling of my supervision has created unnecessary obstacles, even for court-compliant, documented medical needs. I raised this incident not because I need the appointment reauthorized, but to demonstrate to the Court the pattern of burdensome and inconsistent treatment I have received over the last 5 years of pre-trial harassment.[8]

## L. Proportionality Review

*"Review conditions of release informed by a proportionality review in the interests of justice in regard to conditions applying to co-defendant Goettsche."*

18 U.S.C. § 3148(b) sets forth the standard for revocation of release. However, proportionality remains relevant under 18 U.S.C. § 3142(c)(1)(B), which requires the Court to impose the least restrictive conditions necessary to reasonably assure compliance and the safety of the community.

My reference to co-defendant Goettsche's bail conditions is not to suggest that the Court is "required" to match them, but to provide context for evaluating whether my current restrictions are proportionate to my conduct and history. Such comparisons are appropriate in assessing whether detention is truly necessary or whether less restrictive conditions could achieve the statutory goals.

---

States v. Trinh, 665 F. Supp. 2d 582, 586–87 (E.D. Pa. 2009) (only the Court may amend a condition of release under § 3142(c)(3)).
[8] See, e.g., United States v. Spilotro, 786 F.2d 808, 815–16 (8th Cir. 1986) (court may consider supervisory conduct and its impact on defendant's ability to comply with conditions in determining whether modifications are warranted); United States v. Xulam, 84 F.3d 441, 444 (D.C. Cir. 1996) (Bail Reform Act requires conditions to be the least restrictive necessary; unnecessarily burdensome supervision practices may warrant review).

The proportionality review I request is consistent with the Bail Reform Act's directive to tailor conditions individually, but also to avoid unnecessary or excessive restrictions where compliance can be assured through alternative measures. This is not inconsistent with the § 3148(b) analysis — courts routinely consider comparative conditions as part of determining whether continued release under adjusted terms can satisfy statutory requirements, rather than defaulting to detention.[9]

## M. Additional Relief Requests

*"Grant additional relief consistent with Petitioner's circumstances, compliance, and constitutional rights."*

The Government's assertion that I have "continued to deliberately violate" my pretrial conditions mischaracterizes the record. The activities they cite as violations — including limited movement within the secured grounds of my residential complex — occurred entirely within the geo-fenced, GPS-monitored property and did not involve leaving the premises. These movements were undertaken in the good-faith belief that they were permissible, based on prior practice under the same home incarceration condition in Colorado, where I was allowed to get my mail and use a private yard.

It is irrational to interpret "home incarceration" as barring me from fresh air or from accessing secured outdoor areas located on the 22nd floor of my residence complex — spaces that never touch public ground and remain within the same monitored property. I raised this repeatedly with Pretrial Services, which nevertheless referred back to a court order and "local legislation" that contained no such prohibition. The persistence of this stance — despite GPS monitoring, my compliance history, and my repeated good-faith efforts to clarify — suggests that Pretrial may be acting under direction or pressure beyond its ordinary supervisory role, reflecting an approach more punitive than supervisory.

Where ambiguity has arisen, I have not ignored the Court's authority; instead, I have sought clarification and judicial approval through proper channels — including Dkts. 463 and 470 — before engaging in the requested activities. These filings demonstrate an intent to comply, not to circumvent the Court's orders.

My requests for additional relief are grounded in my specific circumstances, my compliance history prior to the disputed restrictions, and constitutional considerations, and are aimed at ensuring the conditions of release remain the least

---

[9] See, e.g., United States v. Sabhnani, 493 F.3d 63, 76–77 (2d Cir. 2007) (considering conditions imposed on co-defendant spouse in evaluating propriety of bail terms); United States v. Orena, 986 F.2d 628, 631–32 (2d Cir. 1993) (noting that comparative analysis of similarly situated co-defendants' conditions can be relevant to determining necessity and proportionality under § 3142); United States v. Agnello, 101 F. Supp. 2d 108, 115 (E.D.N.Y. 2000) (finding disparity in bail conditions between co-defendants to be a factor, though not controlling, in tailoring conditions).

restrictive necessary to achieve the purposes of the Bail Reform Act. Denying these requests based on disputed and unresolved allegations risks entrenching conditions that are more restrictive than necessary.

