# Exhibit A

Certified Hair-Follicle Toxicology Report (Labcorp, November 7, 2025) showing no controlled substances; includes full chain-of-custody certification.

**labcorp**

## HAIR CHAIN OF CUSTODY FORM

COPY 3 – DONOR (green)
596 P Revised 1/2008

Laboratory Corporation of America Holdings
1904 Alexander Dr., Research Triangle Park, NC 27709
69 First Ave., Raritan, NJ 08869

7207 North Gessner, Houston, TX 77040
1120 Main St., Southaven, MS 38671

Specimen Id No. 0613086051

0613086051

**STEP 1: TO BE COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address, Phone, Fax, I.D.No.:

REQUEST A TEST
8748 BRECKSVILLE RD # STE 120

BRECKSVILLE, OH 44141
P: (888)732-2348 F: (440)717-0540

B. MRO Name, Address, Phone, Fax:

34050290

C. Donor I.D.: 08/25/1981

D. Reason for Test: OTHER

E. Collection Site Address.:
LABCORP - 93532
100 NW 170TH STREET SUITE 205
NORTH MIAMI BEACH, FL 33169

Collector Phone No. (305)651-2788

Collector Fax No. (305)770-0256

F. Donor Identification Verified By: PHOTO ID

**STEP 2: TO BE COMPLETED BY COLLECTOR**

Specimen collected from head? YES

REMARKS:

**STEP 3: TO BE COMPLETED BY COLLECTOR AND DONOR**   Collector affixes bottle seal(s) to container(s). Collector dates seal(s). Donor initials seal(s)

**STEP 4: TO BE COMPLETED BY COLLECTOR AND DONOR**

G. Daytime Phone: (720)720-6535          Evening Phone: (720)720-6535          Date of Birth (Mo/Day/Yr): 08/25/1981

Donor Sex : m

H. TEST(S) REQUESTED BY EMPLOYER: 806698

I authorize the collection of this specimen for the purpose of a drug screen. I acknowledge that the specimen container(s) was/were sealed with tamper-proof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen container(s) is correct. I authorize the laboratory to release the results of the test to the company identified on this form or its designated agents.

Jobadiah Weeks

Donor's Name (First MI Last)                    Signature of Donor                    11/04/2025
                                                                                       Month Day Year

**STEP 5: CHAIN OF CUSTODY-INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

I certify that the specimen given to me by the donor identified on this form was collected, labeled, sealed, and released to the Delivery Service noted in accordance with applicable requirements.

X
Signature of Collector
Nativida Desir
Collector's Name (First Last)

Collection Time: 12:52 PM EST

Collection Date: 11/04/2025

SPECIMEN BOTTLE(S) RELEASED TO:

Labcorp Courier
Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB:

X
Signature of Accessioner

(Print) Accessioner's Name (First, MI, Last)          Date (Mo/Day/Yr)

Primary Specimen
Bottle Seal Intact
[ ] Yes
[ ] No, enter remark below

SPECIMEN BOTTLE(S) RELEASED TO:

## Patient Report

**labcorp**

**Specimen ID:** 309-582-2699-0    **Phone:** (888) 732-2348    **Rte:** MA
**Control ID:** 0613086051

**WEEKS, JOBADIAH**

Request A Test, LTD.
6900 S Edgerton Road Suite 100
BRECKSVILLE OH 44141

| **Patient Details** | **Specimen Details** | **Physician Details** |
|---|---|---|
| **DOB:** | **Date collected:** 11/04/2025 1252 Local | **Ordering:** |
| **Age(y/m/d):** 044/02/10 | **Date received:** 11/05/2025 | **Referring:** |
| **Gender:** N | **Date entered:** 11/05/2025 | **ID:** |
| **Patient ID:** 08251981 | **Date reported:** 11/07/2025 0106 ET | **NPI:** |

**General Comments & Additional Information**
Reason for testing: Other:  ME
Collectors Name:        .
Collectors Phone #:   3056512788
MRO Name from CCF:

**Clinical Info:** 08251981
**Clinical Info:** CCU:0338452435 H-00745797
**Clinical Info:** $06 ME   N

**Ordered Items**
Chain-of-Custody Protocol; Hair Standard

| TESTS | RESULT | FLAG | UNITS | REFERENCE INTERVAL | LAB |
|---|---|---|---|---|---|
| **Chain-of-Custody Protocol** | | | | | |
| | Performed | | | | 01 |
| **Hair Standard** | | | | | |
| Cocaine | Negative | | ng/10mg | 5.0 | 02 |
| OPIOIDS | Negative | | ng/10mg | 2.0 | 02 |
| Phencyclidine (PCP) | Negative | | ng/10mg | 3.0 | 02 |
| Amphetamines | Negative | | ng/10mg | 5.0 | 02 |
| Marijuana | Negative | | pg/10mg | 10.0 | 02 |

| 01 | JD | Labcorp OTS Southaven | Dir: Lance Presley, PhD |
|---|---|---|---|
| | | 1120 Main Street, Southaven, MS 38671-1428 | |
| 02 | PYSCA | Psychemedics | Dir: Marvin Pietruszka, MD |
| | | 5832 Uplander Way, Culver City, CA 90230-6608 | |

For inquiries, the physician may contact **Branch: 800-762-4344 Lab: 662-342-1286**

This document contains private and confidential health information protected by state and federal law.
If you have received this document in error, please call 662-342-1286

© 1995-2025 Laboratory Corporation of America® Holdings
All Rights Reserved - Enterprise Report Version: 1.00



# Exhibit B

Attachment A: Proposed Bail-Condition Modifications and Government Position Table.

