**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,
Plaintiff,

v.

JOBADIAH SINCLAIR WEEKS,
Defendant.

**Criminal No. 2:19-cr-00877-CCC**

MY WRITTEN OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT
PURSUANT TO FED. R. CRIM. P. 32

I, Jobadiah Sinclair Weeks, respectfully submits the following written objections and
clarifications regarding the Presentence Investigation Report ("PSR") filed at Dkt. 384
pursuant to Federal Rule of Criminal Procedure 32. These objections are submitted pursuant
to Federal Rule of Criminal Procedure 32 and are intended solely to clarify factual matters
relevant to sentencing. They do not contest the elements of the offense to which I have
entered a guilty plea.

Where cited, references to investigative materials, IRS reports, and financial schedules are
based on documents produced in discovery and materials referenced in the PSR.

# I. Objection – Participation Timeline

PSR ¶12 states that I "joined BCN approximately one year after it was formed." Because the
PSR also states that the BitClub Network ("BCN") was created in 2014, this description may
be interpreted as placing my participation during the early stages of the broader enterprise. To
the extent PSR ¶12 suggests participation at or near the formation of BCN, I object to that
characterization.

The Indictment (Dkt. 9) alleges that the BCN conspiracy operated from approximately April
2014 through December 2019. The existence of a conspiracy during that period, however,
does not establish that I participated during the entire timeframe.

The earliest communications attributed to me in the investigative materials appear in
approximately late 2015 in connection with discussions concerning investor transparency and
mining statistics.[1]

---

[1] *See* Indictment, United States v. Goettsche et al., No. 19-877 (D.N.J.), ¶¶ 45–47.

In addition, IRS-CI interview notes dated April 19, 2019 reflect that I had not referred new investors to BCN for approximately eight months prior to that interview, placing the cessation of referral activity around August 2018.[2]

Financial records referenced in the IRS examination materials also indicate that income attributed to 2015 was approximately $26,299.42, which suggests that my participation occurred later in the overall timeline of the BCN enterprise rather than at the outset of its formation.[3]

Accordingly, the available record indicates that my BCN-related activity occurred approximately between late 2015 and August 2018, representing a limited portion of the broader conspiracy period alleged in the indictment. Earlier periods referenced in the PSR relate to the broader BCN enterprise and the conduct of other participants rather than my own activity.

Clarifying the timeframe of my participation assists the Court in evaluating my individual conduct within the broader enterprise described in the Presentence Report.

## II. Objection – Characterization of Role

The PSR describes me as a promoter of BCN and states that I "sold or caused to be sold by those I recruited BCN mining pool packages to investors."[4] The PSR also states that Joseph Abel and I "worked directly under the two owners of BCN."[5] To the extent this phrasing may suggest a managerial or operational reporting relationship, the record reflects that my role consisted of promotional activity and referral of investors rather than participation in the management or operation of the BCN platform.

The PSR itself identifies Matthew Goettsche and Russ Medlin as the individuals who created and operated BCN, while Silviu Balaci is described as a creator and programmer responsible for the development of the platform.[6] By contrast, the PSR identifies my role as that of a promoter who referred investors, rather than an owner, operator, or developer of the underlying platform.

---

[2] IRS-CI Interview Notes of Jobadiah Weeks, Apr. 19, 2019 (Ritz interview), Bates No. USA_19877_04006423.
[3] IRS Examination Report (Form 4549), Oct. 8, 2020 (reflecting income attributed to 2015 of approximately $26,299.42).
[4] See PSR ¶12.
[5] See PSR ¶14.
[6] See PSR ¶¶9–11.

There is no indication in the PSR that I held any ownership interest in BCN, exercised control over its operations, participated in the development of its mining infrastructure, or had authority over the company's financial management.[7]

Accordingly, I object to any characterization suggesting that I exercised managerial or operational control, as the record reflects only promotional and referral activity.