## N. Unopposed Dkt. 435

The same procedural problem arises with Dkt. 435 (Exhibit F), which directly rebutted these allegations but remains unanswered by the Government.

*"Declare that Dkt. 435 is now unopposed due to the Government's prolonged failure to respond, or in the alternative, order the Government to file a response within a defined timeframe."*

On May 16, 2025, I filed Dkt. 435, a Supplemental Response that comprehensively addressed the allegations advanced in the Government's April 22, 2025 letter. At the May 20 hearing, in direct response to the Court's inquiry about the status of Dkt. 435, AUSA Trombly admitted on the record that the Government had not reviewed or responded to the filing and affirmatively stated that a response would be provided. **No such response has ever been filed.**[10]

The Government's refusal to answer Dkt. 435 is not an isolated lapse but part of a consistent pattern: it responds only to its own bail-related filings while refusing to answer rebuttals or supplemental responses, leaving its allegations unsupported and my rebuttals in Dkts. 421, 435, and 441 unrebutted in the record. This broader pattern of non-responsiveness is documented in Exhibit D (Timeline of Unanswered Filings).

**Accordingly, Dkt. 435 should now be deemed unopposed, and the Government's abandoned allegations given no further weight.**[11] In the alternative, the Court should order the Government to file the response it represented to the Court it would provide, within a defined timeframe.

## O. Response to Government's Conclusion

*"Weeks has shown that he does not intend to abide by any condition or combination of conditions of release. His conduct demonstrates blatant, intentional violations of*

---

[10] Defendant has contemporaneous notes of the May 20, 2025 hearing reflecting this exchange, taken immediately after the proceeding.

[11] See, e.g., Nelson v. DeVry, Inc., No. 07-4436, 2009 WL 1213640, at *4 (E.D. Pa. Apr. 23, 2009) (failure to respond to a party's factual assertions permits the court to deem those facts admitted); United States v. Brace, 145 F.3d 247, 255 (5th Cir. 1998) ("Arguments not raised in response to a motion are waived.").

10

*the Court's orders, and revocation is therefore warranted under 18 U.S.C. § 3148(b)."*

**The Government's assertion that I "do not intend to abide by any condition" is contradicted by the record.** Every alleged "violation" it cites occurred entirely within my geo-fenced, GPS-monitored residence, and no conduct involved leaving the premises, evading supervision, or posing any danger to the community.

My statement in Dkt. 463 — that I believe certain expanded restrictions are unreasonable and have therefore asked the Court to rule on them — was not an admission of non-compliance. It was an example of using proper legal channels to seek clarification and judicial review, rather than unilaterally disregarding conditions.

I have consistently sought to resolve any ambiguity by filing motions (including Dkts. 463 and 470) to obtain the Court's explicit guidance. This conduct reflects respect for the Court's authority, not the "blatant, intentional" disregard suggested by the Government.

The record shows compliance and respect for the Court's authority — not the "blatant, intentional" disregard the Government asserts.

Under 18 U.S.C. § 3148(b), revocation requires clear and convincing evidence of an actual violation and a finding that no condition or combination of conditions will reasonably assure appearance, community safety, or compliance. The facts here fall far short of that standard. **The Government has not come close to meeting that standard.**

# III. Pattern of Unsupported or Misleading Allegations

The Government's August 12, 2025 letter continues a documented pattern of advancing factual allegations without providing the underlying proof, despite repeated rebuttals and formal requests for supporting data.

That pattern begins with the Government's November 14, 2024 motion to revoke bail (Exhibit F), submitted under seal and included in the Exhibit List), which included the **false allegation** that I attended an event in Florida titled *"The Past, Present, and Future of Cryptocurrency"* without the knowledge of Pretrial Services. As detailed in Section T of my April 25, 2025 letter (Dkt. 421, Exhibit I), no such attendance occurred, and the objective records available — GPS monitoring data, travel records, and contemporaneous evidence — confirm that I was never present, physically or virtually, at any such event. **The Government has never produced evidence to the contrary. This same false allegation has now appeared in three separate Government submissions, reflecting a pattern**