Attachment A – Proposed Bail-Condition Modifications & Government Position

*The following proposed modifications reflect the same structure and safeguards presently applied to compliant defendants with similar risk profiles, and are submitted for the Government's position in preparation for a joint filing.*

| # | Category | Proposed Modification / Clarification | Government Position (☐ check one) |
|---|----------|---------------------------------------|-----------------------------------|
| 1 | Procedural Correction | Confirm that any restrictions imposed after May 20, 2025 by Pretrial Services or the Government without a court order are rescinded pending record clarification. | ☐ No Opposition ☐ Partial Consent ☐ Opposed |
| 2 | Monitoring / Supervision | Remove GPS / ankle-monitoring requirement and revert to standard Pretrial reporting conditions. | ☐ No Opposition ☐ Partial Consent ☐ Opposed |
| 3 | Custodian Requirement | Eliminate the third-party custodian obligation; maintain direct Pretrial oversight only. | ☐ No Opposition ☐ Partial Consent ☐ Opposed |
| 4 | Curfew / Home Confinement | Terminate home-confinement or curfew hours and substitute standard travel-approval conditions. | ☐ No Opposition ☐ Partial Consent ☐ Opposed |
| 5 | Internet / Technology Use | Authorize one Pretrial-approved internet-enabled device for legal, employment, and family communication purposes; permit monitored email access. | ☐ No Opposition ☐ Partial Consent ☐ Opposed |
| 6 | Travel Scope | Permit travel within Florida and Colorado, where my daughter and parents reside, subject to 7-day prior notice and itinerary approval by Pretrial Services. | ☐ No Opposition ☐ Partial Consent ☐ Opposed |

| | | | |
|---|---|---|---|
| 7 | Drug Testing Frequency | Reduce testing frequency from up to eight times per month to monthly, absent cause for increase. | ☐ No Opposition ☐ Partial Consent ☐ Opposed |
| 8 | Family / Medical Access | Restore permission for attendance at pediatric, medical, and family-related appointments under Pretrial notice. | ☐ No Opposition ☐ Partial Consent ☐ Opposed |
| 9 | Parity with Co-Defendant | Apply proportionality comparable to relief granted to co-defendant Goettsche (Dkt. 456). | ☐ No Opposition ☐ Partial Consent ☐ Opposed |
| 10 | Reporting / Compliance | Pending resolution of ECF 497, temporarily suspend the most restrictive conditions subject to ongoing Pretrial monitoring. | ☐ No Opposition ☐ Partial Consent ☐ Opposed |
| 11 | Interim Relief | Pending resolution of ECF 497, temporarily suspend the most restrictive conditions subject to Pretrial monitoring. | ☐ No Opposition ☐ Partial Consent ☐ Opposed |
| 12 | General Statement | Confirm that the Government reserves the right to revisit these positions following the Court's ruling on ECF 497. | Acknowledged |

# Exhibit C

Email dated October 13, 2025, subject line "Proposed Joint Submission – Supplemental Motion to Modify Pretrial Release Conditions (ECF 497 Reference)."



**Silence Weeks <silenceweeks1@gmail.com>**

## Proposed Joint Submission – Supplemental Motion to Modify Pretrial Release Conditions (ECF 497 Reference)
1 message

**Silence Weeks** <silenceweeks1@gmail.com>                                    Mon, Oct 13, 2025 at 2:32 PM
To: Trevor.Chenoweth@usdoj.gov, Robert.Moore3@usdoj.gov
Cc: Ernesto Cerimele <ernesto@klingemanlaw.com>

Dear AUSAs Moore and Chenoweth,

Pursuant to Judge Cecchi's directive that the parties confer before filing, I am attaching a short Government Position Table for your convenience.

This proposed filing follows from the Court's October 8, 2025 Order (ECF 497), which addressed several pending matters, including my earlier motions concerning bail and pretrial release conditions. Because that ruling incorporated restrictions based on an incomplete Government submission (ECF 417, which omitted its referenced exhibit), and because the factual record has since materially changed through sustained compliance and the passage of time, I am seeking to ensure that any supplemental review proceeds on a complete and accurate record.

Addressing these clarifications through a joint submission would, in my view, facilitate the Court's review and likely avoid the need for a separate hearing in November—consistent with the Court's preference to decide such matters on the papers when possible.

Since prior communications have not been conducted directly with me, you may also discuss or coordinate this matter with Mr. Ernesto Cerimele, who is assisting me in this process and may act as an intermediary to streamline the conferral and ensure clarity under Fed. R. Evid. 410 protections.

Please indicate by Friday, October 17, 2025, the Government's position on each requested modification (No Opposition / Partial Consent / Opposed), or propose any edits so that we may finalize a joint submission in compliance with the Court's order.