As discussed in Section III below, the financial materials referenced in the investigative record indicate that a substantial portion of the income attributed to me arose from brokerage margin associated with cryptocurrency mining hardware transactions rather than from promotional activity within the BCN multi-level marketing structure.

# III. Objection – Nature and Source of Income Attributed to Mr. Weeks

## A. Composition of Income Attributed to Me

I object to any characterization of the income attributed to me as primarily derived from BCN promotional activity.

The financial record underlying the tax calculation further reflects that the majority of income attributed to me did not arise from promotional activity within the BCN multi-level marketing structure.

PSR ¶¶15–17 and ¶¶21–23 describe the BCN enterprise and summarize cryptocurrency transaction activity associated with me. To the extent these sections may be interpreted as attributing the majority of reconstructed financial activity to BCN promotional activity, the underlying financial schedules reflect multiple categories of transactions, including brokerage margin and stock compensation associated with cryptocurrency mining hardware transactions involving third-party suppliers such as Bitfury. These materials indicate that a substantial portion of the income attributed to me arose from intermediary brokerage activity rather than from investor recruitment or operation of the BCN platform.

The tax analysis referenced by the Government reflects approximately $18.4 million in total income attributed to me during the relevant period. As summarized in Exhibit B, the investigative materials indicate that this total consists of several distinct components, including brokerage margin associated with cryptocurrency mining hardware transactions, Bitfury stock compensation, and other BCN-related income streams.

---

[7] IRS-CI Interview Notes of Jobadiah Weeks, Apr. 19, 2019 (Ritz interview), Bates No. USA_19877_04006423 (noting that "Russ and Matt are 50/50 partners in BitClub").

3

The investigative materials referenced in the government's financial reconstruction appear to attribute approximately $11.09 million to brokerage margin and stock compensation connected to cryptocurrency mining hardware transactions, while approximately $1.1–1.3 million relates to mining earnings and approximately $1.2 million relates to referral commissions. In proportional terms, the financial schedules therefore suggest that a majority of the reconstructed income may relate to hardware brokerage activity, with a substantially smaller portion associated with mining income and referral commissions.

The investigative materials also reflect that the hardware transactions involved intermediary brokerage activity. For example, the IRS-CI interview notes dated April 19, 2019 state that BitClub would transmit funds to me for hardware purchases, that I would retain a commission, and that the remaining funds would then be forwarded to the hardware supplier.[8]

The transaction schedules underlying the Government's financial reconstruction further reflect that the taxable values assigned to certain Bitfury-related transactions were calculated using varying allocation percentages applied to the underlying transaction value. Several transactions described as "Likely Payment to Bitfury" were assigned taxable values ranging from approximately three percent to more than eleven percent of the underlying transaction amount, indicating that these figures reflect estimated brokerage margins rather than direct receipts of the full transaction value.

Accordingly, the financial record indicates that a substantial portion of the income attributed to me arose from intermediary brokerage activity rather than investor recruitment or operation of the BCN platform itself. Because brokerage margin associated with equipment transactions represent intermediary commercial activity rather than operation of the BCN platform or control of investor funds, this distinction is relevant to the Court's assessment of the scope of my role within the broader BCN enterprise.

For context, investigators have alleged that the overall BCN scheme generated approximately $722 million in investor funds. The referral commissions attributed to me total approximately $1,213,700 according to the IRS examination schedules, representing less than one quarter of one percent of the overall financial activity attributed to the BCN enterprise.[9]

Accordingly, I object to any characterization of the income attributed to me as primarily derived from BCN promotional activity where the underlying financial materials reflect that a substantial portion consists of intermediary brokerage activity. I respectfully request that the PSR distinguish between these income categories when assessing role and financial impact.

---

[8] IRS-CI Interview Notes of Jobadiah Weeks, Apr. 19, 2019 (Ritz interview), Bates No. **USA_19877_04006423** (noting that "Bitclub would pay Joby, Joby would then take out a 3% commission, and would send the rest of the money to Bitfury").
[9] IRS Examination Report (Form 4549), Oct. 8, 2020

## B. Clarification Regarding Bitfury Stock Attribution

The PSR attributes a portion of the income referenced in the financial reconstruction to "Bitfury stock." The PSR report states that I received income in various years "stemming from bitcoin, U.S. currency, and Bitfury stock."[10]

The record, however, contains differing descriptions regarding the origin and nature of the Bitfury shares.