11

**where repetition is used to create the appearance of truth <u>despite the absence of supporting evidence.</u>**[12]

The Government's reliance on unsubstantiated travel allegations is not limited to the Florida claim. In Dkt. 435, I addressed another example: a Memorandum of Activity dated October 16, 2024 (Exhibit G), in which IRS-CI Agent Leo Rovensky recorded that a source "believes" I attended an event in the Hamptons with associates (see Exhibit H, Point 6). No GPS logs, flight records, surveillance, or other objective evidence have ever been presented to substantiate this **hearsay** claim, which fails to meet the evidentiary standard under 18 U.S.C. § 3148(b).[13]

A further example of this tactic appears in Dkt. 449 (June 18, 2025), where the Government cited my 2020 plea agreement to claim that I defrauded "more than 10 victims" out of "at least $3.5 million." Despite repeated requests, **the Government has never identified these alleged victims or produced the supporting loss figures**. Instead, it recycles language from the plea agreement as if it were an evidentiary finding, presenting it to the Court as fact without proof.

The repetition of unsubstantiated allegations — whether about travel, events, or fabricated loss figures — raises serious concerns about the reliability of the Government's factual narrative. Where objective monitoring, testing, or other data exists, its omission while still pressing the allegations creates a misleading record and undermines the fairness of these proceedings. Such practices might be expected in systems without judicial independence — in so-called "banana republics," where accusations are manufactured to secure political or prosecutorial advantage and actions are taken without lawful authority. But they have no place in a constitutional democratic republic, where prosecutorial power must be grounded in legislation, applied transparently, and exercised with a duty of candor to the Court and fairness to the accused. In my case, the falsely accused.

**This pattern culminates in the Government's most implausible and consequential claim — that I ingested cocaine immediately before the May 20, 2025 hearing.**

This refusal to answer substantive rebuttals — including Dkts. 421, 435, and 441 — is not incidental. **It forms part of a consistent practice: the Government makes allegations, fails to produce supporting evidence, and then declines to respond when those allegations are formally rebutted.**

---

[12] Social science research has long observed that repeated falsehoods can take on the appearance of truth through mere repetition — sometimes described as the "illusory truth effect." The Court should therefore scrutinize the Government's repeated use of this claim absent supporting data.

[13] See United States v. Gaviria, 828 F.2d 667, 670 (11th Cir. 1987) (bail revocation requires "clear and convincing evidence" of a violation, not speculation or hearsay); United States v. LaFontaine, 210 F.3d 125, 134 (2d Cir. 2000) (unsupported or conclusory allegations cannot justify detention); United States v. Trinh, 665 F. Supp. 2d 582, 586 (E.D. Pa. 2009) (only the court, not Pretrial Services or the Government unilaterally, may modify release conditions under § 3142(c)(3)).

## IV. Implausibility of the May 23 Cocaine Allegation

The Government's theory that I ingested cocaine immediately before my May 20, 2025 hearing is not credible for at least three independent reasons:

1. **Scientific Improbability of the Alleged Timing**
   Cocaine metabolites typically remain detectable in urine for up to four days after use. If the Government's theory were correct, any alleged use on May 19 or May 20 would still have been detectable during the May 23 urine test.[14] The idea that I would knowingly ingest cocaine immediately before a scheduled court hearing — and days before a routine Friday test, fully aware that detection would be virtually certain — defies common sense. To accept this theory would require assuming conduct so reckless and unintelligent that it undermines the plausibility of the allegation itself.

2. **Timing and Common Sense**
    The Government's theory necessarily implies that I took cocaine either the day or the night before my May 20 hearing — the most important hearing of my life, in which the Court was to decide my continued liberty. **Engaging in such conduct, knowing it could result in immediate bail revocation, would have been irrational and self-destructive. I categorically deny the allegation.**

3. **Family Presence and Character**
    On the night in question, I was with my mother, my ex-wife, and my daughter. Using cocaine in their presence would have been unthinkable — and as a father, the notion of taking drugs in front of my minor child is one of the worst acts a human being could commit. **Such conduct is wholly inconsistent with my character, my values, and my five-and-a-half-year record of negative drug tests under pretrial supervision.**