Respectfully,
Jobadiah Sinclair Weeks (Pro Se)



**13102025 Bail options .pdf**
106K

# Exhibit D

Email dated October 2, 2025, subject line "Request for May 23, 2025 Lab Report & Chain of Custody."

 **Silence Weeks <silenceweeks1@gmail.com>**

---

## Request for May 23, 2025 Lab Report & Chain of Custody
1 message

---

**Silence Weeks** <silenceweeks1@gmail.com>                                   Thu, Oct 2, 2025 at 9:59 PM
To: Robert.Moore3@usdoj.gov, Trevor.Chenoweth@usdoj.gov
Cc: Ernesto Cerimele <ernesto@klingemanlaw.com>

Dear AUSA Mr. Moore and AUSA Mr Chenoweth,

I have filed today's letter motion to Judge Hammer regarding the upcoming November 6 hearing (Dkt. 470). To prepare fairly, I ask your assistance in producing the May 23, 2025 lab report, chain-of-custody documentation, and any confirmatory testing results.

Clarity on this issue before the hearing will benefit all parties and avoid unnecessary disputes in court.

Thank you for your cooperation.

Respectfully,
Jobadiah Sinclair Weeks

---

**2 attachments**

 **LETTER 02102025 Motion Lab Tests .pdf**
130K

 **ORDER 02102025 Motion Lab Tests .pdf**
76K

# Exhibit E

Email dated November 4, 2025, subject line "Invitation to Correct Docket Reference to May 23 Toxicology Claim."

 

Silence Weeks <silenceweeks1@gmail.com>

---

## Request to Withdraw Incorrect Cocaine Allegation from Record

1 message

---

**Silence Weeks** <silenceweeks1@gmail.com>                    Tue, Nov 4, 2025 at 6:14 PM
To: Robert.Moore3@usdoj.gov, Trevor.Chenoweth@usdoj.gov
Cc: Ernesto Cerimele <ernesto@klingemanlaw.com>

Dear Mr. Chenoweth and Mr. Moore,

I hope this message finds you well.

In reviewing the docket and related filings, I noted that the record still contains a reference to alleged cocaine use. Independent laboratory testing, conducted through a **hair analysis**, has confirmed that this allegation is factually incorrect.

I would appreciate it if the Government could review this entry and take appropriate steps to withdraw or correct the reference so that the docket accurately reflects the verified evidence. My only objective is to ensure that the official record remains factually consistent.

Please let me know if you would like a copy of the laboratory report or prefer that it be filed through CM/ECF for the Court's notice. I am confident this can be resolved administratively without further proceedings.

Thank you for your attention and cooperation.

Kind regards,
**Jobadiah Sinclair Weeks**
Pro Se Defendant

# Exhibit F

Memorandum on Record Misstatements and Clarifications

Relating to Government's January 15, 2020 Bail Filing (ECF 24)

**Exhibit F – Memorandum on Record Misstatements and Clarifications Relating to Government's January 15 2020 Bail Filing (ECF 24) (Supplement to Dkt 501 Submission)**

**Jobadiah Sinclair Weeks**
Crim. No. 19-877 (CCC)

Table of contents

I. INTRODUCTION                                                                                    1
II. MISSTATEMENTS AND CLARIFICATIONS                                                              3
    A. 2015 Gaw Miners Discussion (ECF 24 p. 12)                                    3
    B. January 2016 Mining-Expense Chat (ECF 24 p. 13)                              3
    C. 2016–2018 Press-Release / VPN / Risk Messages (ECF 24 p. 14)               4
    D. 2017 "Golden Egg" Conversation (ECF 24 p. 15)                               5
    E. 2016 "Stinkin Thinkin" Motivational Chat (ECF 24 p. 16)                    5
    F. 2016 "Antarctica Trip" Payment Instruction (ECF 24 p. 17)                  6
    G. 2017 "Meme" Reference (ECF 24 p. 17)                                        6
    H. April 19, 2019 IRS-CI Meeting (Ritz-Carlton, Arlington VA) (ECF 24 p. 18)  7
    I. 2018 Operational Payment via Octagon Exchange (ECF 24 pp. 18–19)          7
    J. 2017 Brokerage Chat ($1 M Jakarta → Singapore) (ECF 24 p. 19)             8
    K. 2017 Hardware-Wallet References (ECF 24 p. 19)                             9
    L. 2015 "Atlantis / Madeira" Micro-Nation Chat (ECF 24 p. 23)                9
    M. Alleged "Mexican Passport" Chat (ECF 24 pp. 33–34)                        10
    Summary Table – Section II Overview                                           11
III. BROADER MISSTATEMENTS AFFECTING BAIL DETERMINATION                                          12
IV. CONCLUSION                                                                                    14

**I. INTRODUCTION**

Defendant Jobadiah Sinclair Weeks respectfully submits this memorandum to clarify the record concerning several communications cited in the Government's *Opposition to Bail* (ECF No. 24, filed January 15, 2020). That filing served as the factual foundation for the Government's subsequent bail arguments and, by citation and repetition, for portions of the Court's later *Opinion and Order* addressing Defendant's pre-trial release and the alleged "August 12, 2020 proffer session." As the record now confirms, no such proffer occurred; the reference originated from mis-dated materials first introduced in ECF 24.