The IRS examination report dated October 8, 2020 describes the shares as having been received from Bitfury in connection with the brokering of mining hardware transactions. That report states that "Weeks received shares of stock in Bitfury in addition to the hardware from Bitfury as compensation from Bitfury for brokering the transaction."[11]

Other investigative materials provide a different description. The Streamlined Suspicious Activity Report states that I received Bitfury stock that "was not sent or disclosed to Goettsche or Medlin."[12]

These descriptions indicate that the Bitfury shares were associated with transactions involving the hardware supplier rather than payments made by the BCN itself.

To the extent the PSR characterizes Bitfury stock as income stemming from BCN activity, I respectfully object to that attribution. The available investigative materials indicate that the shares were connected to transactions involving Bitfury rather than compensation paid by BCN.

In addition, the shares were not provided as a promotional commission. Documentation relating to the acquisition of the Bitfury shares, including the underlying contractual documentation, will be submitted as an exhibit.

This distinction is material because classification of Bitfury-related transactions as BCN-derived income may affect both the characterization of my role and the financial calculations underlying the guideline analysis.

Accordingly, I object to any characterization of Bitfury stock as BCN-derived income where that attribution is not supported by reliable evidence. I respectfully request that the Probation Office specify the evidentiary basis for this attribution or, in the absence of such support, that this component not be treated as BCN-related income for sentencing purposes.

---

[10] Presentence Investigation Report ¶55, Dkt. 384.
[11] IRS Examination Report (Revenue Agent Report), Oct. 8, 2020, at 8.
[12] Streamlined Suspicious Activity Report, at 4.

# IV. Clarification and Objection – Context Regarding Role and Income Attribution

The foregoing sections are intended to clarify the timeline of my participation, the nature of my role, and the sources of the income attributed to me in the financial reconstruction referenced in the PSR. The available record reflects that my participation in BCN occurred during a limited period, that my role consisted primarily of promotional and referral activity rather than operational control of the platform, and that a substantial portion of the income attributed to me arose from intermediary brokerage activity associated with cryptocurrency mining hardware transactions.

These clarifications are provided so that the Court may evaluate the factual context of the PSR's financial and role descriptions when considering the appropriate sentence under 18 U.S.C. §3553(a).

To the extent the PSR reflects inconsistent conclusions, I object as set forth above.

These objections are not intended to relitigate the offense of conviction, but rather to ensure that the factual record relied upon at sentencing is accurate, complete, and supported by reliable evidence.

# V. Objection – Cryptocurrency Transaction Metrics

I object to the PSR's reliance on cumulative cryptocurrency transaction metrics, as reflected in PSR ¶¶21–23, to the extent such figures are used as a proxy for income, control, or financial gain. The PSR appears to rely on "total received" values derived from blockchain data. However, such metrics reflect aggregate transaction flow through a wallet over time and do not establish ownership of funds, retained balances, or amounts ultimately controlled. Because cryptocurrency may pass through intermediary wallets before being forwarded to other recipients, cumulative transaction values may substantially exceed the amounts actually retained.

**Transaction Flow Does Not Establish Income or Control**

This distinction is important because it clarifies the difference between cumulative blockchain transaction volume and the funds ultimately retained or controlled by me. To the extent the PSR relies on cumulative transaction volume as a proxy for income, control, or financial gain, I object to that characterization and respectfully request clarification distinguishing transaction flow from funds actually retained.

Certain conclusions in the PSR appear to reflect summaries of investigative positions rather than independently verified findings supported by underlying documentation.

6

# VI. Objection – Loss Calculation and Supporting Materials

## A. Absence of Underlying Government Calculation Schedules

Because the advisory guideline range is driven primarily by the loss calculation, the reliability of that calculation is critical.