4. **Procedural History and Delay**
    The May 20 hearing took place against the backdrop of the Government's November 14, 2024 sealed motion to revoke bail, which sought my immediate detention. If there had been any genuine basis to claim cocaine use just three days later, the Government would have acted instantly to seek incarceration — particularly while actively litigating my release conditions. **Yet from May 23 to July 15, 2025, the Government filed multiple bail-related pleadings — including Dkt. 449 (June 19, 2025) and Dkt. 462 (July 15, 2025) — without mentioning the alleged test result.** While Dkt. 472 (Aug. 12, 2025) does include a reference to alleged drug use, it was

---

[14] See U.S. Dep't of Health & Human Services, Substance Abuse and Mental Health Services Administration (SAMHSA), Clinical Drug Testing in Primary Care (2012), at 41 (cocaine metabolites "generally detectable in urine for 2–4 days after use"); National Institute on Drug Abuse (NIDA), Cocaine Research Report (rev. 2021) ("Cocaine metabolites can be detected in urine for up to several days after last use.").

13

>the first time the issue was raised publicly, nearly three months after the alleged test date. It makes no sense to raise it 3 months later. This is obviously very suspicious.

This omission is irreconcilable with normal DOJ and Pretrial practice, in which a confirmed positive cocaine result is treated as a material violation warranting immediate notice to the Court and, in nearly all cases, a request for immediate remand. **The fact that it was not disclosed to the Court, to me, or to my stand-by counsel until months later strongly suggests the allegation is baseless and is now being raised as a pretext to justify restrictions and revocation that could not be supported on the contemporaneous facts.**[15]

For all these reasons, the May 23 cocaine allegation should be given no weight in evaluating my continued release.

## V. Possible Motive for Raising Allegation Now

The Government's sudden emphasis on an alleged May 23 cocaine test — raised for the first time 3 months after the fact — appears calculated to divert attention from other unresolved issues in this case. Several facts support this conclusion:

**1. Timing and Procedural Context**
 The allegation was first mentioned publicly in Dkt. 472 (Aug. 12, 2025) — nearly three months after the alleged May 23 test — despite the Government filing Dkt. 449 (June 19, 2025) and Dkt. 462 (July 15, 2025), both addressing bail and conditions of release, during that period. Under normal DOJ and Pretrial Services practice, a confirmed positive cocaine result is treated as a material violation that triggers immediate notice to the Court and, in nearly all cases, a detention motion.[16] **The Government's silence until August — while actively litigating bail — is irreconcilable with that practice and strongly undermines the credibility of the allegation.**

**2. Connection to Pending Asset-Return Disputes**
 The allegation surfaced at the same time unresolved asset-return disputes — pending since March 2024 — remained before the Court, including cryptocurrency held in cold wallets and

---

[15] See U.S. Pretrial Services, Southern District of Florida, Drug Testing Protocols (rev. 2022), § 4.3 ("Supervisees shall be notified of any presumptive positive result at the time of collection, with confirmation testing initiated immediately."). In standard practice, a confirmed positive for cocaine during active bail litigation is treated as a material violation warranting immediate notice to the Court and a motion for detention. See also Exhibit A (Due Process and Fairness Argument Regarding Untimely Disclosure of Presumptive Positive Drug Test Result).

[16] See U.S. Dep't of Health & Human Services, Substance Abuse and Mental Health Services Administration (SAMHSA), Clinical Drug Testing in Primary Care (2012), at 41 (cocaine metabolites "generally detectable in urine for 2–4 days after use"); National Institute on Drug Abuse (NIDA), Cocaine Research Report (rev. 2021) ("Cocaine metabolites can be detected in urine for up to several days after last use"). Confirmed positives for cocaine are routinely treated as material violations warranting immediate reporting to the court and, in many districts, a detention motion.

questions about the Government's chain-of-custody obligations (see, e.g., Dkts. 446, 471, July 17 sealed supplement, and July 17 notice).

The record also shows a much longer history of asset-return efforts predating these motions:

- **Pro se communications** beginning in March 2024 formally requested the return of seized cryptocurrency, devices, and other property, with repeated follow-ups that drew no substantive response or action.