The same mischaracterizations also informed the Government's later narrative of Defendant's role within the BitClub Network, which remains at issue in Defendant's *Motion to Compel Discovery on Selective Prosecution* (ECF No. 403, filed March 3, 2025). Subsequent production of Facebook business records and related correspondence demonstrates that many quotations in *ECF 24* were mis-dated, incomplete, selectively excerpted, or not present in any verified source record. Because those excerpts were later cited as evidence of guilt, intent, and flight risk, correcting them is essential to any fair assessment of Defendant's conduct and eligibility for release.

Each subsection below reproduces the relevant language as it actually appears in the underlying records and provides a concise explanation of its context, so that the Court's evaluation of prior filings—particularly those relying on ECF 24—rests on a complete and reliable evidentiary record.

**Procedural Context**

ECF No. 24 was the Government's first substantive filing in this case and formed the factual and rhetorical basis for Defendant's pretrial detention. At that stage, the indictment contained only generalized allegations against the broader BitClub Network, and ECF 24 supplied the specific narrative positioning Defendant as a principal actor rather than a peripheral promoter. That characterization, unsupported by later discovery, guided the detention decision and influenced subsequent plea discussions. Accordingly, ensuring the accuracy of ECF 24's underlying record is central to any fair reassessment of Defendant's custodial history and the integrity of the plea process.

Because ECF 24 was the Government's first detailed presentation of Defendant's role, its accuracy bears directly on the fairness of all subsequent determinations of custody and plea.

## II. MISSTATEMENTS AND CLARIFICATIONS

The following communications and descriptions formed the evidentiary core of ECF No. 24—the Government's first substantive filing identifying Defendant as a principal within the BitClub Network and supporting pre-trial detention. Correcting these passages ensures the Court's analysis rests on a complete and accurate record.

### A. 2015 Gaw Miners Discussion (ECF 24 p. 12)

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| Defendant "acknowledged that BitClub Network lacked transparency and compared it to GAW Miners." | "We really should have sep stats and oct stats and nov stats… It's not transparent enough for the big big money guys… want to avoid [SEC intervention] at all costs." | Substantially accurate quotation but mis-characterized purpose. | Conversation urged better documentation and investor reporting, not admission of illegality. |
| Defendant "sent article about GAW Miners SEC action." | No link or article referenced in the chat. | Not supported by the record. | The citation was inferred, not sourced. |

The discussion reflects a legitimate concern for business transparency and investor confidence, as well as early awareness of regulatory expectations—not acknowledgment of wrongdoing or deception.

### B. January 2016 Mining-Expense Chat (ECF 24 p. 13)

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| Defendant learned BitClub "was hiding mined earnings." | "So… We found 18 blocks (≈ 450 BTC)… Correct?" / "Basically yes… It isn't 100 % [after power costs] but basically 100 % of what they see." | Accurate quotation, mis-interpreted. | Routine accounting discussion about electricity expenses, not concealment. |
| "We try to keep that off bitclubpool.com" shows intent to hide profits. | "Yes… But we try to keep that off bitclubpool.com." | Context omitted. | Reference was to internal data displays, not secrecy toward investors. |

The exchange addresses accounting details about electricity costs and share calculations. It reflects ordinary operational discussion, not any effort to conceal or misrepresent mining results.

### C. 2016–2018 Press-Release / VPN / Risk Messages (ECF 24 p. 14)

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| Defendant downplayed regulatory risk ("No need for joint press release… legit MLM vs Ponzi"). | "No need for a joint press release 🙂 We understand there are a lot of people who don't know the difference between a legit MLM and a Ponzi and we definitely don't want to hurt your brand in any way." | Quoted accurately but selectively characterized. | The message shows caution and respect for the vendor's legal concerns. Defendant contrasts a legitimate Bitcoin-mining operation with a Ponzi scheme—acknowledging, not minimizing, regulatory scrutiny. By omitting this context, ECF 24 reversed the statement's meaning. |
| Defendant told investor to use VPN to avoid U.S. rules. | "You can use a VPN to enter the internet most anywhere." | Accurate text but mis-dated; educational only. | The statement appears once in a 2017 chat with a U.S. contact who asked what a VPN was. Defendant's reply is a general explanation of internet use, not an instruction to evade U.S. law or policy. |
| Defendant warned U.S. citizens about "risk with BitClub." | "Don't give them a reason to go after you. U.S. Citizens are at higher risk right now with BitClub." | Quoted accurately but mis-contextualized. | The exchange concerned Elliot's own marketing content, not BitClub's operations or investor communications. Defendant cautioned her against publishing material that might draw regulatory attention to U.S. participants—a compliance warning, not a discussion of BitClub business. |

All three statements are benign and at least two are mis-dated by several months. The VPN reference in particular reflects a basic internet-security explanation; virtual private networks are routinely used worldwide by businesses, journalists, and ordinary users for privacy and data protection. Nothing in the record suggests that Defendant used or recommended a VPN for any unlawful or evasive purpose.