I object to the PSR's loss calculation and related financial conclusions on the grounds that the underlying schedules and methodology necessary to evaluate those calculations have not been provided.

The advisory guideline range in this case is significantly influenced by the financial reconstruction referenced in the PSR. Where sentencing calculations depend on reconstructed income or loss estimates derived from financial analysis, the reliability of the underlying methodology becomes particularly important.

The PSR references loss calculations derived from Government financial analysis but indicates that additional supporting information was requested from the Government and not received. As noted in PSR ¶37, the report states:

> "Additional information regarding loss and/or credits to the investors was requested but not received from the Government."

Because the advisory guideline calculation is driven largely by the estimated loss amount, the absence of the underlying schedules makes it difficult to independently evaluate the methodology used to derive the figures referenced in the PSR.

Without access to the underlying schedules and analytical methodology supporting those calculations, it is not possible to independently determine whether the figures reflect net income retained by me, cumulative transaction flows, brokerage-related margins, or other categories of financial activity that may materially affect the resulting tax-loss estimate.[13]

This lack of transparency is further reflected in the absence of reconciliation between the loss figures referenced in the PSR and the underlying operational data of the enterprise. Available records indicate that the network generated substantial cryptocurrency output that was distributed among participants, including approximately 92,000 BTC.[14] The PSR does not

---

[13]See investigative tax materials referencing reconstructed cryptocurrency transactions, including schedules associated with a Form 4549 (Revenue Agent Report), produced after the plea stage without complete supporting schedules or offset calculations, including the assumptions, tax rates, and methodology applied in deriving the estimated tax loss.

[14] See my Motion Regarding Count One (June 12, 2025) (filed under seal) (addressing role, control, attribution, and the operational structure of the enterprise, including the generation and distribution of approximately 92,000 BTC and 500,000 ETH among participants).

explain how such production and distribution were incorporated into the loss analysis, whether such amounts were offset against investor contributions, or how they relate to the asserted victim figures.

Without a clear reconciliation of production, distribution, and any alleged losses, the reliability of the loss calculation and resulting guideline determination remains uncertain.

Accordingly, I object to reliance on the PSR's loss calculation where the underlying schedules and methodology have not been disclosed, and respectfully request that no sentencing weight be assigned to such estimates absent supporting documentation.

## B. Limited Access to Business Records

I further object to the PSR's financial conclusions to the extent they rely on data that remains inaccessible to the defense.

Certain business records relevant to the financial issues referenced in the PSR remain inaccessible to me because electronic devices seized during the investigation remain in Government custody. Those devices contain business records and contractual documentation relating to cryptocurrency mining hardware transactions, including agreements with third-party suppliers such as Bitfury.

Because I currently have no access to those records, and because my ability during the investigation to obtain relevant information from other sources was limited, my ability to independently review and verify certain financial assumptions reflected in the PSR and related investigative materials is necessarily constrained, including materials previously provided to prior counsel that are not currently available to me.

In addition, as reflected in prior filings, I have not received the full set of discovery materials necessary to evaluate the Government's financial reconstruction, including materials previously provided to prior counsel.[15]

The Government also retains control over seized digital assets and related financial evidence, yet the record reflects the absence of complete forensic reports, reconciled inventories, and verified accounting of seized assets.[16]

In addition, certain seized assets and devices remain subject to related proceedings, including civil asset proceedings in Colorado (Case No. 1:26-cv-00852), and therefore remain outside my possession and control. As a result, records and data necessary to

---

[15] See my Supplemental Motion to Compel Discovery (Dkt. 406) (seeking production of financial and investigative materials necessary to evaluate the Government's analysis).

[16] See my Motion to Compel Accounting of Seized Assets (Dkt. 446); My Motion for Return of Property (Dkt. 486); My Supplemental Motion for Return of Seized Digital Assets (Dkt. 520) (addressing incomplete inventories, missing digital assets, and lack of verified accounting).