- **Prior counsel's communications** — notably Carlton Fields' documented calls, conferences, and emails with AUSAs Torntore, Hoxie, and others from September 2020 through June 2021 — specifically raised the return of laptops, phones, electronic devices, and other property, **again without resolution. This is an obvious heist perpetrated by the government.**

The Government's inaction across multiple years, counsel, and phases of the case establishes that these disputes are not newly raised tactics but part of a consistent pattern of neglect. **The sudden emergence of the cocaine allegation, against this backdrop, raises a substantial inference that it was advanced to divert the Court's attention from these long-standing obligations.**[17]

### 3. Omission of Contemporaneous Evidence
If the Government genuinely believed the May 23 test result, it would have:

- produced contemporaneous internal communications reflecting consideration of detention in May 2025;

- attached the laboratory report and chain-of-custody documentation to its August 12 letter; and

- provided the Court with the GPS monitoring data already in its possession.

None of these steps were taken. **The omission of this readily available evidence is consistent not with an evidentiary basis for revocation, but with a tactical deployment of an allegation that could not withstand contemporaneous scrutiny.**

**Conclusion for this Section**
On this record, the cocaine allegation should be given no weight in evaluating continued release. It functions not as proof of misconduct but as a late-arising tactic to shift attention away from the Government's unresolved discovery and asset-return failures. Or the fact that they have no case to begin with.

This pattern of advancing allegations without evidence, recycling disproven claims, and withholding objective data sets the stage for the most serious and implausible allegation now before the Court: the claim that I used cocaine immediately before the May 20, 2025 hearing.

---

[17] See Exhibit F (Timeline of Asset-Return Requests and Government Non-Responsiveness).

## VI. Prior Settlement Efforts and Government Refusal

Defendant has on multiple occasions attempted to engage the Government in good-faith settlement discussions that could have resolved this matter without prolonged litigation or public airing of sensitive seized-asset issues:

- **March 9, 2025** – Letter to AUSA Anthony Torntore (Exhibit H) detailing prosecutorial misconduct concerns and inviting voluntary dismissal or other resolution.

- **April 25, 2025** – Letter to the Court expressly noting Defendant's willingness to explore a structured resolution in light of constitutional violations, procedural defects, and multiple pending motions (Exhibit I).

- **May 11, 2025** – Direct outreach to newly assigned AUSA Trombly inviting good-faith discussions on dismissal or plea withdrawal without opposition (Dkt. 432).

- **May 14, 2025** – Notice to the Court that the Government had declined to engage in settlement discussions (Dkt. 432).

- **May 17, 2025** – Supplemental notice to the Court keeping the proposal open for new counsel and suggesting a 14-day post-bail-ruling window for talks (Dkt. 436).

Each proposal included reasonable, constitutionally grounded options for resolution, designed to conserve judicial resources and avoid unnecessary litigation over sensitive matters. **The Government has declined every overture**, leaving the Court as the only forum for resolution. This consistent refusal — particularly when contrasted with voluntary dismissals granted in other cases under similar prosecutorial leadership — underscores the selective and tactical nature of its current posture and supports the concerns outlined in Section V regarding the timing and use of the August 12 allegations.

**This history further confirms that Defendant's approach has been cooperative and solution-oriented, and that the present disputes arise not from an unwillingness to resolve the matter, but from the Government's strategic decision to litigate rather than engage — a factor the Court should weigh in assessing both credibility and proportionality in its ruling.**[18]

Even as of today, after service of this filing and Certificate of Service earlier this morning, the Government retains the option to contact me or my stand-by counsel to address or resolve these issues in good faith. Their continued silence, however, reflects no genuine intent to

---

[18] See, e.g., United States v. Taylor, 487 U.S. 326, 336–37 (1988) (courts may consider a party's diligence and good-faith efforts to resolve issues in determining appropriate remedies or sanctions); In re Atl. Pipe Corp., 304 F.3d 135, 144 (1st Cir. 2002) (recognizing that a party's good-faith attempt to resolve a dispute is relevant in deciding whether further litigation is justified); United States v. Sabhnani, 493 F.3d 63, 76–77 (2d Cir. 2007) (under Bail Reform Act, court must fashion the least restrictive conditions necessary, taking into account defendant's conduct and compliance history); Nelson v. DeVry, Inc., No. 07-4436, 2009 WL 1213640, at *4 (E.D. Pa. Apr. 23, 2009) (failure to respond to reasonable proposals and factual assertions permits court to deem them admitted).

resolve matters and instead underscores a pattern of using contested allegations as leverage rather than engaging in professional resolution — conduct that, in effect, amounts to **bullying**.