### D. 2017 "Golden Egg" Conversation (ECF 24 p. 15)

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| Defendant insulted an investor seeking a refund ("What are you retarded?"). | "Bro… Bitcoin is the golden egg. BitClub is the goose that lays golden eggs." | Quotation partially fabricated. | The February 2017 exchange was a friendly chat with Moritz Thiele, not an investor asking for a refund. The conversation contained no insults or refund discussion; it was an upbeat, metaphorical comment about Bitcoin's long-term potential. |
| The defendant claimed "1000 % returns." | No such language. | Not supported. | Phrase absent from all verified communications. |

ECF 24 conflated a friendly 2017 motivational chat about Bitcoin's long-term value with an invented refund dispute. The verified record contains no refund request, no insult, and no investor context.

### E. 2016 "Stinkin Thinkin" Motivational Chat (ECF 24 p. 16)

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| Defendant mocked investors over delayed payments ("$2 a day… leadership ranks"). | No such wording anywhere. | Not supported. | Fabricated phrases; not found in records. |
| Defendant lectured investors to change mindset. | "So first, you must stop the stinkin thinkin. Being broke is a temporary situation… Imagine if instead you said 'how can I?' Your life would change." | Accurately quoted but misattributed. | The statement occurred in a July 2016 motivational chat with Rauldon Augustine about personal attitude and self-improvement. It had no relation to BitClub Network, mining operations, or investor complaints. |

The message was a motivational statement exchanged with a friend about mindset and entrepreneurship. It was unrelated to BitClub Network, mining payouts, or any investment discussion.

**F. 2016 "Antarctica Trip" Payment Instruction (ECF 24 p. 17)**

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| Defendant told investors to hide bitcoin payments ("Put donation / don't mention bitcoin"). | No such instruction. | Unsupported and not found in the record. | The cited language does not exist in the Facebook business records or any related correspondence. The only verified exchange is a single 2016 chat with one individual arranging a wire transfer, where Defendant wrote only: "Make sure to put 'Antarctica trip' in the memo so I know which one it is." That note concerned travel-fund identification, not concealment of bitcoin or investor payments. |
| Defendant said to label payment "Antarctica Trip." | "Make sure to put 'Antarctica trip' in the memo so I know which one it is." | Accurate quotation, used twice in Dkt. 24 for different purposes. | Appears once only, in a single August 2016 chat about a wire transfer. The note identified which personal transfer related to an upcoming expedition; it was not connected to bitcoin or investment payments. Dkt. 24 later cited the same message both as a labeling example and as alleged concealment, though it referred to a single, benign instruction. |

The only verified reference to "Antarctica trip" appears once in an August 2016 chat about a personal wire transfer. The memo line identified a payment for Defendant's private South Pole expedition, during which he placed a U.S. flag, and bore no relation to BitClub or investor funds. ECF 24's suggestion that this reflected concealment or money-laundering intent is unsupported by any record evidence. A photograph of the expedition (Exhibit __) confirms the legitimate purpose of the trip.

**G. 2017 "Meme" Reference (ECF 24 p. 17)**

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| "Weeks sent a meme showing his belief that cryptocurrency is harder to freeze." | Sticker image repeatedly shared in 2017 threads (same Photo ID 369239263222822). | Accurately noted that a sticker was sent; mischaracterized significance. | Casual emoji-style sticker used in multiple friendly chats; contains no text or admission about freezing funds. |

The cited "meme" was an ordinary Facebook sticker—a default Messenger image used by millions of users in 2017. It carries no text or financial meaning and provides no insight into Defendant's intent or conduct.

### H. April 19, 2019 IRS-CI Meeting (Ritz-Carlton, Arlington VA) (ECF 24 p. 18)

| ECF 24 Statement | Actual Event | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| "Weeks reached out to law enforcement in 2019 when the Government's investigation was already underway and still covert. Weeks claimed that he was well-situated to provide information on international money laundering through his contacts and association with others involved in the flow of large sums of funds through overseas cryptocurrency exchanges." | On April 19 2019, Defendant voluntarily met with IRS-CI agents Leo Rovensky and Amjad Qaqish at the Ritz-Carlton in Arlington, VA. He offered general background about cryptocurrency markets and compliance challenges but made no statements concerning BitClub Network's involvement in money-laundering activity. | Accurate that a meeting occurred, but inaccurate and misleading regarding its content. | The discussion concerned Defendant's general industry knowledge and willingness to assist law enforcement. No admission or reference to criminal conduct was made, and no record shows that BitClub Network or any associates were discussed as participants in money-laundering schemes. Verification: See "Notes April 19 2019 Ritz.pdf" and investigator's memorandum filed as Exhibit A to Dkt. 402. |

The April 2019 Ritz-Carlton meeting was a voluntary conversation about cryptocurrency compliance, not a discussion of BitClub Network or money laundering. ECF 24 misstates the substance of that exchange by suggesting that Defendant described BitClub's role in illicit activity. No such statement appears in the contemporaneous notes or any other record. The meeting reflected cooperation, not admission.