8

independently evaluate the Government's financial reconstruction—including transaction records, wallet data, and supporting documentation—are not currently accessible to me.

These limitations directly affect my ability to test the reliability of the financial calculations reflected in the PSR.

To the extent that the loss figures referenced in the PSR include losses occurring prior to my participation in the BitClub Network or outside the scope of my activities, I object to such attribution and request clarification regarding the methodology used to determine the loss amounts attributed to me.

## C. Sensitivity of the Loss Calculation

Because the advisory guideline calculation depends heavily on the estimated loss figure, I submit that the current estimate should not be treated as a fully verified calculation in the absence of the underlying financial schedules and methodology.

**Illustrative Tax-Loss Sensitivity**

For illustrative purposes, Exhibit C provides a simplified reconstruction applying a uniform marginal tax rate to the income figures referenced in the investigative materials. This illustrative calculation produces an estimated tax effect materially below the approximately $7.2 million figure referenced in the investigative report.

This example is provided solely to demonstrate the sensitivity of the tax-loss estimate to the assumptions used in the calculation, including the treatment of cryptocurrency transactions, valuation of stock compensation, and the absence of corresponding expense and offset schedules.

These limitations further illustrate that the financial reconstruction referenced in the PSR represents an estimate dependent on underlying assumptions rather than a fully verified calculation.

Sentencing determinations must be based on information bearing sufficient indicia of reliability to support probable accuracy.

I therefore object to treating the referenced tax-loss figure as a verified or reliable calculation in the absence of supporting methodology and complete financial data.

For these reasons, I respectfully request that the Court exercise caution in relying on the PSR's tax-loss figure in determining the appropriate guideline range.

The PSR appears to rely on investigative materials and summaries that have not been produced in a form permitting independent verification. As reflected in prior filings, key underlying materials—including certified transcripts, complete discovery records, and documentation supporting digital asset attribution—have not been made available or confirmed. This limits the ability to assess the reliability of the financial and factual conclusions reflected in the PSR.

# VII. Objection – Sophisticated Means Enhancement

The PSR applies a two-level enhancement under U.S.S.G. §2B1.1(b)(10)(C) on the basis that the offense allegedly involved "sophisticated means."[17] The PSR states that the enhancement applies because I allegedly "directed individuals to deposit funds in accounts in other individual's names, or in the name of my charity account, to avoid having deposits made into my personal bank account." I respectfully object to this enhancement because the PSR does not identify the evidentiary source for this statement or the investigative materials on which this characterization is based, nor does it specify the amounts involved, the transactions referenced, or the underlying documentation supporting this description.

In the absence of identified transactions, amounts, or supporting documentation, the enhancement rests on a generalized characterization rather than specific conduct attributable to me.

Investigative materials, including a Streamlined Suspicious Activity Report, describe limited "Pay-It-Forward" withdrawals involving fiat currency deposits of approximately $25,265 in 2016 and $43,350 in 2017.[18] These amounts are relatively small in the context of the overall financial reconstruction referenced in the PSR and do not appear to indicate the use of complex financial structures. Those amounts represent a very small portion of the overall financial activity referenced in the PSR and therefore do not reflect the type of complex or layered financial structure typically associated with the "sophisticated means" enhancement under U.S.S.G. §2B1.1(b)(10)(C).

The available materials do not describe the use of shell companies, offshore accounts, layered financial transfers, or other mechanisms typically associated with sophisticated financial concealment. The limited deposits described in the investigative materials appear to involve straightforward transactions rather than especially complex or intricate conduct.

To the extent the sophisticated-means enhancement is based on these limited deposits, I respectfully object to the application of the two-level enhancement under U.S.S.G. §2B1.1(b)(10)(C).

---

[17] See PSR ¶79 and ¶151 (Dkt. 384).
[18] Streamlined Suspicious Activity Report, at 4 (describing Pay-It-Forward withdrawals accepted by Weeks in fiat currency totaling approximately $25,265 in 2016 and $43,350 in 2017).