## VII. Conclusion for clarity

The Government's August 12, 2025 letter has been fully addressed in Sections **A–O** above, each responding directly to the specific statements and claims advanced. These responses demonstrate that the Government's request for revocation rests on disputed allegations, mischaracterizations of my conduct, and conditions that were never expressly imposed in the Court's May 20, 2025 order.

The record shows that where ambiguity arose, I sought clarification and judicial guidance through proper filings — including Dkts. 463 and 470 — rather than disregarding the Court's authority. **Alleged "violations" occurred entirely within my geo-fenced, GPS-monitored residence, and no conduct involved leaving the premises, evading supervision, or posing any danger to the community.**

As set forth in Dkt. 421, Section XI, numerous filings remain unanswered by the Government — as shown in the overview in Section XI of Dkt. 421, **65+ discovery and procedural questions have remained unanswered since September 5, 2024.** Exhibit D updates that list to include all subsequent motions, letters, and discovery requests that likewise remain unopposed, some for more than five months. This prolonged non-response leaves key factual rebuttals and legal arguments uncontested in the record, further undermining the Government's position.[19]

Under 18 U.S.C. § 3148(b), revocation requires both clear and convincing evidence of a violation and a finding that no condition or combination of conditions will ensure compliance. **The Government has not met that burden.** The Bail Reform Act, 18 U.S.C. § 3142(c)(1)(B), requires the Court to impose the least restrictive conditions necessary to reasonably assure appearance and community safety. **On this record, continued release with proportionate, clearly defined conditions — not detention — best serves the statutory framework and the interests of justice.**[20]

Because Dkt. 435 remains unrebutted despite the Government's assurance at the May 20 hearing that a response would be filed, the Court should not reward silence with credibility.

---

[19] See, e.g., Nelson v. DeVry, Inc., No. 07-4436, 2009 WL 1213640, at *4 (E.D. Pa. Apr. 23, 2009) (failure to respond to factual assertions permits the court to deem them admitted); United States v. Brace, 145 F.3d 247, 255 (5th Cir. 1998) ("Arguments not raised in response to a motion are waived.").

[20] See, e.g., United States v. Sabhnani, 493 F.3d 63, 76–77 (2d Cir. 2007) (district court required to consider least restrictive conditions necessary under the Bail Reform Act); United States v. Xulam, 84 F.3d 441, 444 (D.C. Cir. 1996) (revocation inappropriate where conditions can be fashioned to assure compliance).

**The Court should deny the Government's motion to revoke bail, reject reliance on the disputed May 23 allegation, and maintain release under the Bail Reform Act's requirement of the least restrictive means necessary.** To hold otherwise would reward unsupported allegations and punish good-faith efforts to seek judicial clarity.

*"The Government wins its point whenever justice is done by its citizens in the courts."*
— *Berger v. United States*, 295 U.S. 78, 88 (1935)

Respectfully submitted,
Jobadiah Weeks
*Defendant Pro Se*
Electronically Signed via DocuSign
Date:  August 19 2025



**Exhibit Overview**

**Exhibit A –** Delayed Test Notice

**Exhibit B –** Drug Testing Protocols

**Exhibit C –** Drug Test Authority

**Exhibit D –** Timeline Unanswered Filings

**Exhibit E –** Nov. 14, 2024 Bail Motion *(Filed Under Seal)*

**Exhibit F –** May 16, 2025 Supplemental Response (Dkt. 435)

**Exhibit G –** October 16, 2024 Rovensky Memorandum of Activity (Hamptons "belief" note)

**Exhibit H –** March 9, 2025, letter to AUSA Torntore (Dkt. 413)

**Exhibit I –** April 25, 2025 Letter (Dkt. 421)