### I. 2018 Operational Payment via Octagon Exchange (ECF 24 pp. 18–19)

| ECF 24 Statement | Actual Record | Accuracy | Clarification / Context |
|---|---|---|---|
| Defendant "caused Octagon to transfer approximately $1.2 million from its account at California-based Silvergate Bank to the Bank of Georgia on | Treasury records show that on April 30 2018, BitClub's Octagon (OSL) exchange account converted BTC to fiat and wired ≈ $1.2 million via Silvergate Bank to Geo | Amount/date correct, but source and purpose mischaracterized. The transfer was handled by OSL through Silvergate, | OSL (Octagon Strategy Ltd., now OSL Digital Securities Ltd.) was a licensed crypto exchange using Silvergate as its U.S. bank. Defendant sent BitClub's mined BTC to his verified OSL account; the exchange issued the fiat wire to Geo Servers LLC to pay hosting and power costs managed by director Irakli [ |

| behalf of 'Geo Servers LLC,' then received a confirmation from a third-party business email." | Servers LLC in Georgia. A May 1 2018 vendor email confirmed receipt. | not by Defendant personally. | ]. It was a normal operational payment, not offshore concealment. Verification: Treasury Bank-Record Summary & Dec 2019 Seizure Report; no matching Facebook record. |

The Government's portrayal of the April 30, 2018 Octagon transaction as an offshore wire is materially misleading. The record shows a crypto-to-fiat settlement executed by a regulated exchange (OSL) that banked through Silvergate Bank and remitted funds to Geo Servers LLC, BitClub's legitimate hosting vendor in Georgia. Defendant' role was limited to sending BTC from his exchange account to pay operational expenses; he did not initiate a personal wire or conceal assets. ECF 24 therefore misstated both the source and character of the transaction.

### J. 2017 Brokerage Chat ($1 M Jakarta → Singapore) (ECF 24 p. 19)

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| Defendant brokered conversion of $1 million to bitcoin. | "I have $1 m in bitcoin for ya. Can you send a wire?" — part of the same May 2017 chat that also includes "Do we have to bring the cash from Jakarta to Singapore or is it already in Singapore?" | Accurately quoted but taken from one brief conversation, not multiple transactions. | The May 23 2017 exchange with José Contreras was a stand-alone bitcoin sale inquiry. It was unrelated to BitClub Network, did not involve any "investor," and shows no evidence of money-laundering or concealment. The Government cited the same short thread twice to support two different inferences. |
| Defendant introduced "biggest bitcoin trader in the world." | No such phrase. | Not supported. | Added characterization not in record. |
| Investor asked about cash transfer. | Other participant (José Contreras) asked: "Do we have to bring the cash from Jakarta to Singapore or is it already in Singapore?" | Accurately quoted. | The question was posed by the other party, not Defendant, in a one-time 2017 conversation about purchasing bitcoin. There is no mention of BitClub Network or any investment relationship. The exchange reflects a simple logistical inquiry, not laundering or concealment. |

Both quoted lines come from a single May 2017 conversation with José Contreras concerning a private bitcoin sale. Several details cited in ECF 24 have no identifiable source in the chat itself. The discussion was unrelated to BitClub and shows no evidence of money movement, investment solicitation, or concealment.

**K. 2017 Hardware-Wallet References (ECF 24 p. 19)**

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| "I use Ledger and Trezor for hardware wallets." | "I have both Trezor and Ledger." | Accurate quotation. | Routine discussion of digital-asset security. |
| "I keep Trezor and ledge coins offline." | "I keep it in crypto, on a Trezor and Ledger 🙂." | Substantially accurate; minor typographical error ("ledge"). | Ordinary comment about safe storage, not concealment. |

Both messages are routine security comments from mid-2017, not July 2018 or indicative of flight risk. The referenced devices were later seized or rendered inaccessible after December 10, 2019, shortly following the filing of ECF 24. No offline wallets remained under Defendant's control thereafter, eliminating any ongoing flight-financing concern.

**L. 2015 "Atlantis / Madeira" Micro-Nation Chat (ECF 24 p. 23)**

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| Defendant discussed forming a sovereign principality near Madeira. | "Here is how I see the evolution of Atlantis… Step 1 buy island (check)… Step 6 go to the rest of the world." | Accurately quoted. | Satirical description of a micro-nation tourism project inspired by Prince Renato; unrelated to defiance of law. |
| The government characterizes this as "anti-Government streak." | Context: humorous and entrepreneurial. | Misinterpreted. | Shows enthusiasm for blockchain and tourism, not resistance to authority. |

The 2015 "Atlantis" exchange was a light-hearted, entrepreneurial idea for a tourism project unrelated to Defendant's digital-asset work or this case. The Government's portrayal of it as anti-government sentiment is unsupported by the conversation's tone or content.

**M. Alleged "Mexican Passport" Chat (ECF 24 pp. 33–34)**

| ECF 24 Statement | Actual Record | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| "In 2019 Weeks engaged in the following chat … 'I can get you a Mexican one for $20k.' At the time of arrest, Weeks had a U.S. passport and a diplomatic passport issued by the World Sports Alliance." | No such message appears in the Facebook Records. The entire exchange is absent from metadata, timestamps, and thread listings. The source of the quote is unknown. | Unverified / not authenticated. Likely paraphrased or fabricated. | The Government provided no chain-of-custody proof, message ID, or production reference. Under Fed. R. Evid. 901, a social-media statement requires verification from the host record. Absent that, the line is inadmissible and should be disregarded. (See U.S. v. Vayner, 769 F.3d 125 (2d Cir. 2014)). |

The "Mexican passport" quote is unsupported by any authenticated record.