In addition, PSR ¶128 references the plea agreement provision stating that the parties agreed to a two-level enhancement for sophisticated means. Because the PSR does not identify the factual basis for this enhancement or the underlying evidentiary record supporting it, I respectfully request clarification regarding the specific conduct relied upon in applying this enhancement.

# VIII. Objection and Clarification – Victim Attribution

The PSR identifies twelve victim impact statements submitted to the Probation Office in connection with restitution. These statements appear to consist of victim impact submissions describing financial losses and personal experiences related to the BCN investment program.

[19]The PSR further notes that:

> "Additional information regarding loss and/or credits to the investors was requested but not received from the Government."

Given that the Probation Office requested additional information regarding investor losses and credits, I respectfully request access to any materials provided to the Probation Office by the Government concerning victim identification, loss calculations, and any credits or offsets attributed to investors.

Several of the victim impact statements specifically describe interactions with Joseph Frank Abel rather than with me. For example, PSR ¶113 and ¶119 describe cash payments allegedly made to Mr. Abel, including a statement that "Joe Abel received the amount of $10,800 in cash on November 25, 2017" and another stating "I gave $3,600 cash to Joseph Abel when he had a seminar here last November 25, 2017." PSR ¶116 states that the declarant "was approached by an individual named Joseph Frank Abel," while PSR ¶121 similarly states that the declarant "gave cash money to Joseph Frank Abel." PSR ¶123 likewise describes losses attributed to joining "Joseph Frank Abel BCN." These references indicate that several of the victim statements describe interactions involving Mr. Abel rather than activity directly attributed to me.

In addition, PSR ¶124 references a loss of 3.722 Bitcoin, which is described as having a present value of approximately $323,894.40. The statement does not explain the methodology used to determine the valuation date or whether the amount reflects the value of the cryptocurrency at the time of the alleged loss, at the time of the PSR, or at another reference point. Because cryptocurrency values fluctuate significantly over time, clarification of the valuation methodology may be necessary for purposes of calculating restitution.

---

[19] See PSR ¶¶113–124.

11

To the extent that losses attributable to other promoters or activities outside my participation are included in the PSR's loss calculations, I respectfully object to such attribution and request clarification regarding the methodology used to identify victims associated with my conduct.

Accordingly, I object to the inclusion of losses not directly attributable to my conduct and request that the PSR distinguish between victims associated with my activity and those associated with other participants.

# IX. Objection and Clarification – Statements Originating in Dkt. 24

Certain statements appearing in the PSR appear to derive from language first introduced in the Government's detention memorandum (Dkt. 24), which states that I encouraged U.S.-based investors to use virtual private networks ("VPNs") "to avoid detection by U.S. law enforcement and to anonymize the scheme."[20] The detention memorandum indicated that this characterization was based on Facebook communications.

I object to any PSR statements adopting this characterization where not supported by authenticated communications or verified source records. In addition, the absence of complete underlying communications and context further limits the ability to evaluate the accuracy of these characterizations.

Notably, the Government's detention memorandum (Dkt. 24) did not attach the referenced Facebook communications as exhibits on the docket. The detention memorandum also does not identify specific message IDs, thread references, or authenticated source records corresponding to the quoted material. As a result, the Court was not provided with the underlying communications necessary to evaluate the accuracy, completeness, or context of the excerpts cited in that filing. This absence of supporting exhibits further complicates any attempt to verify whether the statements attributed to Mr. Weeks accurately reflect the underlying Facebook records. The absence of the underlying communications is particularly significant because the characterization introduced in Dkt. 24 has subsequently been repeated in later filings and incorporated into the PSR without independent evidentiary support.

The IRS-CI interview record consists of the April 19, 2019 interview notes prepared by the investigating agents. Those notes do not contain statements indicating that I advised investors to use VPNs or other methods to avoid detection by law enforcement. The notes are agent summaries and were not prepared or signed by me.