The Facebook contains no reference to passports, Mexican citizenship offers, or a user stating "IRS took my passport." It therefore appears to have been invented or misattributed within Dkt. 24 and cannot carry evidentiary weight in assessing flight risk or intent.

**Summary Table – Section II Overview**

The following table consolidates the principal statements in *ECF 24* that, upon comparison with the verified Facebook business records, Treasury materials, and related correspondence, were found to be misquoted, incomplete, contextually inaccurate, or not present in any recovered source record. It provides a single reference point for the factual corrections underlying the foregoing subsections.

| # | Category / Theme (Dkt 24 pin cite) | Core Misstatement | Verified Record Clarification | Effect on Bail Analysis |
|---|---|---|---|---|
| 1 | 2018 Octagon → Geo Servers wire (pp. 18–19) | Portrayed as personal offshore transfer. | Routine BitClub operational payment through licensed exchange (OSL via Silvergate Bank). | Misstated control of funds; inflated flight-risk rationale. |
| 2 | April 2019 Ritz meeting (p. 18) | Framed as discussion of "BitClub money-laundering." | Voluntary outreach to IRS-CI about crypto-compliance; no BitClub conduct discussed. | Misused cooperative contact as incriminating evidence. |
| 3 | "Mexican passport for $20 k" (pp. 33–34) | Cited as evidence of false documents. | Absent from Facebook records; source unverified. | Unsupported; inadmissible under FRE 901. |
| 4 | 2015 GAW Miners discussion (p. 12) | Cast as admission of illegality. | Chat urged transparency and investor documentation. | Legitimate business planning, not deception. |
| 5 | 2016 Mining-expense chat (p. 13) | Depicted concealment of revenue. | Conversation about accounting for power costs. | Operational detail miscast as fraud. |
| 6 | 2016–2018 VPN / risk messages (p. 14) | Shown as evasion guidance. | General explanation of VPN use; compliance warning to U.S. users. | Neutral technical discussion, not intent to evade. |
| 7 | 2017 "Golden Egg" conversation (p. 15) | Interpreted as greed / Ponzi rhetoric. | Motivational metaphor for mining profitability. | No evidence of fraudulent intent. |
| 8 | 2016 "Stinkin Thinkin" chat (p. 16) | Depicted as manipulation. | Generic motivational post unrelated to BCN payouts. | Irrelevant to risk or guilt. |
| 9 | 2016 "Antarctica Trip" memo (p. 17) | Claimed coded laundering instruction. | Legitimate trip-fund note; unrelated to BitClub. | Mischaracterized personal payment. |
| 10 | 2017 Brokerage chat ($1 M Jakarta → Singapore) (p. 19) | Suggested hidden currency deals. | Simple logistics query between third parties. | Non-evidentiary; unrelated to BCN. |
| 11 | 2017 Hardware-wallet references (pp. 19–22) | Implied secret asset storage. | Routine security comments; devices later seized or lost in custody. | Unsupported flight-financing claim. |
| 12 | 2015 "Atlantis / Madeira" chat (p. 23) | Used to show anti-government ideology. | Satirical discussion about micronations. | Irrelevant character rhetoric. |
| 13 | 2017 "Meme" reference (p. 17) | Portrayed as proof of concealment awareness. | Ordinary internet meme; no link to assets. | Non-probative; cultural humor misread. |

**III. BROADER MISSTATEMENTS AFFECTING BAIL DETERMINATION**

The foregoing sections addressed inaccuracies in the Government's quotations of individual communications. In addition, ECF 24 contains broader factual and legal misstatements that affected the bail analysis.

The table below summarizes these overarching issues for the Court's convenience.

| Government Assertion (ECF 24 pin cite) | Clarification / Record Correction | Authority / Supporting Record | Effect on Bail Analysis |
|---|---|---|---|
| Wallet "total received $560,354,317.53," later "≈ $124 million." (pp. 15–16) | The government cited blockchain "total received" values from a shared pool address. | Quantitatively inaccurate and conceptually misleading. | The $560 million figure double-counted internal wallet reuse and was never a measure of wealth. Later chain-analysis confirmed that the net holdings personally accessible to Defendant were a small fraction of either number. The Government's own revision to ≈ $124 million implicitly acknowledged the inflation. Using these throughput figures as a proxy for personal assets overstated financial capacity and inflated the flight-risk rationale. |
| "Bitcoin is anonymized and difficult to track." (Sec. C.1) | No such statement by Defendant; it appears in the Government's narrative description. | Government assertion, not defendant claim. | The prosecution characterized Bitcoin as "anonymized" to support a flight-risk argument. The record shows the opposite—Bitcoin transactions are publicly traceable and were later analyzed through forensic tools. |
| Projected 25-year sentence. (Sec. II.A pp. 4–5) | The government estimated potential exposure at "up to 25 years" without Guidelines analysis. | Speculative projection, not supported by later data. | The figure combined statutory maximums rather than the applicable Guidelines range. The subsequent PSR and plea documentation reflected an advisory range of approximately 78–97 months (6½–8 years)—nearly three times lower than the 25-year projection. The inflated estimate overstated Defendant's incentive to flee and materially affected the bail analysis. |
| Reliance on press articles to depict an "anarchist mindset." (pp. 20–23) | The government attached or cited several media clippings and online articles about "sovereign" or "libertarian" communities. None were written by or attributed to Defendant. | Unsupported and inadmissible under the Rules of Evidence. | These articles are hearsay and have no evidentiary value under Fed. R. Evid. 403 and 18 U.S.C. § 3142(f). They were used to create character rhetoric, not to establish facts relevant to flight risk or danger. The inclusion of unauthenticated media pieces improperly substituted narrative for evidence. |