---

[20] See PSR ¶2; Government Detention Memorandum, Dkt. 24 at 5

Subsequent review of the Facebook business records and related discovery materials demonstrates that the specific messages cited in the detention memorandum do not appear in the underlying Facebook records.[21]

The only detailed description of a VPN discussion appears in the August 17, 2020 proffer memorandum, which records the following statement:

> "At this time, WEEKS encouraged new members to use a VPN to access BCN because 'BCN did not want to deal with Americans.' BCN banned U.S. IP addresses from accessing its site. WEEKS encouraged existing members who were U.S. citizens to use a VPN to avoid this restriction. WEEKS recalls telling more than two new members to use a VPN when joining BCN. He learned about the VPN loophole when trying to log in to my own account."[22]

This description reflects a different context than the characterization appearing in the Government's detention memorandum. The proffer memorandum describes a discussion concerning technical access to the BCN website after the platform blocked U.S. IP addresses, rather than advice intended to evade law enforcement or conceal unlawful activity.

Because the PSR repeats allegations that appear to originate from the language in Dkt. 24, I object to any PSR statement adopting that characterization where it is not supported by authenticated communications or other verified source records.

To the extent PSR ¶89 applies a "sophisticated means" enhancement based on the alleged use of VPNs to evade law enforcement or conceal unlawful activity, that characterization is not supported by authenticated communications or verified source records. The only detailed description of VPN-related conduct in the record appears in the August 17, 2020 proffer memorandum, which reflects a discussion concerning technical access to the BCN platform after U.S. IP addresses were blocked, rather than an effort to evade detection. In the absence of authenticated evidence demonstrating deliberate concealment or especially complex conduct, the record does not support a finding that my conduct involved "sophisticated means" within the meaning of U.S.S.G. § 2T1.1(b)(2), and I respectfully object to the application of that enhancement.

Because the PSR appears to rely on language originating in Dkt. 24 rather than on authenticated communications or verified source records, I respectfully request that the Probation Office identify the specific evidentiary basis for any such statements or remove them.

In the absence of such evidentiary support, these statements should not be relied upon for sentencing purposes.

---

[21] See Memorandum on Record Misstatements and Clarifications Relating to Government's Bail Filing (Dkt. 24), Case 2:19-cr-00877-CCC, Dkt. 527-1 at 17 of 32 (PageID 7101). FB Memo Dkt 527 1

[22] See August 17, 2020 Proffer Memorandum, ¶19, filed as Exhibit D, Dkt. 402-1 at 38 (PageID 4959).

# X. Clarification of $722 Million Figure Referenced in the PSR

The PSR references the allegation that the BCN obtained approximately $722 million from investors.[23] I object to any characterization of this figure as loss attributable to me, proceeds received by me, or income earned by me. To the extent this figure is used as a proxy for individual loss or gain, I object to such characterization.

The figure originates from the indictment, which states that the alleged co-conspirators "obtained at least $722 million from investors."[24] As described in the indictment, this figure reflects the total amount of funds transferred by investors to the broader BCN network over multiple years. It does not represent funds personally received by me.

The indictment itself further describes internal allocations of investor funds within the BCN structure. For example, the indictment references statements indicating that portions of investor funds were allocated to mining operations and equipment while other portions were distributed as commissions within the network structure.[25] These descriptions confirm that the $722 million figure reflects aggregate investor inflows to the network rather than proceeds attributable to any individual participant.

The PSR similarly describes the $722 million amount as the total amount obtained by the BCN network from investors. The report further notes that the Government provided additional information indicating that the total investor deposits may have exceeded $1 billion, while also stating that loss amounts attributed to individual defendants will be calculated based on the amounts reflected in their respective plea agreements.[26]

The PSR references these aggregate figures but does not include the underlying calculations or supporting schedules from which the $722 million or the referenced "over $1 billion" estimate were derived. The PSR itself notes that additional information regarding loss and/or investor credits was requested from the Government but not received. In the absence of the underlying calculations or supporting materials, the basis for these aggregate figures cannot be independently evaluated.