| | | | |
|---|---|---|---|
| "No combination of conditions can assure appearance." (p. 32) | The government concluded that no set of bail conditions could "assure" Defendant's presence at trial. | Incorrect legal standard applied. | Under 18 U.S.C. § 3142(c), the test is whether conditions can provide reasonable assurance of appearance—not absolute certainty. See United States v. Xulam, 84 F.3d 441, 442 (D.C. Cir. 1996) ("The Bail Reform Act does not require guarantees of appearance, only reasonable assurance."). By arguing for certainty, the Government imposed an unattainable standard inconsistent with statute and precedent. |
| "No primary residence / unstable housing." (p. 24) | The government asserted that Defendant lacked a stable address or verifiable residence. | Contradicted by records known to the Government. | When ECF 24 was filed, agents had already executed searches and seizures at Defendant's parents' residence—the same verified address on file—and were aware that he lived with his wife and daughter and traveled with them. Subsequent Pretrial Services reports and court filings confirmed a stable, long-term residence, full compliance with supervision, and continuous reporting. The housing concern was unfounded and carried no legitimate weight in the bail assessment. |
| "Hardware wallets and tube in Colorado" imply hidden assets. (pp. 19–22) | The government alleged that Defendant stated he kept hardware wallets in a "tube" in Colorado and that such items were not recovered. | Speculative assertion contradicted by seizure records. | A tube containing personal items, including cold-storage hardware, was observed during the December 2019 Colorado seizure but was never entered into the official custody logs and later disappeared from inventory. The omission was documented in subsequent discovery and discussed in the October 7, 2025 Memorandum of Law. No evidence shows that Defendant retained or accessed any cryptocurrency thereafter. The record therefore provides no basis for any hidden-asset or flight-financing claim. |
| Chat snippets (VPN / tax) cited as evidence of intent to evade law. (pp. 5–6) | The government's introductory narrative relied on isolated chat lines already addressed in Section II. | Partially accurate but materially incomplete. | The same mis-dated, de-contextualized excerpts were restated in the brief's overview to imply criminal intent. As shown in Section II (C), the messages describe common internet-privacy tools and general commentary, not instructions to violate law. Their repetition in ECF 24's summary should be disregarded in evaluating flight risk. |
| "$62 million ran through wallet." (pp. 16, 30–31) | The government cited a Facebook message referring to total transactional volume across a blockchain wallet. | Misleading financial characterization. | he "tube" was located during the December 2019 Colorado seizure and contained personal items, including cold-storage hardware. Despite its recovery, it was never entered into the official custody logs and later disappeared from inventory. This omission was documented in subsequent discovery and detailed in the October 7, 2025 Memorandum of Law. No evidence shows that Defendant retained or accessed any cryptocurrency thereafter, and the record therefore provides no basis for a hidden-asset or flight-financing claim. |

| "Foreign citizenship applications" show flight intent. (pp. 30–31) | The government asserted that Defendant had sought foreign citizenship or passports. | Misleading and unsupported. | The applications referenced predated detention and were never completed or approved. All passports were surrendered to Pretrial Services at the outset of supervision. The Government later acknowledged that no foreign travel documents were valid or pending. The assertion therefore added no legitimate weight to the flight-risk analysis. |

The foregoing entries identify broad factual and legal inaccuracies in the Government's 2020 bail opposition. Each error materially affected the Court's original risk assessment by overstating Defendant's financial means, potential sentence, or propensity for flight, and by relying on unsupported assumptions regarding housing, hardware wallets, and foreign citizenship. Subsequent discovery and verified records—including chain-analysis data, seizure inventories, and Pretrial Services reports—demonstrate that the Government's figures were inflated, its legal standards misapplied, and several factual premises known to be incomplete at the time of filing. Taken together with the communication-level corrections in Section II, these findings confirm that the bail analysis in ECF 24 rested on incomplete or misleading information and warrants reassessment in light of the clarified record.

## IV.    CONCLUSION

The record reviewed in this memorandum demonstrates that the communications cited in *ECF No. 24* were, in nearly every instance, either accurately quoted but benign, materially mis-dated, selectively excerpted in a manner that altered their meaning, or not present in any verified source record.

The verified source materials instead reflect ordinary discussions of business transparency, operational logistics, motivational commentary, and lawful digital-asset management—none of which suggest deception, concealment, or intent to flee.

Defendant submits these clarifications to ensure that the Court's assessment of prior filings, and of

Defendant's conduct more broadly, rests on a complete and reliable evidentiary record.

Filed as Exhibit F to Defendant's Supplemental Submission Regarding Bail Conditions and Discovery Non-Compliance (Dkt 501 Reference)

Dated: November 10, 2025

Signed via DocuSign
/s/ Jobadiah Sinclair Weeks
Defendant (pro se)
18101 Collins Avenue, #4209
Sunny Isles Beach, FL 33160