These descriptions confirm that the $722 million figure represents an aggregate estimate of investor deposits within the broader BCN enterprise, rather than proceeds attributable to any particular participant.

Accordingly, I object to any characterization of the $722 million figure as loss attributable to me, income received by me, or proceeds attributable to me for purposes of guideline

---

[23] PSR ¶35, Dkt. 384.
[24] Indictment ¶4(f), Dkt. 9.
[25] Indictment ¶¶7, 13, Dkt. 9.
[26] PSR ¶37, Dkt. 384.

14

calculations. I respectfully request that the PSR clarify that this figure represents alleged aggregate investor deposits to the BCN network rather than funds personally received by me.

# XI. Objection to Aggregation of Conduct Across Counts One and Two

The PSR's aggregation of conduct across counts creates a risk that sentencing conclusions are not tied to count-specific conduct.

The Presentence Report does not distinguish between the counts of conviction or analyze the distinct legal and factual basis underlying each count. Instead, it presents a unified narrative of offense conduct, role, and loss attribution.[27]

With respect to Count One, the PSR attributes broad conduct, loss figures, and role characterizations that do not reflect my limited and peripheral involvement, as set forth in my prior submissions. The record reflects that I held no ownership interest, exercised no operational control, and did not participate in management, financial structuring, or decision-making within the BitClub Network.

With respect to Count Two, the PSR incorporates conduct and assumptions derived from a securities-registration theory without distinguishing the specific conduct attributable to me as opposed to broader conduct attributed to the overall scheme.

To the extent the PSR aggregates conduct across Counts One and Two without identifying the count-specific basis for loss, role, and victim impact, such aggregation is inconsistent with the Guidelines' requirement that sentencing determinations be based on conduct that is properly attributable to me and supported by the record. The current presentation does not distinguish between conduct underlying the dismissed or unproven aspects of Count One and the offense of conviction in Count Two, nor does it identify the evidentiary basis for attributing specific losses or role enhancements to me. In the absence of a clear, count-specific analysis, the resulting loss and role determinations cannot be independently evaluated for accuracy or reliability, and I respectfully object to any sentencing determination that relies on such aggregated assumptions.

I object to the PSR to the extent it aggregates conduct, role, loss, and victim impact across Counts One and Two without a count-specific analysis. The PSR does not distinguish between the separate factual and legal bases of those counts, and therefore risks attributing to me a level of responsibility, intent, and loss causation that does not

---

[27] See my Motion Regarding Count One (June 12, 2025) (addressing role, control, and attribution) (filed under seal); My Supplemental Memorandum Regarding Count Two (June 20, 2025) (addressing retroactivity and due process) (filed under seal).

reflect my actual conduct or the distinct legal considerations applicable to each count. Accordingly, I respectfully request that the PSR be clarified to distinguish the count-specific basis for any role, loss, and victim-related conclusions, and that no sentencing weight be assigned to aggregated assumptions not supported by such an analysis.

Sentencing determinations must be based on conduct properly attributable to me under the Guidelines and supported by reliable evidence.

# XII. Reservation of Rights

I respectfully reserve the right to supplement or amend these objections if additional information, records, or materials relevant to sentencing are provided or become available prior to the sentencing hearing.

For the foregoing reasons, I respectfully request that the Court consider the clarifications and objections set forth above when evaluating the PSR and determining the appropriate sentence under 18 U.S.C. §3553(a).

These objections are submitted in good faith to ensure that the factual record relied upon at sentencing is accurate, complete, and capable of verification.

To the extent any objection is disputed, I respectfully request that the Court make specific findings pursuant to Federal Rule of Criminal Procedure 32(i)(3)(B) or determine that the disputed matter will not be taken into account in sentencing.

Respectfully submitted,

/s/ Jobadiah Sinclair Weeks
Jobadiah Sinclair Weeks
Defendant, Pro Se
[Address on file with Pretrial Services]
Email: silenceweeks1@gmail.com
Dated: March 19, 2026

Signed by:

Joby Weeks

87866A420DB4490...

16